IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. SELECTIONS, INC.; PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE; MICROKITS, LLC; FISHUSA INC.; TERRY PRECISION CYCLING LLC, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, *in his official capacity as Acting Commissioner of United States Customs and Border Protection;* JAMIESON GREER, *in his official capacity as United States Trade Representative*; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*, <br><br> Defendants. | Case No. 25-00066 <br><br><br> **Complaint** |

1.  The President of the United States claims the authority to unilaterally levy tariffs on goods imported from any and every country in the world, at any rate, calculated via any methodology—or mere caprice—immediately, with no notice, or public comment, or phase-in, or delay in implementation, despite massive economic impacts that are likely to do severe damage to the global economy.

2.  If actually granted by statute, this power would be an unlawful delegation of legislative power to the executive without any intelligible principle to limit his discretion.

3.  But Congress has not delegated any such power. The statute the President invokes—the International Emergency Economic Powers Act ("IEEPA")—does not authorize the President to unilaterally issue across-the-board worldwide tariffs.

4.  And the President's justification does not meet the standards set forth in the IEEPA. His claimed emergency is a figment of his own imagination: trade deficits, which have persisted for decades without causing economic harm, are not an emergency. Nor do these trade deficits constitute an "unusual and extraordinary threat." The President's attempt to use IEEPA to impose sweeping tariffs also runs afoul of the major questions doctrine.

5.  This Court should declare the President's unprecedented power grab illegal, enjoin the operation of the executive actions that purport to impose these tariffs under the IEEPA, and reaffirm this country's core founding principle: there shall be no taxation without representation.

## JURISDICTION

6.  The Court has subject matter jurisdiction under 28 U.S.C. § 1581 because this action is commenced against an officer of the United States and arises out of an executive order providing for tariffs. 28 U.S.C. § 1581(i)(1)(B); *see Silfab Solar, Inc. v. United States*, 296 F. Supp. 3d 1296 (Ct Int'l Trade 2018).

7.  The Court possesses all the powers in law and equity of, or as conferred by statute upon, a district court of the United States. 28 U.S.C. § 1585. The Court may

enter a money judgment for or against the United States in any civil action commenced under 28 U.S.C. § 1581 or 28 U.S.C. § 1582 and may also order any other form of relief that is appropriate in a civil action, including but not limited to declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition.  28 U.S.C. §§ 2643(a)(1), (c)(1).

## PARTIES

8.   Plaintiff V.O.S. Selections, Inc. is a 39-year-old New York-based business, founded by Victor Owen Schwartz, that specializes in the importation and distribution of small-production wines, spirits, and sakes from six continents. V.O.S. Selections has made and makes significant direct purchases of wines, spirits, and sakes from Austria, Italy, Greece, Lebanon, Morocco, Spain, France, Portugal, Mexico, Argentina, Germany, Croatia, Hungary, and South Africa. The products it imports are not reasonably available from a producer in the United States.

9.   Plaintiff Plastic Services and Products, LLC d/b/a Genova Pipe is a Utah-based manufacturer of plastic pipe, conduit, and fittings for plumbing, irrigation, drainage, and electrical applications. Genova Pipe imports raw materials, including plastic resins, from South Korea, Japan, China, Taiwan, Thailand, and Oman; manufacturing equipment from India, Italy, China, and Taiwan; and finished plumbing goods and steel pipe from China, Taiwan, Thailand, Vietnam, and Oman. Genova Pipe has seven facilities across the United States where it manufactures its products, relying on raw materials and equipment from abroad. The products it imports are not reasonably available from a supplier in the United States.

10. Plaintiff MicroKits, LLC is a Virginia-based company founded by David Levi in 2020 that makes educational electronic kits and musical instruments. It imports electronic parts from China, Mexico, Thailand, and Taiwan, which are used to assemble kits by Mr. Levi and one part-time employee at its Charlottesville, Virginia location. The electronic parts MicroKits imports are not readily available from United States suppliers at all, without substantial additional costs, or without having to redesign its products.

11. Plaintiff FishUSA Inc., is a 25-year-old retail and wholesale e-commerce business based in Erie County, Pennsylvania, specializing in the production and sale of sportfishing tackle and related gear. FishUSA imports many of its products, including private label products, from foreign countries including Canada, China, South Korea, and Kenya. The imports FishUSA relies on are not readily available from a United States supplier and cannot be obtained from a United States supplier without substantial additional cost and delay in delivery.

12. Plaintiff Terry Precision Cycling, LLC is a Vermont-based brand of women's cycling apparel. It imports finished goods directly from China, Taiwan, Vietnam, Italy, and the Philippines. Its U.S.-based manufacturing partner imports fabrics and trims from several other countries including Guatemala, El Salvador, China, and the European Union to produce products domestically for Terry Cycling. The imports Terry Cycling relies on are not reasonably available from a supplier in the United States.

13. Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

14. Defendant Executive Office of the President is the federal agency that oversees core functions of the executive branch, including the Office of the United States Trade Representative. It is headquartered in Washington, D.C.

15. Defendant United States of America is the federal government of the United States of America.

16. Defendant United States Customs and Border Protection ("CPB") is a federal agency and a component of the Department of Homeland Security, responsible for, among other things, securing ports of entry and collecting tariffs on imported goods. It is headquartered in Washington, D.C.

17. Defendant Pete R. Flores is the Acting Commissioner of United States Customs and Border Protection. He is sued in his official capacity.

18. Defendant Jameson Greer is the United States Trade Representative and is sued in his official capacity.

19. Defendant Office of the United States Trade Representative is the federal agency responsible for developing United States trade policy. It is headquartered in Washington, D.C.

20. Defendant Howard Lutnick is the United States Secretary of Commerce and is sued in his official capacity.

## FACTS

**The Executive Actions**

21. On February 1, 2025, the President issued Executive Order 14195, entitled "Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China" (the "China Executive Order").[1]

22. The China Executive Order declared that a national emergency posed by the influx of illegal aliens and drugs into the United States applied to the Chinese government's failure to "arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other TCOs, criminals at large, and drugs." It declared that China's failure to act constituted "an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States."

23. The China Executive Order imposed an incremental 10% tariff in addition to existing tariffs on all imports from China.

24. On March 3, 2025, the President issued Executive Order 14228, entitled "Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China,"[2] which doubled the incremental tariffs on imports from China to 20%. As justification for the rate increase, it stated that the Chinese government had "not taken adequate steps to alleviate the illicit drug crisis."

---

[1] Available at https://www.whitehouse.gov/presidential-actions/2025/02/imposing-duties-to-address-the-synthetic-opioid-supply-chain-in-the-peoples-republic-of-china/

[2] Available at https://www.whitehouse.gov/presidential-actions/2025/04/further-amendment-to-duties-addressing-the-synthetic-opioid-supply-chain-in-the-peoples-republic-of-china-as-applied-to-low-value-imports/

25. On April 2, 2025, "Liberation Day," the President issued Executive Order 14257, entitled "Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits" (the "Liberation Day Order").[3]

26. The Liberation Day Order imposed sweeping new tariffs at rates not seen since the Great Depression—including a global 10% tariffs on nearly all countries in the world, regardless of whether they impose tariffs on United States products, the rates at which they do so,[4] or the existence of any trade agreements governing the relationship. These tariffs even applied to places with no civilian population or international trade activity, such as the British Indian Ocean Territory, whose only human inhabitants belong to a joint American and British military base on the island of Diego Garcia, and the Heard and McDonald Islands, which are inhabited only by penguins and seals.

27. In addition to the global 10% tariff, the Liberation Day Order levied much higher tariff rates on dozens of countries based on what the administration claimed to be an estimate of "tariff and nontariff barriers," but ultimately turned out to be a

---

[3] Available at https://www.whitehouse.gov/presidential-actions/2025/04/regulating-imports-with-a-reciprocal-tariff-to-rectify-trade-practices-that-contribute-to-large-and-persistent-annual-united-states-goods-trade-deficits/
[4] Some of the targeted countries, including Israel and Switzerland, impose no tariffs on imports of goods from the United States. See Ilya Somin, *The Tariff Madness Isn't Over*, REASON, Apr.10, 2025, available at https://reason.com/volokh/2025/04/10/the-tariff-madness-isnt-over/; Liz Alderman & Melissa Eddy, *Swiss Indignant to Make the Top 10 of Trump's Tariffs List,* N.Y. TIMES, Apr. 4, 2025, available at https://www.nytimes.com/2025/04/04/business/trump-tariffs-switzerland.html,

simple ratio of the trade deficit in goods (excluding services) as a percentage of total U.S. imports from the given country.

28. The chosen formula is not an accepted methodology for calculating trade barriers and has no basis in economic theory.

29. On April 9, 2025, the President issued an additional Executive Order, entitled "Modifying Reciprocal Tariff Rates To Reflect Trading Partner Retaliation And Alignment,"[5] which paused the elevated tariff rates on most countries for 90 days, while leaving the global 10% tariff in place for all countries.

30. The April 9 Order did not reduce the tariff rate applied to imports from China. Instead, it imposed a new, higher tariff rate of 125% on Chinese goods in retaliation for China's imposition of its own tariffs in response to the President's imposition of elevated tariffs on China. The tariff rate imposed on China was later increased to 145%.

31. On April 11, 2025, the President issued a Memorandum entitled "Clarification of Exceptions Under Executive Order 14257 of April 2, 2025, as Amended,"[6] providing clarification of allowable exceptions under the Liberation Day Order. The Memorandum states that "semiconductors," defined as including products classified in various headings and subheadings of Chapters 84 and 85 of

---

[5] Available at https://www.whitehouse.gov/presidential-actions/2025/04/modifying-reciprocal-tariff-rates-to-reflect-trading-partner-retaliation-and-alignment/
[6] Available at https://www.whitehouse.gov/presidential-actions/2025/04/clarification-of-exceptions-under-executive-order-14257-of-april-2-2025-as-amended/

the Harmonized Tariff Schedule of the United States (HTSUS), are exempted from the tariffs imposed by the Liberation Day Order.

32. As a statutory basis, the Liberation Day Order cites the International Emergency Economic Powers Act of 1977, 50 U.S.C. § 1701 et seq. ("IEEPA"), the National Emergencies Act, 50 U.S.C. § 1601 et seq., section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483, and section 301 of title 3, United States Code.

33. But none of these statutes grants the President the authority to impose tariffs.

34. The Constitution explicitly reserves to Congress the power to "lay and collect taxes, duties, imposts and excises," and "[t]o regulate commerce with foreign nations." U.S. Const. art. I, § 8 cl.1, 3.

35. Indeed, Title 19 of the United States Code, "Customs and Duties," (as opposed to Title 50, "War and National Defense") is where one would expect to find such presidential authority, but it makes no mention of such authority.

36. Congress knows how to grant the President tariff authority when it wants to.

37. Under 19 U.S. Code § 1862, the President has a clear framework for adjusting duties and import restrictions for the purpose of "safeguarding national security." Yet the President has attempted to avoid that framework by stretching Congress's specific grant of emergency authority into general tariff authority. *See Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.,* 595 U.S. 109, 125 (2022) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)) (Congress "does not . . . 'hide elephants in mouseholes'").

38. Other specific grants of authority for the President to impose tariffs in limited specific circumstances exist. Under 19 U.S.C. § 2411, the President may impose tariffs on other countries that have violated trade agreements. And the President may provide specific, targeted relief to industries that need time to adjust to foreign competition pursuant to 19 U.S.C. § 2251.

39. IEEPA provides that the President may:

> (A)  investigate, regulate, or prohibit—
>> (i)  any transactions in foreign exchange,
>>
>> (ii)  transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
>>
>> (iii)  the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States;
>
> (B)  investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

50 U.S.C. § 1702.

40. IEEPA further provides that these authorities "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

41. But the word "tariff" does not appear in the IEEPA, nor does any synonym or equivalent.

10

42. No previous President has used IEEPA to impose tariffs, except for President Trump himself briefly during his first term, in an executive action that was withdrawn before it was fully implemented or subject to judicial review. Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 La. L. Rev. 596, 597 (2023).

43. The "unusual and extraordinary threat" asserted as a "national emergency" by the Liberation Day Order is not an emergency, and is not unusual, extraordinary, new, unexpected, odd, or even surprising.

44. According to the Liberation Day order, the President

find[s] that underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States. That threat has its source in whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural imbalances in the global trading system. I hereby declare a national emergency with respect to this threat.

45. In other words, the national emergency claimed to be unusual and extraordinary in this case is the existence of bilateral trade deficits in goods (excluding services, for which the United States runs a trade surplus with the world) with some foreign trading partners.

46. Trade deficits are not unusual or extraordinary—the United States has run a net trade deficit at most times since World War II, and consistently since the 1970s. Brian Reinbold, Yi Wen, *Historical U.S. Trade Deficits*, Federal Reserve Bank of St.

Louis, May 17, 2019.[7] That necessarily includes bilateral trade deficits with many individual nations.

47. Nor are trade deficits an emergency or even necessarily a problem; they simply mean that some other country sells lots of things Americans want to buy, or that its people are unwilling or unable (often because of poverty) to purchase many American goods.[8] Moreover, trade deficits go hand in hand with capital surpluses, which increases investment in the United States. Norbert Michel, *Trade and Investment Are Not a Balancing Act*, Cato Institute, Nov. 9, 2023.[9]

48. Section 604 of the Trade Act of 1974 provides that "[t]he President shall from time to time, as appropriate, embody in the Harmonized Tariff Schedule of the United States the substance of the relevant provisions of this chapter, and of other Acts affecting import treatment, and actions thereunder, including removal, modification, continuance, or imposition of any rate of duty or other import restriction." 19 U.S.C. § 2483.

---

[7] Available at https://www.stlouisfed.org/on-the-economy/2019/may/historical-u-s-trade-deficits

[8] Economists generally agree bilateral trade deficits are not a meaningful problem at all, much less an emergency or an extraordinary and unusual threat. For overviews, *see* James McBride and Andrew Chatzky, *The U.S. Trade Deficit: How Much Does It Matter?,* Council on Foreign Relations (2019), available at https://www.cfr.org/backgrounder/us-trade-deficit-how-much-does-it-matter (noting that most economists recognize bilateral trade deficits do not matter, and the overall trade deficit is determined mainly by macroeconomic forces); Michael Chapman, *Ignore the Politicians: Trade Deficits Don't Really Matter*, Cato Institute (Aug. 29, 2024), available at https://www.cato.org/blog/ignore-politicians-trade-deficits-dont-really-matter (summarizing standard economic analysis showing that trade deficits don't matter).

[9] Available at https://www.cato.org/policy-analysis/trade-investment-are-not-balancing-act

49. Section 604 is a bookkeeping provision: it assigns to the President the task of periodically updating the Harmonized Tariff Schedule to reflect changes in policy that have occurred. It does not set out any power, authority, or process by which the President may unilaterally set such policies.

50. The National Emergencies Act, 50 U.S.C. § 1601 et seq., provides the general framework for declarations of national emergencies. It explicitly disclaims granting any substantive authority itself, instead requiring that "[w]hen the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631.

51. And 3 U.S.C. § 301 gives the President "[g]eneral authorization to delegate functions" to subordinate federal officials. It has nothing to do with tariffs or trade regulation.

**The Plaintiffs**

52. V.O.S. Selections, Inc. cannot domestically source the variety of wines, spirits, and sake it offers. Wine produced in different regions of the globe is not fungible due to unique characteristics of taste, texture, and aroma imparted by climate, soil quality, grape varietals, elevation and other factors. V.O.S. works with small artisanal producers who craft products that represent the highest level of authenticity and quality of the place they are from. While there are wines, spirits, and sakes produced in the United States, they are not equivalent substitutes for

13

those that are produced abroad. V.O.S. is on the cutting edge, bringing products to the market from producers and regions that the United States market is not familiar with, and building loyal relationships with these foreign producers that span generations. The uncertainty of the tariff rates is particularly severe for V.O.S. because as a wholesaler of alcoholic beverages it is required to post prices a month in advance of sales and is not permitted to change the prices until the next posting period; this prevents V.O.S. from updating prices to reflect the tariffs charged. This uncertainty also hinders its ability to plan shipments and select products that fall within the correct price points for its customers. The reduction in cash flow caused by increased tariffs also necessarily reduces the company's inventory and the level of business that V.O.S. can conduct, leading to an overall reduction in purchase orders placed with both foreign and domestic suppliers.

53. Genova Pipe cannot domestically source the raw materials, including plastic resins, and manufacturing equipment that are necessary to manufacture its American-made plastic pipe, conduit, and fittings. Of the two U.S. producers of ABS resin suitable for pipe and fittings made by Genova Pipe, one producer is shutting down its only American plant and the other is unavailable to supply Genova Pipe. With over 75% of global ABS resin production concentrated in Northeast Asia, Genova Pipe is dependent on imports to continue its manufacturing operations. The tariffs will directly increase the cost of raw materials, manufacturing equipment, and resale goods imported from abroad by Genova Pipe. And its Canadian

customers may opt for local suppliers who are not subject to the tariffs, potentially resulting in a large loss of revenue.

54. At the current rates, MicroKits cannot order parts from China and will have to pause operations when it runs out of parts. The tariffs on imports from countries other than China will force MicroKits to raise prices—even if the tariffs on Chinese imports didn't force it to pause operations. Because of the Liberation Day Order and the April 9 Executive Order, MicroKits will likely be unable to pay its employees, will lose money, and as a result may go out of business. And the clarification set forth in the April 11 Memorandum exempting semiconductors does not change the threat to MicroKits because many of the components imported by MicroKits needed to fabricate its products are not listed as semiconductors exempt under the Memorandum.

55. FishUSA has spent years working with factories to design and build the products it sells. Shifting production to the United States would mean starting the whole process over again. The tariffs have caused FishUSA to delay shipment of finished goods from China due to the unpredictability of the tariff rate that will be imposed when the product arrives, and it has also paused production of some products. The chaos created by the uncertain tariffs is preventing FishUSA from growing its business, creating more jobs in the United States, and developing new products for its customers.

56. Terry Cycling cannot domestically source its fabrics and finished goods at the quality and price necessary to remain viable in a competitive industry. The impacts

of the tariffs on Terry Cycling have been severe and escalating. Terry Cycling has already paid $25,000 in unplanned tariffs this year for goods for which Terry was the importer of record, and Terry projects that the tariffs will cost the company approximately $250,000 by the end of 2025. Looking ahead to 2026, if no changes are made to current trade policy or its supply chain structure, Terry Cycling will face an estimated $1.2 million in tariff costs—an amount that is simply not survivable for a business of its size. To manage these increases, Terry has been forced to pass along costs to its customers and will also decrease product offerings and reduce availability to retail partners. In the short run, these tariffs are an existential threat to Terry Cycling.

57. As these impacts on the Plaintiffs show, the tariffs imposed by the Liberation Day Order are unprecedented, and simply breathtaking in scale.

## COUNT I

**The President's action levying tariffs exceeds his statutory authority.**

58. The preceding paragraphs are incorporated herein by reference.

59. Presidential authority to unilaterally impose worldwide tariffs, if Congress were to grant it at all, must be granted clearly and unmistakably—not through some implication so vague and indeterminate that it went unnoticed by every other President for nearly five decades. *See Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. at 125 (quoting *Whitman*, 531 U.S. at 468) ("Congress does not usually 'hide elephants in mouseholes.'").

60. IEEPA does not mention tariffs or duties, or at any point suggest that it is granting the power to lay and collect such.

16

61. There is no precedent for using IEEPA to impose tariffs. No other President has ever done so or ever claimed the power to do so.

62. The existence of trade deficits in goods with some other countries does not qualify as a national emergency, as required by IEEPA.

63. The existence of trade deficits in goods with some other countries is not an unusual and extraordinary threat, as required by IEEPA.

64. Courts are generally skeptical of newly claimed grants of authority discovered for the first time in decades-old statutes. *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' . . . we typically greet its announcement with a measure of skepticism.") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

65. Indeed, Congress passed IEEPA to *limit* what it saw as presidential abuses of emergency authorities in the years prior to 1977. Peter E. Harrell, *The Case Against IEEPA Tariffs,* Lawfare, Jan. 31, 2025.[10]

66. Congress knows how to grant the President authority to impose or adjust tariffs when it wishes to, and it has done so in more limited statutes contained in Title 19 of the United States Code. But the President has decided to avoid the limits on his authority imposed by Congress by finding a new never-before-seen authority under IEEPA.

---

[10] Available at https://www.lawfaremedia.org/article/the-case-against-ieepa-tariffs

67. The President's interpretation of IEEPA is not entitled to deference—rather, it is the duty of the courts to independently "determine the best reading" of the statute at issue. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024).

68. IEEPA does not grant the President power to impose tariffs at all—it does not mention such a power or imply it. The President's actions exceed the statutory authority Congress granted him.

69. "Courts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up) (quoting *Utility Air Regulatory Group v. EPA*, 573 U. S. 302, 324 (2014)). The assertion that IEEPA grants the President his claimed authority raises a major question that requires Congress to speak clearly in granting such a broad and consequential power to upend the global economy.

70. "In the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give the [President] the unprecedented power over American industry that would result from the Government's view." *Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 645 (1980). If anything qualifies as a "decision . . . of vast economic and political significance," requiring a clear statement under the major question doctrine, this is it. *West Virginia*, 597 U.S. at 716.

71. The Liberation Day Order would impose an estimated average of almost $1,300 in new taxes per year on American households, for a total tax burden of some $1.4 to 2.2 billion over the next ten years, reducing US gross domestic product by some 0.8% (without accounting for retaliation by foreign states). Erica York &

Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War,* Tax
Foundation, Apr. 11, 2025.[11]

72. This impact is at least as large—and likely much larger—than executive
actions previously found by the Supreme Court to be "major questions," requiring a
clear statement by Congress to authorize executive discretion. *See, e.g., Biden v.
Nebraska*, 600 U.S. 477 (2023) (approximately $400 billion in student loan
forgiveness); *West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022)
(EPA authority to regulate carbon emissions where the administration had not
offered a specific emission reduction plan); *Nat'l Fed'n of Indep. Bus. v.
Occupational Safety & Health Admin.*, 595 U.S. 109 (2022) (pandemic-era
vaccination mandate for workers employed by firms with 100 or more employees);
*Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) (temporary pandemic-era
nationwide eviction moratorium).

73. The tariffs illegally imposed by the President via IEEPA directly and
irreparably harm Plaintiffs, who will face increase costs for the goods they sell, less
demand for their higher priced products, and disrupted supply chains, among other
threats to their livelihood, up to and including potentially bankrupting otherwise
solvent companies.

---

[11] Available at https://taxfoundation.org/research/all/federal/trump-tariffs-trade-
war. These estimates include the impact of a few smaller tariff increases adopted by
the administration under IEEPA, but most of the effect is from the Liberation Day
Order.

## COUNT II

### If the IEEPA grants broad, unlimited authority to issue tariffs worldwide to the President, it is an unconstitutional delegation of legislative authority.

74. The preceding paragraphs are incorporated herein by reference.

75. Article I, Section 1 of the Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

76. The nondelegation doctrine is at bottom an attempt to take this provision seriously: there are legislative powers to make laws, and *all* such power resides in the Congress. *See Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 74 (2015) (Thomas, J., concurring) ("[T]he separation of powers is, in part, what supports our enduring conviction that the Vesting Clauses are exclusive and that the branch in which a power is vested may not give it up or otherwise reallocate it.").

77. Implicit in this setup is the premise that neither branch may delegate its sphere of power to any other. "The Vesting Clauses, and indeed the entire structure of the Constitution, make no sense [if there is no limit on delegations]." Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 340 (2002).

78. "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

79. The Court therefore requires that any grant of regulatory authority be provided with an "intelligible principle" that will form the basis of agency action.

*See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935).

80. The basic requirement that derives from the Supreme Court's cases is that "Congress must set forth standards sufficiently definite and precise to enable Congress, the courts, and the public to ascertain whether Congress's guidance has been followed." *Gundy v. United States*, 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting) (quoting *Yakus v. United States*, 321 U. S. 414, 426 (1944)).

81. IEEPA does not authorize tariffs at all, and this Court should so hold, by applying the rule of constitutional avoidance if necessary. But even if IEEPA did grant the President the broad, standardless discretion he claims—which it does not—and had done so clearly enough to satisfy the major questions doctrine—which it has not—it would be an unlawful delegation of legislative authority without any intelligible governing principle.

82. If there are any constitutional limits to delegation at all, they apply here, in a case where the executive claims virtually limitless authority to impose massive tax increases and start a worldwide trade war. This is the most "sweeping delegation of legislative power" claimed by the executive since the Supreme Court invalidated the National Recovery Act in 1935. *Schechter Poultry*, 295 U.S. at 539; *see id.* at 542 (noting that the NRA gave the "virtually unfettered" discretion to the President "in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country").

83. "The Government's theory would give [the President] power to impose enormous costs that might produce little, if any, discernible benefit." *Indus. Union Dep't,* 448 U.S. at 645.

84. This interpretation would render the Act the equivalent of the delegations the Supreme Court previously struck down, "one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 U.S. at 474.

85. This interpretation of the IEEPA would constitute a "sweeping delegation of legislative power" of the kind rejected in previous Supreme Court cases. *Indus. Union Dep't,* 448 U.S. at 646 (quoting *Schechter Poultry*, 295 U.S. at 539).

86. If longstanding, perfectly normal, bilateral trade deficits qualify as an "emergency" and as an "unusual and extraordinary threat," the same can be said of virtually any international economic transaction that the President disapproves of for virtually any reason. The President would have the power to impose any level of tariffs on goods or services from any country, for any purpose, pretty much anytime he wants.

87. The sheer breadth of this claimed power—to impose tariffs at any level on any country at any time, at levels that could very well crash the global economy—counsels against reading IEEPA to confer such an extreme delegation of authority. *Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is

raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.").

88. IEEPA provides no intelligible principle for the imposition of tariffs—indeed, it provides no principle at all by which this Court, or anyone else, might determine whether the guidance Congress provided has been followed.

89. The tariffs illegally imposed by the President via the unconstitutional delegation of authority under IEEPA directly and irreparable harm Plaintiffs, who will face increase costs for the goods they sell, less demand for their higher prices products, and disrupted supply chains, among other threats to their livelihood, up to and including potentially bankrupting otherwise-solvent companies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant the following relief:

a. Declare that IEEPA grants the President no statutory authority to unilaterally impose tariffs;

b. Declare that the President has not identified a valid national emergency as required by IEEPA and that the continued existence of trade deficits in goods is not in and of itself a national emergency;

c. Declare that the President has failed to make any showing of an "unusual and extraordinary threat" as required by IEEPA;

d.  Declare that, if Congress has granted the President unilateral authority to impose global tariffs of any amount at his whim, it is an unconstitutional delegation of legislative power;

e.  Enjoin the operation of the April 2, 2025, Executive Order entitled "Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits";

f.  Enjoin the operation of the April 9, 2025, Executive Order entitled "Modifying Reciprocal Tariff Rates To Reflect Trading Partner Retaliation And Alignment";

g.  Award Plaintiffs damages in the amount of any tariffs collected by Defendants pursuant to the challenged orders;

h.  Award Plaintiffs other such damages as are appropriate;

i.  Award Plaintiffs their attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable law; and

j.  Grant any such other relief as this Court may deem just or proper.

Dated: April 14, 2025

Respectfully submitted,

/s/ Jeffrey M. Schwab

Jeffrey Schwab
Reilly Stephens
James McQuaid
Bridget Conlan
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org
rstephens@ljc.org
jmcquaid@ljc.org
bconlan@ljc.org

Ilya Somin
Antonin Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, Virginia 22201
703-993-8069
isomin@gmu.edu