IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

Before Honorable Gary S. Katzmann, Judge, Honorable
Timothy M. Reif, Judge, Honorable Jane A. Restani, Judge

| | |
|---|---|
| V.O.S. SELECTIONS, INC., *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> Defendants. | Case No. 25-00066-GSK-TMR-JAR |

## Proposed Order

Upon consideration of Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction and/or Summary Judgment for Permanent Injunction, and after due deliberation, it is hereby:

ORDERED that Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction/Motion for Summary Judgment is granted; and it is further

ORDERED that Defendants are enjoined pending resolution of this matter/permanently from enforcing the tariffs imposed by Executive Order 14257.

_____
JUDGE, United States Court of International Trade

Dated: _____

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

Before Honorable Gary S. Katzmann, Judge, Honorable
Timothy M. Reif, Judge, Honorable Jane A. Restani, Judge

| | |
|---|---|
| V.O.S. SELECTIONS, INC., *et al.* | |
| Plaintiffs, | Case No. 25-00066-GSK-TMR-JAR |
| v. | |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

**Plaintiffs' Application for Temporary Restraining Order
and Motion for Preliminary Injunction and/or Summary
Judgment for Permanent Injunction**

In accordance with Rule 7 and 65 of the Rules of the United States Court of
International Trade, Plaintiffs ask this Court to enter a temporary restraining
order and move for a preliminary injunction, preventing defendants from enforcing
the tariffs imposed by Executive Order 14257, dated April 2, 2025. In addition, or in
the alternative, Plaintiffs move for summary judgment and request the entry of a
permanent injunction, pursuant to Rule 56 of the United States Court of
International Trade, to permanently enjoin defendants from enforcing the tariffs
imposed by the April 2 Executive Order.

Plaintiffs request that this Court issue the following relief:

(A) hold that Plaintiffs:

(1) have a likelihood of success on the merits of their claims; and/or

(2) are entitled to judgment as a matter of law on their claims that:

1

(i) IEEPA grants the President no statutory authority to unilaterally impose tariffs;

(ii) the President has not identified a valid national emergency as required by IEEPA and that the continued existence of trade deficits in goods is not in and of itself a national emergency;

(iii) the President has failed to make any showing of an "unusual and extraordinary threat;" and/or

(iv) if Congress has granted the President unilateral authority to impose tariffs of any amount at his whim, it is an unconstitutional delegation of legislative power;

(B) issue a temporary restraining order and/or preliminary injunction preventing the imposition of all tariffs set forth in Executive Order 14257, dated April 2, 2025; and/or

(C) issue summary judgment in favor of Plaintiffs and permanently enjoin the imposition of all tariffs set forth in Executive Order 14257, dated April 2, 2025;

(D) award money damages in the amount already paid by Plaintiffs on tariffs imposed by Executive Order 14257, dated April 2, 2025;

(E) award Plaintiffs their attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable law; and

(F) grant other just relief as this Court may deem just or proper.

A TRO is necessary to preserve the status quo, allowing Plaintiffs to continue operating their businesses as usual while the litigation is pending without suffering irreparable harm to their business operations.

Plaintiffs seek a preliminary injunction for the duration of this litigation, including all relevant appeals and remands, until such time as a final court decision is rendered. Plaintiffs seek to preliminarily enjoin Defendants' actions imposing and enforcing tariffs, which pose an existential threat to Plaintiffs' business operations.

Plaintiffs request that their application and motions be set for hearing at the Court's earliest convenience.

In support, Plaintiffs rely upon their Complaint, the following Memorandum, and the accompanying declarations, attached as Exhibits A–E.

Respectfully submitted,

Dated: April 18, 2025

/s/ Bridget F. Conlan
Jeffrey M. Schwab
Bridget F. Conlan
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org
bconlan@ljc.org

*Counsel for Plaintiffs V.O.S. Selections, Inc., Plastic Services and Products LLC d/b/a Genova Pipe, Microkits LLC, FishUSA Inc., and Terry Precision Cycling LLC.*

# Table of Contents

Table of Authorities ................................................................................. ii

Facts ........................................................................................................ 2

    I.     The Executive Action ................................................................ 2

    II.    Plaintiffs' Injuries ................................................................... 5

          A.  Injury to V.O.S. Selections Inc. ..................................... 5

          B.  Injury to Genova Pipe ................................................... 6

          C.  Injury to MicroKits LLC ............................................... 7

          D.  Injury to FishUSA ......................................................... 7

          E.  Injury to Terry Precision Cycling LLC ......................... 8

Legal Standard ........................................................................................ 9

Summary of the Argument ...................................................................... 9

Argument ................................................................................................ 11

    I.     The tariffs imposed by the President's April 2, 2025 Executive Order exceed his lawful authority. .......................... 11

          A.  IEEPA does not authorize the President to impose the Liberation Day tariffs. .................................................. 11

          B.  Because of their economic and political significance, this Court should not presume IEEPA authorizes the President to impose the Liberation Day tariffs. ........... 12

          C.  Even if IEEPA might authorize some tariffs, it does not authorize the President's Liberation Day tariffs. ...... 18

          D.  If IEEPA did authorize the President to impose these tariffs, that would be an unconstitutional delegation of legislative power to the executive. ................................. 19

    II.    Plaintiffs will suffer irreparable harm if the tariffs imposed by the Liberation Day Order are not enjoined. ...................... 26

    III.   The balance of interests weighs in favor of enjoining the tariffs imposed by the Liberation Day Order and an injunction serves the public interest. ................................ 28

Conclusion .............................................................................................. 29

Certificate of Compliance ...................................................................... 31

Certificate of Service .............................................................................. 32

# Table of Authorities

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
   295 U.S. 495 (1935) ............................................................................ 20, 23

*Ala. Ass'n of Realtors v. HHS*,
   594 U.S. 758 (2021) ................................................................ 14, 15, 16, 20

*Am. Signature, Inc. v. United States*,
   598 F.3d 816 (Fed. Cir. 2010) ............................................................. 28

*American Institute for Intern. Steel, Inc. v. United States*,
   376 F.Supp.3d 1335 (Ct. Int'l Trade 2019) ......................................... 21

*Biden v. Nebraska*,
   600 U.S. 477 (2023) .............................................................................. 14

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .............................................................................. 9

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
   664 F.3d 922 (Fed. Cir. 2012) ............................................................. 26

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012) .............................................................................. 11

*Confederación de Asociaciones Agrícolas del Estado de Sinaloa, A.C. v. United States*,
   389 F.Supp.3d 1386 (Ct. Int'l Trade 2019) ......................................... 26

*Crowell v. Benson*,
   285 U.S. 22 (1932) ................................................................................ 17

*Dep't of Transp. v. Ass'n of Am. R.R.*,
   575 U.S. 43 (2015) ...................................................................... 21, 22, 24

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) .............................................................................. 12

*Gundy v. United States*,
   588 U.S. 128 (2019) ...................................................................... 23, 24

*Harmoni Int'l Spice, Inc. v. United States*,
   211 F. Supp. 3d 1298 (Ct. Int'l Trade 2017) ....................................... 26

*Hirabayashi v. United States*,
   320 U.S. 81 (1943) ................................................................................ 25

*In re Section 301 Cases*,
   524 F. Supp. 3d 1355 (Ct. Int'l Trade 2021) ....................................... 29

*Indus. Union Dep't, AFL-CIO v. API*,
   448 U.S. 607 (1980) ...................................................................... 14, 20, 23

*J.W. Hampton, Jr. &Co. v. United States*,
  276 U.S. 394 (1928) ........................................................... 23

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) ........................................................... 17

*Marshall Field & Co. v. Clark*,
  143 U.S. 649 (1892) ........................................................... 22

*Mistretta v. United States*,
  488 U.S. 361 (1989) ...................................................... 21, 24

*NFIB v. OSHA*,
  595 U.S. 109 (2022) ........................................................... 14

*Panama Refining Co. v. Ryan*,
  293 U.S. 388 (1935) ................................................ 20, 23, 24

*Paul v. United States*,
  140 S. Ct. 342 (2019) ......................................................... 23

*Retractable Techs., Inc. v. United States*,
  739 F. Supp. 3d 1330 (Ct. Int'l Trade 2024) ...................... 9, 26

*Sampson v. Murray*,
  415 U.S. 61 (1974) ............................................................. 26

*Silfab Solar, Inc. v. United States*,
  892 F.3d 1340 (Fed. Cir. 2018) ............................................ 9

*Sumecht NA, Inc. v. United States*,
  331 F. Supp. 3d 1408 (Ct. Int'l Trade 2018) ........................ 26

*Suntec Indus. Co. v. United States*, No. 13-00157,
  2016 Ct. Intl. Trade LEXIS 40 (Ct. Int'l Trade Apr. 21, 2016) ............ 9

*Tri Union Frozen Prods. v. United States*,
  161 F. Supp. 3d 1333 (Ct. Int'l Trade 2016) ......................... 2

*United States v. U.S. Coin & Currency*,
  401 U.S. 715 (1971) ........................................................... 28

*United States v. Yoshida Int'l, Inc.*,
  526 F.2d 560 (C.C.P.A. 1975) ............................................. 12

*Utility Air Regulatory Group v. EPA*,
  573 U.S. 302 (2014) ........................................................... 13

*Wayman v. Southard*,
  23 U.S. (10 Wheat.) 1 (1825) ............................................. 22

*West Virginia v. Environmental Protection Agency*,
  597 U.S. 697 (2022) ........................................................... 14

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ................................................................. 20

*Yakus v. United States*,
  321 U.S. 414 (1944) ............................................................ 23, 25

*Zenith Radio Corp. v. United States*,
  710 F.2d 806 (Fed. Cir. 1983) .................................................. 26

**Statutes**

19 U.S.C. § 1862 ........................................................................ 16

19 U.S.C. § 2132 ........................................................................ 16

19 U.S.C. § 2251 ........................................................................ 17

19 U.S.C. § 2411 ........................................................................ 17

19 U.S.C. § 2483 .......................................................................... 4

42 U.S.C. § 264 .......................................................................... 15

50 U.S.C. § 1601 .......................................................................... 4

50 U.S.C. § 1701 ...................................................................... 4, 18

50 U.S.C. § 1702 ...................................................................... 4, 11

Mass. Const. pt. 1, art. XXX ....................................................... 22

U.S. Const. art. I, § 1 .................................................................. 21

U.S. Const. art. I, § 8 .................................................................. 14

U.S. Const. art. II, § 1 ................................................................. 21

**Other Authorities**

1 W. Blackstone, Commentaries on the Laws of England (1765) .............................. 22

Akrur Barua and Michael Wolf, *Tariffs will impact the economy and so will uncertainty*, Deloitte Global Economics Research Center, April 11, 2025 ............. 29

Erica York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, Tax Foundation, Apr. 11, 2025 ............................................. 13

Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327 (2002) .......... 21

H.R. Rep. No. 95-459 (1977) ....................................................... 18

Ilya Somin, *A Takings Clause Lawsuit Against the CDC Eviction Moratorium*, Reason, Aug.3, 2021 ................................................................. 15

James McBride and Andrew Chatzky, *The U.S. Trade Deficit: How Much Does It Matter?*, Council on Foreign Relations (2019) ...................................... 19

Joseph Bishop-Henchman, *High Protective Tariffs Have Been Short-Lived in American History*, Cato Institute, Apr. 8, 2025 ..................................... 28

Peter E. Harrell, *The Case Against IEEPA Tariffs*, LAWFARE, Jan. 31, 2025 . 12, 13

Reinbold, & Yi Wen, *Historical U.S. Trade Deficits*, Federal Reserve Bank of St. Louis (May 17, 2019) ........................................................................... 19

Ruth Simon, *Small Sellers of Fireworks, Ski Apparel and Other Imports Can't Escape Tariff War*, WALL St. J., Apr. 11, 2025 ....................................... 29

The Federalist No. 47 (James Madison) ................................................. 22

Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 La. L. Rev. 596 (2023) . 5

**Rules**

Fed. R. Evid. 201(b) ............................................................................. 2

USCIT R. 56(a) .................................................................................... 9

**Regulations**

90 Fed. Reg. 15041 ....................................................................... 2, 3, 5

90 Fed. Reg. 15621 ............................................................................. 3

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

Before Honorable Gary S. Katzmann, Judge, Honorable
Timothy M. Reif, Judge, Honorable Jane A. Restani, Judge

| | |
|---|---|
| V.O.S. SELECTIONS, INC., *et al.* | Case No. 25-00066-GSK-TMR-JAR |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

**Memorandum in Support of Plaintiffs' Application for
Temporary Restraining Order and Motion for Preliminary
Injunction and/or Summary Judgment for Permanent Injunction**

On April 2, 2025, the President issued Executive Order 14257, which

unilaterally levied a 10% tariff on goods imported from all countries with the

exception of Canada and Mexico, and reciprocal tariffs on approximately 90

countries, with no process, notice, oversight, limitation, or consistency, based on

purported authority provided in the International Emergency Economic Powers Act

of 1977 ("IEEPA")—which no President has ever relied on to impose any tariffs. But

if IEEPA were read to grant the President the power to impose unlimited tariffs, it

would be an unconstitutional delegation of legislative power to the executive

without any intelligible principle to limit his discretion.

In reality, Congress has not delegated any such power. IEEPA does not

authorize the President to impose unilateral worldwide tariffs on any country he

chooses at any rate he chooses. And, in any event, the requirements set forth in

1

IEEPA for the President to take action are not met: the United States's trade deficit in goods with other countries is not an emergency—it has existed for decades without causing economic harm. Nor do these trade deficits constitute an "unusual and extraordinary threat."

Plaintiffs, a group of owner-operated businesses that each rely on imports from foreign countries, are irreparably harmed by the President's unlawful tariffs and therefore seek to enjoin the President from issuing tariffs under IEEPA.

## Facts[1]

### I. The Executive Action

On April 2, 2025, "Liberation Day," the President issued Executive Order 14257, entitled "Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits." (the "Liberation Day Order"). 90 Fed. Reg. 15041 (April 7, 2025).[2] The Liberation Day Order imposed sweeping new tariffs: a global 10% tariff on nearly every country in the world, regardless of whether they impose tariffs on United States products, the rates at which they do so, or the existence of any trade agreements

---

[1] The facts set forth in this section are not likely to be disputed and thus serve as a basis for Plaintiffs' motion for temporary restraining order and preliminary injunction, as well as their motion for summary judgment.

[2] Available at https://www.whitehouse.gov/presidential-actions/2025/04/regulating-imports-with-a-reciprocal-tariff-to-rectify-trade-practices-that-contribute-to-large-and-persistent-annual-united-states-goods-trade-deficits/. *See* Fed. R. Evid. 201(b); *see also Tri Union Frozen Prods. v. United States*, 161 F. Supp. 3d 1333, 1337 (Ct. Int'l Trade 2016) ("the offered information is not subject to reasonable dispute because it is 'generally known' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'")

governing the relationship and, in addition, much higher tariff rates on dozens of countries based on what the administration claimed to be an estimate of "tariff and nontariff barriers," *id.*, but ultimately turned out to be a simple ratio of the trade deficit in goods (excluding services) as a percentage of total U.S. imports from the given country.[3]

On April 9, 2025, the President issued an additional Executive Order, entitled "Modifying Reciprocal Tariff Rates To Reflect Trading Partner Retaliation And Alignment," which paused the elevated tariff rates on most countries for 90 days, while leaving the global 10% tariff in place for all countries. 90 Fed. Reg. 15621 (April 15, 2025).[4] The April 9 Order did not reduce the tariff rate applied to imports from China. *See id.* Instead, it imposed a new, higher tariff rate of 125%—later increased to 145%—on Chinese goods in retaliation for China's imposition of its own tariffs in response to the President's imposition of elevated tariffs on China. *Id.*

On April 11, 2025, the President issued a Memorandum entitled "Clarification of Exceptions Under Executive Order 14257 of April 2, 2025, as Amended,"[5] providing clarification of allowable exceptions under the Liberation Day Order. The Memorandum states that "semiconductors," defined as including products classified

---

[3] The Administration's published formula Reciprocal Tariff Calculations is available on the U.S. Trade Representative website: https://ustr.gov/sites/default/files/files/Issue_Areas/Presidential%20Tariff%20Action/Reciprocal%20Tariff%20Calculations.pdf

[4] Available at https://www.whitehouse.gov/presidential-actions/2025/04/modifying-reciprocal-tariff-rates-to-reflect-trading-partner-retaliation-and-alignment/

[5] Available at https://www.whitehouse.gov/presidential-actions/2025/04/clarification-of-exceptions-under-executive-order-14257-of-april-2-2025-as-amended/

in various headings and subheadings of Chapters 84 and 85 of the Harmonized

Tariff Schedule of the United States (HTSUS), are exempted from the tariffs

imposed by the Liberation Day Order. *Id.*

As its statutory basis, the Liberation Day Order cites the International

Emergency Economic Powers Act of 1977, 50 U.S.C. § 1701 et seq. ("IEEPA"), the

National Emergencies Act, 50 U.S.C. § 1601 et seq., section 604 of the Trade Act of

1974, as amended, 19 U.S.C. § 2483, and section 301 of title 3, United States Code.

Exec. Order 14257.

IEEPA provides that the President may:

    (A)    investigate, regulate, or prohibit—
        (i)    any transactions in foreign exchange,
        (ii)    transfers of credit or payments between, by, through, or to any
        banking institution, to the extent that such transfers or payments
        involve any interest of any foreign country or a national thereof,
        (ii)    the importing or exporting of currency or securities, by any person,
        or with respect to any property, subject to the jurisdiction of the
        United States;
    (B)    investigate, block during the pendency of an investigation, regulate,
    direct and compel, nullify, void, prevent or prohibit, any acquisition,
    holding, withholding, use, transfer, withdrawal, transportation,
    importation or exportation of, or dealing in, or exercising any right,
    power, or privilege with respect to, or transactions involving, any
    property in which any foreign country or a national thereof has any
    interest by any person, or with respect to any property, subject to the
    jurisdiction of the United States . . .

50 U.S.C. § 1702. IEEPA further provides that these authorities "may only be

exercised to deal with an unusual and extraordinary threat with respect to which a

national emergency has been declared for purposes of this chapter and may not be

exercised for any other purpose." *Id.*

No previous President has used IEEPA to impose tariffs, except for President Trump himself briefly during his first term, in an executive action that was withdrawn before it was fully implemented or subject to judicial review. Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 LA. L. REV. 596, 597 (2023).

The President's Liberation Day order declares a national emergency due to "large and persistent annual U.S. goods trade deficits," attributed to a "lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies." Exec. Order 14257. The order deems this circumstance "an unusual and extraordinary threat to the national security and economy." *Id.*

## II. Plaintiffs' Injuries

### A. Injury to V.O.S. Selections Inc.

Plaintiff V.O.S. Selections, Inc. ("V.O.S.") imports wines and spirits from countries including Austria, Italy, Greece, Lebanon, Morocco, Spain, France, Portugal, Mexico, Argentina, Germany, Croatia, Hungary, and South Africa. Declaration of Victor Schwartz ("Schwartz Decl.") ¶ 4, Exhibit A. V.O.S. is required to post product prices with the State Liquor Authority[6] a full month in advance. *Id.* ¶ 20. Tariff uncertainty is devastating to V.O.S.'s ability to operate and maintain relationships with its suppliers. *Id.* ¶ 30. And the products it imports are not readily available or replaceable from suppliers in the United States, partly because characteristics such as taste, texture, and aroma are determined by factors specific

---

[6] V.O.S. is regulated by the State Liquor Authority of New York, the New Jersey Division of Alcoholic Beverage Control, and the Pennsylvania Liquor Control Board.

to the geography of the producing vineyard, such as climate, soil quality, and elevation. *Id.* ¶¶ 5, 14–18. As a result of the tariffs imposed by the Liberation Day Order, V.O.S. will be unable to plan its import orders because the change in price will change customer behavior. *Id.* ¶¶ 33–35. V.O.S.'s relationships with wholesale customers will be harmed by its inability to provide products that meet those customers' price points. Schwartz Decl. ¶¶ 35-38. And V.O.S.'s relationships with farmers who produce the wines it provides—relationships that go back generations in some cases—will be harmed if V.O.S. cannot sell those wines. *Id.* ¶¶ 11–12, 31. As a result of the tariffs, V.O.S. will suffer damage to its reputation and goodwill with both its suppliers and customers, as well as lost business opportunities and a substantial loss of business. *Id.* ¶ 39.

### B. Injury to Genova Pipe

Plaintiff Plastic Services and Products, LLC d/b/a/ Genova Pipe ("Genova Pipe") imports raw materials, manufacturing equipment, and finished goods from South Korea, Japan, China, Taiwan, Indonesia, Italy, Thailand, Vietnam, India, and Oman. Declaration of Andrew Reese ("Reese Decl.") ¶ 5, Exhibit B. Genova Pipe cannot domestically source the raw materials, including plastic resins and manufacturing equipment that are necessary to manufacture its American-made plastic pipe, conduit, and fittings; it is dependent on imports to continue its manufacturing operations. *Id.* at ¶¶ 6, 8. The tariffs will directly increase the cost of raw materials, manufacturing equipment, and resale goods imported from abroad by Genova Pipe. *Id.* ¶¶ 9. And its Canadian customers may opt for local suppliers who are not subject to the tariffs, potentially resulting in a large loss of revenue as

well as harm to Genova Pipe's reputation and loss of goodwill with its customers. *Id.* ¶ 13.

### C. Injury to MicroKits LLC

Plaintiff MicroKits LLC ("MicroKits") imports electronic parts from China, Mexico, Thailand, and Taiwan. Declaration of David Levi ("Levi Decl.") ¶ 6, Exhibit C. Under the current tariffs, MicroKits cannot afford to import parts from China and will have to pause operations when it runs out of parts in about seven weeks. *Id.* ¶¶ 7, 10. The Liberation Day tariffs will force MicroKits to raise prices, which will likely lead to a loss of revenue and make MicroKits unable to compete with copycat versions of its product that are made entirely in China. *Id.* ¶¶ 8, 15. As a result, MicroKits is forced to delay hiring, cannot maintain its inventory necessary for its products, and may be forced to shut down. *Id.* ¶¶ 16, 10–12. And because of the tariffs, MicroKits will suffer harm to its reputation and goodwill to customers by having to raise prices or by running out of its products due to lack of necessary components. *Id.* ¶¶ 8, 12, 17.

### D. Injury to FishUSA

Plaintiff FishUSA Inc. ("FishUSA") directly imports products from countries including Canada, China, South Korea, and Kenya. Declaration of Dan Pastore ("Pastore Decl.") ¶ 5, Exhibit D. Although FishUSA also procures products from domestic suppliers, many if not most of those products are also sourced in whole or in part from abroad, meaning that almost all the company's inventory will be affected by the tariffs. *Id.* ¶ 11. FishUSA imports some product directly from vendors in Canada and produces its own private label products—including fishing

7

rods, fishing nets, tackle storage, and fly boxes—which go through a multi-year development process with the manufacturer to source, design, and test before going into production. *Id.* ¶¶ 7–8. FishUSA has had to pause some import orders, and has delayed shipment of finished goods, due to fluctuating tariff rates and uncertainty. *Id.* ¶¶ 17–23. There is currently no alternative source for cost-effective fishing tackle that is made entirely in the United States, and there is not sufficient time for FishUSA to develop that infrastructure before it faces dire consequences from the inability to keep inventory in stock for its customers. *Id.* ¶ 25. FishUSA has also stopped work on a project in China that was slotted to go into production imminently because the current tariffs would make that project unworkable. *Id.* ¶ 27.

### E. Injury to Terry Precision Cycling LLC

Plaintiff Terry Precision Cycling LLC ("Terry Cycling") imports goods from China, Taiwan, Vietnam, Italy, and the Philippines. Declaration of Nik Holm ("Holm Decl.") ¶ 6, Exhibit E. Its manufacturing partner imports fabrics and other materials from several other countries including Guatemala, El Salvador, and the European Union. *Id.* ¶ 7. Terry Cycling has already paid $25,000 in unplanned tariffs this year and expects to pay an additional $250,000 in tariffs by the end of 2025. *Id.* ¶ 24–25. In 2026, Terry Cycling will face an estimated $1.2 million in tariff costs—which it will not be able to pay. *Id.* ¶ 26. Terry Cycling's products are highly sensitive to price elasticity, particularly in an inflationary environment. *Id.* ¶ 32. Terry Cycling has been forced to increase prices by 30% or more to attempt to mitigate the tariffs, which will harm its reputation and goodwill with consumers.

*Id*. ¶¶ 28–35. Due to the uncertainty surrounding the tariffs, Terry Cycling cannot confirm costs with its wholesale customers and may lose this business if it is forced to increase prices because of the IEEPA duties. *Id*. ¶ 19.

## Legal Standard

To obtain injunctive relief a party must demonstrate: "(1) likelihood of success on the merits, (2) irreparable harm absent immediate relief, (3) the balance of interests weighing in favor of relief, and (4) that the injunction serves the public interest." *Retractable Techs., Inc. v. United States*, 739 F. Supp. 3d 1330, 1336–1337 (Ct. Int'l Trade 2024) (citing *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018)).

Summary judgment is appropriate where there are no material facts in dispute and the case at hand hinges on pure questions of law. *Suntec Indus. Co. v. United States*, No. 13-00157, 2016 Ct. Intl. Trade LEXIS 40, *4 (Ct. Int'l Trade Apr. 21, 2016) (relying on *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also* USCIT R. 56(a).

## Summary of the Argument

The President has no authority under IEEPA to issue the tariffs. IEEPA does not even mention tariffs. No other President has asserted this authority. IEEPA was passed to limit the President's emergency powers. If Congress wanted to grant the President the authority to issue tariffs in IEEPA, it could have, as it has done so elsewhere. But when Congress does give the President tariff authority, it does so subject to strict statutory limits.

Legitimate use of IEEPA is limited to cases of emergencies where there is an "unusual and extraordinary threat." But the national emergency the President has declared—the existence of bilateral trade deficits with some countries—is not an emergency, nor is it unusual or extraordinary. The United States has had some amount of trade deficit in goods for most of the last century, while having the most economic success of any country in history.

Moreover, the power claimed by the President here is extreme: he claims the power to unilaterally impose infinite tariffs of his choosing on any country he chooses—even countries with which we run a trade *surplus*. Any grant of such authority by Congress to the President should qualify as a major question subject to the strictest judicial scrutiny—which this claim of authority under IEEPA cannot survive.

And even if it were true that IEEPA did grant the President the authority he claims—which it does not—it would constitute an unconstitutional delegation of legislative authority.

Plaintiffs are likely to succeed on the merits of their claim and will suffer irreparable harm if they do not. The Liberation Day tariffs represent an existential threat to Plaintiffs' businesses and to thousands of small businesses just like them around the country. An injunction will also serve the public interest because it is always in the public interest for the government to follow the Constitution, and the Liberation Day tariffs will impose significant economic harms.

Therefore, this Court should enjoin the Liberation Day tariffs imposed by the President under IEEPA.

# Argument

## I.    The tariffs imposed by the President's April 2, 2025 Executive Order exceed his lawful authority.

### A.    IEEPA does not authorize the President to impose the Liberation Day tariffs.

IEEPA—the President's asserted statutory basis for this global tariff scheme—does not authorize the President to impose tariffs at all, much less the sort of broad, worldwide tariffs the President has imposed. The text of IEEPA does not mention the word "tariff." The closest it comes is that portion of 50 U.S.C. § 1702(a)(1)(B) which states that the President may "by means of instructions, licenses, or otherwise, . . . regulate [any] transfer [of] any property in which any foreign country or a national thereof has any interest." But a tariff is not an "instruction" or a "license," and well-established principles of statutory interpretation mean that the "otherwise" should be read as limited by the specific terms that precede it. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 163 n.19 (2012) ("the canon of ejusdem generis limits general terms that follow specific ones to matters similar to those specified").

No other president has ever claimed that language encompassed tariff authority. Indeed, the point of IEEPA was to *limit* presidential discretion. The statute was passed in 1977, in the wake of various presidential scandals that motivated Congress to attempt to cabin the president's emergency powers—the entire point was to *take away* power the President had previously asserted, and abused, under

11

the Trading with the Enemy Act of 1917 ("TWEA"). Peter E. Harrell, *The Case Against IEEPA Tariffs*, LAWFARE, Jan. 31, 2025 ("In the wake of the Watergate scandal, Congress was keen to reign in executive power, and TWEA was in its sights.")[7]. The Nixon Administration *had* used the TWEA once to impose a tariff in response to balance-of-payments concerns as the United States went off the gold standard, and IEEPA was part of a broader response to such abuses. *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 566 (C.C.P.A. 1975). In response, Congress passed a separate statute in 1974, 19 U.S.C.§ 2132, which laid out a specific process for the President to implement temporary and limited tariffs to address such balance-of -payments concerns—and then passed IEEPA on top of that to *limit* the President's general emergency authority. "Congress's overarching objective with IEEPA was to narrow the scope of the president's powers while continuing to provide the president with adequate authorities to address genuine emergencies." Harrell, *The Case Against IEEPA Tariffs*, *supra*.

## B. Because of their economic and political significance, this Court should not presume IEEPA authorizes the President to impose the Liberation Day tariffs.

And this Court should not presume that Congress delegated its tariff authority to the President under IEEPA. The Supreme Court has explained that courts should not lightly presume congressional intent to implicitly delegate decisions of major economic or political significance to agencies. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *Utility Air Regulatory Group v. EPA*, 573

---

[7] https://www.lawfaremedia.org/article/the-case-against-ieepa-tariffs

U.S. 302, 324 (2014) (plurality) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism."). And these tariffs are of unprecedented significance: In 2024, United States imports were approximately $3 trillion, which means that a 10% tariff would have amounted to roughly $300 billion in new taxes, assuming the amount of imports did not itself adjust in the face of higher tariff rates—imposed at the President's caprice, without notice or public comment, and subject to change at any point based on his whims. Harrell, *The Case Against IEEPA Tariffs*, *supra*. Current estimates project that the Liberation Day Order would impose an estimated average of almost $1,300 in new taxes per year on American households, for a total tax burden of some $1.4 to 2.2 trillion[8] over the next ten years, reducing U.S. gross domestic product by some 0.8% (without accounting for retaliation by foreign states). Erica York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, Tax Foundation, Apr. 11, 2025.[9]

These impacts are at least as large—and likely much larger—than executive actions that the Supreme Court has found to be "major questions" requiring a clear statement by Congress to authorize executive discretion. *See, e.g., Biden v.*

---

[8] Plaintiffs' Complaint contained a typo, incorrectly stating this number as "$1.4 to 2.2 billion." *See* ECF 2 at ¶ 71. The correct number is the one stated here: $1.4 to 2.2 *trillion*.

[9] https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/. Plaintiffs' Complaint contained a typo, incorrectly stating this number as "$1.4 to 2.2 billion." *See* ECF 2 at ¶ 71. The correct number is the one stated here: $1.4 to 2.2 *trillion*.

*Nebraska*, 600 U.S. 477 (2023) (approximately $400 billion in student loan forgiveness); *West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022) (EPA authority to regulate carbon emissions where the administration had not offered a specific emission reduction plan); *NFIB v. OSHA*, 595 U.S. 109 (2022) (pandemic-era vaccination mandate for workers employed by firms with 100 or more employees); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) (temporary pandemic-era nationwide eviction moratorium).

And this is an instance where the President is claiming to exercise a core, enumerated legislative power; under our Constitution, Congress holds the powers to "lay and collect taxes, duties, imposts and excises," and "[t]o regulate commerce with foreign nations." U.S. Const. art. I, § 8 cl. 1, 3. The President can therefore exercise such authority *only* if it is in fact delegated to him by the legislature. But in "the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give the Secretary the unprecedented power over American industry that would result from the Government's view." *Indus. Union Dep't, AFL-CIO v. API,* 448 U.S. 607, 645 (1980). A catch-all phrase at the end of a statute is not a loophole through which to drive nationwide social policy. In *Alabama Association of Realtors v. HHS*, 594 U.S. 758, 766 (2021), the Supreme Court barred the CDC from imposing a nationwide eviction moratorium based on statutory language authorizing the CDC director to "provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human

14

beings, and other measures, as in his judgment may be necessary." 42 U.S.C. § 264(a). The Court ruled that the catch-all phrase "other measures" could not authorize so sweeping a power as the use of an eviction moratorium and rejected this "breathtaking" and "unprecedented" claim "of expansive authority." *Ala. Ass'n of Realtors*, 594 U.S. at 765. The authority claimed by the defendants in the present case is even more sweeping, affecting a far larger portion of the economy, and, imposing vastly greater costs on the American public than those landlords suffered as a result of the CDC eviction moratorium (estimated at $26 billion). *See* Ilya Somin, *A Takings Clause Lawsuit Against the CDC Eviction Moratorium,* Reason, Aug.3, 2021.[10]

If Congress had wanted to include broad tariff powers as part of IEEPA's grant of emergency authority, it could have said as much.

In *Alabama Association of Realtors*, the Supreme Court explained that the Centers for Disease Control and Prevention could not unilaterally grant itself control of the nation's housing market by issuing a nationwide eviction moratorium. Such sweeping authority must come, if at all, from Congress. *Ala. Ass'n of Realtors*, 594 U.S. at 760. There, as here, the government's reading of the statute was far too expansive, contending that the statute gave it "broad authority to take whatever measures it deem[ed] necessary to control the spread of COVID-19." *Id*. at 763.

---

[10] Available at https://reason.com/volokh/2021/08/03/a-takings-clause-lawsuit-against-the-cdc-eviction-moratorium/ (noting plaintiffs in Takings Clause case against the eviction moratorium estimated their losses at that amount).

Here, the President's actions indicate that he believes he has the power to impose whatever tariffs he wants on whatever goods from whatever countries at whatever rates he prefers, with no limitations on scope, methodology, timing, or anything else. The Liberation Day Order imposed 10% tariffs on most countries, without taking into account differences in those countries' trade policies, and additional reciprocal tariffs on specific countries based on a simple ratio of the trade deficit in goods (excluding services) as a percentage of total U.S. imports from the given country.[11] Nine days later, the President issued a Memorandum unilaterally pausing the latter "reciprocal" tariffs for 90 days, while simultaneously raising the tariff rate on China to 145%, subject to various exemptions applied by the President without any standards or procedures. "It strains credulity to believe that this statute grants the [President] the sweeping authority that [he] asserts." *Ala. Ass'n of Realtors*, 594 U.S. at 760.

Also, the President's asserted unlimited power to impose tariffs cannot be correct because Congress has elsewhere specified grants of tariff authority to the President. *See* 19 U.S.C. § 2132 (providing limited authority for the President to impose tariffs to correct balance of payments issued); 19 U.S.C. § 1862 (providing a framework under which the President can adjust duties and import restrictions for "safeguarding national security," including a full administrative process in which the Secretary of Commerce, in consultation with the Secretary of Defense, investigates and makes a formal report to the President, who determines whether

---

[11] *See* U.S. Trade Representative, Reciprocal Tariff Calculations, *supra* note 3.

to act on that report, and provision for specific forms of congressional oversight); 19 U.S.C. § 2411 (providing a framework for imposing tariffs when some trading partner is breaking the rules); 19 U.S.C. § 2251 (authorizing the President to protect specific domestic industries by imposing tariffs "which the President determines will facilitate efforts by the domestic industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs").

But the President does not rely on any of these statutes. Instead, he relies on a virtually unlimited authority to impose tariffs under the IEEPA that none of his predecessors have asserted. But that authority doesn't exist; Congress has never passed a statute granting him such authority.

If nothing else, the canon of constitutional avoidance counsels against adopting a radically expansive vision of the President's tariff powers under IEEPA. "Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018); *see also Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."). The President's

preferred interpretation raises substantial constitutional issues regarding the delegation of unlimited authority to the executive. *See* Section I.D.

But a constitutionally dubious reading of IEEPA can be avoided. A straightforward reading of IEEPA shows that it does not grant the President the virtually unlimited power to issue tariffs he asserts; rather, its purpose is to *limit* the President's emergency authority.

### C. Even if IEEPA might authorize some tariffs, it does not authorize the President's Liberation Day tariffs.

And even if IEEPA did grant the President tariff authority, by the statute's explicit terms that authority "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701. As a House of Representatives report leading to the enactment of IEEPA put it: the legislation is based on "a recognition that emergencies are by their nature rare and brief, and are not to be equated with normal ongoing problems." H.R. Rep. No. 95-459, at 65 (1977). The report adds that "[a] national emergency should be declared and emergency authorities employed only with respect to a specific set of circumstances which constitute a real emergency, and for no other purpose . . . . A national emergency should not be a *normal state of affairs*." *Id.* (emphasis added).

The basis of the Liberation Day Order's claimed national emergency is "persistent annual U.S. goods trade deficits." But the persistent annual trade deficits are not unusual or extraordinary, nor are they an emergency. Indeed, they

18

are about as ordinary and usual as one can imagine: the United States has run a net trade deficit at most times since World War II, and consistently since the 1970s. Brian Reinbold, & Yi Wen, *Historical U.S. Trade Deficits*, Federal Reserve Bank of St. Louis (May 17, 2019).[12] The trade deficit is not rare or brief; it is the normal state of affairs. To refer to a state of affairs in existence for five decades as an "emergency," much less an "unusual and extraordinary threat," is to defy any reasonable understanding of the ordinary meaning of these common words.

Nor are trade deficits necessarily a problem; they simply mean that some other country sells lots of things Americans want to buy, or that its people are unwilling or unable to purchase many American goods. Most of those countries are relatively poor, so their citizens generally cannot afford to buy as many relatively high-priced U.S.-made goods as Americans buy from them. The mainstream economic consensus is that trade deficits aren't usually a problem at all, much less an emergency requiring historic tariffs be imposed on every country in the world—including many countries with which the United States has a trade surplus. James McBride and Andrew Chatzky, *The U.S. Trade Deficit: How Much Does It Matter?*, Council on Foreign Relations (2019).[13]

### D.    If IEEPA did authorize the President to impose these tariffs, that would be an unconstitutional delegation of legislative power to the executive.

Even if IEEPA grants the President the authority to impose tariffs that he asserts through the Liberation Day Order—which it does not—such a broad and

---

[12] https://www.stlouisfed.org/on-the-economy/2019/may/historical-u-s-trade-deficits
[13] https://www.cfr.org/backgrounder/us-trade-deficit-how-much-does-it-matter

capricious grant of legislative authority to the executive violates the nondelegation

doctrine. "The Government's theory would give [the President] power to impose

enormous costs that might produce little, if any, discernible benefit." *Indus. Union*

*Dep't*, 448 U.S. at 645. Such an interpretation of IEEPA would constitute a

"sweeping delegation of legislative power" of the kind rejected in previous Supreme

Court cases. *Id.* at 646 (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295

U.S. 495, 539 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)).

The Supreme Court "expect[s] Congress to speak clearly when authorizing an

agency to exercise powers of vast economic and political significance." *Ala. Ass'n of*

*Realtors*, 594 U.S. at 764. If IEEPA allows the President to impose immediate

worldwide tariffs at any rate, at any time, then it allows almost anything,

delegating to the executive plenary power to singlehandedly upend the entire global

economy, void treaty obligations Congress has ratified, and leave the public in a

perpetual state of chaos and uncertainty. This interpretation would render IEEPA

at least the equivalent of the delegations the Supreme Court previously enjoined as

unconstitutional—"one of which provided literally no guidance for the exercise of

discretion, and the other of which conferred authority to regulate the entire

economy on the basis of no more precise a standard than stimulating the economy

by assuring 'fair competition.'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474

(2001).

"The nondelegation doctrine is rooted in the principle of separation of powers

that underlies our tripartite system of Government." *Mistretta v. United States*, 488

U.S. 361, 371 (1989). The opening sentence of the Constitution specifies, "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. The doctrine is at bottom an attempt to take this provision seriously: there are legislative powers to make laws, and "all" such power resides in the Congress. *See Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 74 (2015) (Thomas, J., concurring) ("[T]he separation of powers is, in part, what supports our enduring conviction that the Vesting Clauses are exclusive and that the branch in which a power is vested may not give it up or otherwise reallocate it.").

The President does not have legislative power. The Constitution provides that "[t]he *executive* Power shall be vested in a President." U.S. Const. art. II, § 1, cl. 1 (emphasis added). Implicit in this arrangement is the premise that neither branch may delegate its sphere of power to any other. "The Vesting Clauses, and indeed the entire structure of the Constitution, make no sense [if there is no limit on delegations]." Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 340 (2002). "Supreme Court jurisprudence, from the early days of the Republic, evinces affirmation of the principle that the separation of powers must be respected and that the legislative power over trade cannot be abdicated or transferred to the Executive." *American Institute for Intern. Steel, Inc. v. United States,* 376 F.Supp.3d 1335, 1347 (Ct. Int'l Trade 2019) (Katzmann, J., dubitante).

The premise that these powers must be separated, and delegations avoided, is not a modern invention. It predates the founding. Commentators as far back as the

English Jurist Lord Coke affirmed that the King could not "change any part of the common law, nor create any offence by his proclamation, which was not an offence before, without Parliament." *Ass'n of Am. R.R.*, 575 U.S. at 72 (Thomas, J., concurring) (quoting Case of Proclamations, 12 Co. Rep. 74, 75, 77 Eng. Rep. 1352, 1353 (K.B. 1611)). William Blackstone, in his influential *Commentaries*, likewise argued that when "the right both of making and of enforcing the laws . . . are united together, there can be no public liberty." 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 142 (1765). John Adams, in drafting the Massachusetts state constitution, expressly provided that "[t]he executive shall never exercise the legislative and judicial powers . . . to the end it may be a government of laws and not of men." Mass. Const. pt. 1, art. XXX. James Madison warned, "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many . . .may justly be pronounced the very definition of tyranny." The Federalist No. 47 (James Madison).

Early Supreme Court cases likewise recognize this principle, with Chief Justice Marshall declaring, "It will not be contended that Congress can delegate to the courts, or to any other tribunals, powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825). Indeed, some years later the Court state "that Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892); cf. *J.W. Hampton, Jr. &Co. v. United*

*States*, 276 U.S. 394, 406 (1928) ("it is a breach of the national fundamental law if Congress gives up its legislative powers and transfers it to the President')."

Recognizing these concerns, the Supreme Court has a long-developed doctrine limiting Congress's discretion to delegate its legislative prerogatives. The doctrine works to ensure "that important choices of social policy are made by Congress, the branch of our Government most responsive to the popular will." *Indus. Union Dep't*, 448 U.S. at 685–86 (Rehnquist, J., concurring) (internal citation omitted). Any rulemaking authority delegated by Congress must therefore include an "'intelligible principle' to guide the exercise of the delegated discretion." *Id*. This "ensures that courts charged with reviewing the exercise of delegated legislative discretion will be able to test that exercise against ascertainable standards." *Id. See also Schechter Poultry Corp*., 295 U.S. at 529; *Panama Refining Co*., 293 U.S. at 430.

The basic requirement that derives from the Supreme Court's cases is that "Congress must set forth standards sufficiently definite and precise to enable Congress, the courts, and the public to ascertain whether Congress's guidance has been followed." *Gundy v. United States*, 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting) (quoting *Yakus v. United States*, 321 U.S. 414, 426 (1944)). The onus is on Congress to "expressly and specifically decide the major policy question itself and delegate to the agency the authority to regulate and enforce." *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., statement respecting denial of certiorari). Congress cannot "merely announce vague aspirations and then assign

others the responsibility of adopting legislation to realize its goals." *Gundy*, 588 U.S. at 153 (Gorsuch, J., dissenting).

Of course, "no statute can be entirely precise, and . . . some judgments, even some judgments involving policy considerations, must be left to the officers executing the law and to the judges applying it." *Mistretta*, 488 U.S. at 415 (Scalia, J., dissenting). But this is not a reason to abandon the exercise because courts "may not—without imperiling the delicate balance of our constitutional system—forgo [their] judicial duty to ascertain the meaning of the Vesting Clauses and to adhere to that meaning as the law." *Ass'n of Am. R.R.*, 575 U.S. at 76 (Thomas, J., concurring). Even where a line is not readily apparent, "the inherent difficulty of line-drawing is no excuse for not enforcing the Constitution." *Id.* at 61 (Alito, J., concurring). The failure to enforce these requirements undermines democratic trust and accountability since "the citizen confronting thousands of pages of regulations— promulgated by an agency directed by Congress to regulate, say, 'in the public interest'—can perhaps be excused for thinking that it is the agency really doing the legislating." *Id.* at 62 (Alito, J., concurring) (quoting *Arlington v. FCC*, 569 U.S. 290, 315 (2013) (Roberts, C.J., dissenting)).

Our constitutional structure requires that each Congressional enactment "furnish[ ] a declaration of policy or a standard of action." *Panama Ref. Co.*, 293 U.S. at 416. It falls to Congress, and Congress alone, to "establish primary standards, devolving upon others the duty to carry out the declared legislative policy." *Id.* at 426. Courts, therefore, must reject regimes in which they find "an

absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." *Yakus*, 321 U.S. at 426. The President's assertion of authority here has no meaningful limiting standards, essentially enabling him to impose any tariff rate he wants on any country at any time, for virtually any reason. The power claimed here is clearly legislative authority—indeed, Article I explicitly reserves the setting of tariffs, duties, and other taxes to congress. If the President is to exercise such power at all, he can only do so by receiving a delegation of that enumerated congressional authority.

The President's claim of authority here is even more troubling than other delegations the courts have considered. Many of those prior examples were at least subject to administrative process: there was notice, comments were heard, and time was taken to consider the merits of the proposal. But here the President operated under no such encumbrances and imposed tariffs that went into effect almost immediately.

Delegating this sort of unreviewable, standardless discretion to the executive with no oversight endangers our economy, and ultimately the liberty guaranteed to each of us as citizens, as past failures to uphold these principles should remind us. *See, e.g.*, *Hirabayashi v. United States*, 320 U.S. 81, 104 (1943) (approving the delegation of authority to military commanders to intern citizens of Japanese descent).

This Court should therefore find that any such authority, if it has been granted to the President, is an unconstitutional delegation of legislative power that must be struck down.

## II.    Plaintiffs will suffer irreparable harm if the tariffs imposed by the Liberation Day Order are not enjoined.

"Irreparable harm includes 'a viable threat of serious harm which cannot be undone.'" *Sumecht NA, Inc. v. United States*, 331 F. Supp. 3d 1408, 1412 (Ct. Int'l Trade 2018) (citing *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983)). Although generally claims of financial loss do not constitute irreparable harm, *Sampson v. Murray*, 415 U.S. 61, 90 (1974), "bankruptcy or a substantial loss of business may constitute irreparable harm because those events render a final judgment ineffective and deprive movant of 'meaningful judicial review.'" *Retractable Techs., Inc. v. United States*, 739 F. Supp. 3d 1330, 1340 (Ct. Int'l Trade 2024) (citing *Harmoni Int'l Spice, Inc. v. United States*, 211 F. Supp. 3d 1298, 1307 (Ct. Int'l Trade 2017)). "'Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities' may also constitute irreparable harm in some circumstances." *Id*. (citing *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012)); *see, e.g., Confederación de Asociaciones Agrícolas del Estado de Sinaloa, A.C. v. United States*, 389 F.Supp.3d 1386, 1398 (Ct. Int'l Trade 2019).

Without an injunction issued by this Court, Plaintiffs will suffer irreparable harm.

V.O.S. will suffer irreparable harm from the Liberation Day tariffs. It will be unable to plan its import orders, will suffer harm to its relationships with wholesale

customers and its farmers who produce the wine, will suffer harm to its reputation and goodwill, and eventually will become unable to operate the business. Schwartz Decl. ¶¶ 35–39; *see* Facts Section II.A, above.

Genova Pipe will suffer irreparable harm because of the Liberation Day tariffs. Because of the tariffs, it will be unable to source the raw materials –including plastic resins –and manufacturing equipment that are necessary to manufacture its American-made plastic pipe, conduit, and fittings; its cost of raw materials will increase; it may lose foreign customers, such as those in Canada; and it will suffer harm to its reputation. Reese Decl. at ¶¶ 6–9, 13. *see* Facts Section II.B, above.

MicroKits will suffer irreparable harm to its business because of the Liberation Day tariffs. As a result of the tariffs, MicroKits cannot afford to import component parts for its kits, cannot maintain its inventory necessary for its products, will have to pause operations when it runs out of parts, will have to raise prices and delay hiring, and may be forced to shut down. Levi Decl. ¶¶ 7–17. *see* Facts Section II.C, above.

FishUSA will suffer irreparable harm because of the Liberation Day tariffs. It has been forced to delay imports of some products, pause orders, and postpone expansion projects. Pastore Decl. ¶¶ 21–27. As a result of the tariffs, it has or will lose business opportunities, suffer damage to its reputation, and lose goodwill. *Id*. ¶¶ 24, 26, 28. *see* Facts Section II.D, above.

Terry Cycling will suffer irreparable harm because of the Liberation Day tariffs . Terry Cycling has been forced to increase prices to attempt to mitigate the tariffs

and cannot confirm costs with its wholesale customers, which will result in the loss of business opportunities, harm to reputation and goodwill, and constitute an existential threat to Terry Cycling's business. *Id*. ¶¶ 5, 19, 28–35. *see* Facts Section II.E, above.

### III. The balance of interests weighs in favor of enjoining the tariffs imposed by the Liberation Day Order and an injunction serves the public interest.

As noted, Plaintiffs face irreparable harm in the absence of an injunction. The government, on the other hand, would not be harmed by an injunction preventing it from imposing unlawful tariffs because "[o]f course the government has no legitimate interest in upholding an unconstitutional system" or requirement. *United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971) (Brennan J., concurring).

Moreover, any purported hardship from the loss of funds that would otherwise be generated from the tariffs does not outweigh the injury suffered by the Plaintiffs. Tariffs have not historically been viewed as a primary way to raise revenue since the introduction of income taxes in 1913. *See* Joseph Bishop-Henchman, *High Protective Tariffs Have Been Short-Lived in American History*, Cato Institute, Apr. 8, 2025.[14] And further, the Liberation Day order itself does not cite raising revenue as a justification for the tariffs.

And granting a nationwide injunction is in the public interest. "The public interest is served by ensuring that governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly." *Am. Signature, Inc. v.*

---

[14] Available at https://www.cato.org/blog/high-protective-tariffs-have-been-short-lived-american-history

*United States*, 598 F.3d 816, 830 (Fed. Cir. 2010). Further, granting an injunction would serve the public interest because many other businesses are suffering and will continue to suffer from the Liberation Day tariffs. Small businesses are particularly vulnerable as they are less equipped to absorb these extra costs. Close to two thirds of small businesses have reported that tariffs and other trade issues would hurt their businesses. Ruth Simon, *Small Sellers of Fireworks, Ski Apparel and Other Imports Can't Escape Tariff War*, WALL St. J., Apr. 11, 2025.[15] American consumers, too, will face dire consequences if the tariffs are not enjoined. Prices will increase for nearly every product purchased by everyday Americans. And tariffs are likely to lead to higher inflation, which will decrease the purchasing power of everyday American consumers, exacerbating the effect of the rising cost of consumer goods on American households.[16]

As to any interest the public may have in the policy underlying the Executive Order, "[t]he issuance of an injunction does not undermine that interest, it merely maintains the status quo." *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1372 (Ct. Int'l Trade 2021).

## Conclusion

For the reasons set forth herein, Plaintiffs respectfully request that this Court grant Plaintiffs' Application for Temporary Restraining Order and grant their

---

[15] Available at https://www.wsj.com/economy/trade/smallest-businesses-are-biggest-losers-in-global-tariff-war-f4df62d5
[16] Akrur Barua and Michael Wolf, *Tariffs will impact the economy and so will uncertainty*, Deloitte Global Economics Research Center, April 11, 2025, available at https://www2.deloitte.com/us/en/insights/economy/spotlight/united-states-tariffs-impact-economy.html

Motion for Preliminary Injunction and/or issue summary judgment in favor of Plaintiffs and permanently enjoin the imposition of tariffs set forth in Executive Order 14257, dated April 2, 2025, and grant other just relief as this Court may deem just or proper. A proposed order is attached.

Dated: April 18, 2025

Respectfully submitted,

/s/ Bridget F. Conlan

Jeffrey M. Schwab
Reilly Stephens
James McQuaid
Bridget F. Conlan
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org
rstephens@ljc.org
jmcquaid@ljc.org
bconlan@ljc.org

Ilya Somin
Antonin Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, Virginia 22201
703-993-8069
isomin@gmu.edu

# Certificate of Compliance

I, Bridget Conlan, hereby certify that this brief complies with the 14,000 word limitation of the United States Court of International Trade set forth in Standard Chambers Procedure § 2(B)(1) because this brief contains 7325 words. In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

Respectfully submitted

Dated: April 18, 2025

/s/ Bridget F. Conlan
Bridget F. Conlan
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
bconlan@ljc.org

*Counsel for Plaintiffs V.O.S. Selections, Inc., Plastic Services and Products LLC d/b/a Genova Pipe, Microkits LLC, FishUSA Inc., and Terry Precision Cycling LLC.*

## Certificate of Service

I, Jeffrey Schwab, one of the attorneys for Plaintiffs, certify that the foregoing

document was filed electronically with the Court's Case Management/ Electronic

Case Filing (CM/ECF) system on April 18, 2025. The Court and/or Clerk of Court

may serve and give notice to counsel by CM/ECF electronic transmission.


Respectfully submitted

Dated: April 18, 2025

/s/ Bridget F. Conlan
Bridget F. Conlan
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
bconlan@ljc.org

*Counsel for Plaintiffs V.O.S.
Selections, Inc., Plastic Services and
Products LLC d/b/a Genova Pipe,
Microkits LLC, FishUSA Inc., and
Terry Precision Cycling LLC.*

# Exhibit

# A

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. Selections, Inc., *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> Donald J. Trump, *et al.*, <br><br> Defendants. | Case No. 25-00066 |

## DECLARATION OF VICTOR SCHWARTZ

I, Victor Schwartz, state as follows:

1.  I am a US citizen at least 18 years of age. If called to testify, I would testify as follows:

2.  I am the CEO of V.O.S. Selections, Inc. ("V.O.S.").

3.  V.O.S.is headquartered in New York. It employs 19 people.

4.  V.O.S. imports wines, spirits, and sakes from 16 different countries, including Austria, Italy, Greece, Lebanon, Morocco, Spain, France, Portugal, Mexico, Argentina, Germany, Croatia, Hungary and South Africa.

5.  The products V.O.S. imports are not reasonably available from a supplier in the United States.

6.  V.O.S. represents small family farmers from around the world with a deep connection to their culture. These farmers rely on V.O.S. as dependable partners to properly market their products.

1

7. V.O.S. works with relatively small, artisanal producers who craft products that represent the highest level of authenticity and quality of the place they are from.

8. V.O.S. is cutting edge, bringing to the market producers and regions that the U.S. market may not be familiar with, in furtherance of its motto "Fearless Importing."

9. V.O.S. carries products from six continents in its highly curated portfolio.

10. V.O.S. works directly with suppliers as much as possible, eschewing middlemen when feasible.

11. V.O.S. has a direct, personal relationship with its suppliers, visiting their operations and hosting them in New York.

12. V.O.S. believes in loyalty and continuity, now working with the daughters and sons of a number of its suppliers.

13. V.O.S. believes the best products can only be produced at a certain quantity level; this philosophy carries over into its portfolio and the size of the company, focusing on human connection.

14. Wine produced in different regions of the globe is not fungible due to unique characteristics of taste, texture, and aroma imparted by climate, soil quality, grape varietals, elevation and other factors.

15. The products V.O.S. carries are integrally and inseparably connected to the geography from where they are produced, that is the concept of "terroir."

2

16. A popular wine like Chianti cannot be replicated domestically because the raw ingredients only exist in that specific geographical location in Tuscany, Italy and the wine can only be raised in the specific climate of that place to produce the qualities that a customer seeks when buying a bottle of said wine.

17. While there are wines, sprits, and sakes produced in the United States, they are not equivalent substitutes for those that are produced abroad.

18. The products V.O.S. carries would not be authentic if they were somehow made elsewhere; its customers know this and know the difference.

19. V.O.S. will suffer irreparable harm from fluctuating tariff rates.

20. As a wholesaler of alcoholic beverages, a heavily regulated business, V.O.S. is required to post product prices with the State Liquor Authority a full month in advance, locking V.O.S. into pricing decisions that don't account for sudden, unpredictable tariffs.

21. These prices cannot be changed until the next price posting period; for instance, the final day of price posting for May, in the state of New York, was Monday, April 7 (before the 90-day pause was instituted on April 9).

22. The flux and unknowable amount of the tariffs made this price posting on April 7 an impossible gamble.

23. Even with a 90-day pause announced on April 9 (where the 10% tariff will still be imposed) V.O.S. is left in a quandary due to the need to plan shipments for after that period.

3

24. The increased tariffs make it impossible for V.O.S. to guarantee customers a price on a wine they would like to use beyond that period, through the spring and summer.

25. Tariffs must be paid by V.O.S. upon arrival at the Port of New York, putting a large, immediate, strain on its cash flow.

26. Even if V.O.S. raises the prices to cover the tariffs, V.O.S. will not see the cash from those sales for months.

27. Increased tariffs impact V.O.S. differently than when a supplier raises prices; suppliers provide substantial notice before instituting a price increase, giving V.O.S. time to adjust and V.O.S. gets terms from its international suppliers which are typically around 90 days ex-cellars or from Port of Arrival.

28. V.O.S. has containers of shipments that are expected to arrive during the 10% pause period; when those containers get to port, V.O.S. will need to lay out the 10% tariff-tax immediately upon arrival, on top of the significant, existing taxes and duties V.O.S. already pays on these goods.

29. The reduction in cash flow caused by increased tariffs also necessarily reduces the company's inventory and the level of business that V.O.S. can conduct, leading to an overall reduction in purchase orders placed with both foreign and domestic suppliers.

30. This is devastating to the company's ability to operate and maintain relationships with the farmers who produce the small-production wines, spirits, and sakes, that V.O.S. specializes in.

31. V.O.S. has cultivated relationships with the farmers who produce these wines over the last 39 years, spanning generations in some cases—these relationships will be irreparably harmed by interference from the tariffs.

32. Uncertainty has stopped customers from making buying decisions and caused customers to hold off on orders until the tariff situation has settled.

33. The first quarter of 2025 was one of the worst for V.O.S., with all of its wholesale clients complaining about their weak business level due to uncertainty caused by tariffs. V.O.S. wholesale customers were not buying because their customers were not buying.

34. The uncertainty of the tariffs have caused a constipation in the market at all levels of V.O.S.'s business.

35. This uncertainty also hinders V.O.S.'s ability to plan shipments and select products that fall within the correct price points for its customers.

36. V.O.S. customers have relatively fixed price points for which they seek product. If one of V.O.S.'s products that the customer has been using no longer fits that price point the customer will find something else, and not necessarily a domestic substitute.

37. As a smaller company V.O.S. cannot weather a price war like large companies can.

38. Unexpected increases in tariff rates will wipe out V.O.S.'s profit margin and ultimately make the business inoperable.

5

39. Steep tariffs on foreign-produced wines, spirits and sakes will immediately cause V.O.S. damage to its reputation and goodwill with both its suppliers and customers, as well as lost business opportunities.

Under penalty of perjury, I affirm that the foregoing is true and correct.

Dated: 4/15/25

Victor Schwartz

# Exhibit

# B

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Case No. 25-00066 |

## DECLARATION OF ANDREW REESE

I, Andrew Reese, state as follows:

1. I am a US citizen at least 18 years of age. If called to testify, I would testify as follows:

2. I am the President of Plastic Services and Products, LLC d/b/a Genova Pipe ("Genova Pipe").

3. Genova Pipe is headquartered in Salt Lake City, Utah. It employs 234 people.

4. Genova Pipe makes pipe, conduit, fittings, pipe nipples, and other specialty products for plumbing, irrigation, drainage, and electrical applications.

5. Geneva Pipe imports raw materials from South Korea, Japan, China, Taiwan, Indonesia, and Oman; manufacturing equipment from India, Italy, China, and Taiwan; and finished plumbing goods and steel pipe from China, Taiwan, Indonesia, Thailand, and Vietnam.

1

6. At this time, Genova Pipe cannot domestically secure the raw materials, including plastic resins, and manufacturing equipment that are necessary to manufacture its American-made plastic pipe, conduit, and fittings.

7. Of the two U.S. producers of ABS resin suitable for pipe and fittings made by Genova Pipe, one producer is shutting down its only American plant and the other has been unavailable to supply Genova Pipe with the required resin since 2021. Because the latter supplier has not supplied Genova Pipe since 2021, it is uncertain whether that supplier would, in the future, become available to supply Genova Pipe under mutually agreeable terms.

8. With over 75% of global ABS resin production concentrated in Northeast Asia, Genova Pipe is dependent on imports to continue its manufacturing operations.

9. The tariffs will directly increase the cost of raw materials, manufacturing equipment, and resale goods imported from abroad by Genova Pipe.

10. Genova Pipe has open orders placed before the tariff announcements which are scheduled to arrive in May and June.

11. The estimated additional cost from tariffs on these resin shipments is $274,087, based on the 10% rate.

12. Genova Pipe already manufactures its products in the United States, but further shifts to domestic suppliers are currently unfeasible due to the closure of Ineos-Styrolution's domestic plant and a lack of competitive equipment suppliers in the U.S.

2

13. Genova Pipe's Canadian customers may opt for local suppliers who are not subject to the tariffs, potentially resulting in a large loss of revenue as well as harm to Genova Pipe's reputation and goodwill with customers and suppliers.

Under penalty of perjury, I affirm that the foregoing is true and correct.

Dated: _04 / 17 / 2025_

Andrew Reese

3

# Exhibit

# C

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Case No. 25-00066 |

## DECLARATION OF DAVID LEVI

I, David Levi, state as follows:

1.  I am a US citizen at least 18 years of age. If called to testify, I would testify as follows:

2.  I am the CEO of MicroKits LLC ("MicroKits").

3.  MicroKits is headquartered in Charlottesville, Virginia.

4.  MicroKits makes small educational electronic kits and musical instruments that students and hobbyists can assemble. They are a useful tool to teach students and hobbyists the basics of electrical engineering.

5.  MicroKits employs one part-time worker in addition to David Levi.

6.  MicroKits imports electronic parts from China, Mexico, Thailand, and Taiwan, but final assembly takes place in Charlottesville.

7.  At the current rates, MicroKits cannot order parts from China and will have to pause operations when it runs out of parts.

1

8.  The tariffs on imports from countries other than China will force MicroKits to raise prices—even if the tariffs on Chinese imports didn't force it to pause operations.

9.  Because of the Liberation Day Order and the April 9 Executive Order, MicroKits will likely be unable to order more parts to make its products, which will cause it to furlough its employees, lose money, and potentially go out of business.

10. MicroKits estimates that it currently has enough parts to continue manufacturing operations as usual for 7 weeks before it will have to shut down its U.S. manufacturing.

11. The length of the shutdown is dependent upon the duration of the tariffs; due to an estimated 10 week delay between ordering and receiving imported parts, if the injunction were granted today MicroKits estimates they would shut down for 3 weeks.

12. MicroKits will not be able to produce enough inventory to stay in stock during the crucial Q4 holiday sales season if more parts are not ordered to continue manufacturing.

13. MicroKits cannot afford to pay higher prices for the component parts it orders from China and cannot source the component parts domestically for a reasonable price.

14. MicroKits is currently fighting to compete with Chinese factories that have stolen its code and designs.

15. MicroKits will not be able to compete with copycat versions of its product, made by companies infringing on its intellectual and fully producing their products in China, if it has to pay more for its component parts due to tariffs or if MicroKits runs out of inventory.

16. MicroKits had planned to hire an operations assistant to provide more time for David Levi to design products, but the tariffs have put that plan on hold.

17. MicroKits will suffer irreparable harm to its business absent an injunction due to loss of business opportunities, harm to its reputation and loss of goodwill with consumers.

Under penalty of perjury, I affirm that the foregoing is true and correct.

Dated: 4/16/2025

David Levi

David Levi

# Exhibit

# D

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., *et al.*<br><br>           Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>           Defendants. | Case No. 25-00066 |

## DECLARATION OF DAN PASTORE

I, Dan Pastore, state as follows:

1. I am a US citizen at least 18 years of age. If called to testify, I would testify as follows:

2. I am the President of FishUSA, Inc. ("FishUSA").

3. FishUSA is headquartered in Fairview, Pennsylvania. It employs approximately 70 full and part-time employees.

4. FishUSA produces and sells sportfishing tackle and related gear.

5. FishUSA is a direct importer of many products from foreign countries, including from Canada, China, South Korea, and Kenya.

6. The imports FishUSA relies on are not reasonably available from a United States supplier.

7. FishUSA imports some of its product directly from vendors in Canada, whose product is manufactured in Canada and in other countries.

1

8.  FishUSA also produces its own private label products. For private label products FishUSA goes through a multi-year development process with the manufacturer to source, design, and test before going into production. These private label products include fishing rods, fishing nets, tackle storage and fly boxes, terminal tackle and apparel.

9.  FishUSA purchases fishing tacking from major tackle manufacturers and that product is made all over the world. Much of the fishing tackle available in the United States is manufactured in China and other Asian countries.

10. FishUSA also sells tackle, gear and apparel manufactured by hundreds of different suppliers, including U.S.-based companies or the U.S. divisions of international companies that import their products from foreign countries. Much of this gear is produced in foreign countries, especially China. FishUSA anticipates manufacturers will raise the prices on the products FishUSA purchases due to the tariffs; some have already done so.

11. Many if not most of the products that FishUSA purchases from domestic suppliers are sourced in whole or in part from abroad, meaning that almost all of its inventory sources will be impacted by the tariffs at some level.

12. There is currently no alternative source for cost-effective fishing tackle that is made entirely in the United States, and there is not sufficient time for businesses like FishUSA to develop that infrastructure before the business will face dire consequences.

2

13. It takes many months and in many cases years working with a factory to design FishUSA's private label product. FishUSA cannot just shift this production to the US without starting over.

14. The imposition of tariffs that effectively require FishUSA to shift production to the United States will push back delivery of their product at least months and in many cases years, and the cost will be substantially higher.

15. If FishUSA had the ability to source its products in the United States at a competitive price, it would have already done so.

16. FishUSA would be willing to source products manufactured in the United States, if they were competitively priced to make economic sense for the business; to FishUSA's knowledge, this does not exist currently and would take many years to develop. FishUSA is building a private label rod in the United States, but the cost of the rod is significantly higher than having a comparable rod built overseas.

17. The tariffs have caused FishUSA to delay shipment of finished goods from China due to the unpredictability of the tariff rate that will be imposed when the product arrives.

18. The tariffs have also caused FishUSA to pause production of some products.

19. The chaos created by the uncertain tariffs is preventing FishUSA from growing its business, creating more jobs in the United States, and developing new products for its customers.

20. From the time the order is placed it takes 2-3 months for an order to arrive in the United States; the current state of fluctuating tariff rates means that when

3

FishUSA places an order it is unable to predict what tariff rate it will be required to pay when that order arrives.

21. This level of uncertainty is untenable for a for-profit business; FishUSA needs to know the net cost of its imports before placing an order.

22. Without complete information on its costs, FishUSA cannot determine if a product will be profitable and if it is even worth ordering.

23. Due to this uncertainty, FishUSA has decided to pause some of its orders until there is more clarity on the future of tariffs.

24. FishUSA will suffer damage to its reputation and loss of goodwill in its relationships with suppliers if FishUSA is forced to continue pausing orders and becomes unreliable as a purchaser.

25. There is not sufficient time for FishUSA to develop the necessary supply chain infrastructure before the business will face dire consequences from the inability to keep inventory in stock for its customers.

26. FishUSA has a reputation with its customers as a reliable source of fishing tackle and related gear. FishUSA will lose customers if it is unable to keep inventory in stock on its website.

27. FishUSA has also stopped work on a project in China that was slotted to go into production imminently, because the current tariffs would make that project unworkable.

28. The tariffs are directly causing FishUSA the irreparable harm of lost business opportunities.

Under penalty of perjury, I affirm that the foregoing is true and correct.

Dated: April 15, 2025

Dan Pastore

# Exhibit

# E

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. Selections, Inc., *et al.* | |
| Plaintiffs, | Case No. 25-00066 |
| v. | |
| Donald J. Trump, *et al.*, | |
| Defendants. | |

**DECLARATION OF NIKOLAUS HOLM**

I, Nikolaus Holm, state as follows:

1. I am a US citizen at least 18 years of age. If called to testify, I would testify as follows:

2. I am the President of Terry Precision Cycling, LLC ("Terry Cycling").

3. Terry Cycling is a brand of women's cycling apparel, registered in Delaware with its principal place of business in Burlington, Vermont.

4. Terry Cycling is a family-owned business with 16 employees.

5. The current IEEPA tariffs represent an existential threat more severe than anything Terry Cycling has faced before.

6. Today, Terry Cycling imports finished goods directly from China, Taiwan, Vietnam, Italy and the Philippines.

7. Terry Cycling's US-based manufacturing partner imports fabrics and trims from several other countries including Guatemala, El Salvador, China, and the European Union to produce products domestically for Terry Cycling.

1

8.  Many of the fabric imports Terry Cycling relies on are not reasonably available from a supplier in the United States.

9.  Terry Cycling cannot domestically source its fabrics and finished goods at the quality and price necessary to remain viable in a competitive industry.

10. Terry Cycling has actively explored opportunities to expand its U.S.-based manufacturing. Terry Cycling continues to work with a longstanding domestic partner in Washington State, but despite ongoing efforts, Terry Cycling has not found additional U.S. manufacturers able to meet its product quality standards at a market-competitive price point.

11. Even factoring in the already high tariffs on goods made in China (typically 28–32%), the cost of goods produced abroad has consistently been 30–40% lower than domestic production for Terry Cycling's products.

12. Terry Cycling's saddle products have always been manufactured in Taiwan and Italy, where the expertise, equipment, and quality standards required for this highly technical product exist. Currently, there is no U.S.-based manufacturing for saddles that meets Terry Cycling's performance and quality requirements.

13. U.S. production has always remained part of Terry Cycling's supply chain through a long-standing partnership in Washington State.

14. Terry Cycling would like to expand its domestic manufacturing footprint, but this would require significant time and price increases to its consumers.

15. Over the years, Terry Cycling has absorbed shrinking margins on U.S.-made goods due to ongoing wage inflation with higher margin product from overseas.

16. Currently our margins on our US made products are less than the margins of imported goods. U.S. made products would need to generate higher margins to keep the business financially sustainable.

17. Even if Terry Cycling moved all manufacturing to the United States, under the current tariff regime the tariffs on raw material costs needed for U.S. production will still make US production unstainable without a dramatic increase in prices on goods sold to the consumer

18. Terry Cycling expects to implement some level of tariff mitigation, but the nature of these tariffs—both far-reaching and unpredictable—makes long-term planning nearly impossible for a small business to navigate.

19. Terry Cycling's largest wholesale customer, which represents approximately 14% of projected 2025 revenue, is currently requesting confirmation of fall pricing. Due to the uncertainty surrounding the tariffs, Terry Cycling is unable to confirm costs, and may lose this business if it is forced to increase prices to account for the IEEPA duties.

20. Product development in Terry Cycling's product category is complex and time-intensive; it typically takes 1–2 years to develop a new product with an existing supplier or to onboard a new manufacturing partner.

21. The product development process includes fine-tuning fit, engineering prints, building detailed BOMs (Bills of Materials), and developing production-ready patterns.

3

22. The technical components of product development are handled by Terry Cycling's manufacturing partners, as the business is not large enough to support redundant development resources for each supplier, especially given the unique requirements at every factory.

23. While Terry Cycling is actively exploring options to mitigate tariff impacts, a full-scale shift to new sources of production or tariff-free regions is not a quick or simple solution.

24. The impacts of the tariffs on Terry Cycling have been severe and escalating; Terry Cycling has already paid $25,000 in unplanned tariffs this year for goods where Terry was the importer of record.

25. Terry Cycling projects that the tariffs will cost the company approximately $250,000 by the end of 2025.

26. If no changes are made to current trade policy or its supply chain structure, Terry Cycling will face an estimated $1.2 million in tariff costs in 2026; this amount is not survivable for a business of its size.

27. Tariffs will become the single largest line item operating expense on Terry Cycling's Profit & Loss Statement. It would be larger than payroll.

28. To attempt to manage these increases Terry Cycling has already been forced to pass on costs to consumers by increasing some prices by 30% or more.

29. Terry Cycling's newest high-performance product—the Caicos Short—may need to increase in retail price from $165 to $199 to offset nearly $50 in added duty per unit.

30. Terry Cycling is raising the price of its best-selling Soleil tops by $5 in its upcoming summer catalog.

31. Current price adjustments were made before the full scope of tariff increases became clear; future pricing will need to be even higher.

32. Terry Cycling sells consumer discretionary products, a category that is highly sensitive to price elasticity, particularly in an inflationary environment.

33. The ripple effects of the tariffs will be felt across the entire business and materialize as a decrease in product offerings, constrained seasonal product lines, and reduced availability of inventory for its retail partners.

34. These tariffs are an existential threat to Terry Cycling, and will cause irreparable harm through lost business opportunities, loss of goodwill, and damage to its reputation as a pioneering brand of women's cycling apparel.

35. In the short run, these tariffs are an existential threat to Terry Cycling.

Under penalty of perjury, I affirm that the foregoing is true and correct.

Dated: __4/10/25__                                    _____

                                                              Nikolaus Holm