**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
               THE HONORABLE TIMOTHY M. REIF, JUDGE
               THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC, )<br><br>Plaintiffs, )<br><br>v. )<br><br>DONALD J. TRUMP in his official capacity, EXECUTIVE OFFICE OF THE PRESIDENT, THE UNITED STATES, U.S. CUSTOMS AND BORDER PROTECTION, PETE R. FLORES in his official capacity, JAMIESON GREER in his official capacity, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, and HOWARD LUTNICK in his official capacity, )<br><br>Defendants. ) | Court No. 25-00066 |

**DEFENDANTS' RESPONSE IN OPPOSITION TO
APPLICATION FOR TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

I.   The President's Authority Under IEEPA To Regulate Importation During National
Emergencies ................................................................................................................... 3

II.  Factual Background ...................................................................................................... 6

   A.  Executive Order 14257 and Modification............................................................. 6

ARGUMENT ...................................................................................................................... 8

I.   Plaintiffs Cannot Establish The Likelihood Of Immediate, Irreparable Harm .................. 9

   A.  Plaintiffs Have Not Deposited Estimated Duties For These Tariffs ............................ 10

   B.  Plaintiffs' Feared Economic Harms Are Insufficient To Show Irreparable Harm
   Justifying A Temporary Restraining Order ................................................................ 11

II.  Plaintiffs Are Unlikely To Succeed On The Merits.......................................................... 16

   A.  Plaintiffs Lack Article III Standing.............................................................................. 17

   B.  IEEPA Authorizes The President To Impose Tariffs, Including The Tariffs Contested
   Here................................................................................................................................ 18

      1.  IEEPA's Text, Context, And History Confirm That It Authorizes The President To
      Impose Tariffs ....................................................................................................... 18

      2.  The Tariffs Imposed By Executive Order 14257 Come Within IEEPA's Ambit..... 26

   C.  The Major-Questions Doctrine Does Not Apply Here, And Even If It Did, Congress
   Spoke Clearly When Authorizing The Imposition Of Tariffs Through IEEPA .................. 30

   D.  IEEPA Is A Valid Delegation Of Congressional Authority ......................................... 35

III. The Public Interest And Equities Favor Permitting The President To Exercise Foreign-
Affairs and National-Security Powers To Protect The Nation ................................................ 37

IV.  Any Temporary Restraining Order Should Be Limited Only To Plaintiffs And Would
Require The Posting Of A Bond................................................................................................ 39

CONCLUSION ....................................................................................................................... 41

# TABLE OF AUTHORITIES

**Cases**

*A&W X-Press, Inc. v. FCA US, LLC,*
  2022 WL 2759872 (6th Cir. July 14, 2022)............................................................... 10

*Ala. Ass'n of Realtors v. HHS,*
  594 U.S. 758 (2021)....................................................................................................... 31

*Al-Bihani v. Obama,*
  619 F.3d 1 (D.C. Cir. 2010)........................................................................................ 24

*Alcan Sales v. United States,*
  693 F.2d 1089 (Fed. Cir. 1982)................................................................................. 19

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States,*
  751 F.2d 1239 (Fed. Cir. 1985) ................................................................................. 13

*Am. Inst. for Int'l Steel v. United States,*
  806 F. App'x 892 (Fed. Cir. 2020) ........................................................................... 37

*Asociacion Colombiana de Exportadores de Flores v. United States,*
  717 F. Supp. 847 (Ct. Int'l Trade 1989) ................................................................... 9

*Atari Games Corp. v. Nintendo of America,*
  897 F.2d 1572 (Fed. Cir. 1990) ................................................................................. 10

*Baker v. Carr,*
  369 U.S. 186 (1962)....................................................................................................... 26

*Bd. of Trs. of Univ. of Ill. v. United States,*
  289 U.S. 48 (1933)......................................................................................................... 19

*Beacon Products Corp. v. Reagan,*
  633 F. Supp. 1191 (D. Mass. 1986) .................................................................... 27, 28

*Biden v. Missouri,*
  595 U.S. 87 (2022)......................................................................................................... 32

*Biden v. Nebraska,*
  600 U.S. 477 (2023)....................................................................................................... 35

*Biden v. Texas,*
  597 U.S. 785 (2022)....................................................................................................... 29

*B-W Imports, Inc. v. United States,*
  75 F.3d 633 (Fed. Cir. 1996) ............................................................................... 24, 31

*Chang v. United States,*
859 F.2d 893 (Fed. Cir. 1988) ........................................................................ 27

*Chilean Nitrate Corp. v. United States,*
11 C.I.T. 538 (1987) ....................................................................................... 12

*City and County of San Francisco,*
896 F. 3d 1225 (9th Cir. 2018) ....................................................................... 40

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) .......................................................................................... 17

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States,*
393 F. Supp. 3d 1271 (Ct. Int'l Trade 2019) .................................................... 9

*Corus Grp. PLC v. Bush,*
217 F. Supp. 2d 1347 (Ct. Int'l Trade 2002) ............................................ 12, 13

*Corus Grp. PLC. v. ITC,*
352 F.3d 1351 (Fed. Cir. 2003) .................................................................. 17, 29

*Ctr. for Biological Diversity v. Trump,*
453 F. Supp. 3d 11 (D.D.C. 2020) ................................................................. 27

*Dames & Moore v. Regan,*
453 U.S. 654 (1981) ..................................................................................... 5, 22

*Dep't of Navy v. Egan,*
484 U.S. 518 (1988) ........................................................................................ 31

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ........................................................................................ 33

*Fed. Energy Admin. v. Algonquin,*
426 U.S. 548 (1976) ........................................................................................ 37

*Field v. Clark,*
143 U.S. 649 (1892) ........................................................................................ 34

*Florida v. HHS,*
19 F.4th 1271 (11th Cir. 2021) ....................................................................... 34

*Florsheim Shoe Co., Div. of Interco v. United States,*
744 F.2d 787 (Fed. Cir. 1984) ........................................................ 24, 27, 29, 34

*FMC Corp. v. United States,*
3 F.3d 424 (Fed. Cir. 1993) ............................................................................ 16

*Forest Grove Sch. Dist. v. T.A.*,
    557 U.S. 230 (2009) ................................................................. 21

*Gemveto Jewelry Co. v. Jeff Cooper Inc.*,
    800 F.2d 256 (Fed. Cir. 1986) ................................................... 40

*Georgia v. Public.Resource.Org, Inc.*,
    590 U.S. 255 (2020) ................................................................. 23

*Gibbons v. Ogden*,
    22 U.S. 1 (1824) ...................................................................... 19

*Groves v. Slaughter*,
    40 U.S. 449 (1841) ................................................................... 19

*Gundy v. United States*,
    588 U.S. 128 (2019) ............................................................. 35, 37

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
    174 F.3d 411 (4th Cir. 1999) ..................................................... 10

*Humane Soc. of U.S. v. Clinton*,
    236 F.3d 1320 (Fed. Cir. 2001) ................................................. 24

*In re 650 Fifth Ave. & Related Props.*,
    777 F. Supp. 2d 529 (S.D.N.Y. 2011) ........................................ 27

*Japan Whaling Ass'n v. Am. Cetacean Soc.*,
    478 U.S. 221 (1986) ................................................................. 26

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018) ................................................................. 24

*Lorillard v. Pons*,
    434 U.S. 575 (1978) ................................................................. 21

*Loving v. United States*,
    517 U.S. 748 (1996) ................................................................. 36

*Maine Cmty. Health Options v. United States*,
    590 U.S. 296 (2020) ................................................................. 25

*Maple Leaf Fish Co. v. United States*,
    762 F.2d 86 (Fed. Cir. 1985) ............................................... 17, 34

*Martin v. Mott*,
    25 U.S. 19 (1827) ..................................................................... 26

*Mazurek v. Armstrong*,
 520 U.S. 968 (1997) ............................................................................ 8

*Michael Simon Design, Inc. v. United States*,
 609 F.3d 1335 (Fed. Cir. 2010) ....................................................... 29

*Ninestar Corp. v. United States*,
 687 F. Supp. 3d 1308 (Ct. Int'l Trade 2024) ................................. 15

*Nken v. Holder*,
 556 U.S. 418 (2009) .......................................................................... 38

*Norwegian Nitrogen Prods. Co. v. United States*,
 288 U.S. 294 (1933) .......................................................................... 13

*PrimeSource Bldg. Prods., Inc. v. United States*,
 59 F.4th 1255 (Fed. Cir. 2023) ........................................... 17, 25, 37

*Pulsifer v. United States*,
 601 U.S. 124 (2024) .......................................................................... 20

*Queen's Flowers de Colombia v. United States*,
 947 F. Supp. 503 (Ct. Int'l Trade 1996) ........................................ 13

*Regan v. Wald*,
 468 U.S. 222 (1984) ....................................................................... 5, 22

*Retractable Techs., Inc. v. United States*,
 739 F. Supp. 3d 1330 (Ct. Int'l Trade 2024) .................................. 9

*Riles v. Shell Expl. & Prod. Co.*,
 298 F.3d 1302 (Fed. Cir. 2002) ....................................................... 40

*S. Corp. v. United States*,
 690 F.2d 1368 (Fed. Cir. 1982) ....................................................... 19

*S. J. Stile Assoc. v. Snyder*,
 646 F.2d 522 (C.C.P.A. 1981) ........................................................... 9

*Sampson v. Murray*,
 415 U.S. 61 (1974) ............................................................................ 16

*Sec. Pac. Nat. Bank v. Gov't & State of Iran*,
 513 F. Supp. 864 (C.D. Cal. 1981) ................................................. 22

*Seila Law LLC v. CFPB*,
 591 U.S. 197 (2020) .......................................................................... 30

*Shandong Huarong General Grp. v. United States*,
    122 F. Supp. 2d 143 (Ct. Int'l Trade 2000) ........................................................ 12

*Shenzhen Root Tech. v. Chiaro Tech.*,
    2023 WL 3937394 (W.D. Wash. May 17, 2023) ................................................ 10

*Shree Rama Enterprises v. United States*,
    983 F. Supp. 192 (Ct. Int'l Trade 1997) ................................................ 12, 13, 16

*Silfab Solar, Inc. v. United States*,
    892 F.3d 1340 (Fed. Cir. 2018) ........................................................... 17, 34

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ................................................................................. 18

*Taggart v. Lorenzen*,
    587 U.S. 554 (2019) ................................................................................. 22

*Tex. Dep't of Housing & Comm. Affairs v. Incl. Comms. Project, Inc.*,
    576 U.S. 519 (2015) ................................................................................. 21

*Town of Chester v. Laroe Estates, Inc.*,
    581 U.S. 433 (2017) ................................................................................. 17

*Transpacific Steel LLC v. United States*,
    4 F.4th 1306 (Fed. Cir. 2021) ........................................................... 23, 37

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ........................................................................... 26, 31

*U.S. Auto Parts Network, Inc. v. United States*,
    307 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) ........................................... 9

*United States v. Amirnazmi*,
    645 F.3d 564 (3d Cir. 2011) ................................................................. 28

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936) ................................................................................. 34

*United States v. George S. Bush & Co.*,
    310 U.S. 371 (1940) ................................................................................. 27

*United States v. Shih*,
    73 F.4th 1077 (9th Cir. 2023) ........................................................... 27, 36

*United States v. Spawr Optical Rsch., Inc.*,
    685 F.2d 1076 (9th Cir. 1982) ........................................................... 19, 35

*United States v. White*,
97 F.4th 532 (7th Cir. 2024) ........................................................................ 34

*United States v. Yoshida Int'l, Inc.*,
526 F.2d 560 (C.C.P.A. 1975) ............................................................. passim

*USP Holdings, Inc. v. United States*,
36 F.4th 1359 (Fed. Cir. 2022) ................................................................... 17

*Util. Air Reg. Grp. v. EPA*,
573 U.S. 302 (2014) ..................................................................................... 31

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State*,
454 U.S. 464 (1982) ..................................................................................... 18

*West Virginia v. EPA*,
597 U.S. 697 (2022) ............................................................................. passim

*Wind Tower Trade Coal. v. United States*,
741 F.3d 89 (Fed. Cir. 2014) ......................................................................... 9

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008) ..................................................................................... 9, 38

*Wisconsin Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ....................................................................... 9

*Yakus v. United States*,
321 U.S. 414 (1944) ..................................................................................... 38

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ..................................................................................... 30

*Zenith Radio Corp. v. United States*,
710 F.2d 806 (Fed. Cir. 1983) ....................................................................... 9

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) ..................................................................................... 31

**Constitutional Provisions**

U.S. Const. art. II, §2 ....................................................................................... 39

## Statutes

19 U.S.C. § 1862 ...................................................................................................................... 25

19 U.S.C. § 2132 ...................................................................................................................... 25

19 U.S.C. § 2251 ...................................................................................................................... 25

19 U.S.C. § 2411 ...................................................................................................................... 25

28 U.S.C. § 2643 ...................................................................................................................... 16

28 U.S.C. § 2644 ...................................................................................................................... 16

50 U.S.C. § 1621(a) ................................................................................................................... 4

50 U.S.C. § 1622 ........................................................................................................................ 4

50 U.S.C. § 1641 ........................................................................................................................ 4

50 U.S.C. § 1662 ................................................................................................................... 5, 28

50 U.S.C. § 1701 ................................................................................................................ 29, 31

50 U.S.C. § 1701(a) ................................................................................................................... 5

50 U.S.C. § 1702(a)(1)(B) ................................................................................................. passim

50 U.S.C. § 1702(b) ................................................................................................................... 5

50 U.S.C. § 1703 ........................................................................................................................ 6

50 U.S.C. § 1703(a) ................................................................................................................... 6

50 U.S.C. § 1703(d) ................................................................................................................... 5

First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838, 839-40 (1941) ................................ 3

National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976) .................................... 3

Trading With the Enemy Act, Pub. L. No. 65-91, 40 Stat. 411 (1917) .................................... 3

## Rules

USCIT Rule 65(b) ....................................................................................................................... 8

USCIT Rule 65(b)(2) ........................................................................................................... 10, 11

USCIT Rule 65(c) .................................................................................................... 39

**Executive Orders and Implementing Notices**

Executive Order 12959, *Prohibiting Certain Transactions With Respect to Iran*, 95 Fed. Reg.
    11,694 (May 6, 1995) ...................................................................................... 32

Executive Order 13873, *Securing the Information and Communications Technology Services
    Supply Chain*, 84 Fed. Reg. 22,689 (May 15, 2019) ...................................... 32

Executive Order 14257, *Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices
    That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed.
    Reg. 15,041 (Apr. 7, 2025) ...................................................................... 6, 7, 29

Executive Order 14259 of April 8, 2025, *Amendment to Reciprocal Tariffs and Updated Duties
    as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509
    (Apr. 14, 2025) ................................................................................................. 7

Executive Order 14266 of April 9, 2025, *Modifying Reciprocal Tariff Rates to Reflect Trading
    Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625 (Apr. 15, 2025) ............... 7

**Other Authorities**

Cong. Research Serv., *The International Emergency Economic Powers Act: Origins, Evolution,
    and Use*, R45618 (Jan. 30, 2024) ................................................................. 33

H.R. Rep. No. 95-459 (1977) ........................................................................ 3, 6, 22, 29

*Legal Authorities Available to the President to Respond to A Severe Energy Supply Interruption
    or Other Substantial Reduction in Available Petroleum Prods.*, 6 U.S. Op. Off. Legal Counsel
    644 (1982) ...................................................................................................... 24

Nat'l Bureau of Econ. Research, Douglas A. Irwin, *The Nixon Shock after Forty Years: The
    Import Surcharge Revisited* (2012) ............................................................... 22

Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Gov't Relations, 94th
    Cong. (Mar. 6, 1975) ......................................................................................... 4

*Regulate*, American Heritage Dictionary (1976) ........................................... 19

*Regulate*, Black's Law Dictionary (12th ed. 2024) ....................................... 18

*Regulate*, Black's Law Dictionary (5th ed. 1979) ......................................... 19

*Regulate*, Random House College Dictionary (rev. ed. 1975) ...................... 19

*Regulate*, Webster's Third New International Dictionary (1976) ................................................. 19

S. Rep. No. 94-922 (1976) ................................................................................................................. 3

S. Rep. No. 95-466 (1977) ................................................................................................................. 4

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
THE HONORABLE TIMOTHY M. REIF, JUDGE
THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC, <br><br>           Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP in his official capacity, EXECUTIVE OFFICE OF THE PRESIDENT, THE UNITED STATES, U.S. CUSTOMS AND BORDER PROTECTION, PETE R. FLORES in his official capacity, JAMIESON GREER in his official capacity, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, and HOWARD LUTNICK in his official capacity, <br><br>           Defendants. | Court No. 25-00066 |

**DEFENDANTS' RESPONSE IN OPPOSITION TO
APPLICATION FOR TEMPORARY RESTRAINING ORDER**

**INTRODUCTION**

Plaintiffs' request for a temporary restraining order (TRO) enjoining Executive Order

14257's tariffs should be denied.[1]  Their motion satisfies none of the requirements for that

---

[1]  Pursuant to the Court's April 18, 2025 order, ECF No. 11, defendants respond only to the application for a temporary restraining order.  Defendants intend to file, by the current deadline of May 9, 2025, a response to the motion for a preliminary injunction.  Plaintiffs also move for summary judgment, but this Court should decline to entertain the motion until it rules on the motion for a preliminary injunction, at which point the parties should be allowed to fully brief a motion for summary judgment.

extraordinary remedy.  First, plaintiffs fail to establish that they would be irreparably harmed without a TRO.  They provide no evidence that they have paid tariffs pursuant to the Executive Orders they seek to challenge.  Nor do they show that they plan to pay any tariffs during the 14-day maximum period for a TRO.  Moreover, it is well-established that mere economic injury is insufficient to show irreparable harm.  This is particularly so here, where plaintiffs rely only on conclusory, speculative statements of future economic harm that they fear will occur, not specifically in the next 14 days, but at some unspecified time in the future. That is—at minimum—no basis for seeking a TRO.

Plaintiffs are also unlikely to succeed on the merits.  The Court of Customs and Patent Appeals (CCPA), the predecessor to the Court of Appeals for the Federal Circuit, in *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975), held that materially identical language in IEEPA's predecessor statute clearly authorized imposing tariffs and satisfied the nondelegation doctrine.  That holding—which still binds this Court—alone defeats plaintiffs' request for the extraordinary and drastic remedy of a TRO.

In any event, *Yoshida* was right.  The relevant language in IEEPA authorizes the President to "regulate . . . importation," which clearly includes the authority to impose tariffs, as the CCPA explained.  Through IEEPA, Congress lawfully delegated to the President authority to regulate importation through the imposition of tariffs under specified circumstances.  Plaintiffs' challenge to the President's declaration of a national emergency also fails.  The correctness of a President's declaration of an emergency is non-justiciable.  Nor do the tariffs implicate the major-questions doctrine.  That doctrine does not apply to statutes like IEEPA that delegate power to the President.  It also does not apply to statutes delegating authority in foreign policy or national security.  And even if it did, the tariffs are not a transformative exercise of IEEPA

authority given a previous President's use of a materially identical statute to impose tariffs and given the Federal Circuit's predecessor already holding that a materially identical statute satisfied the nondelegation doctrine. Plaintiffs are thus unlikely to succeed on the merits of any of their claims.

Finally, plaintiffs cannot show that the equities favor them rather than the United States' national security and economic protection. The Court should thus deny plaintiffs' application for a TRO.

## BACKGROUND

I. **The President's Authority Under IEEPA To Regulate Importation During National Emergencies**

The history of IEEPA begins with its predecessor, the Trading With the Enemy Act (TWEA), Pub. L. No. 65-91, 40 Stat. 411 (1917). The statute was first intended for use during wartime, but then expanded to apply during times of peace. *See* First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838, 839-40 (1941). In 1971, President Nixon invoked TWEA during peacetime to impose tariffs. Specifically, he "declared a national emergency with respect to the balance-of-payments crisis and under that emergency imposed a surcharge on imports." H.R. Rep. No. 95-459, at 5 (1977). The Federal Circuit's predecessor upheld the lawfulness of President Nixon's TWEA tariffs. *Yoshida*, 526 F.2d at 575-76.

After President Nixon invoked TWEA to impose tariffs, Congress passed two new laws modifying the President's use of emergency powers: the National Emergencies Act and IEEPA. *See* H.R. Rep. No. 95-459, at 6-7 (1977).

First, the National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976), "establish[ed] procedural guidelines for the handling of future emergencies with provision for regular Congressional review." S. Rep. No. 94-922, at 1 (1976); *see* S. Rep. No. 95-466, at 2

(1977) (explaining that, with certain exemptions, the National Emergencies Act "provides safeguards for the role of Congress in declaring and terminating national emergencies . . . ."). The statute includes directives for Presidential declarations of national emergencies with respect to statutes "authorizing the exercise, during the period of a national emergency, of any special or extraordinary power . . . ." 50 U.S.C. § 1621(a). Congress did not place any conditions on the President's ability to declare a national emergency. Instead, Congress committed this determination to the President, as "it would be wrong to try to circumscribe with words with what conditions a President might be confronted." Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Gov't Relations, 94th Cong. 27 (Mar. 6, 1975) (statement of Sen. Mathias); *see also id.* at 31 ("[W]e didn't attempt to define it specifically because we were afraid we would circumscribe the President's constitutional powers."); *id.* at 27 (statement of Sen. Church) (similar).

Recognizing that a declaration of an emergency would be a political question to be resolved by the political branches, Congress gave itself exclusive oversight authority over the President's national-emergency declaration. For instance, Congress directed that a declaration of a national emergency be "immediately . . . transmitted to the Congress and published in the Federal Register." 50 U.S.C. § 1621(a). Congress also directed the President to comply with congressional reporting requirements pertaining to that declaration. *Id.* § 1641(a)-(c). Congress may terminate a national emergency through a joint resolution that is subject to fast-track procedures, and it is directed to meet "[n]ot later than six months after a national emergency is declared, and [every six months thereafter]," to consider whether the emergency shall be terminated. *Id.* § 1622(a)-(c). A declaration of a national emergency also "terminate[s] on the

anniversary of the declaration" unless the President provides notice to Congress that the emergency "continue[s]." *Id.* § 1662(d).

Second, Congress separated the President's authority to act in wartime and peacetime. Congress modified the existing TWEA so that it applied only in periods of declared wars, and adopted IEEPA, which extended the President's authority to periods of declared national emergencies during peacetime. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). The broad powers granted to the President under IEEPA are "essentially the same as" those under its predecessor TWEA. *Id.*; *see Dames & Moore v. Regan*, 453 U.S. 654, 671-72 (1981) (observing that the operative language of IEEPA was "directly drawn" from the language of TWEA). IEEPA authorizes the President to exercise those powers during peacetime, "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Once the President declares a national emergency relating to such a threat, IEEPA empowers the President to "regulate . . . importation . . . with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B). Unlike TWEA, IEEPA contains narrowly focused exceptions to this broad grant of authority, which, among other things, provide that the President may not regulate or prohibit "the importation from any country . . . of any information or informational materials . . . ." *Id.* § 1702(b)(1)-(4). But none of the exceptions involves the President's authority to impose tariffs to deal with a declared national emergency.

Additionally, through IEEPA, Congress gave itself extensive oversight authority in addition to that afforded by the National Emergencies Act. 50 U.S.C. § 1703(d). The President, when possible, "shall consult with the Congress before exercising" IEEPA authorities "and shall

consult regularly with the Congress so long as such authorities are exercised." *Id.* § 1703(a). The President also is directed to "immediately transmit to the Congress a report" on the national emergency, to be updated every six months. *Id.* § 1703(b)-(c).

Even so, Congress explained that IEEPA's "new authorities should be sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies." H.R. Rep. No. 95-459, at 10 (1977). For instance, Congress rejected a proposal "that it place a definite time limit on the duration of any state of national emergency." *Id.*

## II. Factual Background

### A. Executive Order 14257 and Modification

On April 2, 2025, the President declared a national emergency. He found "that underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States." Executive Order 14257, *Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025). The President found that the emergency "has its source in whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural imbalances in the global trading system." *Id.*

In particular, these "large and persistent annual U.S. goods trade deficits" have "atroph[ied]" our nation's "domestic production capacity" to the point where, now, the United States' "military readiness" and "national security posture" are "compromise[d]"—an

"especially acute" emergency given "the recent rise in armed conflicts abroad." *Id.* at 15,044-45. The Executive Order explains, for instance, that "because the United States has supplied so much military equipment to other countries, U.S. stockpiles of military goods are too low to be compatible with U.S. national defense interests." *Id.* at 15,043. Additionally, "[i]ncreased reliance on foreign producers for goods also has compromised U.S. economic security by rendering U.S. supply chains vulnerable to geo-political disruption and supply shocks." *Id.* (noting the existence of supply disruptions currently being caused by "Houthi rebels . . . attacking cargo ships in the Middle East"). "The future of American competitiveness depends on reversing" the hemorrhaging of manufacturing and manufacturing jobs to create "the industrial base" the nation "needs for national security," as well as safeguarding the vitality of the nation's food and agriculture sectors. *Id.* at 15,044.

Using his broad powers under IEEPA, the President took action to deal with this threat, imposing *ad valorem* duties, ranging from 10 percent to 50 percent, on most imported goods. *Id.* at 15,045. These duties took effect on April 5, 2025, increased duty rates for select countries taking effect on April 9. *Id.* Since the initial declaration, the President has twice taken additional actions that he deemed necessary and appropriate to address this national emergency. Executive Order 14266 of April 9, 2025, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625 (Apr. 15, 2025); Executive Order 14259 of April 8, 2025, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025). In particular, Executive Order 14266 temporarily suspended—for a period of 90 days—application of the country-specific increased additional duty rates listed in Executive Order 14257, except with respect to China (for which the Executive Order raised the rate).

**B.      Plaintiffs Apply For Temporary Restraining Order**

On April 14, 2025, plaintiffs—V.O.S. Selections, Inc. (V.O.S.); Plastic Services and Products, LLC d/b/a Genova Pipe; (Genova Pipe); MicroKits, LLC (MicroKits); FishUSA Inc. (FishUSA); and Terry Precision Cycling, LLC (Terry Cycling)—filed a complaint in this Court. Compl., ECF No. 2.  On April 18, 2025, they filed an application for a temporary restraining order, motion for preliminary injunction, and motion for summary judgment in support of a permanent injunction.[2]  *See generally* Mot.  In their complaint, plaintiffs all purport to be importers.  Compl. ¶¶ 8-12.  However, in their application, they style themselves as "a group of owner-operated businesses that each rely on imports from foreign countries."  Mot. 2.

Plaintiffs allege that IEEPA "does not authorize the President to unilaterally issue across-the-board worldwide tariffs," that imposing tariffs under IEEPA "would be an unlawful delegation of legislative power to the executive," and that "the President's justification does not meet the standards set forth in . . . [ ] IEEPA" because trade deficits "are not an emergency."  *Id.*  As a remedy, plaintiffs request that the Court "[d]eclare the President's unprecedented power grab illegal, [and] enjoin the operation of the executive actions that purport to impose these tariffs under . . . IEEPA."  *Id.*

## ARGUMENT

This Court should deny plaintiffs' TRO motion.  Although USCIT Rule 65(b) allows this Court to issue a TRO, injunctive relief is nonetheless "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis added).  To obtain a

---

[2]  Again, defendants restrict this response only to the application for a temporary restraining order.

TRO, plaintiffs must show that they are "likely to succeed on the merits," they are "likely to suffer irreparable harm in the absence of preliminary relief," "that the balance of equities tips in their favor, "and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *see Wind Tower Trade Coal. v. United States*, 741 F.3d 89, 95 (Fed. Cir. 2014); *U.S. Auto Parts Network, Inc. v. United States*, 307 F. Supp. 3d 1373, 1377 (Ct. Int'l Trade 2018). Plaintiffs' motion satisfies none of the factors.

## I.    Plaintiffs Cannot Establish The Likelihood Of Immediate, Irreparable Harm

Plaintiffs fail to show entitlement to a TRO because they fail to show they "will be immediately and irreparably injured" before the Court can decide the case on the merits, let alone rule on the preliminary-injunction motion. *Asociacion Colombiana de Exportadores de Flores v. United States*, 717 F. Supp. 847, 851 (Ct. Int'l Trade 1989). Critically, "irreparable harm may not be speculative, or determined by surmise." *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*, 393 F. Supp. 3d 1271, 1276 (Ct. Int'l Trade 2019) (citations omitted). As the Federal Circuit has explained, a TRO "will not issue simply to prevent a mere possibility of injury, even where prospective injury is great. A presently existing, actual threat must be shown." *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983) (quoting *S. J. Stile Assoc. v. Snyder*, 646 F.2d 522, 525 (C.C.P.A. 1981)). "A movant must show that the harm is certain to occur and that it is a direct result of the action it is challenging." *Retractable Techs., Inc. v. United States*, 739 F. Supp. 3d 1330, 1340 (Ct. Int'l Trade 2024) (citing *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "Allegations only of what is likely to occur are of no value." *Id.* (cleaned up). The court "should be wary of issuing an injunction based solely upon allegations and conclusory affidavits

submitted by plaintiff." *Atari Games Corp. v. Nintendo of America*, 897 F.2d 1572, 1575 (Fed. Cir. 1990).

### A.    Plaintiffs Have Not Deposited Estimated Duties For These Tariffs

Plaintiffs have failed to present any actual evidence that they will experience immediate, irreparable harm absent the entry of a TRO, particularly before this Court can rule on the preliminary-injunction motion.  Indeed, no plaintiff has provided evidence it has even *paid* additional duties pursuant to the April 2nd and 9th Executive Orders.  And none say that they plan to pay duties in the next 14 days—the typical maximum duration of any temporary restraining order issued under USCIT Rule 65(b)(2).  *See, e.g.*, *A&W X-Press, Inc. v. FCA US, LLC*, 2022 WL 2759872, at *3 (6th Cir. July 14, 2022) (TRO's "purpose" is to give "a court time to determine whether a preliminary injunction is warranted."); *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999) (TROs and preliminary injunctions perform "different functions."); *Shenzhen Root Tech. v. Chiaro Tech.*, 2023 WL 3937394, at *3 (W.D. Wash. May 17, 2023) ("Aside from ordinary lost-revenue concerns (which could perhaps be compensable through money damages), Plaintiff has not demonstrated that the harms asserted are so immediate and irreparable that they will occur in the period between this order and a future preliminary-injunction hearing." (cleaned up)).

Terry Cycling appears to be the only plaintiff claiming to have already paid increased duties, asserting that it has "already paid $25,000 in unplanned tariffs this year for goods where Terry was the importer of record."  Mot. Exh. E ¶ 24.  But Terry Cycling does not claim that these tariffs relate to those imposed by the April 2nd and 9th Executive Orders—the only tariffs plaintiffs explicitly contest.  *See* Compl. Prayer for Relief (asking the Court to enjoin only the operation of the April 2nd and 9th Executive Orders); Mot. 1 (asking the Court to enjoin the

Government from "enforcing the tariffs imposed by Executive Order 14257"). And a search by U.S. Customs and Border Protection using the importer of record number associated with Terry Cycling indicates that it has not paid tariffs related to the April 2nd Executive Order. Nor has Terry Cycling provided any evidence that it has imported or will imminently import goods that are subject to those tariffs. *See* Mot. Exh. E ¶ 25 (alleging only that the tariffs will cost it approximately $250,000 by the end of 2025).

Genova Pipe, meanwhile, claims that it has orders "scheduled to arrive in May and June" and that estimated additional costs on those orders will be $274,087. Mot. Exh. B ¶¶ 10-11. But the company provides no detail as to when in May or June the orders are expected to arrive at the border, when it will be required to deposit estimated duties for those orders, or how it arrived at the $274,087 amount. Genova Pipe's conclusory, speculative allegations do not suffice for a finding of immediate irreparable harm warranting a temporary restraining order. *Atari Games*, 897 F.2d at 1575. For its part, V.O.S. asserts that it has "containers of shipments that are expected to arrive during the 10% pause period," Mot. Exh. A. ¶ 28, but gives even less detail than Genova Pipe, again failing to demonstrate that any threat of harm is immediate or within the 14-day period of a TRO. USCIT Rule 65(b)(2).

Last, MicroKits and FishUSA do not even claim that they intend to import goods subject to the tariffs within any particular period. Given this, the Court need proceed no further in its harm analysis.

**B.    Plaintiffs' Feared Economic Harms Are Insufficient To Show Irreparable Harm Justifying A Temporary Restraining Order**

Even if plaintiffs were liable for duties pursuant to the Executive Orders, they still cannot show irreparable harm because the speculative statements in their declarations show only the possibility of future economic loss, which this Court has held is insufficient to show irreparable

harm.  *See*, *e.g.*, *Corus Grp. PLC v. Bush,* 217 F. Supp. 2d 1347, 1355 (Ct. Int'l Trade 2002)

(threat of "economic injury" does not constitute irreparable harm).  In *Corus*, despite testimony

that "sound business principles would require [the company] to close the plant rather than

operate at a loss," the Court concluded that the plaintiff had failed to establish irreparable harm

because there was no evidence the plant was "in danger of imminent closure."  *Id.*

      Similarly, this Court found failure to establish irreparable harm when a plaintiff

submitted an affidavit from its "major customer" in the United States stating that it would cancel

all existing and future orders if cash deposits were required.  *Shandong Huarong General Grp. v.

United States*, 122 F. Supp. 2d 143, 146-47 (Ct. Int'l Trade 2000).  Noting that "affidavits

submitted by interested parties are weak evidence, unlikely to justify a preliminary injunction,"

the Court found that the plaintiff did not meet its burden because the affidavits were not

supported by evidence "indicating exactly how and when these lost sales would force it out of

business."  *Id.* at 147 (cleaned up).

      The Court also found no irreparable harm in a case where a plaintiff claimed "significant

and permanent monetary injury as a consequence of posting large cash deposits" arising from a

countervailing duty proceeding.  *Shree Rama Enterprises v. United States*, 983 F. Supp. 192, 195

(Ct. Int'l Trade 1997) (quoting *Chilean Nitrate Corp. v. United States*, 11 C.I.T. 538, 540

(1987)).  There, the plaintiffs submitted affidavits "describing the anticipated effect of increased

deposit rates"—including that the new rates would "affect between 59 and 81 percent of

plaintiffs' sales revenues."  *Id.*  The affidavits included customer letters and descriptions of

conversations stating that they had or would switch suppliers rather than pay the higher deposit

rates—which, according to plaintiffs, could "eliminate[]" certain exporters from the U.S. market.

*Id.*  The Court found this showing was "insufficient."  *Id.*  Unlike one case in which plaintiffs

established "immediate extinction," *id.* (citing *Queen's Flowers de Colombia v. United States*, 947 F. Supp. 503, 507 (Ct. Int'l Trade 1996)), the Court held that the *Shree Rama* plaintiffs did not meet the standard for showing irreparable harm, *id.* The Court explained that even allegations of bankruptcy would be "weak evidence" if based on affidavits from interested parties—absent "evidence from independent sources" or "hard evidence" of the serious permanent harm that would result. *Id.*

The theme is clear: As explained in *Corus,* "[e]very increase in duty rate will necessarily have an adverse effect on foreign producers and importers," but if "the court were to find irreparable harm under these facts, the court would likely be required to do so in any challenge to a duty increase because every plaintiff could argue that increased tariffs would cause revenue shortfalls possibly resulting in either operating at a loss or plant closure at some future date." 217 F. Supp. 2d at 1355. Thus, "the mere threat of an adverse economic impact" cannot establish irreparable harm because it would "effectively create a *per se* irreparable harm rule in similar challenges-a result likely contrary to the extraordinary nature of the remedy." *Id.*

This analysis makes even more sense when read against the backdrop of the country's international trade system. There is no right to import and no "protectable interest to engage in international trade." *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1250 (Fed. Cir. 1985); *see Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 318 (1933) ("No one has a legal right to the maintenance of an existing rate or duty."). To establish harm under these parameters, plaintiffs must at least show actual harm, but plaintiffs here do no more than speculate as to mere adverse economic impact, falling short of the threshold required for a finding of irreparable harm.

Like in *Corus*, *Shandong Huarong*, and *Shree Rama*, plaintiffs in this case cannot establish irreparable harm. First, plaintiffs fail to provide any "hard evidence" that they face immediate extinction absent a temporary restraining order. Instead, their declarations reflect no more than speculative concerns as to the effects the tariffs may eventually have on aspects of their businesses. For example, V.O.S. contends that the 90-day pause will leave it in a "quandary" as to how to plan shipments for after the 90-day period, that it expects to pay the existing 10 percent tariffs when its shipments arrive at ports of entry at some unspecified date, and that a tariff increase will "wipe out V.O.S.'s profit margin and ultimately make the business inoperable." Mot. Exh. A ¶¶ 23, 28, 38.

MicroKits, meanwhile, claims that the tariffs will make it "likely [to] be unable to order more parts to make its products, which will cause it to furlough its employees, lose money, and potentially go out of business" and that it "will not be able to produce enough inventory to stay in stock during the crucial Q4 holiday sales season" if it does not order more parts. *Id.* Exh. C ¶¶ 9, 12.

Terry Cycling asserts that, "[d]ue to the uncertainty surrounding the tariffs, [it] is unable to confirm costs, and may lose" business from a customer, and that "tariffs will cost the company approximately $250,000 by the end of 2025," and that it "will face an estimate $1.2 million in tariff costs in 2026; this amount is not survivable for a business of its size." *Id.* Exh. E ¶¶ 19, 26. Plaintiffs' generalized and speculative allegations come nowhere close to establishing that plaintiffs are at real and immediate risk of extinction, and do not constitute "hard" or "independent" evidence of serious, imminent harm. Indeed, they do not even rise to the level of evidence submitted in *Shandong Huarong* and *Shree Rama*, in which the Court still found that

14

plaintiffs had failed to establish irreparable harm sufficient for a preliminary injunction—let alone for the even-more-immediate relief of a temporary restraining order.

Genova Pipe and FishUSA provide even more attenuated claims of harm than the other three plaintiffs. Genova Pipe estimates it will need to pay $274,087 in duties resulting from the tariffs in "May and June" and that its customers "may opt for" other suppliers, "potentially resulting in a large loss of revenue." *Id.* Exh. B. ¶¶ 10-11, 13. FishUSA states that "[t]he chaos created by the uncertain tariffs is preventing FishUSA from growing its business," that the "level of uncertainty is untenable for a for-profit business," and that it "has decided to pause some of its orders until there is more clarity on the future of tariffs." *Id.* Exh. D ¶¶ 19, 21, 23. Genova Pipe's and FishUSA's declarations are entirely devoid of the sort of detail this Court has held is needed to establish certain, imminent harm.

Plaintiffs also claim they will experience loss of goodwill and reputational harm, but they provide no concrete evidence or additional detail beyond conclusory, unsupported statements. *See, e.g.*, Mot. Exh. B ¶ 13 ("Genova Pipe's Canadian customers may opt for local suppliers . . . potentially resulting in . . . harm to Genova Pipe's reputation and goodwill"), Exh. C ¶ 17 ("MicroKits will suffer . . . harm to its reputation and loss of goodwill"), Exh. D ¶ 24 ("FishUSA will suffer damages to its reputation and loss of goodwill . . . if FishUSA is forced to continue pausing orders"), Exh. E ¶ 34 ("These tariffs . . . will cause . . . loss of goodwill, and damage to its reputation"). These vague allegations do not include evidence as to precisely *how* the tariffs pose an immediate threat to plaintiffs' reputation and goodwill, and do not establish enduring, irreparable reputational harm. *See Ninestar Corp. v. United States*, 687 F. Supp. 3d 1308, 1340-41 (Ct. Int'l Trade 2024) (finding no irreparable harm because the plaintiff "has not offered the [requisite] quantum of evidence here to show that the loss of its reputation is irreparable absent a

15

preliminary injunction" even though the plaintiff provided multiple pieces of evidence showing that business intended to distance themselves due to allegations of forced labor).  Plaintiffs also fail to explain how they would sustain any of these harms absent their own business decisions made as a result of lost earnings—which are not sufficient to show irreparable harm, given that "temporary loss of income" does not generally constitute irreparable harm.  *See Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Finally, plaintiffs fail to explain how monetary compensation would be inadequate.  For plaintiffs who will actually pay tariffs, were they to ultimately prevail, they could receive back any duties or tariffs they paid on any unliquidated entries.  28 U.S.C. § 2643-44.

And, even if future entries are liquidated, defendants do not intend to oppose the Court's authority to order reliquidation of entries of merchandise subject to the challenged tariffs if the tariffs are found in a final and unappealable decision to have been unlawfully collected.  Such reliquidation would result in a refund of all duties determined to be unlawfully assessed, with interest.  *See* Joint Proposed Stipulation, *Auxin Solar, Inc. v. United States*, Ct. Int'l Trade No. 23-274, ECF No. 19; Joint Proposed Stipulation, *Retractable Technologies, Inc. v. United States*, Ct. Int'l Trade No. 24-185, ECF No. 68.

## II.    Plaintiffs Are Unlikely To Succeed On The Merits

Because plaintiffs have failed to demonstrate immediate irreparable harm, this Court need not consider the other factors at this stage.  *See Shree Rama*, 983 F. Supp. at 195-96 (finding it unnecessary to "discuss the remaining" injunctive factors in depth when "plaintiffs have failed to establish irreparable harm"); *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) (holding that the "absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial" of

preliminary relief).  But even if the Court examines the other factors, plaintiffs are unable to

establish likely success on the merits, so they still fail to show entitlement to a TRO, especially

in this context, where plaintiffs challenge *the President's* action.  "In international trade

controversies of this highly discretionary kind—involving the President and foreign affairs—this

court and its predecessors have often reiterated the very limited role of reviewing courts."  *Maple*

*Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985).  "For a court to interpose, there

has to be a *clear* misconstruction of the governing statute, a significant procedural violation, or

action outside delegated authority."  *Id.* (emphasis added); *see, e.g.*, *Corus Grp. PLC. v. ITC*, 352

F.3d 1351, 1361 (Fed. Cir. 2003); *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed.

Cir. 2018); *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1365 (Fed. Cir. 2022);

*PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1260 (Fed. Cir. 2023).

### A.  Plaintiffs Lack Article III Standing

This Court lacks jurisdiction to entertain plaintiffs' claims because they have failed to

establish Article III standing.  Standing is not "dispensed in gross."  *Town of Chester v. Laroe*

*Estates, Inc.*, 581 U.S. 433, 439 (2017) (quotation omitted).  Instead, "a plaintiff must

demonstrate standing for each claim he seeks to press and for each form of relief that is sought."

*Id.*  (quotation omitted).  As part of that demonstration, a plaintiff must at least plausibly allege

that he "has sustained or is immediately in danger of sustaining some direct injury as a result of

the challenged official conduct."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (cleaned

up).

As explained above, no plaintiff has offered evidence that it has *actually paid* tariffs

pursuant to the Executive Orders.  Nor do plaintiffs' allegations establish a sufficiently imminent

future injury for Article III standing.  These facts should be enough for the Court to find that

plaintiffs lack standing. At the very least, the Court should hold that FishUSA and MicroKits lack standing, given that they do not even allege that they intend to import articles subject to the tariffs within any particular period of time. *See, e.g.*, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (holding that, for a plaintiff to establish injury in fact, the injury in fact must be "real, not abstract"); *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 482 (1982) (standing is "not satisfied by the abstract injury" because it is not sufficiently direct) (cleaned up).

**B. IEEPA Authorizes The President To Impose Tariffs, Including The Tariffs Contested Here**

      **1.    IEEPA's Text, Context, And History Confirm That It Authorizes The President To Impose Tariffs**

The President imposed the challenged tariffs under the authority granted to him by IEEPA to "regulate . . . importation" to deal with a national emergency. 50 U.S.C. § 1702(a)(1)(B). The President has properly declared a national emergency, and IEEPA clearly authorizes the President to impose tariffs. Text, context, and history compel this conclusion.

IEEPA's plain text authorizes the President to impose tariffs. Section 1702 authorizes the President to:

> investigate, block during the pendency of an investigation, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in … *any property* in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702(a)(1)(B) (emphases added). Imposing tariffs on foreign goods falls within the power to "regulate . . . importation" of foreign goods. *Id.* Tariffs control how often, and on what terms, foreign goods enter the United States. That is consistent with the definition of "regulate," both now and when IEEPA was enacted. *See Regulate*, Black's Law Dictionary (12th ed. 2024)

("To control (an activity or process) esp. through the implementation of rules"); *Regulate*, Black's Law Dictionary 1156 (5th ed. 1979) ("[F]ix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws"); *Regulate*, Random House College Dictionary 1112 (rev. ed. 1975) ("[T]o control or direct by a rule, principle, method, etc."); *Regulate*, American Heritage Dictionary (1976) ("To control or direct according to a rule"); *Regulate*, Webster's Third New International Dictionary (1976) ("[T]o govern or direct according to rule; to bring under the control of law or constituted authority").

Precedent confirms this straightforward reading of the text. Interpreting identical relevant language in TWEA, the Federal Circuit's predecessor upheld a tariff imposed by President Nixon, explaining that the phrase "regulate importation" permitted the President to "impos[e] an import duty surcharge." *Yoshida*, 526 F.2d at 576; *accord Alcan Sales v. United States*, 693 F.2d 1089, 1093 (Fed. Cir. 1982); *United States v. Spawr Optical Rsch., Inc.*, 685 F.2d 1076, 1081 n.10 (9th Cir. 1982). That precedent remains binding today. *See S. Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982). Courts have likewise long held that tariffs are a form of regulation of commerce. *See, e.g.*, *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 58 (1933) (recognizing that it is "well established" that import duties may be imposed "in the exercise of the power to regulate commerce"); *Groves v. Slaughter*, 40 U.S. 449, 505 (1841) (McLean, J., concurring) ("Under the power to regulate foreign commerce, [C]ongress [may] impose duties on importations."); *Gibbons v. Ogden*, 22 U.S. 1, 202 (1824) ("[D]uties may often be, and in fact often are, imposed on tonnage, with a view to the regulation of commerce."). IEEPA expressly granted the President the power to "regulate . . . importation" of "any property in which any foreign country or a national thereof has any interest" and

accordingly vested the President with authority to impose tariffs on such property, as the Federal Circuit's predecessor already held when consider the same language in IEEPA's predecessor statute.

Statutory context reinforces this conclusion. The power to "regulate" imports by imposing tariffs is similar to the other powers granted in IEEPA's subsection (a)(1)(B), like the power to "block" the import of goods during an investigation, or the power to "prevent or prohibit" those imports. 50 U.S.C. § 1702(a)(1)(B). Each term grants the President a significant power over foreign commerce. And many partially or fully overlap, suggesting that Congress entrusted the President with wide-ranging powers with respect to imports rather than carefully picking and choosing isolated types of interventions. For example, the provision's list of powers includes two obvious pairs of belt-and-suspenders terms: "direct and compel" and "prevent or prohibit." *Id.* It confers the overlapping powers to "nullify" and "void" various transactions. *Id.* And the power to "prevent or prohibit" imports could be used to "block" imports during an investigation, but the statute goes out of its way to grant both powers. *Id.*

Regardless, attempting to read § 1702(a)(1)(B)'s list as enumerating discrete powers instead of covering the waterfront would lead to the same conclusion about "regulation." If each power articulated in the list is distinct, then "regulation" of imports must include actions such as tariffs; otherwise, it would mean little if anything other than the power to "prevent or prohibit" imports—leaving the term largely superfluous. *See, e.g.*, *Pulsifer v. United States*, 601 U.S. 124, 141-43 (2024) (rejecting reading that would leave a provision "superfluous," "without any operative significance"). Plaintiffs also claim that the President, in issuing the Executive Orders, is not complying with the provision of § 1702(a)(1)(B) allowing the President to, "by means of instructions, licenses, or otherwise" "regulate . . . importation" because a tariff is not an

"instruction" or "license."  Mot. 11.  But these terms also appeared in TWEA, and *Yoshida* rejected that they did not include the President's action to impose tariffs.  *See* 526 F.2d at 576. And for good reason: there is simply no reasonable way to construe the Executive Orders *except* as instructing agencies to implement the President's regulation of importation through the tariffs.[3]

Plaintiffs misinterpret IEEPA's history, which in fact further confirms that IEEPA authorizes the President to impose tariffs.  "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."  *Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *see Tex. Dep't of Housing & Comm. Affairs v. Incl. Comms. Project, Inc.*, 576 U.S. 519, 536 (2015); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 243 n.11 (2009).  Congress drew the relevant language directly from a predecessor statute, TWEA, and did so *after* the CCPA interpreted identical language to uphold the President's levying of tariffs in 1975.  During the legislative process for IEEPA, Congress was well aware of the relevant language and the court's decision interpreting the language to authorize the President to impose tariffs, but Congress chose to keep the language when it enacted IEEPA in 1977.

Start with the key language in IEEPA, "regulate . . . importation."  50 U.S.C. § 1702(a)(1)(B).  That language was copied verbatim from TWEA.  *See* Dec. 18, 1941, ch. 593,

---

[3] Plaintiffs also contend that the term "otherwise" should be read as limited by the terms that precede it.  Mot. 11.  Because the executive orders are "instructions," this argument does not matter.  Even so, "or otherwise" should be construed as intentionally broad, in order to encompass all the ways in which the President can exercise his powers under the statute. To conclude otherwise would violate *Yoshida*, which squarely rejected the same arguments plaintiffs make here and instead concluding that plaintiffs' reading would "require a re-writing, in effect, of" TWEA's materially identical language and require "violat[ing] a basic rule of statutory construction."  526 F.2d at 576.

title III, § 301, 55 Stat. 839 (authorizing the President to "investigate, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in . . ." (emphases added)). Courts, including the Supreme Court, have repeatedly recognized the close relationship between IEEPA and TWEA and that IEEPA's scope is essentially the same as TWEA's. *See, e.g.*, *Dames*, 453 U.S. at 671-72 (the pertinent section of IEEPA's language was "directly drawn" from TWEA); *Regan*, 468 U.S. at 227-28 ("[T]he authorities granted to the President [under] IEEPA are essentially the same as those [under] TWEA."); *Sec. Pac. Nat. Bank v. Gov't & State of Iran*, 513 F. Supp. 864, 875, 877 (C.D. Cal. 1981) (Section 1702 of "IEEPA is, except for stylistic changes, a reenactment of the powers previously conferred on the President by § 5(b) of the TWEA.").

Congress was well aware of *Yoshida*'s interpretation of TWEA when it chose to use the same language in IEEPA. President Nixon's use of TWEA to impose tariffs provoked outcry, becoming known as the "Nixon shock." *See, e.g.*, Nat'l Bureau of Econ. Research, Douglas A. Irwin, *The Nixon Shock after Forty Years: The Import Surcharge Revisited* (2012). Nor was TWEA's role or its interpretation unfamiliar to Congress. To the contrary, the House Report on IEEPA specifically cited *Yoshida* and explained its holding. H.R. Rep. No. 95-459 at 5. It recounted that "section 5(b) [of TWEA] came into play when . . . President Nixon declared a national emergency . . . and under that emergency imposed a surcharge on imports," that the Customs Court invalidated the action after holding that "section 5(b) . . . did not" permit "imposition of duties," but that "the Appeals Court reversed." *Id.* Aware of that history, Congress chose to adopt the same language in IEEPA. *See, e.g.*, *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) ("When a statutory term is obviously transplanted from another legal source, it

brings the old soil with it." (cleaned up)); *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 270 (2020); *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1329 (Fed. Cir. 2021) (requiring a "'clear indication from Congress'" that same language does not have same meaning).

Plaintiffs come to the entirely wrong conclusion about this history, contending that Congress passed IEEPA to take away power previously asserted by the President.  Mot. 11.  But Congress limited the President's power by specifying specific procedural directives and delineating specific exceptions to the otherwise broad grant of authority under IEEPA—none of which curtailed the President's authority to impose tariffs to deal with a declared national emergency.  Congress *knew* that TWEA had been used to impose tariffs, yet chose to use the same language that conferred that authority, without providing an exception limiting their imposition.

Finally, IEEPA's evident purpose confirms that it includes the power to impose tariffs. The purpose of emergency statutes, like IEEPA, is to give the President broad and flexible powers to effectively address problems associated with a national emergency.  *See Yoshida*, 526 F.2d at 573 ("[T]he primary implication of an emergency power is that it should be effective to deal with a national emergency successfully.  The delegation in [TWEA] is broad and extensive; it could not have been otherwise if the President were to have, within constitutional boundaries, the flexibility required to meet problems surrounding a national emergency with the success desired by Congress.").  Indeed, "the legislative history of [IEEPA] notes that the authorities available to the President should be sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies." *Legal Authorities Available to the President to Respond to A Severe Energy Supply Interruption or Other Substantial*

*Reduction in Available Petroleum Prods.*, 6 U.S. Op. Off. Legal Counsel 644, 681 (1982) (quotation omitted). Interpreting IEEPA to include the power to impose tariffs furthers Congress's purpose to give the President the necessary tools and flexibility to effectively handle national emergencies.

Especially in this context. In the context of foreign affairs and national security, "broad grants by Congress of discretion to the Executive are common." *Florsheim Shoe Co., Div. of Interco v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984). IEEPA "is intimately involved with foreign affairs, an area in which congressional authorizations of presidential power should be given a broad construction and not hemmed in or cabined, cribbed, confined by anxious judicial blinders." *Id.* at 793 (cleaned up); *see, e.g.*, *B-W Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996) ("[T]he principle that statutes granting the President authority to act in matters touching on foreign affairs are to be broadly construed"); *Al-Bihani v. Obama*, 619 F.3d 1, 39 (D.C. Cir. 2010) (Kavanaugh, J., concurring). When foreign affairs and national security are involved, "the President plays a dominant role," and "it is generally assumed that Congress does not set out to tie the President's hands; if it wishes to, it must say so in clear language." *Humane Soc. of U.S. v. Clinton*, 236 F.3d 1320, 1329 (Fed. Cir. 2001). Plaintiffs cannot point to clear language cabining the President's authority. Quite the opposite—text, history, and context all show that IEEPA authorizes the President to impose tariffs.

Plaintiffs seek a narrower reading by invoking constitutional avoidance. Mot. 17-18. But, as explained below, there is no nondelegation problem to avoid. Nor would a constitutional-avoidance reading be possible here, where Congress has spoken clearly to authorize the President to impose tariffs. *See, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (constitutional avoidance only appropriate when a statute has "more than one plausible construction").

24

Plaintiffs also seek to narrow IEEPA's plain text by pointing to other statutes that use different language and also allow the President to impose tariffs in certain circumstances. Mot. 16-17 (discussing the President's powers under 19 U.S.C. §§ 1862, 2132, 2411, and 2251). But the fact that Congress has elsewhere used narrower, more specific language to convey a power says little about the meaning of the broader language it used in TWEA. Nor does the existence of a statute permitting the President to impose tariffs to address balance of payment issues somehow narrow the scope of the later-enacted IEEPA. Mot. 16 (citing 19 U.S.C. § 2132). That earlier-enacted statute cannot narrow IEEPA; when statutes irreconcilably conflict, it is the *later* enactment that prevails. *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 315-16 (2020). Nor is there any conflict here. Section 2132 permits non-emergency tariffs to address balance of payment issues; IEEPA provides broad emergency powers, including tariffs, to address a variety of threats. Indeed, *Yoshida* already rejected the idea that statutes applicable in non-emergency situations can narrow the powers available in an emergency. *See* 526 F.2d at 578 ("trade acts" that do not involve "national emergency powers" did not narrow TWEA's scope). Congress provided multiple types of Presidential authority to meet the many types and severity of crises faced by the nation. Indeed, it would be passing strange to conclude in the field of national security and foreign relations, where sensitive judgments and the calibrated use of authority are necessary to provide the Executive Branch with flexibility, that Congress intended to limit the President's authority when "regulate . . . importation" has been interpreted to provide a range of permissible powers. At bottom, plaintiffs cannot show that the action here is a "clear misconstruction" of IEEPA. *PrimeSource*, 59 F.4th at 1260.

2.      **The Tariffs Imposed By Executive Order 14257 Come Within IEEPA's Ambit**

Plaintiffs claim that IEEPA, even if authorizing tariffs as a regulation of importation, does not authorize tariffs in response to what the President determined to be an unusual and extraordinary threat.  This argument fares no better.  Mot. 18-19.  The question whether a threat is unusual or extraordinary is reviewable only by Congress, as set out in the National Emergencies Act and IEEPA itself.

"Cases" and "controversies" that contain "a textually demonstrable constitutional commitment of the issue to a coordinate political department," *Baker v. Carr*, 369 U.S. 186, 217 (1962), or "revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch," *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986), are political questions beyond the courts' authority to resolve.  *See Baker*, 369 U.S. at 217.  Such deference is particularly critical in cases involving national emergencies, where courts have a long history of declining to review the political branches' responses.  *See, e.g.*, *Martin v. Mott*, 25 U.S. 19, 31 (1827) (The President "is necessarily constituted the judge of the existence of the exigency in the first instance, and is bound to act according to his belief of the facts."); *Trump v. Hawaii*, 585 U.S. 667, 708 (2018) ("[W]e cannot substitute our own assessment for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy.").

More to the point, courts have consistently held that the President's emergency declarations under the National Emergencies Act, and the adequacy of his policy choices addressing those emergencies under IEEPA, are unreviewable.  "Although presidential declarations of emergencies . . . have been at issue in many cases, *no* court has ever reviewed the merits of such a declaration." *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 31

(D.D.C. 2020) (emphasis in original). And the Federal Circuit has recognized that an inquiry to "examine the President's motives and justifications for declaring a national emergency" under IEEPA "would likely present a nonjusticiable political question." *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988); *see, e.g.*, *Yoshida*, 526 F.2d at 579 ("courts will not normally review the essentially political questions surrounding the declaration or continuance of a national emergency"); *United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) (refusing to review declaration of emergency under IEEPA); *In re 650 Fifth Ave. & Related Props.*, 777 F. Supp. 2d 529, 575 n.16 (S.D.N.Y. 2011) (concluding that whether the government of Iran's actions and policies constituted an "unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" was an unreviewable judgment "reserved to the executive branch"); *Beacon Products Corp. v. Reagan*, 633 F. Supp. 1191, 1194-95 (D. Mass. 1986) (concluding that whether Nicaragua posed sufficient threat to trigger the President's IEEPA power to impose an embargo on the country was a nonjusticiable political question).

Reviewing the legitimacy of the underlying emergency—a foreign-affairs and national-security matter constitutionally and statutorily committed to the President—would require "the court to assess the wisdom of the President's judgment concerning the nature and extent of that threat, a matter not susceptible to judicially manageable standards." *Beacon Products*, 63 F. Supp. at 1195. Thus, the President's "motives, his reasoning, his finding of facts requiring the action, and his judgment, are immune from judicial scrutiny." *Florsheim*, 744 F.2d at 796; *see United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940) ("For the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains."). Further, Congress designated itself—not the judiciary—as the body to review emergency declarations and the adequacy of the President's response. *See* 50 U.S.C.

§ 1622(c) (creating fast-tracked procedures for review and disapproval of emergency

declarations); *United States v. Amirnazmi*, 645 F.3d 564, 577 (3d Cir. 2011) (In IEEPA,

"Congress reaffirmed its essential legislative function, and struck a careful balance between

affording the President a degree of authority to address the exigencies of national emergencies

and restraining his ability to perpetuate emergency situations indefinitely by creating more

opportunities for congressional input." (cleaned up)).  Therefore, any challenge to the legitimacy

of the emergency at issue—particularly the claim that the emergency is not "unusual" or

"extraordinary" enough, in plaintiffs' view—is a nonjusticiable political question that this Court

lacks jurisdiction to consider.

Plaintiffs' armchair economics (Mot. 19) merely reinforce why that must be the case.

Citing one Washington think tank paper from six years ago and invoking the "mainstream

economic consensus," Plaintiffs claim that persistent trade deficits are not "necessarily a

problem."  But whether that is so is precisely the sort of judgment committed to the political

branches of government.  "How, for example, is the court to determine whether" the effects of

persistent trade deficits on the United States' national security posture "pose[] more than an

ordinary or usual threat?"  *Beacon Products*, 63 F. Supp. at 1195.  The question is not fit for

judicial resolution, and essentially seeks an advisory opinion.  Regardless, a national emergency

exists for the reasons explained in the President's executive orders.  Even if the Court could

entertain that question (it cannot), plaintiffs ignore (Mot. 18-19) that the basis for the declared

emergency is not just "persistent annual U.S. goods trade deficits."  It is also the currently acute

*effects* of such persistent trade deficits.  As noted, the President found that these deficits have

"atroph[ied]" our nation's "domestic production capacity" such that now, the United States'

"military readiness" and "national security posture" are "compromise[d]."  90 Fed. Reg. at

15,044-45.  That finding of an abnormal state of affairs, *cf.* H.R. Rep. No. 95-459, at 65, besides being unreviewable, is unchallenged by plaintiffs.  Plaintiffs are thus unlikely to succeed on their claim attacking the legitimacy of the declared emergency.

The same is true with the means the President has chosen to deal with the declared national emergency.  Mot. 16.  IEEPA, by using "may," 50 U.S.C. § 1701, gives the President discretion how to deal with the relevant threat.  How the President uses that discretion is unreviewable.  *See, e.g.*, *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1342-44 (Fed. Cir. 2010) (use of "may" in statutory authorization to the President meant that "the President's exercise of his discretion is not subject to judicial review"); *Corus*, 352 F.3d at 1358 ("The Supreme Court has established that where the President has complete discretion whether to take an action in the first place, courts are without authority to review the validity of an agency recommendation to the President regarding such action."); *Florsheim*, 744 F.2d at 793; *Biden v. Texas*, 597 U.S. 785, 802 (2022) ("This Court has repeatedly observed that the word 'may' clearly connotes discretion." (cleaned up)).  In any event, the President's chosen means is reasonably related to addressing the national emergency.  The imposed tariffs have a "direct effect" on the United States' trade deficit, *Yoshida*, 526 F.2d at 580, and on improving this nation's "domestic production capacity," "military readiness," and "national security posture," 90 Fed. Reg. at 15,044-45.  The President's action thus bears "an eminently reasonable relationship to the emergency confronted."  *Yoshida*, 526 F.2d at 580.  Plaintiffs are unlikely to succeed on their claim attacking the legitimacy of the means the President chose to address the national emergency.

### C. The Major-Questions Doctrine Does Not Apply Here, And Even If It Did, Congress Spoke Clearly When Authorizing The Imposition Of Tariffs Through IEEPA

Plaintiffs' claim that the Court should not presume that Congress delegated authority to the President because of the "unprecedented significance" of the tariffs does not come close to establishing likely success on the merits.  Mot. 12-13.  The major-questions doctrine does not apply here, and it would not help plaintiffs in any event.  "Where the statute at issue is one that confers authority upon an administrative agency. . . . there are extraordinary cases that . . . provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (cleaned up).  In such cases, under the "major questions doctrine," the agency "must point to clear congressional authorization" for the proposed regulation." *Id.* at 732 (quotation omitted).

At the threshold, the Court should not engage in a major-questions analysis at all because the doctrine does not apply to presidential actions, especially in the national-security and foreign-affairs domains.  The major-questions doctrine has never been applied to the President's authority to address national-security interests or other circumstances where the President has independent authority.  No political-accountability justification applies here, where "the Framers made the President the most democratic and politically accountable official in Government," *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020), and the President directs an action in an executive order.  And the President's overlapping powers in the national-security and foreign-affairs realm diminish any concerns of unauthorized overreach.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-36 (1952) (Jackson, J., concurring in the judgment) (the President's "authority is at its maximum" when he acts pursuant to the "authorization of Congress," and in those circumstances he "may be said" to "personify the federal sovereignty").

Those considerations foreclose application of the major-questions doctrine to national-security and foreign-policy matters. A major-questions approach treats a decision with a "measure of skepticism." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That approach is irreconcilable with longstanding precedent compelling the opposite approach in these contexts. *See, e.g.*, *Trump*, 585 U.S. at 686 (acknowledging "the deference traditionally accorded the President" on these matters); *Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988) (recounting the "utmost deference to Presidential responsibilities" that courts have "traditionally shown" in these matters); *B-W Imports*, 75 F.3d at 636. There is no "reason to hesitate before concluding that Congress meant to confer" significant authority to regulate foreign commerce on the President. *West Virginia*, 597 U.S. at 721 (internal quotation marks omitted).

Even if the major-questions doctrine were not categorically inapplicable, plaintiffs press no persuasive argument that it would apply to the challenged tariffs. Plaintiffs point to the CDC's eviction moratorium, which presented a major question when the CDC attempted to transform its regulatory power by acting far outside its typical expertise based on a catch-all phrase in a statute. Mot. 14-15 (citing *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021)). But each of those considerations points in the opposite direction here.

Unlike the CDC's attempt to regulate "the landlord-tenant relationship" in response to the COVID-19 pandemic, *Ala. Ass'n*, 594 U.S. at 764, IEEPA directs the President to exercise power well within his expertise. In IEEPA, Congress charged the President with identifying a "national security, foreign policy, or econom[ic]" emergency and responding with a litany of expansive powers implicating foreign policy. 50 U.S.C. §§ 1701(a), 1702. Matters of national security and foreign policy are "the prerogative of Congress and the President." *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017); *see, e.g.*, *Egan*, 484 U.S. at 527 (discussing "constitutional investment of power

in the President" over matters of national security).  Little could be more clearly within the President's core duties and competencies, and the President's exercise of statutorily conferred authority over foreign policy and national security is utterly unsurprising.  *Cf. Biden v. Missouri*, 595 U.S. 87, 95 (2022) (action not "surprising," despite unprecedented scope, because "addressing infection problems in Medicare and Medicaid facilities is what [the Secretary of HHS] does").

Nor is the President's use of IEEPA an exercise of "unheralded power," especially given the President's exercise of his tariff power under materially identical language in IEEPA's predecessor statute.  *West Virginia*, 597 U.S. at 724; *see* Mot. 15, 17.  The President's exercise of his power under materially identical language in IEEPA's predecessor statute means the challenged action is far from "unheralded."  *West Virginia*, 597 U.S. at 724.  Likewise, the President's challenged actions accord with a robust history of similar exercises of power under IEEPA to achieve foreign-policy objectives by regulating imports and exports—often with even more serious measures like total or near-total embargoes.  *See, e.g.*, Executive Order 13873, *Securing the Information and Communications Technology Services Supply Chain*, 84 Fed. Reg. 22,689 (May 15, 2019) (invoking IEEPA to bar the "importation . . . of any information and communications technology" that was "designed, developed, manufactured, or supplied, by persons owned by, controlled by, or subject to the jurisdiction or direction of a foreign adversary"); Executive Order 12959, *Prohibiting Certain Transactions With Respect to Iran*, 95 Fed. Reg. 11,694 (May 6, 1995) (invoking IEEPA to bar "the importation into the United States or the financing of such importation of any goods or services of Iranian origin," with certain exceptions); Cong. Research Serv., *The International Emergency Economic Powers Act: Origins,*

*Evolution, and Use*, R45618 at 58-62 (Jan. 30, 2024) (collecting dozens of similar uses of IEEPA to regulate imports and exports, with one or more in nearly every year since 1979).

Nor does IEEPA confer the power to impose tariffs in a "catch-all phrase at the end of [the] statute." Mot. 14. IEEPA's authorization of the President to regulate imports in an emergency is not a catch-all clause; nor is it an example of "modest words" or an "ancillary provision" of the statute. *West Virginia*, 597 U.S. at 723-24. Just the opposite: the power is conferred as one of the enumerated terms in a list of powers making up one of the statute's principal provisions, and that term straightforwardly grants the President broad, consequential powers over foreign commerce to deal with broad, consequential problems facing the Nation. Section 1702(a)(1)(B), by including authorization for the President to "regulate . . . importation," could never be mistaken for a mousehole.

Finally, Plaintiffs point out Congress's authorization of the President to impose tariffs in other statutes, Mot. 16-17, but they fail to realize that those statutes cut *against* their argument. Those statutes only prove that it is not surprising that Congress would delegate tariff authority to the President—the basic thrust of the major-questions inquiry. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (looking to evidence of "Congress'[s] consistent judgment to deny the power being exercised"); *West Virginia*, 597 U.S. at 724 (agency adopted "a regulatory program that Congress had conspicuously and repeatedly declined to enact itself"). Here, Congress has repeatedly conferred tariff power on the President and—more specifically— has repeatedly considered and decided *not* to revoke the President's power to impose tariffs under IEEPA. *See, e.g.*, Global Trade Accountability Act, S. 1060, 118th Cong., 1st sess., March 29, 2023; Protecting Our Democracy Act, S. 2921, 117th Cong., 1st sess., September 30, 2021; Global Trade Accountability Act of 2021, H.R. 2618, 117th Cong., 1st sess., April 16, 2021;

Global Trade Accountability Act, S. 691, 117th Cong., 1st sess., March 10, 2021; Global Trade

Accountability Act, H.R. 723, 116th Cong., 1st sess., January 23, 2019; Reclaiming

Congressional Trade Authority Act of 2019, S. 899, 116th Cong., 1st sess., March 27, 2019.

Additionally, applying the major-questions doctrine would conflict with the strong

presumption that when Congress uses broad language in a delegation to the President in the

foreign-affairs and national-security context, courts give the statute "a broad construction."

*Florsheim*, 744 F.2d at 793; *see, e.g.*, *Field v. Clark*, 143 U.S. 649, 691 (1892) ("[I]n the

judgment of the legislative branch of the government, it is often desirable, if not essential for the

protection of the interests of our people, . . . to invest the President with large discretion in

matters arising out of the execution of statutes relating to trade and commerce with other

nations."); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 312 (1936); *see also Maple

Leaf*, 762 F.2d at 89 (because case involves the President's authority, the court's review is

limited to whether the case involves a "clear misconstruction" of IEEPA). "If Congress desires

to eliminate these tariffs or to cabin the President's authority, that is a matter for Congress to

address in future legislation, not a matter for this court." *Silfab*, 892 F.3d at 1349. At a

minimum, plaintiffs have not shown a strong likelihood of success on the merits.

Even if the major-questions doctrine were relevant here, the Executive Orders would still

be supported by the "clear congressional authorization for the power" it exercised to impose and

modify tariffs in response to unfair foreign trade practices. *West Virginia*, 597 U.S. at 723

(quotation omitted). The doctrine provides no basis to invalidate an action where the statute

"specifically authorizes the [agency] to make decisions like th[e] one" under review. *United

States v. White*, 97 F.4th 532, 540 (7th Cir. 2024); *see Florida v. HHS*, 19 F.4th 1271, 1288 (11th

Cir. 2021) (major-questions doctrine did not apply because "a broad grant of authority" that

"plainly encompasses the [agency's] actions . . . does not require an indication that specific activities are permitted"); *Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring) (unlike true "clear-statement" rules, major questions doctrine does not require "an 'unequivocal declaration' from Congress authorizing the *precise* agency action under review"); *West Virginia*, 597 U.S. at 723 ("something more than a merely *plausible* textual basis for the agency action is necessary" (emphasis added)).[4]  Indeed, the Ninth Circuit has found the relevant language here to be "*unambiguous*" and to "*clearly* show[] that the President's actions [imposing tariffs] were in accordance with the power Congress delegated." *Spawr Optical*, 685 F.2d at 1081 n.10 (emphases added).

IEEPA's grant of authority to the President to "regulate" the "importation or exportation of" foreign goods, through "instructions" and other methods, clearly authorizes the President to impose tariffs upon declaration of an emergency.  50 U.S.C. § 1702(a)(1)(B).  Plaintiffs are thus unlikely to succeed on the merits of this argument.

### D.  IEEPA Is A Valid Delegation Of Congressional Authority

Plaintiffs have no path to success on their claim that Congress cannot delegate its authority to impose tariffs.  *See* Mot. 19-26.  "The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government" without supplying "an intelligible principle to guide the delegee's use of discretion."  *Gundy v. United States*, 588 U.S. 128, 132, 135 (2019).  That standard is "not demanding."  *Id.* at 146.  "Only twice in this

---

[4]  *Contra* plaintiffs, Mot. 11, the major-questions doctrine does not impose a magic-words requirement, so it does not matter that Congress chose to use the broader phrase "regulate . . . importation" rather than specifically using "tariffs" or "duties."  Given IEEPA's text, context, historical and legal backdrop, IEEPA provides sufficiently clear authorization to the President to use his discretion to address a national emergency, including by imposing tariffs.

country's history (and that in a single year)" has the Supreme Court "found a delegation excessive." *Id.*  IEEPA does not fail this undemanding standard.

Indeed, binding authority compels this conclusion.  In *Yoshida*, the CCPA concluded that the President's imposition of tariffs, using his authority under TWEA to "regulate . . . importation," was a constitutional delegation.  526 F.2d at 582.  There, the Court identified the intelligible principles: "Presidential exercise is limited to actions consistent with the national emergency purpose" of the statute, a purpose that requires the President "to take a political step, the declaring of a national emergency, before acting."  *Id.* at 582-83.  *Yoshida* controls here because IEEPA provides the same intelligible principles the Court identified as lawful—a limitation to actions consistent with the national emergency purpose.  *See id.* at 582 ("Congress, by delegating to the President in [TWEA] the power to regulate imports within the national emergency powers standard, has not succeeded in abdicating its constitutional power to regulate foreign commerce."); *see also, e.g.*, *Shih*, 73 F.4th at 1092 ("[A]gree[ing] with every Circuit to have considered the issue that IEEPA" does not "run afoul of the nondelegation doctrine") (collecting cases).[5]

In addition, IEEPA involves an area where the President has independent authority—over national security and foreign affairs—making the intelligible-principle standard even easier to meet.  *See Loving v. United States*, 517 U.S. 748, 772 (1996) (In criminal courts martial context, "[t]he same limitations on delegation do not apply 'where the entity exercising the delegated

---

[5]  If anything, the other circuits that have rejected a nondelegation challenge to the use of IEEPA to "'define criminal conduct,'" an area where courts assume a *higher* nondelegation standard applies.  *See, e.g.*, *Shih*, 73 F.4th at 1092 (relying on *Touby v. United States*, 500 U.S. 160, 166 (1991), which assumed, without deciding, that "greater congressional specificity is required in the criminal context" for nondelegation purposes).  The delegation of authority here easily passes the even less demanding standard that applies here.

authority itself possesses independent authority over the subject matter.'"); *Gundy*, 588 U.S. at 159 (Gorsuch, J., dissenting) (similar); *Am. Inst. for Int'l Steel v. United States*, 806 F. App'x 892, 990 (Fed. Cir. 2020).

This conclusion is also consistent with the Supreme Court and the Federal Circuit's repeated decisions rejecting nondelegation challenges to the President's imposition of tariffs under similar statutory language. *See, e.g.*, *Fed. Energy Admin. v. Algonquin*, 426 U.S. 548, 559-60 (1976) (concluding that the President's imposition of tariffs under his authority to "adjust imports" in Section 232 of the Trade Expansion Act was not an improper delegation of Congress's power to regulate commerce); *Transpacific Steel*, 4 F.4th at 1332-33 (same). Indeed, like Section 232, IEEPA has "clear []conditions," such as congressional reporting and consultation, on the President exercising his discretion to deal with an unusual and extraordinary threat to the United States' national security and economy. *See PrimeSource*, 59 F.4th at 1263; *see also Amirnazmi*, 645 F.3d at 577 ("In effecting the shift of peacetime authority from TWEA to IEEPA, Congress placed several procedural restrictions on the President's exercise of the national-emergency powers, including congressional consultation, review, and termination. In so doing, Congress reaffirmed its essential legislative function, and struck a careful balance between affording the President a degree of authority to address the exigencies of national emergencies and restraining his ability to perpetuate emergency situations indefinitely by creating more opportunities for congressional input." (cleaned up)). Plaintiffs are thus unlikely to succeed in their nondelegation challenge.

## III. The Public Interest And Equities Favor Permitting The President To Exercise Foreign-Affairs and National-Security Powers To Protect The Nation

Even if plaintiffs could establish that they are likely to succeed on the merits and would suffer irreparable harm absent a temporary restraining order, that showing would still be

"outweighed" by the balance of hardships and the public interest, *Winter*, 555 U.S. at 33, factors that "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009). It is not in the public interest to enjoin the President's response to a national emergency and exercise of foreign-affairs powers; nor does the balance of hardships favor plaintiffs.

Courts must "pay particular regard for the public consequences" when "employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quotations and citations omitted). Indeed, in *Winter*, the Supreme Court vacated the lower court's injunction, concluding that, even if the petitioners had shown irreparable harm, the public interest and balance of equities weighed decisively against injunctive relief. *Id*. at 23-32 (an injunction "does not follow from success on the merits as a matter of course").

Plaintiffs' purported irreparable harm is far outweighed by the public interest in maintaining the challenged executive actions. The President has declared a national emergency in light of threats to the United States' economy, military preparedness, and national security. In these circumstances, the National Emergencies Act and IEEPA all authorize the President to take all appropriate and feasible action to address this emergency. The equities and public interest lie there, not with plaintiffs.

Moreover, where, as here, the President is acting with Congress's authorization, adding its constitutional authority to regulate trade to the President's constitutional authority over foreign affairs, the "public interest" is the policy underlying the specific legislation. *Yakus v. United States*, 321 U.S. 414, 442 (1944). Injunctive relief interfering with action authorized by Congress and taken by the President, after following all the applicable procedures, would contravene the public interest.

As for the balance of hardships, Plaintiffs' proposed injunction would be an enormous intrusion on the President's conduct of foreign affairs and efforts to protect national security under IEEPA and the Constitution, *see* U.S. Const. art. II, §2.

Plaintiff's request to import merchandise without paying the applicable tariffs would undermine the President's goals, and the requested temporary restraining order would weaken the effectiveness of the President's chosen action.  By contrast, plaintiffs have not shown any hardship beyond compensable economic harm.  Moreover, plaintiffs' concerns about cost and competitiveness are far from unique.  In considering the public interest, the Court should also consider the broader implications if the thousands of other companies subject to similar tariffs requested the same relief.

Given the significant foreign-affairs and national-security concerns at stake, the balance of hardships favor the Government.

## IV.    Any Temporary Restraining Order Should Be Limited Only To Plaintiffs And Would Require The Posting Of A Bond

If this Court were to issue a temporary restraining order, the scope of the Court's order must be limited to the parties to this litigation.  Moreover, the Court should order plaintiffs to quantify their harm—for instance, specify what tariffs that they would otherwise have paid, which must not be speculative—and post a bond in that amount.

USCIT Rule 65(c) requires "the movant [to] give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Here, should the Court enter a TRO, (i) any order should be

limited to the plaintiffs to this litigation;[6] (ii) as a condition of relief, plaintiffs should identify the entries, by entry number, importer name, and importer number, that would be covered by any such order; and (iii) the Court should order plaintiffs to post Single Transaction Bonds for all such identified entries during the pendency of any injunctive order in an amount equal to the total entered value, plus all applicable duties, taxes, and fees, including the duties that would otherwise have been deposited pursuant to the Executive Orders. Such an order would ensure that the Court follow the directive that it "must narrowly tailor an injunction to fit the specific adjudged violations." *Riles v. Shell Expl. & Prod. Co*., 298 F.3d 1302, 1311 (Fed. Cir. 2002) (citing *Gemveto Jewelry Co. v. Jeff Cooper Inc*., 800 F.2d 256, 259, 230 (Fed. Cir. 1986)), while ensuring minimal protection of the United States' interests.

---

[6] Of course, injunctive relief should be narrowly tailored and limited to the harm shown. *See Gemveto Jewelry Co. v. Jeff Cooper Inc.*, 800 F.2d 256, 259 (Fed. Cir. 1986). Moreover, nationwide injunctions are only available in "exceptional cases." *City and County of San Francisco*, 896 F. 3d 1225, 1244 (9th Cir. 2018). Here, plaintiffs cannot show why a TRO is even necessary, let alone a nationwide one. As established above, plaintiffs do not show irreparable harm is likely to occur before the Court issues a decision on a preliminary injunction.

## CONCLUSION

For these reasons, the Court should deny plaintiffs' application for a temporary

restraining order.

Respectfully submitted,

                                        YAAKOV M. ROTH
                                        Acting Assistant Attorney General

                                        ERIC J. HAMILTON
OF COUNSEL:                             Deputy Assistant Attorney General

ALEXANDER K. HAAS                       PATRICIA M. McCARTHY
Director                                Director
STEPHEN M. ELLIOTT
Assistant Director                      /s/ Claudia Burke
U.S. Department of Justice              CLAUDIA BURKE
Civil Division                          Deputy Director
Federal Programs Branch
                                        /s/ Justin R. Miller
LUKE MATHERS                            JUSTIN R. MILLER
BLAKE W. COWMAN                         Attorney-In-Charge
Trial Attorneys                         International Trade Field Office
U.S. Department of Justice
Civil Division                          /s/ Sosun Bae
Commercial Litigation Branch            SOSUN BAE
                                        Senior Trial Counsel
                                        U.S. Department of Justice
                                        Civil Division
                                        Commercial Litigation Branch
                                        1100 L St. NW
                                        Washington, D.C. 20005
                                        202-353-9063
                                        Sosun.bae@usdoj.gov
April 21, 2025                          *Counsel for Defendants*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendants' counsel certifies that this motion complies with the Court's type-volume limitation rules.  According to the word count calculated by the word processing system with which the brief was prepared, this brief contains a total of 12,243 words.


<u>/s/ Sosun Bae</u>
SOSUN BAE

April 21, 2025

42

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:      THE HONORABLE GARY S. KATZMANN, JUDGE
                  THE HONORABLE TIMOTHY M. REIF, JUDGE
                  THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC, | )<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) |
| v. | ) |
| DONALD J. TRUMP in his official capacity, EXECUTIVE OFFICE OF THE PRESIDENT, THE UNITED STATES, U.S. CUSTOMS AND BORDER PROTECTION, PETE R. FLORES in his official capacity, JAMIESON GREER in his official capacity, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, and HOWARD LUTNICK in his official capacity, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

Court No. 25-00066

## <u>ORDER</u>

Upon consideration of plaintiffs' application for a temporary restraining order,

defendants' response thereto, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' application is DENIED.


Dated:_____              _____
         New York, New York                         JUDGE