IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

Before Honorable Gary S. Katzmann, Judge, Honorable
Timothy M. Reif, Judge, Honorable Jane A. Restani, Judge

| | |
|---|---|
| V.O.S. Selections, Inc., *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>Donald J. Trump, *et al.*,<br><br>        Defendants. | Case No. 25-00066 |

JOINT BRIEF OF *AMICI CURIAE* FORMER SENATOR AND GOVERNOR
GEORGE F. ALLEN, PROFESSOR STEVEN CALABRESI, ATTORNEY JOSHUA
A. CLAYBOURN, FORMER SENATOR AND AMBASSADOR TO THE UNITED
NATIONS JOHN C. DANFORTH, PROFESSOR RICHARD A. EPSTEIN, FORMER
SENATOR AND SECRETARY OF DEFENSE CHARLES T. HAGEL, PROFESSOR
AND FORMER DEAN HAROLD HONGJU KOH, PROFESSOR GERARD N.
MAGLIOCCA, PROFESSOR AND FORMER JUDGE MICHAEL W. McCONNELL,
FORMER ATTORNEY GENERAL AND JUDGE MICHAEL B. MUKASEY,
PROFESSOR ALAN SYKES, FORMER JUDGE JOHN DANIEL TINDER,
FORMER WHITE HOUSE COUNSEL PETER WALLISON, FORMER STATE
DEPARTMENT COUNSELOR AND DIRECTOR OF THE 9/11 COMMISSION
PHILIP ZELIKOW

Michael W. McConnell
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: (650) 736-1326
mcconnell@law.stanford.edu

*Of Counsel*

John B. Brew
Daniel Cannistra
Weronika Bukowski

Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Telephone: (202) 624-2500
Email: jbrew@crowell.com

*Attorneys to Amici Curiae*

# TABLE OF CONTENTS

Interest of Amici Curiae ............................................................. 1

I.    Introduction and Summary of Argument ................................. 2

II.   Argument ................................................................................ 6

   A.   Congress, Not the President, Has the Power to Impose Tariffs ...................... 6

   B.   IEEPA Does Not Authorize Tariffs ................................................... 9

      1.   IEEPA Does Not Mention Tariffs—Because It Was Never Meant To ...... 10

      2.   Congress Deliberately Rejected Tariff Authority in IEEPA .................... 13

      3.   These Tariffs Aren't Emergency Measures—They're Permanent Policy .. 16

      4.   Reading Tariff Power into IEEPA Raises Constitutional Concerns.......... 18

      5.   No President Has Ever Used IEEPA This Way ......................................... 20

   C.   The President's Tariffs Lack Clear Legal Authority ....................................... 21

      1.   The Court Has Repeatedly Rejected Sweeping Power from Ambiguous Text............................................................................................... 21

      2.   Constitutional Precedent Bars Executive Lawmaking............................ 24

      3.   The Greater the Power, the Clearer the Grant Must Be .......................... 26

III.  Conclusion ........................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                     **Page(s)**

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
    594 U.S. 758 (2021) ........................................................................ 5, 23

*Dames & Moore, v. Regan,*
    453 U.S. 654 (1981) ........................................................................ 9

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ........................................................................ 18, 22

*Gibbons v. Ogden,*
    22 U.S. (9 Wheat.) 1 (1824) ........................................................... 7

*Home Bldg. & Loan Ass'n v. Blaisdell,*
    290 U.S. 398 (1934) ........................................................................ 18

*J.W. Hampton, Jr. & Co. v. United States,*
    276 U.S. 394 (1928) ........................................................................ 8

*Ex parte Milligan,*
    71 U.S. (4 Wall.) 2 (1866) ............................................................. 18

*Nat'f Fed'n of Indep. Bus. v. Dep't of Labor,*
    595 U.S. 109 (2022) ........................................................................ 23

*Util. Air Regul. Group (UARG) v. EPA,*
    573 U.S. 302 (2014) ........................................................................ 19, 20

*W. Va. v. EPA,*
    597 U.S. 697 (2022) ........................................................................ 27

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ........................................................................ 19, 22, 25

*United States v. Yoshida International, Inc.,*
    526 F.2d 560 (Cust. Ct. 1975) ...................................................... 14

*Utility Air Regulatory Group v. EPA,*
    573 U.S. 302 (2014) ........................................................................ 18

*Whitman v. American Trucking Associations,*
    531 U.S. 457 (2001) ........................................................................ 19

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ..........................................................................*passim*

**Statutes**

50 U.S.C. § 1701(a) .................................................................................. 10, 17

50 U.S.C. § 1702(a)(1) .................................................................................... 10

50 U.S.C. § 1702(a)(1)(A)(ii) ......................................................................... 10

50 U.S.C. § 1702(b) ........................................................................................ 10

19 U.S.C. § 1862(a) ........................................................................................ 11

19 U.S.C. § 1862(c) ........................................................................................ 11

19 U.S.C. § 2251(a)(3)(A), (B) ...................................................................... 11

19 U.S.C. § 2411(c)(1)(B) ............................................................................... 11

International Emergency Economic Powers Act,
  50 U.S.C. §§ 1701–1707 ...........................................................................*passim*

The Tariff Act of 1789 ...................................................................................... 7

Trade Act of 1974, Pub. L. No. 93-618 .................................................*passim*

Trade Expansion Act of 1962, Pub. L. No. 87-794 ............................... 11, 13

U.S. Const. art. I, § 8 ................................................................................... 6, 7

U.S. Const. art. I, § 8, cl. 1 ........................................................................... 20

**Other Authorities**

BLACK'S LAW DICTIONARY (2d ed.) ............................................................. 10

Chairman Steve Miran, Hudson Institute Event Remarks, The White
  House (Apr. 7, 2025), https://www.whitehouse.gov/briefings-
  statements/2025/04/cea-chairman-steve-miran-hudson-institute-
  event-remarks/................................................................................................ 17

Christopher A. Casey, Cong. Rsch. Serv., IN11129, *The International
  Emergency Economic Powers Act and Tariffs* 1 (2020) ......................... 14

Fact Sheet: President Donald J. Trump Declares National Emergency
    to Increase Our Competitive Edge, Protect Our Sovereignty, and
    Strengthen Our National and Economic Security, The White House
    (Apr. 2, 2025), https://www.whitehouse.gov/fact-sheets/2025/04/fact-
    sheet-president-donald-j-trump-declares-national-emergency-to-
    increase-our-competitive-edge-protect-our-sovereignty-and-
    strengthen-our-national-and-economic-security/ ................................................. 17

H.R. Rep. No. 95-459 (1977) ............................................................. 13, 14, 15

Michael W. McConnell, THE PRESIDENT WHO WOULD NOT BE KING:
    EXECUTIVE POWER UNDER THE CONSTITUTION (2020) ...........................................6, 7

S. Rep. No. 95-466 (1977) ............................................................................ 15

THE FEDERALIST, *No. 58* ................................................................................ 6

THE FEDERALIST, *No. 62* (Jacob E. Cooke ed. 1961) ....................................... 26

**INTEREST OF AMICI CURIAE**

Amici are constitutional scholars, legal historians, public lawyers, retired federal appellate judges, a former United States Attorney General, and three former United States Senators united by a common conviction: the endurance of the American Republic depends not only on elections or policy outcomes, but on the faithful preservation of its constitutional structure. They span the ideological spectrum, joined not by partisanship but by a common concern over the erosion of Congress's Article I authority.

Amici also include former federal appellate judges and other senior officials who, though not elected, were entrusted with solemn constitutional duties. In their service on the bench and in high office, they bore responsibility for interpreting and upholding the Constitution—often in precisely the kinds of disputes over executive authority and congressional power now before this Court. Several amici—including a former Attorney General of the United States—held senior executive positions and daily grappled questions of constitutional power and duty.

Notably, three amici served as United States Senators, directly engaged in the legislative processes now at risk of displacement. Their firsthand experience in crafting, debating, and enacting legislation gives them a deep understanding of the constitutional balance between Congress and the Executive. They are acutely aware of the stakes when lawmaking authority shifts from the collective deliberation of Congress to unilateral executive action.

Amici do not appear to defend or oppose any particular trade policy. They file this brief because they believe the Constitution draws bright lines between legislative and executive power—and that those lines are being blurred in ways that threaten democratic accountability itself.

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

What unites these amici is a shared conviction that process matters—that how we govern is as vital as what we decide. The powers to tax, to regulate commerce, and to shape the nation's economic course must remain with Congress. They cannot drift silently into the hands of the President through inertia, inattention, or creative readings of statutes never meant to grant such authority. That conviction is not partisan. It is constitutional. And it strikes at the heart of this case.

This dispute is not about the wisdom of tariffs or the politics of trade. It is about who holds the power to tax the American people. May a President, absent a clear delegation from Congress and without guidance that amounts to an intelligible principle, unilaterally impose sweeping tariffs under laws never designed for that purpose? This is not a debate over outcomes but a test of structure. It asks not what should happen, but who decides.

The Constitution gives a clear answer. Article I vests Congress—not the President—with the power to "lay and collect Taxes, Duties, Imposts and Excises," and to "regulate Commerce with foreign Nations." Unless Congress has delegated that authority through a valid and clearly bounded framework, the President may not impose tariffs. As the Supreme Court made plain in *Youngstown Sheet & Tube*

*Co. v. Sawyer*, 343 U.S. 579 (1952), presidential power must stem from the Constitution or an act of Congress. Here, it does neither.

In April 2025, President Trump proclaimed a sweeping tariff regime that touches nearly every imported good sold in the United States. The measures include a 10% baseline tariff on all imports and a 34% duty on Chinese goods (raising total tariffs to 65%). These levies did not arise from legislation. They were not the product of congressional debate or any statutory process. Nor were they supported by specific findings under existing trade laws. Instead, they were imposed unilaterally, by presidential proclamation, and justified under statutes like the International Emergency Economic Powers Act ("IEEPA") and sections of the Trade Act of 1974. On April 9, 2025, President Trump announced a 90-day pause on most of these tariffs, except for those on Chinese imports, which were increased to 125%. The baseline 10% tariffs on nearly every country remained in effect.

But no statute authorizes what the President has done. The laws cited permit limited and targeted actions under narrow conditions. They do not authorize sweeping economic realignment. They do not permit unilateral taxation of vast sectors of the U.S. economy. These duties came not from Congress, but from a claim of executive power detached from constitutional limits.

IEEPA, the central statute invoked, cannot bear this weight. Enacted in 1977 to rein in presidential overreach, IEEPA allows the President to impose sanctions in response to genuine emergencies—not to reorder the economy in response to long-

term trends. Its legislative history is clear: Congress never intended it as a backdoor for permanent tax policy, nor as a means of sidestepping Article I.

The core principle urged by amici is this: IEEPA and related statutes do not grant the President the power to impose tariffs of this kind or scope. That power remains squarely within the legislative domain. The Constitution places decisions about taxation and commerce in Congress's hands—not as a formality, but as a structural safeguard of democratic accountability.

The President's actions here violate the limits of that structure. The statutes he invoked were never meant to authorize unilateral lawmaking. Yet he used them to bypass bicameralism and presentment—the very processes that make government accountable. He now claims an open-ended emergency power that, if upheld, would let any President reshape the economy without Congress.

That claim is not saved by the word "emergency." No emergency exists, and even if one did, the Constitution is not suspended during crises. The Framers understood the danger of emergency rule. They designed a system to resist it. As Justice Jackson warned in *Youngstown*, 343 U.S. at 650, "emergency powers would tend to kindle emergencies" (Jackson, J., concurring). Liberty endures not through executive decree but through constitutional limits—especially in urgent times.

To be clear, amici do not argue that the Executive lacks all authority under IEEPA or Section 301. Congress has delegated some powers under specific conditions. But those powers do not include imposing across-the-board tariffs untethered from any statutory criteria. They do not include the authority to bypass Congress in

matters of taxation. And they do not authorize the President to override constitutional structure by invoking an "emergency."

This case is not about trade any more than *Youngstown* was about steel or *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021) was about landlord-tenant law. It is about power—who has it, and who must authorize its use. The principle remains: "[t]he President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585.

This case requests this Court apply the principles which have been reaffirmed time and again: that Congress makes the law, and the Executive enforces it; that major policies require explicit legislation; and that the Constitution does not permit taxation by proclamation. These principles are neither new nor partisan. They are the foundation of the American republic.

The stakes here are immediate and profound—not because of any particular trade policy, but because of the process by which that policy was imposed. For decades, the United States has anchored a global trading system built on transparency, deliberation, and the rule of law. That stability is jeopardized when core powers—like the power to tax—are exercised unilaterally, without congressional input, statutory grounding, or public explanation. The President's tariff proclamations bypass the constitutional framework that lends legitimacy and predictability to American lawmaking. Already, foreign governments are reexamining their trade commitments in response. If courts permit this path to stand

unreviewed, it will invite escalating disruption—not just to international commerce, but to the very norms that sustain constitutional governance. The Court's intervention is not merely appropriate; it is essential to reaffirm that in a republic, process cannot be subordinated to expediency.

The Court should conclude that plaintiffs are likely to succeed on the merits of showing that the statutes invoked by the President do not authorize the imposition of general tariffs; that such authority remains with Congress; and that the separation of powers is not a matter of convenience, but of constitutional command. Accordingly, the Court should grant plaintiffs the relief they seek.

## II.   ARGUMENT

### A.   Congress, Not the President, Has the Power to Impose Tariffs.

From the founding of the Republic, the power to impose tariffs—like the power to levy taxes—has belonged exclusively to Congress. This is no formality. This nation was born of the slogan "No taxation without representation," which means that the authority to tax, raise revenue, and shape the public's economic obligations must rest with the people's elected representatives.[1]

The Constitution is explicit. Article I, Section 8 grants Congress the power "[t]o lay and collect Taxes, Duties, Imposts and Excises" and "[t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8. These provisions were not afterthoughts—they were foundational. As James Madison wrote in *The Federalist No. 58*, vesting

---

[1] See Michael W. McConnell, THE PRESIDENT WHO WOULD NOT BE KING: EXECUTIVE POWER UNDER THE CONSTITUTION 100-107, 214-220 (2020) (explaining that the Constitution vests the powers to tax and regulate commerce in Congress as part of its core structural design).

control of taxation in the legislature served as a deliberate check on executive power, born of colonial resistance to Crown-imposed duties levied without consent. That structural safeguard ensures that only a geographically diverse and representative Congress—not the Executive—may impose economic burdens on the people.

Tariffs fall squarely within this constitutional design. If the Framers had merely used the term "taxes," this would have encompassed tariffs, which are taxes. But the Framers went out of their way to list "duties" and "imposts" as within the legislative domain. And no wonder: the Framers expected that the "impost," which meant tariffs, would generate sufficient revenue to pay for most of the ordinary operations of the federal government in peacetime. McConnell, *supra*, at 101. "It was undisputed that the executive would have no prerogative power to tax, spend, or borrow." *Id*.

Indeed, Congress's very structure underscores this design. With short terms and direct elections, the House was crafted to ensure close accountability to the electorate. The Senate, in turn, provided a stabilizing force for deliberation. Together, they alone were entrusted with the power to tax and regulate commerce. As Chief Justice Marshall wrote in *Gibbons v. Ogden*, "[t]he power to regulate commerce … is complete in itself, and may be exercised to its utmost extent." 22 U.S. (9 Wheat.) 1, 196 (1824). That power, he affirmed, rests with Congress—not the Executive.

Congress historically guarded this authority with care. The Tariff Act of 1789—among the first laws passed under the new Constitution—imposed duties across a broad range of imported goods. It was introduced in the House, debated in

both chambers, amended, and enacted through the full machinery of legislative deliberation. For more than a century, tariff policy remained one of the most visible and contested areas of congressional action, often shaping party lines and national elections. Tariffs were the centerpiece of Henry Clay's "American System," and the so-called "Tariff of Abominations" was the impetus for the Nullification Crisis of 1832-33. Whether popular or unpopular, it was Congress—not the President—that decided which goods to tax, at what rates, and for what ends.

When Congress has delegated authority in trade matters, the Court has required strict limits. In *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928), the Court upheld a tariff delegation only because it was governed by an "intelligible principle" and confined to narrow bounds. That remains the constitutional baseline. Where Congress has authorized executive action in trade policy, it has done so through specific, tightly constrained statutes—typically requiring factual findings, defined procedures, and clearly delineated circumstances.

The Trade Act of 1974 and the Trade Expansion Act of 1962 exemplify this approach. They allow the Executive to address unfair trade practices or national security threats, but only within carefully prescribed limits. Even then, these statutes do not—and constitutionally cannot—authorize the President to enact a sweeping tariff regime absent new legislation.

This is not a mere technicality. Requiring Congress to impose taxes serves core democratic values. It ensures transparency, accountability, and public deliberation. When the President claims that power without legislative enactment, he bypasses

these safeguards and substitutes unilateral executive judgment for collective representative will.

To allow the Executive to impose tariffs of the kind at issue here—broad, untethered, and unsupported by specific statutory findings—would transform the taxing power into an executive instrument. That result would contradict the text, history, and structure of the Constitution. It would unravel the very system of accountability the Framers established to prevent the consolidation of power.

The Constitution entrusts the taxing power—including the authority to impose tariffs—to Congress. That delegation is clear, deliberate, and indispensable. No statute should be read to disrupt it unless Congress has done so expressly and unequivocally.

**B.     IEEPA Does Not Authorize Tariffs.**

The Administration's statutory claim rests on the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1707. That reliance is misplaced. Although IEEPA grants the President significant authority during genuine national emergencies—and no such emergency exists here—its powers are narrow and precisely drawn. See *Dames & Moore, v. Regan*, 453 U.S. 654 (1981) (use of the statute to freeze Iranian assets during the Iranian hostage crisis). The statute is silent on tariffs, and for good reason. It was never meant, and has never been understood, to authorize the President to impose them. Still less does it permit the Executive to restructure the nation's trade regime. The statute's text, context, and legislative history point to a different purpose: to empower the President to block or

freeze foreign assets and financial transactions in targeted, temporary ways—not to raise revenue or rewrite the core terms of international commerce.

1. *IEEPA Does Not Mention Tariffs—Because It Was Never Meant To.*

IEEPA grants the President delimited authority to regulate international economic transactions upon declaring a national emergency "to deal with any unusual and extraordinary threat … to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). Once that condition is met, the statute permits the President to "investigate, regulate, or prohibit . . . transfers of credit or payments . . . involv[ing] any interest of any foreign country or a national thereof, by any person . . . subject to the jurisdiction of the United States." *Id*. § 1702(a)(1)(A)(ii). The term "emergency" does not extend to every problem that is serious or threatening, but only to those that are "sudden, unexpected, or impending." BLACK'S LAW DICTIONARY (2d ed.).

Upon a presidential proclamation of emergency under IEEPA, Section 1702(a) empowers the President to "investigate, regulate or prohibit" various transactions involving foreign exchange, credit, currency, or securities. 50 U. S. C. § 1702 (a) (1). Obviously, this provision has no application to tariffs. Section 1702(b) permits the President to "investigate, regulate, direct and compel, nullify, void, prevent or prohibit" the acquisition, use, or transfer of property owned by a foreign nation or individual.  This enables the executive branch, in a foreign policy crisis, to block transactions, freeze assets, and seize, or sequester foreign property. Notably,

Congress employed seven different verbs to capture the intended types of economic sanction, but did not include the term "tax" or any of its synonyms. If Congress had intended to delegate the power of taxing ordinary commerce, it surely would have said so. Moreover, all the permitted presidential actions have their effects abroad; IEEPA did not authorize the President to tax or regulate the domestic activities or property of Americans.

Tariffs, unlike the foreign sanctions explicitly authorized under IEEPA, are taxes paid by Americans. They fall squarely within Congress's taxing power and, under the Constitution, require the explicit consent of the people's representatives. The absence of tariff language in IEEPA stands in sharp contrast to statutes where Congress has affirmatively granted such power. When Congress intends to authorize duties, it says so. Section 301 of the Trade Act of 1974 allows the President to "impose duties or other import restrictions." 19 U.S.C. § 2411(c)(1)(B). Section 201 of that same Act empowers the President to "proclaim an increase in, or the imposition of, any duty on the imported article" or to "proclaim a tariff-rate quota." 19 U.S.C. § 2251(a)(3)(A), (B). Similarly, Section 232 of the Trade Expansion Act authorizes the adjustment of "duties" on imports, 19 U.S.C. § 1862(a), and grants authority to "adjust the imports." *Id*. § 1862(c). In each case, Congress spoke with clarity when it intended to delegate authority over tariffs and it encumbered the grant of authority with procedural and substantive conditions and prerequisites.

IEEPA contains no such language. It includes no reference to duties, tariffs, or taxes—only the more general term "regulate . . . importation." Nothing in the statute

suggests that Congress intended to authorize the President to alter revenue measures or adjust tariff rates under the guise of regulating imports. Against the backdrop of constitutional text and targeted statutory delegations, the better reading of IEEPA is plain: it permits embargoes and licensing regimes, not taxation at the border. Interpreting the statute to include tariffs would blur the distinction between blocking a transaction and taxing it, effectively granting the Executive a unilateral power over tax and trade policy that the Constitution reserves for Congress.

The more specific tariff-authorizing statutes cannot support the President's current action either. The President has not specifically invoked the authority of Trade Act of 1974 or the Trade Expansion Act in support of his April 2 tariffs, and for good reason. Section 122 of the Trade Act authorizes import surcharges of 15% for no more than 150 days "to deal with large and serious United States balance-of-payments deficits." President Trumps's tariffs exceed that limit and would last far longer. Section 201 is even farther afield. It allows targeted tariff increases upon a finding by the United States International Trade Commission that increased imports of a product are causing substantial injury to the domestic industry producing that product. There have been no such findings here. Indeed, across-the-board tariffs of 10% on all imports bear no resemblance to the targeted tariff increases contemplated by this provision. Section 301 of the Act authorizes "duties or other import restrictions" on foreign nations that have been found—after notice and investigation—to have committed unfair trade practices or violated trade agreements with the United States. There have been no such investigations, and no notice to the

12

nations involved. In any event, this provision has largely been superseded by investigations and proceedings under the World Trade Organization framework. Section 232 of the Trade Expansion Act concerns national security threats, yet no plausible finding has been made—or could be made—that every product from every nation in the world poses such a threat. The Administration has not even invoked these statutes in support of the tariffs at issue. Their existence, however, makes it even more implausible that IEEPA silently conveys limitless powers that these statutes convey only through express, narrow limits and procedural safeguards.

2.    *Congress Deliberately Rejected Tariff Authority in IEEPA.*

The legislative history of IEEPA makes clear that Congress did not intend to delegate tariff authority to the President. On the contrary, Congress enacted IEEPA in 1977 to narrow, not expand, the Executive's previously overbroad powers under the World War I–era TWEA. The House Committee Report leaves no ambiguity: the statute was designed to provide "a new set of authorities for use in time of national emergency which are both more limited in scope than those of [TWEA] and subject to various procedural limitations." H.R. Rep. No. 95-459, at 2 (1977).

Nothing in IEEPA's legislative history suggests that Congress intended to give the President tariff-making power. The House Report accompanying the bill identified the key powers carried over from TWEA that were deemed necessary for emergencies: controls on foreign exchange transactions, banking transfers, and securities; regulation of property in which foreign nationals have an interest; vesting (seizing) foreign-owned property; and handling or liquidating such property for the

United States' benefit. See H.R. Rep. No. 95-459, at 1–2 (1977). Notably absent from that list is any power to raise import duties or impose new tariffs. In fact, tariffs are only addressed in a historical discussion of past uses of TWEA, not as a contemplated feature of IEEPA. See *id*. at 5–6.

The legislative history recounts that President Nixon in 1971 declared a national emergency and imposed a 10% import surcharge (an extra tariff) under TWEA's authority. See *id*. at 5; see also Christopher A. Casey, Cong. Rsch. Serv., IN11129, *The International Emergency Economic Powers Act and Tariffs* 1 (2020). A lawsuit by an importer (the *Yoshida* case) challenged the surcharge, and the appellate court upheld Nixon's action – finding that TWEA's "express delegation" of power to the President "is broad indeed," such that the power to impose tariffs could be inferred from the power to "regulate" imports during a crisis. See *Yoshida*, 526 F.2d at 574–75.

Congress took note of this episode, and its response is telling. Rather than embracing Nixon's emergency tariff as a model for future use of economic powers, Congress moved to cabin and replace that authority, not to perpetuate it. In 1974, while the *Yoshida* litigation was still pending, Congress enacted Section 122 of the Trade Act of 1974 – a provision that explicitly authorizes the President to impose an emergency import surcharge, but with tight limits (capped at 15% and lasting no more than 150 days) and only to deal with balance-of-payments deficits. See Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1991 (codified at 19 U.S.C. § 2132). Congress reiterated this approach in the same legislation with Section 301 of

the Trade Act of 1974, which expressly authorizes the President to impose duties or other import restrictions—but only after procedural steps and substantive determinations concerning unfair foreign trade practices. Congress made clear that if a President is to have any emergency tariff power, it must come from a specifically tailored statute with clear parameters, not an open-ended mandate.

Notably, IEEPA's enactment followed on the heels of this new tariff authority, yet Congress did not incorporate any similar tariff language into IEEPA. To the contrary, the House Report indicated that Nixon's 1971 surcharge was a product of TWEA being used for purposes "which would not be contemplated in normal times"— effectively an extraordinary outlier, not a precedent to build upon. See H.R. Rep. No. 95-459, at 5 (1977). Congress's decision in 1977 to retain TWEA's general language ("regulate importation…") in IEEPA without adding any tariff-specific provision strongly suggests that lawmakers did not regard IEEPA as a vehicle for import taxes. They had already addressed emergency tariffs separately, and IEEPA was meant for other tools of economic sanctions (like freezing assets or embargoing particular transactions), not for across-the-board duties.

The Senate Committee Report emphasized that IEEPA should not be read to provide "a blank check for presidential control over the economy." S. Rep. No. 95-466, at 5–6 (1977). The legislative history as a whole demonstrates Congress's intent to exclude tariff measures from IEEPA's scope. Lawmakers pointedly did not list tariff authority among the "important" powers to be conveyed, and they had already provided a separate, bounded mechanism for any tariff-like response to economic

15

emergencies. In short, IEEPA was crafted as a sanctions and embargo authority, not as a blank check for the President to rewrite tariff schedules in a national emergency.

Congress understood the implications of tariff authority. It did not legislate in ignorance. It knew that duties and imposts fell within Article I's taxing power—and that they required bicameral passage and origination in the House. If Congress had intended to grant the President power to impose tariffs through IEEPA, it would have said so. The absence of such language is not an oversight; it is a reflection of constitutional restraint.

3.   *These Tariffs Aren't Emergency Measures—They're Permanent Policy.*

IEEPA was enacted to enable short-term, targeted responses to genuine, extraordinary threats—not to authorize permanent alterations to the nation's trade regime. Its very title—the *International Emergency Economic Powers Act*— underscores this purpose: to grant the Executive narrow powers to act swiftly during unforeseen emergencies. It is not a tool for addressing long-standing policy concerns or for implementing structural reforms that require legislative debate.

The tariffs imposed by the President in April 2025 are plainly at odds with that purpose. They are not tied to a discrete or time-sensitive emergency. Nor are they temporary. On the contrary, they are designed to remain in effect indefinitely and to respond to broad, persistent conditions—such as global supply chain realignment, foreign industrial policy, and chronic trade imbalances—that the Administration claims threaten American economic security in a general and enduring way.

President Trump has made no effort to conceal this long-term intent. He has explicitly defended his tariff policy as a corrective to economic trends spanning more than two decades. The official White House Fact Sheet explains that the President invoked IEEPA to address "the national emergency posed by the large and persistent trade deficit." It claims that "[f]or generations, countries have taken advantage of the United States," and cites the loss of "around 5 million manufacturing jobs" from 1997 to 2024—a 27-year period. It also references Chinese trade practices "between 2001 and 2018"—conduct that began nearly a quarter century ago and concluded seven years prior. [2] These are not unforeseen emergencies. They are longstanding policy grievances, best addressed by Congress—not by emergency proclamation.

The Administration has also touted these tariffs as a means of generating long-term revenue. On April 2, President Trump predicted that the tariffs would generate "trillions and trillions of dollars to reduce our taxes and pay down our national debt." The Chair of the Council of Economic Advisors echoed this aim, stating that "tariffs will help pay for both tax cuts and deficit reduction." [3] But tax cuts and budget deficits—however important—are not "unusual and extraordinary threat[s]" under IEEPA. 50 U.S.C. § 1701(a). They are routine subjects of political debate and legislative negotiation. Their invocation here confirms that these tariffs are not

---

[2] See Fact Sheet: President Donald J. Trump Declares National Emergency to Increase Our Competitive Edge, Protect Our Sovereignty, and Strengthen Our National and Economic Security, The White House (Apr. 2, 2025), https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-declares-national-emergency-to-increase-our-competitive-edge-protect-our-sovereignty-and-strengthen-our-national-and-economic-security/.

[3] CEA Chairman Steve Miran, Hudson Institute Event Remarks, The White House (Apr. 7, 2025), https://www.whitehouse.gov/briefings-statements/2025/04/cea-chairman-steve-miran-hudson-institute-event-remarks/.

temporary emergency measures, but a shift in fiscal and trade policy pursued through unilateral executive action.

Courts have long held that emergency powers must be interpreted in light of their temporal and contextual limits.[4] A statute grounded in emergency cannot be stretched to support open-ended policymaking, especially where the alleged threat is neither imminent nor novel. If decades-old trade deficits now qualify as an "emergency," then any President could invoke IEEPA at will to bypass Congress on matters of taxation, commerce, and industrial policy. That is not how emergency statutes function. And it is not how the Constitution permits economic power to be exercised.

4.    *Reading Tariff Power into IEEPA Raises Constitutional Concerns.*

Even if IEEPA's text were ambiguous—and it is not—interpreting it to confer the power to impose tariffs would violate important principles of statutory interpretation and raise a serious question of standardless delegation. The Supreme Court has made clear: when Congress delegates authority of vast political and economic consequence, it must do so with unmistakable clarity. In *FDA v. Brown & Williamson Tobacco Corp.*, the Court refused to read an implicit delegation of regulatory authority where Congress had legislated extensively in the same area without granting such power. 529 U.S. 120, 133 (2000). And in *Utility Air Regulatory*

---

[4] See *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 652 (1952) (Jackson, J., concurring) ("Emergency powers are consistent with free government only when their control is lodged elsewhere than in the Executive…"); *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425–26 (1934) ("Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved."); *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120–21 (1866) ("The Constitution … is a law for rulers and people, equally in war and in peace…").

*Group v. EPA*, the Court reiterated that it "expect[s] Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" 573 U.S. 302, 324 (2014) (citation omitted).

Here, reading IEEPA to permit tariff authority would present a textbook example of what courts have repeatedly declined to allow: using vague or general language to justify sweeping powers Congress never clearly conveyed. Congress has enacted dozens of statutes addressing trade and tariff policy—none of which identify IEEPA as a source of tariff authority. That silence is telling.

Interpreting IEEPA to authorize tariffs would also invite a grave nondelegation problem. The statute supplies no intelligible principle to guide the President in determining when, how, or to what extent duties should be imposed If construed to allow the imposition of tariffs without meaningful limits or standards, IEEPA would amount to an open-ended delegation of legislative power—precisely what the nondelegation doctrine forbids. As the Court explained in *Whitman v. American Trucking Associations*, Congress must "lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." 531 U.S. 457, 472 (2001) (citation omitted). That principle is absent here with respect to trade duties.

Such an interpretation would also invert IEEPA's purpose. IEEPA was enacted to curtail executive economic powers, not to expand them. Enacted to rein in executive overreach under the TWEA, IEEPA was meant to restore congressional control over economic decisions affecting the public at large. It was a legislative effort to narrow

presidential authority, not to expand it. To now read it as a wellspring of unilateral tariff power is to defy its text, structure, and history.

To be sure, tariffs are not merely regulatory. They are taxes—duties and imposts that raise revenue and affect domestic prices. The Constitution treats them as such, placing them squarely within Congress's power to "lay and collect Taxes, Duties, Imposts and Excises." U.S. Const. art. I, § 8, cl. 1. That is why tariffs appear not only in trade statutes, but in revenue measures. The power to regulate foreign commerce may be broad—but it does not erase the Constitution's command that taxation originate with the legislature.

    5.    *No President Has Ever Used IEEPA This Way.*

The Supreme Court has cautioned that "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' … we typically greet its announcement with a measure of skepticism." *Util. Air Regul. Group (UARG) v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). That skepticism is warranted here. In the nearly five decades since its enactment, IEEPA has never been used to impose a general tariff. Presidents have invoked it to freeze assets, block financial transfers, and impose targeted sanctions on hostile regimes and individuals. But never to levy broad-based duties on imports. That settled practice confirms what the statute's text and legislative record already show: Congress did not grant tariff authority.

The 2025 tariff proclamations depart radically from that established understanding. They do not target discrete foreign actors or particular transactions. They impose sweeping, across-the-board import taxes on goods from nearly every country and industry. That is not sanctions policy—it is tax policy. It is not a response to a sudden emergency—it is an attempt to address conditions that have existed for decades. And it lacks the statutory foundation that such a policy requires.

Worse still, the use of IEEPA here is marked by the absence of coherent standards. The President imposed tariffs across broad sectors without articulating clear criteria, offering consistent justification, or explaining how duties were determined, modified, or exempted. That absence of rationale—the hallmark of arbitrary governance—underscores the danger of repurposing emergency statutes to justify sweeping economic proclamations untethered from legislative direction.

**C.     The President's Tariffs Lack Clear Legal Authority.**

1.     *The Court Has Repeatedly Rejected Sweeping Power from Ambiguous Text.*

In matters of vast political and economic consequence, the Supreme Court insists on unmistakable legislative authority before allowing the Executive Branch to act. It is not a novel doctrine but a longstanding interpretive principle: it is improbable that Congress means to transfer vast swathes of its constitutional power without saying so directly. General language will not suffice. The point here is not (as with the nondelegation doctrine) to limit Congress's ability to legislate, but to protect Congress from having its words twisted to unintended purposes.

That principle, dubbed the "major questions doctrine," applies with full force here. The President has proclaimed a fundamental reordering of U.S. trade policy: a baseline 10% tariff on nearly all imports, a 34% tariff on Chinese goods, and a 25% tariff on foreign automobiles—without new legislation or specific congressional approval. The asserted authority rests on statutory language not enacted for this purpose and never before used in this way. That, under binding precedent, is not enough.

The Court applied this principle decades ago in *Brown & Williamson*. There, it rejected the FDA's attempt to regulate tobacco under broad statutory language, noting that Congress had legislated extensively in the area without granting that power. "[Congress] could not have intended to delegate a decision of such economic and political significance in so cryptic a fashion." 529 U.S. at 160. The Court refused to assume that Congress had granted sweeping authority without saying so. As the Court warned, Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

So too here. Trade and tariff policy is a domain Congress has long governed directly. It has enacted dozens of statutes to manage trade relationships, address unfair practices, and adjust duties for national security purposes. In none of these statutes has Congress given the President unilateral authority to impose general tariffs in the absence of new legislative enactment. That omission is no accident. It reflects a consistent understanding: the power to impose duties lies with Congress.

In *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021), the Court struck down the CDC's attempt to extend a nationwide eviction moratorium under general public health authority. The relevant statute allowed measures to prevent disease transmission, but none of the enumerated measures bore any resemblance to moratorium on evictions. That mattered. The Court emphasized that sweeping economic actions require unmistakable legislative approval— particularly where Congress had considered and declined to extend the policy itself. The CDC's reliance on broad language was not enough.

The situation here is analogous. Like the CDC, the President relies on a few generalized words ("regulate" and "importation") in a statute designed for narrow, targeted emergencies to justify a dramatic, long-term economic intervention. And as in *Alabama Association*, Congress has not merely failed to speak clearly—it has expressly declined to authorize the action now claimed. Cf. *Youngstown*, 343 U.S. at 586 (noting that Congress had considered and declined to grant the President authority to seize private property in response to labor disputes). When enacting IEEPA, Congress rejected proposals to include tariff powers, understanding that such authority rested with the legislative branch. That history cannot be rewritten by implication or executive interpretation.

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109 (2022), reinforces the point. There, the Court invalidated OSHA's nationwide vaccine-or-test mandate, holding that such a significant policy required explicit congressional authorization. Though OSHA invoked its general authority to regulate workplace safety, the Court

found that such sweeping measures could not rest on generalized statutory terms. The Executive may not transform a broad statute into a blank check for nationwide regulation—particularly when fundamental personal and economic rights are at stake. The same logic applies here: the President's use of IEEPA to impose economy-wide tariffs lacks the clear legislative endorsement the Constitution demands.

Congress has enacted comprehensive frameworks for negotiating trade agreements, responding to unfair foreign practices, and adjusting import restrictions for national security. In none of these efforts has it granted the President carte blanche to impose sweeping tariffs. That omission is deliberate. It reflects Congress's enduring understanding that the power to impose duties resides in its own hands. See *Youngstown*, 343 U.S. at 585–89 (finding presidential action unlawful where Congress had legislated in the relevant area but had declined to authorize the action taken).

2.  *Constitutional Precedent Bars Executive Lawmaking.*

The principles make sense as an ordinary matter of statutory interpretation, but they also bolster the Constitution's separation of powers. As the Supreme Court recognized in *Youngstown*, the President does not possess a general reservoir of domestic authority. When he acts without express statutory backing—especially in areas where Congress has spoken—his power is "at its lowest ebb." 343 U.S. at 637 (Jackson, J., concurring). In *Youngstown*, President Truman attempted to seize steel mills to avert a labor strike during wartime. The Court rejected the claim of inherent

executive power and held that, even in urgent circumstances, the President lacked constitutional or statutory authority to commandeer the nation's industrial base.

That lesson remains instructive. The Court did not ask whether Congress might have silently acquiesced. It asked whether Congress had clearly authorized the action—and it had not. The same inquiry governs here. The power to impose tariffs—taxes on American consumers—must rest on explicit legislative approval. Nothing less suffices.

*Whitman* reinforces this constraint. There, the Court declined to invalidate a statute on nondelegation grounds but warned against reading vague provisions to effect sweeping policy changes. The first line of defense against non-delegation is not constitutional judicial review, but interpretive caution to ensure that Congress intended the delegation in the first place. Courts must guard not only against excessive delegations, but also against excessive claims of power drawn from silence.

That caution is especially warranted here. The President's tariffs reach into every sector of the American economy. They alter prices, reshape supply chains, and affect the daily lives of millions of Americans. Such decisions are not mere technical adjustments. They are fundamental exercises of economic authority—precisely the kind of power the Constitution assigns to Congress and the kind of power courts have repeatedly held must rest on clear legislative command.

The Framers' decision to allocate lawmaking to a representative body and execution to a single executive serves practical as well as theoretical purposes. Legislatures – especially bicameral legislatures – are by their nature deliberative,

25

and therefore slower to change course, by comparison to the executive, whose singular virtues include "energy" and "dispatch." They well understood what Madison called the "mischievous effects of a mutable government," and sought to guard against it by the bicameral structure of Congress. THE FEDERALIST, *No. 62*, at 420 (Jacob E. Cooke ed. 1961). As Madison explained, "It will be of little avail to the people, that the laws are made by men of their own choice, if the laws . . . be repealed or revised before they are promulgated, or undergo such incessant changes that no man, who knows what the law is to-day, can guess what it will be to-morrow." He posed the question: "What prudent merchant will hazard his fortunes in any new branch of commerce when he knows not but that his plans may be rendered unlawful before they can be executed? What farmer or manufacturer will lay himself out for the encouragement given to any particular cultivation or establishment, when he can have no assurance that his preparatory labors and advances will not render him a victim to an inconstant government?" *Id.* at 421-22. So, too of American merchants and manufacturers today, whose decisions are affected by the cost of imported goods and materials. It is not an argument for one tariff policy over another to observe the wisdom of the Constitution's assignment of these powers to the branch most likely to pursue a consistent and predictable policy.

3.    *The Greater the Power, the Clearer the Grant Must Be.*

The President's reliance on vague statutory language to justify sweeping tariff authority is not simply an aggressive interpretation—it is a constitutional provocation. Accepting such a claim would upend the separation of powers, enabling

the Executive to bypass Congress's exclusive control over taxation and commerce. Under that logic, the President could impose economic burdens of historic magnitude merely by invoking an "emergency" or citing open-ended statutory terms—without legislative debate, approval, or constraint.

That result is incompatible with the Constitution and irreconcilable with the Court's recent jurisprudence. Justice Gorsuch warned in *W. Va. v. EPA*, "Permitting Congress to divest its legislative power to the Executive Branch would 'dash [this] whole scheme' . . . Legislation would risk becoming nothing more than the will of the current President, or, worse yet, the will of unelected officials barely responsive to him." 597 U.S. 697, 739 (2022) (Gorsuch, J., concurring). Although this case does not involve an administrative agency, the principle holds. The President—no less than an agency—may not assume legislative powers absent a clear, limited, and constitutionally valid delegation.

The statutes cited by the Administration lack that clarity. They were not enacted to authorize tariffs and cannot be retrofitted to support them now. To hold otherwise would sanction the very danger the Court has repeatedly warned against: the silent transfer of core legislative power to the Executive, masked by broad language and framed as interpretation.

*    *    *    *    *

This case presents the Court with a choice—not between competing trade policies, but between rival understandings of constitutional governance. One preserves the balance the Framers struck, requiring that major economic decisions

27

receive explicit legislative authorization. The other would allow the Executive to unilaterally remake the nation's commercial framework under vague and general statutory language never intended to support such action.

The Court should choose the former. It should reaffirm that the power to tax, regulate commerce, and shape the nation's economic course resides with Congress. It should reject the notion that emergency silently confer sweeping tariff powers. And it should make clear that even in moments of perceived urgency, the Constitution's structural safeguards remain—not as relics, but as restraints that preserve liberty and ensure accountability in a republic.

## III.    CONCLUSION

The Court should reject this vision of executive power—not merely because it lacks statutory support, but because it permits arbitrary taxation untethered from the constitutional processes designed to safeguard liberty.

Amici respectfully urge the Court to hold that the President may not unilaterally reshape American trade law through proclamation, absent a clear and limited delegation grounded in intelligible principles. The separation of powers remains the first and strongest safeguard of liberty in a constitutional republic. It must be upheld here.

The Court should grant plaintiffs' request for relief because plaintiffs are likely to succeed on the merits.

Respectfully submitted,

Michael W. McConnell
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: (650) 736-1326
Email: mcconnell@law.stanford.edu

*Of Counsel*


Dated: April 23, 2025

*/s/ Weronika Bukowski*
John B. Brew
Daniel Cannistra
Weronika Bukowski

Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Telephone: (202) 628-5116
Email: jbrew@crowell.com

*Attorneys to Amici Curiae*

# APPENDIX: LIST OF AMICI

The undersigned amici join this brief in their individual capacities. They do not represent any party to this matter. Institutional affiliations are provided for identification only and do not reflect the views or endorsements of their employers.

**George F. Allen** served as Governor of Virginia from 1994 to 1998 and as a United States Senator from 2001 to 2007. Earlier in his career, he represented Virginia in the U.S. House of Representatives and served in the Virginia House of Delegates.

**Steven G. Calabresi** is the Clayton J. & Henry R. Barber Professor at Northwestern Pritzker School of Law. He served as Special Assistant to Attorney General Edwin Meese from 1985 to 1987 and as Chief Aide to the Hon. T. Kenneth Cribb, Assistant to President Ronald Reagan for Domestic Affairs, in the West Wing of the White House.

**Joshua A. Claybourn** is an attorney who advises public-sector clients—including legislative bodies—on constitutional and administrative law. His legal and historical scholarship focuses on the separation of powers and the constitutional legacy of the early Republic and Abraham Lincoln.

**John C. Danforth** served as a United States Senator from Missouri and as U.S. Ambassador to the United Nations. Prior to his Senate tenure, he was Attorney General of Missouri for eight years. He currently serves on the national advisory board of the John C. Danforth Center on Religion and Politics at Washington University.

**Richard A. Epstein**[*] is the Laurence A. Tisch Professor of Law at New York University School of Law, the Peter and Kirsten Bedford Senior Fellow at the Hoover Institution at Stanford University, and the James Parker Hall Distinguished Service Professor Emeritus and Senior Lecturer at the University of Chicago Law School.

**Charles T. Hagel** represented Nebraska in the United States Senate from 1997 to 2009, where he served on the Foreign Relations and Intelligence Committees. He served as the 24th United States Secretary of Defense from 2013 to 2015 and as co-chairman of the President's Intelligence Advisory Board from 2009 to 2013.

**Harold Hongju Koh** is Sterling Professor of International Law and former Dean at Yale Law School. From 2009 to 2013, he served as Legal Adviser to the United States Department of State, and from 1998-2001, he served as Assistant Secretary of State for Democracy, Human Rights and Labor.

---

[*] Professor Epstein serves on the board of directors of the Liberty Justice Center, which represents Plaintiffs in this case. He has not been involved in the litigation.

**Gerard N. Magliocca** is a Distinguished Professor and the Lawrence A. Jegen III Professor at the Indiana University Robert H. McKinney School of Law. A leading scholar of constitutional law and constitutional history, he is the author of five books and dozens of articles exploring the evolution of American constitutional thought, with a focus on the Founding era and Reconstruction.

**Michael W. McConnell** is the Richard and Frances Mallery Professor of Law and Director of the Constitutional Law Center at Stanford Law School, and a Senior Fellow at the Hoover Institution. From 2002 to 2009, he served as Circuit Judge on the United States Court of Appeals for the Tenth Circuit. He served on the President's Intelligence Oversight Board under Presidents Reagan and Bush. He is author of THE PRESIDENT WHO WOULD NOT BE KING: EXECUTIVE POWER UNDER THE CONSTITUTION (Princeton Univ. Press 2020).

**Michael B. Mukasey** was Attorney General of the United States from 2007 to 2009. Earlier, he sat on the U.S. District Court for the Southern District of New York from 1988 to 2006, serving the last six years as Chief Judge. Before joining the bench, he tried complex cases as an Assistant U.S. Attorney in that district and later handled commercial litigation in private practice. Today he advises clients and speaks and writes on national-security and constitutional law.

**Alan O. Sykes** is a Professor at Stanford Law School, where he serves as Director of the LL.M. Program in International Economic Law, Business and Policy. He is also a Senior Fellow at the Stanford Institute for Economic Policy Research. He is co-author of Legal Problems of International Economic Relations (7th ed. 2021), a leading casebook in the field.

**Judge John Daniel Tinder** (Ret.) served as a judge on the United States Court of Appeals for the Seventh Circuit from 2007 to 2015, and on the United States District Court for the Southern District of Indiana from 1987 to 2007. Prior to his judicial service, he was the United States Attorney for the Southern District of Indiana from 1984 to 1987.

**Peter J. Wallison** is a Senior Fellow Emeritus at the American Enterprise Institute. He previously served as General Counsel of the U.S. Department of the Treasury and as White House Counsel to President Ronald Reagan.

**Philip Zelikow** is the Botha-Chan Senior Fellow at Stanford University's Hoover Institution and formerly held a chaired professorship in history at the University of Virginia, where he directed the nation's foremost center for the study of the presidency. He served as Counselor of the U.S. Department of State under President George W. Bush, was a member of the National Security Council staff during the George H.W. Bush administration, and directed the 9/11 Commission.

He also served on the President's Intelligence Advisory Board under both
Presidents George W. Bush and Barack Obama.

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

Before Honorable Gary S. Katzmann, Judge, Honorable
Timothy M. Reif, Judge, Honorable Jane A. Restani, Judge

| | |
|---|---|
| V.O.S. SELECTIONS, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> Defendants. | Case No. 25-00066 |

## **Certificate of Compliance**

Pursuant to U.S. Court of International Trade's Standard Chambers Procedures, undersigned counsel, certifies this brief complies with the Court's type-volume limitation rules. This brief contains no more than 7,200 words. This brief also complies with all typeface and margin requirements.

Respectfully submitted,

*/s/ Weronika Bukowski*
Weronika Bukowski

*Attorney to Amici Curiae*