**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:      THE HONORABLE GARY S. KATZMANN, JUDGE
             THE HONORABLE TIMOTHY M. REIF, JUDGE
             THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP in his official capacity, EXECUTIVE OFFICE OF THE PRESIDENT, THE UNITED STATES, U.S. CUSTOMS AND BORDER PROTECTION, PETE R. FLORES in his official capacity, JAMIESON GREER in his official capacity, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, and HOWARD LUTNICK in his official capacity, <br><br> Defendants. | Court No. 25-00066 |

**DEFENDANTS' RESPONSE IN OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT**

OF COUNSEL:

ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Sosun Bae
SOSUN BAE
Senior Trial Counsel
LUKE MATHERS
CATHERINE M. YANG
BLAKE W. COWMAN
COLLIN T. MATHIAS
Trial Attorneys
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 305-7568
sosun.bae@usdoj.gov

Dated: April 29, 2025

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
            THE HONORABLE TIMOTHY M. REIF, JUDGE
            THE HONORABLE JANE A. RESTANI, JUDGE

| | | |
|---|---|---|
| V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Court No. 25-00066 |
| v. | ) ) | |
| DONALD J. TRUMP in his official capacity, EXECUTIVE OFFICE OF THE PRESIDENT, THE UNITED STATES, U.S. CUSTOMS AND BORDER PROTECTION, PETE R. FLORES in his official capacity, JAMIESON GREER in his official capacity, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, and HOWARD LUTNICK in his official capacity, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## <u>ORDER</u>

Upon consideration of plaintiffs' motion for a preliminary injunction and summary judgment, defendants' response thereto, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion for a preliminary injunction is DENIED, and it is further

ORDERED that plaintiffs' motion for summary judgment is DENIED, and it is further

ORDERED that judgment is entered in favor of defendants.

Dated:_____                    _____
        New York, New York                          JUDGE

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

I.    The President's Authority Under IEEPA To Regulate Importation During National Emergencies................................................................................................................. 3

II.   Factual Background ................................................................................................. 6

    A.   The President's Declaration Of A National Emergency And Action To Address That Emergency ........................................................................................... 6

    B.   Plaintiffs Sue To Enjoin The Executive Orders........................................... 7

SUMMARY OF THE ARGUMENT ................................................................................... 8

STANDARD OF REVIEW ................................................................................................. 9

ARGUMENT ..................................................................................................................... 10

I.    IEEPA Constitutionally Authorizes The President To Impose Tariffs, Including The Tariffs Contested Here ............................................................................................ 10

    A.   IEEPA Includes Tariff Authority ................................................................. 10

        1. Text And Context........................................................................................ 11

        2. History........................................................................................................ 17

        3. Purpose....................................................................................................... 19

        4. The Major-Questions Doctrine .................................................................. 21

    B.   IEEPA Is A Valid Delegation Of Congressional Authority ........................... 27

II.   The National Emergency Is A Political Question And Valid If Subject To Review........ 32

III.  Plaintiffs Are Not Entitled To A Preliminary Injunction......................................... 37

    A.   Plaintiffs Cannot Establish The Likelihood of Immediate, Irreparable Harm.............. 37

    B.   The Remaining Preliminary Injunction Factors Do Not Favor Plaintiffs..................... 42

    C.   Any Preliminary Injunction Should Be Limited Only To Plaintiffs and Would Require Them To Post A Bond ........................................................................... 44

CONCLUSION.................................................................................................................. 45

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ala. Ass'n of Realtors v. HHS,*
  594 U.S. 758 (2021) ................................................................................................ 23

*Al-Bihani v. Obama,*
  619 F.3d 1 (D.C. Cir. 2010) ..................................................................................... 20

*Alcan Sales v. United States,*
  693 F.2d 1089 (Fed. Cir. 1982) ............................................................................... 12

*Am. Inst. for Int'l Steel v. United States,*
  806 F. App'x 982 (Fed. Cir. 2020) .......................................................................... 32

*Am. Power & Light Co. v. SEC,*
  329 U.S. 90 (1946) ............................................................................................ 30, 31

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
  239 F.3d 1343 (Fed. Cir. 2001) ............................................................................... 10

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................................................... 9

*Asociacion Colombiana de Exportadores de Flores v. United States,*
  717 F. Supp. 847 (Ct. Int'l Trade 1989) ................................................................. 37

*Atari Games Corp. v. Nintendo of America,*
  897 F.2d 1572 (Fed. Cir. 1990) ............................................................................... 38

*Baker v. Carr,*
  369 U.S. 186 (1962) ................................................................................................ 32

*Bd. of Trs. of Univ. of Ill. v. United States,*
  289 U.S. 48 (1933) .................................................................................................. 12

*Beacon Prods. Corp. v. Reagan,*
  633 F. Supp. 1191 (D. Mass. 1986) .................................................................. 34, 35

*Biden v. Missouri,*
  595 U.S. 87 (2022) .................................................................................................. 24

*Biden v. Nebraska,*
  600 U.S. 477 (2023) .......................................................................................... 26, 27

*Biden v. Texas,*
  597 U.S. 785 (2022) ................................................................................................ 36

*B-West Imports, Inc. v. United States*,
   75 F.3d 633 (Fed. Cir. 1996) ................................................................. 20, 23

*Canadian Wheat Bd. v. United States*,
   641 F.3d 1344 (Fed. Cir. 2011) ...................................................................... 9

*Canadian Wheat Bd. v. United States*,
   580 F. Supp. 2d 1350 (Ct. Int'l Trade 2008) ............................................... 9

*Chang v. United States*,
   859 F.2d 893 (Fed. Cir. 1988) ............................................................... 33, 37

*City of Chicago v. Barr*,
   961 F.3d 882 (7th Cir. 2020) ....................................................................... 44

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or*
   *Negots. v. United States*,
   393 F. Supp. 3d 1271 (Ct. Int'l Trade 2019) .............................................. 38

*Corus Grp. PLC. v. ITC*,
   352 F.3d 1351 (Fed. Cir. 2003) ......................................................... 11, 35, 37

*Corus Grp. PLC v. Bush*,
   217 F. Supp. 2d 1347 (Ct. Int'l Trade 2002) ........................................ 39, 40

*City and County of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ..................................................................... 44

*Ctr. for Biological Diversity v. Trump*,
   453 F. Supp. 3d 11 (D.D.C. 2020) .............................................................. 33

*Dalton v. Specter*,
   511 U.S. 462 (1994) ..................................................................................... 35

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ................................................................. 5, 17, 18, 30

*NFIB v. Dep't of Labor.*,
   595 U.S. 109 (2022) ............................................................................... 22, 25

*Dep't of Navy v. Egan*,
   484 U.S. 518 (1988) ............................................................................... 22, 23

*FAA v. Cooper*,
   566 U.S. 284 (2012) ..................................................................................... 16

*Facebook, Inc. v. Duguid,*
    592 U.S. 395 (2021) ........................................................................... 19

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ........................................................................... 25

*Fed. Energy Admin. v. Algonquin SNG, Inc.,*
    426 U.S. 548 (1976) ................................................................ 15, 16, 30

*Field v. Clark,*
    143 U.S. 649 (1892) ........................................................................... 26

*Florida v. HHS,*
    19 F.4th 1271 (11th Cir. 2021) ..................................................... 27, 44

*Florsheim Shoe Co., Div. of Interco v. United States,*
    744 F.2d 787 (Fed. Cir. 1984) ...................................... 20, 26, 34, 35

*Forest Grove Sch. Dist. v. T.A.,*
    557 U.S. 230 (2009) ........................................................................... 17

*Gemveto Jewelry Co. v. Jeff Cooper Inc.,*
    800 F.2d 256 (Fed. Cir. 1986) ..................................................... 44, 45

*Georgia v. PublicResource.Org, Inc.,*
    590 U.S. 255 (2020) ........................................................................... 18

*Gibbons v. Ogden,*
    22 U.S. 1 (1824) ................................................................................. 12

*Groves v. Slaughter,*
    40 U.S. 449 (1841) ............................................................................. 12

*Gundy v. United States,*
    588 U.S. 128 (2019) ..................................................................... 28, 32

*Haig v. Agee,*
    453 U.S. 280 (1981) ........................................................................... 30

*Helsinn Healthcare S. A. v. Teva Pharmaceuticals USA, Inc.,*
    586 U.S. 123 (2019) ........................................................................... 18

*Htet v. Trump.,*
    No. 24-1446, 2025 WL 522033 (D.D.C. Feb. 18, 2025) ................ 33

*Humane Soc. of U.S. v. Clinton,*
    236 F.3d 1320 (Fed. Cir. 2001) ....................................................... 20

*In re 650 Fifth Ave. & Related Props.*,
   777 F. Supp. 2d 529 (S.D.N.Y. 2011)...................................................................... 33

*Japan Whaling Ass'n v. Am. Cetacean Soc.*,
   478 U.S. 221 (1986)........................................................................................................ 32

*Jennings v. Rodriguez*,
   583 U.S. 281 (2018)........................................................................................................ 21

*Lorillard v. Pons*,
   434 U.S. 575 (1978)........................................................................................................ 17

*Loving v. United States*,
   517 U.S. 748 (1996)........................................................................................................ 32

*Maine Cmty. Health Options v. United States*,
   590 U.S. 296 (2020)........................................................................................................ 15

*Maple Leaf Fish Co. v. United States*,
   762 F.2d 86 (Fed. Cir. 1985)................................................................................. 11, 26

*Marshall Field & Co. v. Clark*,
   143 U.S. 649 (1892)........................................................................................................ 26

*Martin v. Mott*,
   25 U.S. 19 (1827)............................................................................................................. 33

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997)........................................................................................................ 10

*Michael Simon Design, Inc. v. United States*,
   609 F.3d 1335 (Fed. Cir. 2010)................................................................................ 35

*Mingus Constructors, Inc. v. United States*,
   812 F.2d 1387 (Fed. Cir. 1987)................................................................................... 9

*Munaf v. Geren*,
   553 U.S. 674 (2008)........................................................................................................ 10

*Ninestar Corp. v. United States*,
   687 F. Supp. 3d 1308 (Ct. Int'l Trade 2024) ....................................................... 41

*Nken v. Holder*,
   556 U.S. 418 (2009)........................................................................................................ 42

*PrimeSource Bldg. Prods., Inc. v. United States*,
   59 F.4th 1255 (Fed. Cir. 2023) ................................................................... 11, 21, 30

*PrimeSource Bldg. Prods., Inc. v. United States*,
    535 F. Supp. 3d 1327 (Ct. Int'l Trade 2021) ........................................ 45

*Pulsifer v. United States*,
    601 U.S. 124 (2024) ............................................................................... 14

*Regan v. Wald*,
    468 U.S. 222 (1984) ........................................................................... 5, 17

*Retractable Techs., Inc. v. United States*,
    739 F. Supp. 3d 1330 (Ct. Int'l Trade 2024) ...................................... 38

*Riles v. Shell Expl. & Prod. Co.*,
    298 F.3d 1302 (Fed. Cir. 2002) ........................................................... 45

*S. Corp. v. United States*,
    690 F.2d 1368 (Fed. Cir. 1982) ........................................................... 12

*Sampson v. Murray*,
    415 U.S. 61 (1974) ................................................................................ 41

*Sebelius v. Auburn Regional Medical Center*,
    568 U.S. 145 (2013) .............................................................................. 16

*Sec. Pac. Nat. Bank v. Gov't & State of Iran*,
    513 F. Supp. 864 (C.D. Cal. 1981) ................................................ 17, 18

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) .............................................................................. 22

*Shandong Huarong General Grp. v. United States*,
    122 F. Supp. 2d 143 (Ct. Int'l Trade 2000) ........................................ 39

*Shree Rama Enterprises v. United States*,
    983 F. Supp. 192 (Ct. Int'l Trade 1997) ............................................. 40

*Silfab Solar, Inc. v. United States*,
    892 F.3d 1340 (Fed. Cir. 2018) ............................................... 10, 11, 26

*Sumecht NA, Inc. v. United States*,
    923 F.3d 1340 (Fed. Cir. 2019) ........................................................... 10

*Taggart v. Lorenzen*,
    587 U.S. 554 (2019) .............................................................................. 18

*Tex. Dep't of Housing & Comm. Affairs v. Incl. Comms. Project, Inc.*,
    576 U.S. 519 (2015) .............................................................................. 17

*Touby v. United States*,
    500 U.S. 160 (1991) ................................................................. 32

*Transpacific Steel LLC v. United States*,
    4 F.4th 1306 (Fed. Cir. 2021) ................................................ 30

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ...................................................... 22, 33, 37

*United States v. Amirnazmi*,
    645 F.3d 564 (3rd Cir. 2011) .............................. 28, 29, 34, 37

*United States v. Arch Trading Co.*,
    987 F.2d 1087 (4th Cir. 1993) ............................................... 29

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936) ...................................................... 16, 26, 31

*United States v. Dhafir*,
    461 F.3d 211 (2d Cir. 2006) .......................................... 28, 29, 32

*United States v. Bush & Co.*,
    310 U.S. 371 (1940) ............................................................... 34

*United States v. Mazurie*,
    419 U.S. 544 (1975) ............................................................... 31

*United States v. Shih*,
    73 F.4th 1077 (9th Cir. 2023) .................................. 29, 30, 32, 33

*United States v. Spawr Optical Rsch., Inc.*,
    685 F.2d 1076 (9th Cir. 1982) ......................................... 12, 27

*United States v. White*,
    97 F.4th 532 (7th Cir. 2024) .................................................. 27

*United States v. Yoshida Int'l, Inc.*,
    526 F.2d 560 (C.C.P.A. 1975) ......................................... passim

*USP Holdings, Inc. v. United States*,
    36 F.4th 1359 (Fed. Cir. 2022) ............................................. 11

*Util. Air Reg. Grp. v. EPA*,
    573 U.S. 302 (2014) ............................................................... 22

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ......................................................... passim

*Winter v. Nat. Res. Def. Council, Inc.,*
　555 U.S. 7 (2008) ............................................................................. 10, 42

*Wisconsin Gas Co. v. FERC,*
　758 F.2d 669 (D.C. Cir. 1985) ........................................................... 38

*Yakus v. United States,*
　321 U.S. 414 (1944) ........................................................................... 31, 43

*Yellen v. Confederated Tribes of Chehalis Rsrv.,*
　594 U.S. 338 (2021) ........................................................................... 19

*Youngstown Sheet & Tube Co. v. Sawyer,*
　343 U.S. 579 (1952) ........................................................................... 22

*Zemel v. Rusk,*
　381 U.S. 1 (1965) ............................................................................... 30

*Zenith Radio Corp. v. United States,*
　710 F.2d 806 (Fed. Cir. 1983) ........................................................... 38

*Ziglar v. Abbasi,*
　582 U.S. 120 (2017) ........................................................................... 23

**Constitutional Provisions**

U.S. Const. art. II, §2 ............................................................................. 43

**Statutes**

19 U.S.C. § 1307 ..................................................................................... 15

19 U.S.C. § 1338 ..................................................................................... 2

19 U.S.C. § 1862 ..................................................................................... 14, 16

19 U.S.C. § 2132 ..................................................................................... 15

28 U.S.C. §§ 2643-44 ............................................................................. 42

50 U.S.C. § 1621(a) ............................................................................... 4

50 U.S.C. § 1622(c) ............................................................................... 34, 37

50 U.S.C. § 1701 ..................................................................................... 5, 23, 35

50 U.S.C. § 1702 ..................................................................................... 2

50 U.S.C. § 1702(a)(1) .................................................................................. passim

50 U.S.C. § 1702(b) ........................................................................................ 5, 19

50 U.S.C. § 1703 .............................................................................................. 5, 6

50 U.S.C. § 4302 .................................................................................................. 5

50 U.S.C. § 4305(b)(1)(B) ................................................................................. 19

First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838, 839-40 (1941) ........................................ 3

National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976) ........................................ 4

Trading With the Enemy Act, Pub. L. No. 65-91, 40 Stat. 411 (1917) ........................................ 3

Act of June 4, 1794, ch. 41, § 1, 1 Stat. 372 ........................................................ 1

## Rules

USCIT Rule 56(a) ................................................................................................. 9

USCIT Rule 56(f)(1) ........................................................................................... 10

USCIT Rule 65(c) ............................................................................................... 44

## Executive Actions

Executive Order 12959, *Prohibiting Certain Transactions With Respect to Iran*, 95 Fed. Reg. 11,694 (May 9, 1995) ................................................ 24

Executive Order 13873, *Securing the Information and Communications Technology Services Supply Chain*, 84 Fed. Reg. 22,689 (May 15, 2019) .............................. 24

Executive Order 14257, *Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025) .................... 6, 7, 10

Executive Order 14259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025) ........................................ 7

Executive Order 14266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625 (Apr. 15, 2025) ................................................................................ 7

Notice of Mar. 7, 2025, *Continuation of the National Emergency With Respect to Iran*, 90 Fed. Reg. 11,887 (Mar. 12, 2025) ........................................ 37

Proclamation 4074, *Imposition of Supplemental Duty for Balance of Payments Purposes*, 36 Fed. Reg. 15,724 (Aug. 17, 1971) ...................................................... 3

**Other Authorities**

American Heritage Dictionary (1976) .......................................................................... 12

Black's Law Dictionary (12th ed. 2024) ...................................................................... 11

Black's Law Dictionary (5th ed. 1979) ........................................................................ 12

Cong. Research Serv., *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, R45618 (Jan. 30, 2024) ................................. 24, 37

H.R. Rep. No. 95-459 (1977) ............................................................... 3, 4, 6, 18, 36, 37

Joint Resolution, S.J. Res. 49, 119th Cong. (2025) ..................................................... 35

*Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Prods.*, 6 U.S. Op. Off. Legal Counsel 644, 681 (1982)........................ 20

Nat'l Bureau of Econ. Research, Douglas A. Irwin, *The Nixon Shock after Forty Years: The Import Surcharge Revisited* (2012)..................................... 18

Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Gov't Relations, 94th Cong. (Mar. 6, 1975).............................................................. 4

Random House College Dictionary 1112 (rev. ed. 1975) ........................................... 12

Webster's Third New International Dictionary (1976) ................................................. 12

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
             THE HONORABLE TIMOTHY M. REIF, JUDGE
             THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., PLASTIC ) SERVICES AND PRODUCTS, LLC d/b/a ) GENOVA PIPE, MICROKITS, LLC, ) FISHUSA INC., TERRY PRECISION ) CYCLING LLC, ) )          Plaintiffs, ) ) v. ) ) DONALD J. TRUMP in his official capacity, ) EXECUTIVE OFFICE OF THE PRESIDENT, ) THE UNITED STATES, U.S. CUSTOMS AND ) BORDER PROTECTION, PETE R. FLORES ) in his official capacity, JAMIESON GREER ) in his official capacity, OFFICE OF THE ) UNITED STATES TRADE ) REPRESENTATIVE, and HOWARD ) LUTNICK in his official capacity, ) )          Defendants. ) | Court No. 25-00066 |

**DEFENDANTS' RESPONSE IN OPPOSITION TO**
**MOTION FOR PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT**

**INTRODUCTION**

    Since the Nation's infancy, Presidents have held and exercised the power to conduct

foreign affairs and ensure national security through the regulation of trade.  In 1794, for instance,

Congress empowered the President to lay or revoke embargoes "whenever, in his opinion, the

public safety shall so require" and "under such regulations as the circumstances of the case may

require[.]" Act of June 4, 1794, ch. 41, § 1, 1 Stat. 372, 372.  Since then, Congress has continued

to delegate to the President substantial authority over foreign commerce, including the authority

to impose tariffs. In the absence of a national emergency, Congress has traditionally permitted the President to impose tariffs up to specific rates and for specific purposes. *See, e.g.*, 19 U.S.C. §§ 1338, 2132. But when the President declares a national emergency, his powers are broader. He may "regulate" the importation of goods. 50 U.S.C. § 1702(a)(1)(B). Past administrations have invoked these authorities to impose tariffs and similar restrictions on imported goods. And both Congress and the courts have approved those exercises of authority.

On April 2, 2025, the President declared a national emergency, finding that "persistent annual U.S. goods trade deficits" have "atroph[ied]" our nation's "domestic production capacity" such that now, the United States' "military readiness" and "national security posture" are "compromise[d]." To address this unusual and extraordinary threat, the President invoked his authority under the International Emergency Economic Powers Act (IEEPA) to "regulate . . . importation" by imposing a baseline 10 percent *ad valorem* tariff on most imports, among other measures. Plaintiffs—several purported importers, none of which have yet paid the tariffs at issue—challenge the President's exercise of congressionally delegated and inherent authority to regulate importation during a national emergency. They argue that regulating importation under IEEPA does not include the power to impose tariffs. They also question the national emergency that the President declared, inviting judicial second-guessing of the President's judgment.

The Court should reject those arguments and deny plaintiffs' motions for a preliminary injunction and summary judgment. IEEPA's text, purpose, and history authorize the President to "regulate" importation during a national emergency by imposing tariffs. Neither the nondelegation doctrine nor the major-questions doctrine undermines this clearly established authorization. And plaintiffs' alternative challenge to the merits of the President's emergency declaration is a nonjusticiable political question.

Plaintiffs' motion for a preliminary injunction requires additional showings that they are unable to make. They fail to show that any of the other injunctive-relief factors—irreparable harm, the balance of hardships, and the public interest—favor drastic preliminary relief. Accordingly, the Court should deny plaintiffs' motion for summary judgment and a preliminary injunction.

**BACKGROUND**

I. **The President's Authority Under IEEPA To Regulate Importation During National Emergencies**

Before IEEPA, the Trading With the Enemy Act (TWEA), Pub. L. No. 65-91, 40 Stat. 411 (1917), authorized the President to "regulate . . . importation" of foreign goods during wartime. Later, Congress expanded the authority to apply during times of peace as well. *See* First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838, 839-40 (1941). In 1971, President Nixon invoked TWEA's importation regulation authority to impose tariffs during peacetime. Proclamation 4074, *Imposition of Supplemental Duty for Balance of Payments Purposes*, 36 Fed. Reg. 15,724 (Aug. 17, 1971). Because a "prolonged decline in the international monetary reserves" of the United States had seriously threatened its "international competitive position" and potentially impaired its ability to assure national security, he "declared a national emergency with respect to the balance-of-payments crisis and under that emergency imposed a surcharge on imports" and called upon the public and private sector to "make the efforts necessary to strengthen the international economic position of the United States." H.R. Rep. No. 95-459, at 5 (1977); Proclamation 4074, 36 Fed. Reg. at 15,724. The Federal Circuit's predecessor upheld the lawfulness of those tariffs, rejecting an argument that TWEA did not authorize the President to impose tariffs. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 575-76 (C.C.P.A. 1975).

Later, Congress modified the TWEA authority through two new laws: the National Emergencies Act (NEA) and IEEPA. *See* H.R. Rep. No. 95-459, at 6-7. First, NEA, Pub. L. No. 94-412, 90 Stat. 1255 (1976), "authorized" "the President" "to declare [a] national emergency" "[w]ith respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a). Congress placed no substantive conditions on the President's ability to declare a national emergency. Instead, it committed this determination to the President, as "it would be wrong to try to circumscribe with words with what conditions a President might be confronted." Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Gov't Relations, 94th Cong. 27 (Mar. 6, 1975) (statement of Sen. Mathias); *see id.* at 31 ("[W]e didn't attempt to define it specifically because we were afraid we would circumscribe the President's constitutional powers."); *id.* at 27 (statement of Sen. Church) (similar).

Recognizing that emergency declarations would be political questions, Congress gave itself oversight authority over national-emergency declarations. National-emergency declarations must be "immediately . . . transmitted to the Congress and published in the Federal Register." 50 U.S.C. § 1621(a); *see id.* § 1641(a)-(c). Congress is authorized to terminate a national emergency by enacting a joint resolution into law. 50 U.S.C. § 1622(a)(1). Fast-track procedures accelerate congressional review when a resolution is introduced. *Id.* § 1622(c). And Congress must meet within six months of the declaration of a national emergency to consider terminating the emergency. *Id.* § 1622(b). In addition, national-emergency declarations automatically terminate after one year unless the President notifies Congress that the emergency "continue[s]." *Id.* § 1662(d).

4

Second, IEEPA separated the President's authority to act in wartime and peacetime. Congress limited TWEA to apply only in periods of declared wars. *See* 50 U.S.C. § 4302. IEEPA then extended the President's authority to periods of declared national emergencies during peacetime. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). The broad powers granted to the President under IEEPA are "essentially the same as" those under its predecessor TWEA. *Id.* Indeed, IEEPA's operative language was "directly drawn" from TWEA. *Dames & Moore v. Regan*, 453 U.S. 654, 671-72 (1981). IEEPA authorizes the President to exercise those powers during peacetime, "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Once the President declares a national emergency relating to such a threat, IEEPA empowers the President to "regulate . . . importation . . . with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B). Unlike TWEA, IEEPA contains narrow exceptions to this broad grant of authority. Among other things, the President cannot regulate or prohibit "the importation from any country . . . of any information or informational materials . . . ." *Id.* § 1702(b)(1)-(4). But none of IEEPA's exceptions involve the President's authority to impose tariffs to deal with a declared national emergency.

Congress gave itself additional oversight authority over exercises of IEEPA powers beyond that afforded by NEA. 50 U.S.C. § 1703(d). The President "shall consult regularly with the Congress so long as [IEEPA] authorities are exercised." *Id.* § 1703(a). The President also is directed to "immediately transmit to the Congress a report" on the national emergency, to be updated every six months. *Id.* § 1703(b)-(c). Even so, the Congress that enacted IEEPA recognized that its "new authorities should be sufficiently broad and flexible to enable the

President to respond as appropriate and necessary to unforeseen contingencies." H.R. Rep. No. 95-459, at 10. For instance, Congress rejected a proposal "that it place a definite time limit on the duration of any state of national emergency." *Id.*

## II. Factual Background

### A. The President's Declaration Of A National Emergency And Action To Address That Emergency

On April 2, 2025, the President declared a national emergency based on the trade deficit's effect on the country's economy and security. The President found "that underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States." Executive Order 14257, *Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025). He deemed the emergency to "ha[ve] its source in whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural imbalances in the global trading system." *Id.*

These "large and persistent annual U.S. goods trade deficits" have "atroph[ied]" our nation's "domestic production capacity" to the point where, now, the United States' "military readiness" and "national security posture" are "compromise[d]"—an "especially acute" emergency given "the recent rise in armed conflicts abroad." *Id.* at 15,044-45. The Executive Order explains that "U.S. stockpiles of military goods are too low to be compatible with U.S. national defense interests." *Id.* at 15,043. Additionally, "[i]ncreased reliance on foreign producers for goods also has compromised U.S. economic security by rendering U.S. supply

chains vulnerable to geo-political disruption and supply shocks." *Id.* (noting the existence of supply disruptions currently being caused by "Houthi rebels . . . attacking cargo ships in the Middle East"). "The future of American competitiveness depends on reversing" the hemorrhaging of manufacturing and manufacturing jobs to create "the industrial base" the nation "needs for national security," as well as safeguarding the vitality of the nation's food and agriculture sectors. *Id.* at 15,044.

Citing IEEPA, the President acted on this threat by imposing duties ranging from 10 percent to 50 percent *ad valorem* on most imported goods. *Id.* at 15,045. These duties took effect on April 5, 2025, with increased duty rates for select countries taking effect on April 9, 2025. *Id.* Since the initial declaration, the President has twice taken additional actions to address this national emergency. An April 8, 2025 executive order addressed retaliatory tariffs imposed by China. Executive Order 14259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025). An April 9, 2025 executive order imposed a 90-day suspension of the country-specific increased additional duty rates listed in Executive Order 14257, except with respect to China (for which the Executive Order raised the rate). Executive Order 14266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625 (Apr. 15, 2025).

### B. Plaintiffs Sue To Enjoin The Executive Orders

On April 14, 2025, V.O.S. Selections, Inc. (V.O.S.); Plastic Services and Products, LLC d/b/a Genova Pipe (Genova Pipe); MicroKits, LLC (MicroKits); FishUSA Inc. (FishUSA); and Terry Precision Cycling, LLC (Terry Cycling) filed a complaint in this Court. Compl., ECF No. 2. Four days later, they moved for a temporary restraining order, preliminary injunction, and

summary judgment.  *See generally* Mot., ECF No. 10.  Plaintiffs' complaint alleges that they are importers, Compl. ¶¶ 8-12, but their motion describes themselves as "a group of owner-operated businesses that each rely on imports from foreign countries."  Mot. 2.  Plaintiffs argue that IEEPA "does not authorize the President to unilaterally issue across-the-board worldwide tariffs," that imposing tariffs under IEEPA "would be an unlawful delegation of legislative power to the executive," and that "the President's justification does not meet the standards set forth in . . . [ ] IEEPA" because trade deficits "are not an emergency."  Compl. ¶¶ 2-4.  Plaintiffs seek a court order enjoining enforcement of "the tariffs imposed by Executive Order 14257."  Mot. Proposed Order.  On April 22, 2025, the Court denied plaintiffs' request for a temporary restraining order and ordered this combined response to plaintiffs' preliminary-injunction and summary-judgment motions.  Order, ECF No. 13.

## SUMMARY OF THE ARGUMENT

This Court should deny plaintiffs' motion for summary judgment and instead enter judgment in favor of the Government.  IEEPA permits the President to "regulate . . . importation" of foreign goods.  Binding authority interpreting identical text from IEEPA's predecessor statute holds that this term encompasses the power to impose tariffs on imported goods.  Neither the nondelegation nor the major-questions doctrine changes this conclusion.  Congress has long delegated authority to regulate importation and international commerce to the President, and the Federal Circuit's predecessor has upheld IEEPA's predecessor—which has even fewer constraints than IEEPA—as a constitutionally valid delegation.

Plaintiffs' remaining merits arguments—about the validity of the President's declarations of national emergencies and the nondelegation doctrine—are either unreviewable or simply incorrect.  The President's declaration of a national emergency is an unreviewable political

question, and, in any event, a national emergency exists, as explained in the Executive Orders. And the "intelligible principles" expressed by IEEPA readily meet the undemanding standard required to find a valid delegation of Congressional authority.

Because plaintiffs are not entitled to summary judgment, and the Government is entitled to summary judgment, the Court can enter final judgment now and need not consider whether a preliminary injunction is warranted. But if the Court does consider plaintiffs' preliminary-injunction motion, the law shows that plaintiffs are unlikely to succeed on the merits of their case. Nor can they establish irreparable harm, given they allege no more than speculative economic loss and, in any event, would have the possibility of a refund of any duties through the reliquidation of entries. Moreover, the equities and public interest cut against enjoining a President from using his foreign-affairs powers to protect the United States' economy and national security. Plaintiffs' motion for a preliminary injunction should be denied.

## STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine disputes as to any material fact. USCIT R. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). "The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a); *see Canadian Wheat Bd. v. United States*, 580 F. Supp. 2d 1350, 1356 (Ct. Int'l Trade 2008) ("Once it is clear there are no material facts in dispute" and the case at hand "hinges on pure questions of law, resolution by summary judgment is appropriate.") (quotation omitted), *aff'd*, 641 F.3d 1344

(Fed. Cir. 2011).  Under this Court's rules, the Court may grant summary judgment in favor of the nonmovant.  USCIT R. 56(f)(1).[1]

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis and citation omitted).  It is "never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).  "To receive a preliminary injunction, the movant must show '(1) likelihood of success on the merits, (2) irreparable harm absent immediate relief, (3) the balance of interests weighing in favor of relief, and (4) that the injunction serves the public interest.'"  *Sumecht NA, Inc. v. United States*, 923 F.3d 1340, 1345 (Fed. Cir. 2019) (quoting *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018)).  "[C]ase law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes both of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm."  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (citation omitted).

## ARGUMENT

### I.    IEEPA Constitutionally Authorizes The President To Impose Tariffs, Including The Tariffs Contested Here

#### A.    IEEPA Includes Tariff Authority

The President imposed the challenged tariffs under the authority granted to him by IEEPA to "regulate . . . importation" to deal with a national emergency.  50 U.S.C. § 1702(a)(1)(B);

---

[1]  In light of the expedited briefing schedule directing defendants to respond to plaintiffs' motion for summary judgment, we do not raise certain threshold issues at this time, including lack of standing and improper defendants, but we reserve the opportunity to make those arguments in future motions.

Executive Order 14257, 90 Fed. Reg. 15,041.  The President has properly declared a national emergency, and IEEPA clearly authorizes the President to impose tariffs.  Text, context, and history compel this conclusion.

Even if there were doubt, the limited standard of review for reviewing challenges to the President's action would resolve that doubt in defendants' favor.  "In international trade controversies of this highly discretionary kind—involving the President and foreign affairs—this court and its predecessors have often reiterated the very limited role of reviewing courts."  *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985) (citations omitted).  "For a court to interpose, there has to be a *clear* misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority."  *Id.* (emphasis added); *see, e.g.*, *Corus Grp. PLC. v. ITC*, 352 F.3d 1351, 1361 (Fed. Cir. 2003); *Silfab*, 892 F.3d at 1346; *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1365 (Fed. Cir. 2022); *PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1260 (Fed. Cir. 2023).  Plaintiffs have not shown any misconstruction of IEEPA or a constitutional violation, let alone a clear one.

### 1.     Text And Context

IEEPA's plain text authorizes the President to impose tariffs.  When a national emergency is declared:

> [T]he President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise . . . investigate, block during the pendency of an investigation, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in . . . *any property* in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702(a)(1)(B) (emphases added). Imposing tariffs falls within the power to "regulate . . . importation" of foreign goods. *Id.* Tariffs set the terms on which foreign goods enter the United States. That is consistent with the definition of "regulate," both now and when IEEPA was enacted. *See Regulate*, Black's Law Dictionary (12th ed. 2024) ("To control (an activity or process) esp. through the implementation of rules"); *Regulate*, Black's Law Dictionary 1156 (5th ed. 1979) ("[F]ix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws"); *Regulate*, Random House College Dictionary 1112 (rev. ed. 1975) ("[T]o control or direct by a rule, principle, method, etc."); *Regulate*, American Heritage Dictionary (1976) ("To control or direct according to a rule"); *Regulate*, Webster's Third New International Dictionary (1976) ("[T]o govern or direct according to rule; to bring under the control of law or constituted authority").

Precedent confirms this straightforward reading of IEEPA's language. Interpreting identical relevant language in TWEA, the Federal Circuit's predecessor upheld a tariff imposed by President Nixon, explaining that the phrase "regulate importation" permitted the President to "impos[e] an import duty surcharge." *Yoshida*, 526 F.2d at 576; *accord Alcan Sales v. United States*, 693 F.2d 1089, 1093 (Fed. Cir. 1982); *United States v. Spawr Optical Rsch., Inc.*, 685 F.2d 1076, 1081 n.10 (9th Cir. 1982). That precedent remains true today. *See S. Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (Federal Circuit adopting the body of law of the Court of Customs and Patent Appeals (CCPA)). Courts have likewise long held that tariffs are a form of regulation of commerce. *See, e.g.*, *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 58 (1933) (recognizing that it is "well established" that import duties may be imposed "in the exercise of the power to regulate commerce"); *Groves v. Slaughter*, 40 U.S. 449, 505 (1841)

(McLean, J., concurring) ("Under the power to regulate foreign commerce, [C]ongress [may] impose duties on importations[.]"); *Gibbons v. Ogden*, 22 U.S. 1, 202 (1824) ("[D]uties may often be, and in fact often are, imposed on tonnage, with a view to the regulation of commerce[.]"); *Yoshida*, 526 F.2d at 575 n.20 ("it is well established that" the power to "lay duties upon imports" "can be employed in the exercise" of "the power to regulate commerce" (collecting cases)); *id.* at 575 ("to impose duties can be to 'regulate'").  IEEPA expressly granted the President the power to "regulate . . . importation" of "any property in which any foreign country or a national thereof has any interest," 50 U.S.C. § 1702(a)(1)(B), and accordingly vested the President with authority to impose tariffs on such property, as the Federal Circuit's predecessor already held when considering the same language in IEEPA's predecessor statute. *Yoshida*, 526 F.2d at 576.  If there were any doubt, IEEPA also authorizes the President to regulate any property "subject to the jurisdiction of the United States."  50 U.S.C. § 1702(a)(1)(B).

Statutory context reinforces this conclusion.  The power to "regulate" imports by imposing tariffs is similar to the other powers granted in IEEPA's subsection (a)(1)(B), like the power to "block" the import of goods during an investigation, or the power to "prevent or prohibit" those imports.  *Id.* § 1702(a)(1)(B).  Each of these terms grants the President a significant power over foreign commerce.  And many partially or fully overlap, suggesting that Congress entrusted the President with wide-ranging powers with respect to imports rather than carefully picking and choosing isolated types of interventions.  For example, the provision's list of powers includes two obvious pairs of belt-and-suspenders terms: "direct and compel" and "prevent or prohibit."  *Id.*  It confers the overlapping powers to "nullify" and "void" various

transactions. *Id.*  Similarly, the power to "prevent or prohibit" imports could be used to "block" imports during an investigation, but the statute goes out of its way to grant both powers.  *Id.*

Regardless, attempting to read section 1702(a)(1)(B)'s list as enumerating discrete powers instead of providing broad Presidential authority would lead to the same conclusion about "regulation."  If each power articulated in the list is distinct, then "regulation" of imports must include actions such as tariffs; otherwise, it would mean little, if anything, other than the power to "prevent or prohibit" imports—leaving the term largely superfluous.  *See, e.g.*, *Pulsifer v. United States*, 601 U.S. 124, 141-43 (2024) (rejecting reading that would leave a provision "superfluous," "without any operative significance").

Plaintiffs claim that the President, in issuing the Executive Orders, is not complying with section 1702(a)(1)(B), which allows the President to, "by means of instructions, licenses, or otherwise" "regulate . . . importation," because a tariff is not an "instruction" or "license."  Mot. 11.  But these terms also appeared in TWEA, and *Yoshida* rejected an argument that they did not include the President's action to impose tariffs.  *See* 526 F.2d at 576.  And for good reason: there is simply no reasonable way to construe the Executive Orders *except* as instructing subordinates to implement the President's regulation of importation through the tariffs.  Those subordinates' actual imposition of tariffs on importations also takes the form of an instruction.  And even if not, the statutes' catch-all term—"otherwise"—would capture defendants' acts.  To conclude otherwise would contradict *Yoshida*, which rejected the same arguments plaintiffs make here.  *See* 526 F.2d at 576.

Plaintiffs seek to narrow IEEPA's plain text by pointing to statutes that use different language to authorize the President to impose tariffs in certain circumstances.  Mot. 16-17 (discussing the President's powers under 19 U.S.C. §§ 1862, 2132, 2411, and 2251).  That

14

argument's premise is wrong: Congress used similarly broad language to permit imposition of tariffs in section 232. *See* 19 U.S.C. § 1862(c) ("adjust . . . imports"); *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 562 (1976) (Section 232's "adjust . . . imports" means that "the President's authority extends to the imposition of monetary exactions, i.e., license fees and duties[.]"). Regardless, the fact that Congress has elsewhere used narrower language to convey a power says little about the meaning of the broader language it used in TWEA or IEEPA. Nor does the existence of a statute permitting the President to impose tariffs to address balance-of-payment issues somehow narrow the scope of the later-enacted IEEPA. Mot. 16 (citing 19 U.S.C. § 2132). That earlier-enacted statute cannot narrow IEEPA; when statutes irreconcilably conflict, it is the *later* enactment that prevails. *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 315-16 (2020). In any event, there is no conflict here. Section 2132 permits non-emergency tariffs to address balance-of-payment issues; IEEPA provides broad emergency powers, including tariffs, to address a variety of threats. Indeed, *Yoshida* already rejected the idea that statutes applicable in non-emergency situations can narrow the powers available in an emergency. *See* 526 F.2d at 578 ("trade acts" that do not involve "national emergency powers" did not narrow TWEA's scope).

Amici posit that, because Congress has "affirmatively granted" the power to impose tariffs in other statutes, IEEPA is better read as permitting embargoes and licensing regimes, but not tariffs. Amicus Br. 12, ECF No. 31. But on amici's reasoning, IEEPA would not permit that authority either, as Congress has similarly "affirmatively granted" the power to impose embargoes and effect licensing regimes in other statutes. *See, e.g.*, 19 U.S.C. §§ 1307 (prohibiting the entry of all goods manufactured or produced by forced labor), 1626 (authorizing a requirement to present an export license to enter with steel mill products), 2581 (authorizing

the President to sell import licenses at public auction). And as a practical matter, it would be strange for Congress to grant the President authority to impose embargoes, but not to resolve an emergency with the lesser remedy of tariffs that, "[u]nlike quotas and other forms of action," can "be quickly imposed and removed" and are "administratively less complex." *Yoshida*, 526 F.2d at 580.

Amici also contend that IEEPA was never meant to cover tariffs because tariffs are taxes paid by Americans, and IEEPA "employ[s] seven different verbs to capture the intended types of economic sanction, but [does] not include the term 'tax' or any of its synonyms." Amicus Br. 11. But Congress need not "incant magic words in order to speak clearly." *Sebelius v. Auburn Regional Medical Center*, 568 U.S. 145, 153 (2013); *see FAA v. Cooper*, 566 U.S. 284, 291 (2012) ("We have never required that Congress use magic words."). In IEEPA, Congress made its intentions clear by authorizing the President to "regulate . . . importation"—a term that, under binding precedent, allows the President to impose import duties. *Yoshida*, 526 F.2d at 576. That tariffs also incidentally produce revenue does not overshadow that they are an important tool for regulating trade and commerce with other nations. *See United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 312 (1936); *Algonquin*, 426 U.S. at 571 (a tariff and "a license fee as much as a quota has its initial and direct impact on imports[.]"). The many statutes authorizing the imposition of duties confirm the distinction between domestic taxes and this important foreign policy tool, and amici's argument would undo those tariff authorities, too. For example, section 232 of the Trade Expansion Act authorizes the President to levy duties on imports where national security is threatened. 19 U.S.C. § 1862(c). And section 301 of the Trade Act of 1974 permits the imposition of tariffs against foreign nations engaging in unreasonable or discriminatory practices against the United States. *Id.* § 2411(b)(1)-(2).

2.    **History**

IEEPA's history further confirms that it authorizes the President to impose tariffs. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *see Tex. Dep't of Housing & Comm. Affairs v. Inclusive Comms. Project, Inc.*, 576 U.S. 519, 536 (2015); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 243 n.11 (2009). Congress drew the relevant language directly from TWEA, and it did so *after* the CCPA interpreted that identical language to permit the President to impose tariffs in 1975. During the legislative process for IEEPA, Congress was well aware of the relevant language and the court's decision interpreting the language to authorize the President to impose tariffs, but chose to keep the language when it enacted IEEPA in 1977.

The key language in IEEPA, "regulate . . . importation," was borrowed verbatim from TWEA. *See* Dec. 18, 1941, ch. 593, title III, § 301, 55 Stat. 839 (authorizing the President to "investigate, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in . . ." (emphases added)); 50 U.S.C. § 1702(a)(1)(B). Courts, including the Supreme Court, have repeatedly recognized the close relationship between the substantive powers conferred by IEEPA and TWEA. *See, e.g.*, *Dames*, 453 U.S. at 671-72 (the pertinent section of IEEPA's language was "directly drawn" from TWEA); *Regan*, 468 U.S. at 227-28 ("[T]he authorities granted to the President [under] IEEPA are essentially the same as those [under] TWEA."); *Sec. Pac. Nat. Bank v. Gov't & State of Iran*, 513 F. Supp. 864, 875 (C.D. Cal. 1981) (Section 1702 of "IEEPA is, except for stylistic changes, a reenactment of the powers previously conferred on the President by § 5(b) of the TWEA.").

Congress was also aware of *Yoshida*'s interpretation of TWEA when it chose to use the same language in IEEPA.  President Nixon's use of TWEA to impose tariffs was well known— widely called the "Nixon shock."  *See, e.g.*, Nat'l Bureau of Econ. Research, Douglas A. Irwin, *The Nixon Shock after Forty Years: The Import Surcharge Revisited* (2012).  And TWEA's role and interpretation was familiar to Congress.  Indeed, the House Report on IEEPA cited *Yoshida* and explained its holding.  H.R. Rep. No. 95-459, at 5.  It recounted that "section 5(b) [of TWEA] came into play when . . . President Nixon declared a national emergency . . . and under that emergency imposed a surcharge on imports," that the Customs Court invalidated the action after holding that "section 5(b) . . . did not" permit "imposition of duties," but that "the Appeals Court reversed."  *Id.*  Aware of that history, Congress chose to adopt the same language in IEEPA.

The language Congress drew directly from TWEA carries the same meaning in IEEPA.  "[W]hen Congress 'adopt[s] the language used in [an] earlier act,'" courts "presume that Congress 'adopted also the construction given'" to that language.  *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 270 (2020) (quoting *Helsinn Healthcare S. A. v. Teva Pharm. USA, Inc.*, 586 U.S. 123, 131 (2019)); *see Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) ("When a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.'").  Courts, including the Supreme Court, have recognized this by applying TWEA precedent to interpret IEEPA.  *See Dames*, 453 U.S. at 672 ("[W]e think both the legislative history and cases interpreting the TWEA fully sustain the broad authority of the Executive when acting under this congressional grant of power [*i.e.*, IEEPA].");  *Sec. Pac. Nat. Bank*, 513 F. Supp. at 877 ("[T]he substantial body of judicial interpretation of the TWEA should be applied to interpret the powers of the President under the IEEPA.").

Plaintiffs and amici read this history backwards. They argue that Congress passed IEEPA to take away power previously asserted by the President. Mot. 11; Amicus Br. 14. But Congress limited the President's power by including specific procedural directives and delineating specific exceptions to the otherwise broad grant of authority under IEEPA—none of which curtailed the President's authority to impose tariffs to deal with a declared national emergency. Congress *knew* that TWEA had been used to impose tariffs, yet it chose to use the same language that had conferred such authority, without modifying it or expressing precluding their imposition. *See* 50 U.S.C. § 1702(b) (listing "Exceptions to Grant of Authority," none of which involve imposing tariffs). Amici also claim that, when enacting IEEPA, "Congress rejected proposals to include tariff powers" and "expressly declined to authorize" tariffs, Amicus Br. 23, but they cite no support for these statements, and the legislative history discussed above refutes them. Moreover, as explained below, Congress has repeatedly declined to *revoke* the President's authority to impose tariffs under IEEPA. And plaintiffs' theory would mean that TWEA itself does not authorize the President *in times of war* to impose tariffs, as TWEA still has the same relevant language plaintiffs claim does not authorize the President to impose tariffs under IEEPA. 50 U.S.C. § 4305(b)(1)(B); *see Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 360 (2021) (rejecting interpretation that would have a "highly counterintuitive result").

### 3.     Purpose

Finally, IEEPA's evident purpose confirms that it includes the power to impose tariffs. The purpose of emergency statutes, like IEEPA, is to give the President broad and flexible powers to effectively address problems associated with a national emergency. As the CCPA explained, "the primary implication of an emergency power is that it should be effective to deal with a national emergency successfully." *Yoshida*, 526 F.2d at 573. "The delegation in [TWEA]

is broad and extensive; it could not have been otherwise if the President were to have, within constitutional boundaries, the flexibility required to meet problems surrounding a national emergency with the success desired by Congress." *Id.* Indeed, "the legislative history of [IEEPA] notes that the authorities available to the President should be sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies." *Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Prods.*, 6 U.S. Op. Off. Legal Counsel 644, 681 (1982) (quotation omitted). Interpreting IEEPA to include the power to impose tariffs furthers Congress's purpose to give the President the necessary tools and flexibility to effectively handle national emergencies.

Especially in this context. When it comes to foreign affairs, "broad grants by Congress of discretion to the Executive are common." *Florsheim Shoe Co., Div. of Interco v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984). IEEPA "is intimately involved with foreign affairs, an area in which congressional authorizations of presidential power should be given a broad construction and not hemmed in or cabined, cribbed, confined by anxious judicial blinders." *Id.* at 793 (cleaned up); *see, e.g.*, *B-West Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996) (reiterating "the principle that statutes granting the President authority to act in matters touching on foreign affairs are to be broadly construed"); *Al-Bihani v. Obama*, 619 F.3d 1, 39 (D.C. Cir. 2010) (Kavanaugh, J., concurring). When foreign affairs and national security are involved, "the President plays a dominant role," and "it is generally assumed that Congress does not set out to tie the President's hands; if it wishes to, it must say so in clear language." *Humane Soc. of U.S. v. Clinton*, 236 F.3d 1320, 1329 (Fed. Cir. 2001). Plaintiffs cannot point to clear language

cabining the President's authority. Just the opposite—text, history, and context all show that IEEPA authorizes the President to impose tariffs.

Plaintiffs seek a narrower reading by invoking constitutional avoidance. Mot. 17-18. But, as explained below, there is no nondelegation problem to avoid. Nor would a constitutional-avoidance reading be possible here, where Congress has spoken clearly to authorize the President to impose tariffs. *See, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (constitutional avoidance appropriate only when a statute has "more than one plausible construction"). In sum, plaintiffs cannot show that the action here is a "clear misconstruction" of IEEPA. *PrimeSource*, 59 F.4th at 1260.

### 4.    The Major-Questions Doctrine

In plaintiffs' view, the Court should not presume that Congress delegated authority to the President because of the "unprecedented significance" of the tariffs. Mot. 12-13. But the major-questions doctrine does not apply here and, even if it did, it would not help plaintiffs anyway. "Where the statute at issue is one that confers authority upon an administrative agency . . . there are extraordinary cases that . . . provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (cleaned up). In such cases, under the major-questions doctrine, the agency "must point to clear congressional authorization" for the proposed regulation." *Id.* at 723 (quotation omitted).

At the threshold, the major-questions doctrine does not apply because "the statute at issue" does not "confer[] authority upon an administrative agency." *Id.* at 721. It confers authority on the President. The Supreme Court has never applied the major-questions doctrine to a statute delegating power to the President. It has instead described the doctrine as applicable to statutes giving authority to agencies. "[T]he major questions doctrine label . . . took hold because it refers to an identifiable body of law that has developed over a series of significant

cases all addressing a particular and recurring problem: *agencies* asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *Id.* at 724 (cleaned up) (emphasis added). Unlike the President, agencies lack political accountability. *See NFIB v. Dep't of Lab.*, 595 U.S. 109, 125 (2022) (Gorsuch, J., concurring) (allowing Congress to "hand off all its legislative powers to unelected agency officials" would replace "government by the people" with "government by bureaucracy" (citation omitted)). No political-accountability justification applies here, where "the Framers made the President the most democratic and politically accountable official in Government," *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020), and the President directs an action in an executive order. And the President's overlapping powers in the national-security and foreign-affairs realm diminish any concerns of unauthorized overreach. The President's "authority is at its maximum" when he acts pursuant to the "authorization of Congress," and in those circumstances he "may be said" to "personify the federal sovereignty." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-36 (1952) (Jackson, J., concurring in the judgment).

Similarly, the major-questions doctrine does not apply to national-security and foreign-policy matters. A major-questions approach treats a decision with a "measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That approach is irreconcilable with longstanding precedent compelling the opposite approach in these contexts. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 686 (2018) (acknowledging "the deference traditionally accorded the President" on these matters); *Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988) (recounting the "utmost deference to Presidential responsibilities" that courts have "traditionally shown" in these matters); *B-West Imports*, 75 F.3d at 636. So, in this area, unlike in cases where courts have taken a major-questions approach, there is no "reason to hesitate before concluding that Congress

meant to confer" significant authority to regulate foreign commerce on the President. *West Virginia*, 597 U.S. at 721 (cleaned up).

Even if the major-questions doctrine were not categorically inapplicable, plaintiffs press no persuasive argument that it would apply to the challenged tariffs. The Supreme Court has identified several traits of regulatory action that, in combination, implicate the major-questions doctrine when an agency takes a sufficiently significant action. No one doubts the significance of the challenged tariffs, but significance alone does not implicate the major-questions doctrine; otherwise, it would apply to countless government actions, including every emergency statute. None of the remaining indicia of major questions—let alone an adequate combination—are present here.

Plaintiffs and amici point to the CDC's eviction moratorium, which presented a major question when the CDC attempted to transform its regulatory power by acting far outside its typical expertise based on a catch-all phrase in a statute. Mot. 14-15 (citing *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021)), Amicus Br. 23 (same). But each of those considerations points in the opposite direction here. Unlike the CDC's attempt to regulate "the landlord-tenant relationship" in response to the COVID-19 pandemic, *Ala. Ass'n*, 594 U.S. at 764, IEEPA directs the President to exercise power well within his expertise. In IEEPA, Congress charged the President with identifying a "national security, foreign policy, or econom[ic]" emergency and responding with a litany of expansive powers implicating foreign policy. 50 U.S.C. §§ 1701(a), 1702. Matters of national security and foreign policy are "the prerogative of Congress and the President." *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017); *see Egan*, 484 U.S. at 527 (discussing the "constitutional investment of power in the President" over matters of national security). Little could be more clearly within the President's core duties and

competencies, and the President's exercise of statutorily-conferred authority over foreign policy and national security is utterly unsurprising.  *Cf. Biden v. Missouri*, 595 U.S. 87, 95 (2022) (action not "surprising," despite unprecedented scope, because "addressing infection problems in Medicare and Medicaid facilities is what [the Secretary of HHS] does").

Nor is the President's use of IEEPA an exercise of "unheralded power," especially given the President's exercise of his tariff power under materially identical language in IEEPA's predecessor statute.  *West Virginia*, 597 U.S. at 724; *see* Mot. 15, 17.  The President's exercise of his power under materially identical language in IEEPA's predecessor statute means the challenged action is far from "unheralded."  *West Virginia*, 597 U.S. at 724.  Likewise, the President's challenged actions accord with a robust history of similar exercises of power under IEEPA to achieve foreign-policy objectives by regulating imports and exports—often with even more serious measures like total or near-total embargoes.  *See, e.g.*, Executive Order 13873, *Securing the Information and Communications Technology Services Supply Chain*, 84 Fed. Reg. 22,689 (May 15, 2019) (invoking IEEPA to bar the "importation . . . of any information and communications technology" that was "designed, developed, manufactured, or supplied, by persons owned by, controlled by, or subject to the jurisdiction or direction of a foreign adversary"); Executive Order 12959, *Prohibiting Certain Transactions With Respect to Iran*, 60 Fed. Reg. 24,757 (May 9, 1995) (invoking IEEPA to bar "the importation into the United States or the financing of such importation of any goods or services of Iranian origin," with certain exceptions); Cong. Rsch. Serv., *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, R45618 at 58-62 (Jan. 30, 2024) (collecting dozens of similar uses of IEEPA to regulate imports and exports, with one or more in nearly every year since 1979).

24

IEEPA's authorization of the President to regulate imports in an emergency is not a catch-all clause, Mot. 15; nor is it an example of "modest words" or an "ancillary provision" of the statute. *West Virginia*, 597 U.S. at 723-24; *see* Amicus Br. 23-24 (making a similar argument based on *NFIB*, 595 U.S. at 109). Just the opposite: the power is conferred as one of the enumerated terms in a list of powers making up one of the statute's principal provisions, and that term straightforwardly grants the President broad, consequential powers over foreign commerce to deal with broad, consequential problems facing the country. Section 1702(a)(1)(B), by including authorization for the President to "regulate . . . importation," could never be mistaken for a mousehole.

Plaintiffs point out Congress's authorization of the President to impose tariffs in other statutes, Mot. 16-17, but they fail to realize that those statutes cut *against* their argument. Those statutes only prove that it is *not* surprising that Congress would delegate tariff authority to the President—the basic thrust of the major-questions inquiry. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (looking to evidence of "Congress'[s] consistent judgment to deny the" power being exercised); *West Virginia*, 597 U.S. at 724 (agency adopted "a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."). Here, Congress has repeatedly conferred tariff power on the President and—more specifically—has repeatedly considered and decided *not* to revoke the President's power to impose tariffs under IEEPA. *See, e.g.*, Global Trade Accountability Act, S. 1060, 118th Cong., 1st sess., March 29, 2023; Protecting Our Democracy Act, S. 2921, 117th Cong., 1st sess., September 30, 2021; Global Trade Accountability Act of 2021, H.R. 2618, 117th Cong., 1st sess., April 16, 2021; Global Trade Accountability Act, S. 691, 117th Cong., 1st sess., March 10, 2021; Global Trade

Accountability Act, H.R. 723, 116th Cong., 1st sess., January 23, 2019; Reclaiming

Congressional Trade Authority Act of 2019, S. 899, 116th Cong., 1st sess., March 27, 2019.

Applying the major-questions doctrine would also conflict with the strong presumption

that when Congress uses broad language in a delegation to the President in the foreign-affairs

and national-security context, courts give the statute "a broad construction."  *Florsheim*, 744

F.2d at 793; *see, e.g.*, *Marshall Field & Co.  v. Clark*, 143 U.S. 649, 691 (1892) ("[I]n the

judgment of the legislative branch of the government, it is often desirable, if not essential for the

protection of the interests of our people . . . to invest the [P]resident with large discretion in

matters arising out of the execution of statutes relating to trade and commerce with other

nations."); *Curtiss-Wright*, 299 U.S. at 312; *see also Maple Leaf*, 762 F.2d at 89 (because case

involves the President's authority, the court's review is limited to whether the case involves a

"clear misconstruction" of IEEPA).  "If Congress desires to eliminate these tariffs or to cabin the

President's authority, that is a matter for Congress to address in future legislation, not a matter

for this court."  *Silfab*, 892 F.3d at 1349.

Finally, the major-questions doctrine compares the text of the statute to the power

exercised.  The doctrine is more likely to apply when the power exercised amounts to "a

fundamental revision of the statute, changing it from one sort of scheme of regulation into an

entirely different kind," *Biden v. Nebraska*, 600 U.S. 477, 502 (2023) (cleaned up)—or, put

differently, whether the power goes "beyond what Congress could reasonably be understood to

have granted," *West Virginia*, 597 U.S. at 724.  These considerations are largely accounted for

already.  But to sum up:  IEEPA unambiguously confers far-reaching powers over foreign trade,

the President has repeatedly exercised his powers under IEEPA in comparable actions and

contexts, and the powers conferred upon and exercised by the President fall within his core

competencies of national security and foreign relations.  The President's latest step, exercising

tariff authority, is predictable and precedented, not transformational or surprising.  The major-

questions doctrine is not implicated here.

Even if it were, the Executive Orders would still be supported by the "clear congressional

authorization for the power" they exercised to impose and modify tariffs in response to unfair

foreign trade practices.  *West Virginia*, 597 U.S. at 723 (quotation omitted).  The major-questions

doctrine provides no basis to invalidate an action where the statute "specifically authorizes the

[agency] to make decisions like th[e] one" under review.  *United States v. White*, 97 F.4th 532,

540 (7th Cir. 2024).  That remains true, plaintiffs' denial notwithstanding, *see* Mot. 11, when the

authorization is couched in clear but broad language.  *See Florida v. HHS*, 19 F.4th 1271, 1288

(11th Cir. 2021) (major-questions doctrine did not apply because "a broad grant of authority" that

"plainly encompasses the [agency's] actions . . . does not require an indication that specific

activities are permitted[.]"); *Nebraska*, 600 U.S. at 511 (Barrett, J., concurring) (unlike true

"clear-statement" rules, major-questions doctrine does not require "an 'unequivocal declaration'

from Congress authorizing the *precise* agency action under review[.]"); *West Virginia*, 597 U.S.

at 723 ("something more than a merely *plausible* textual basis for the agency action is

necessary[.]" (emphasis added)).  Indeed, the Ninth Circuit has found the relevant language here

to be "*unambiguous*" and to "*clearly* show[] that the President's actions [imposing tariffs] were

in accordance with the power Congress delegated."  *Spawr Optical*, 685 F.2d at 1081 n.10

(emphases added).

**B.    IEEPA Is A Valid Delegation Of Congressional Authority**

Congress's delegation to the President in IEEPA does not violate the nondelegation

principle.  *See* Mot. 19-26.  "The nondelegation doctrine bars Congress from transferring its

legislative power to another branch of Government" without supplying "an intelligible principle

to guide the delegee's use of discretion." *Gundy v. United States*, 588 U.S. 128, 132, 135 (2019).

That standard is "not demanding." *Id.* at 146. "Only twice in this country's history (and that in a

single year)" has the Supreme Court "found a delegation excessive." *Id.* Courts, including the

Supreme Court, have "over and over upheld even very broad delegations." *Id.* IEEPA readily

meets this undemanding standard.

Binding authority compels this conclusion. In *Yoshida*, the CCPA upheld Congress's

delegation of tariff authority to the President against a similar nondelegation challenge involving

IEEPA's predecessor statute. 526 F.2d at 582. There, the Court identified the intelligible

principles: (1) "Presidential exercise is limited to actions consistent with the national emergency

purpose" of the statute, a purpose that requires the President "to take a political step, the

declaring of a national emergency, before acting"; and (2) "that the power delegated therein shall

be applied only to 'property in which any foreign country or a national thereof has any interest.'"

*Id.* at 581-83. *Yoshida* controls here because IEEPA provides at least the same intelligible

principles the Court identified as lawful—a limitation to actions consistent with the national-

emergency purpose applying only to property in which there is a foreign interest. *See id.* at 582

("Congress, by delegating to the President in [TWEA] the power to regulate imports within the

national emergency powers standard, has not succeeded in abdicating its constitutional power to

regulate foreign commerce.").

In fact, IEEPA, has even more limitations than those *Yoshida* upheld for TWEA, showing

that Congress clearly provided intelligible principles that "meaningfully constrain the President's

discretion." *United States v. Dhafir*, 461 F.3d 211, 216 (2nd Cir. 2006) (cleaned up). Contrary

to plaintiffs' contention, IEEPA does not "obviat[e] Congress's role as ultimate arbiter of

emergency trade policy." *United States v. Amirnazmi*, 645 F.3d 564, 576 (3rd Cir. 2011); *accord*

*Yoshida*, 526 F.2d at 582.  "In effecting the shift . . . from TWEA to IEEPA, Congress placed several procedural restrictions on the President's exercise of the national-emergency powers, including congressional consultation, review, and termination." *Amirnazmi*, 645 F.3d at 577 (cleaned up).  "In so doing, Congress reaffirmed its essential legislative function and struck a careful balance between affording the President a degree of authority to address the exigencies of national emergencies and restraining his ability to perpetuate emergency situations indefinitely by creating more opportunities for congressional input." *Id.* (cleaned up); *see Yoshida*, 526 F.2d at 582 (even for TWEA, Congress "remains the ultimate decision maker and the fundamental reservoir of power to regulate commerce.  It may, of course, recall or limit the delegated emergency power at any time.").  Congress guarded against any nondelegation concerns by positioning itself as the body to determine whether the President's use of IEEPA authority is permissible, assuring that IEEPA "should not be hemmed in or cabined, cribbed, confined by anxious judicial blinders." *Id.* at 583.  Plus, "[t]he authorities granted to the President . . . may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared." *Dhafir*, 461 F.3d at 216-17 (citing 50 U.S.C. § 1701(b)).  And "[t]he powers granted to the President are explicitly defined and circumscribed." *United States v. Arch Trading Co.*, 987 F.2d 1087, 1093 (4th Cir. 1993) (citing 50 U.S.C. § 1702); *accord Dhafir*, 461 F.3d at 217 ("[T]he authorities delegated are defined and limited."); *United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) (IEEPA "limits the President's authority to prohibit certain types of transactions.") (citing 50 U.S.C. § 1702(b)).

That IEEPA passes the nondelegation doctrine accords with the Supreme Court's and Federal Circuit's repeated decisions rejecting nondelegation challenges to the President's imposition of trade regulations, including tariffs, under similar statutory language. *See, e.g.*,

*Algonquin*, 426 U.S. at 559-60 (concluding that the President's imposition of a license fee system under his authority to "adjust imports" in Section 232 of the Trade Expansion Act was not an improper delegation of Congress's power to regulate commerce); *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1332-33 (Fed. Cir. 2021) (same); *Shih*, 73 F.4th at 1092 ("[a]gree[ing] with every Circuit to have considered the issue that IEEPA" does not "run afoul of the nondelegation doctrine") (collecting cases). As with Section 232, IEEPA has clear conditions, such as congressional reporting, consultation, and termination, on the President exercising his discretion to deal with an unusual and extraordinary threat to the United States' national security and economy. *See PrimeSource*, 59 F.4th at 1263.

Amici argue that IEEPA lacks an intelligible principle because it does not provide specific standards for "when, how, or to what extent duties should be imposed." Amicus Br. 19. But Congress is not constitutionally required to enact such exacting standards, as "[t]he legislative process would frequently bog down if Congress were constitutionally required to appraise before-hand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946); *see Dames*, 453 U.S. at 678 ("Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act. Such failure of Congress specifically to delegate authority does not, especially in the areas of foreign policy and national security, imply congressional disapproval of action taken by the Executive." (cleaned up)); *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas."); *Haig v. Agee*, 453 U.S. 280, 291 (1981). This is especially so here, where Congress delegated with respect to an

emergency. "It cannot be lightly dismissed that" IEEPA is operative only during declared "national emergencies, which inherently preclude prior prescription of specific detailed guidelines," and "[t]he need for prompt action, another essential feature of a national emergency, precludes the otherwise oft-provided requirement for prior hearings, extensive fact finding, Tariff Commission reports to the President, and the like." *Yoshida*, 536 F.2d at 581-82.

Indeed, the Supreme Court has upheld Congress's delegation of authority where the intelligible principles expressed were much broader than those for IEEPA. For example, in *Yakus v. United States*, the Court held that there was no nondelegation problem with a statute directing the Price Administrator to establish "fair and equitable" prices. 321 U.S. 414, 419 (1944). Likewise, in *American Power & Light*, the Court approved a statute directing the SEC to "ensure that the corporate structure or continued existence of any company in a particular holding company system does not 'unduly or unnecessarily complicate the structure' or 'unfairly or inequitably distribute voting power among security holders.'" 329 U.S. at 104. The Court remarked that these "standards are certainly no less definite in nature than those speaking in other contexts in terms of "'public interest,' 'just and reasonable rates,' 'unfair methods of competition' or 'relevant factors.'" *Id.* at 105 (citing cases).

In addition, IEEPA involves an area where the President has independent authority— national security and foreign affairs—making the intelligible-principle standard even easier to meet. *See Curtiss-Wright*, 299 U.S. at 320 (in nondelegation challenges, "congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved."); *United States v. Mazurie*, 419 U.S. 544, 556-57 (1975) ("This Court has recognized limits on the authority of

Congress to delegate its legislative power. Those limitations are, however, less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter." (citation omitted)); *Loving v. United States*, 517 U.S. 748, 772 (1996) (similar); *Gundy*, 588 U.S. at 159 (Gorsuch, J., dissenting) (similar); *Dhafir*, 461 F.3d at 215; *Am. Inst. for Int'l Steel v. United States*, 806 F. App'x 982, 990 (Fed. Cir. 2020).[2]

Given that every circuit to address nondelegation challenges to IEEPA and TWEA has rejected such challenges, and given the intelligible principles guiding the President's exercise of his delegated authority and the President's independent authority in the realm of foreign affairs and national security, plaintiffs' nondelegation argument fails.

## II.    The National Emergency Is A Political Question And Valid If Subject To Review

Plaintiffs argue that IEEPA, even if it authorizes tariffs in some circumstances, does not authorize the challenged tariffs because plaintiffs disagree with the President's declared emergency. Mot. 18-19. But whether a threat is unusual or extraordinary is reviewable only by Congress, not by the courts, as NEA and IEEPA make clear.

"Cases" and "controversies" that contain "a textually demonstrable constitutional commitment of the issue to a coordinate political department," *Baker v. Carr*, 369 U.S. 186, 217 (1962), or "revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch," *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986), are political questions beyond the courts' authority to resolve. *See Baker*, 369 U.S. at 217. Such deference is particularly critical in cases

---

[2] Moreover, other circuits have rejected nondelegation challenges to the use of IEEPA to "'define criminal conduct,'" an area where courts assume a *higher* nondelegation standard applies. *See, e.g.*, *Shih*, 73 F.4th at 1092 (relying on *Touby v. United States*, 500 U.S. 160, 166 (1991), which assumed, without deciding, that "greater congressional specificity is required in the criminal context" for nondelegation purposes). The delegation of authority here easily passes the even less demanding standard that applies here.

involving national emergencies, where courts have a long history of declining to review the political branches' responses. *See, e.g.*, *Martin v. Mott*, 25 U.S. 19, 31 (1827) (The President "is necessarily constituted the judge of the existence of the exigency in the first instance, and is bound to act according to his belief of the facts."); *Hawaii*, 585 U.S. at 708 ("[W]e cannot substitute our own assessment for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy.").

More to the point, courts have consistently held that the President's emergency declarations under NEA, and the adequacy of his policy choices addressing those emergencies under IEEPA, are unreviewable. "Although presidential declarations of emergencies . . . have been at issue in many cases, *no* court has ever reviewed the merits of such a declaration." *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 31 (D.D.C. 2020) (emphasis in original). And the Federal Circuit has recognized that an inquiry to "examine the President's motives and justifications for declaring a national emergency" under IEEPA "would likely present a nonjusticiable political question." *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988); *see, e.g.*, *Yoshida*, 526 F.2d at 579 ("courts will not normally review the essentially political questions surrounding the declaration or continuance of a national emergency"); *id.* at 581 n.32 ("courts will not review the bona fides of a declaration of an emergency by the President"); *Shih*, 73 F.4th at 1092 (refusing to review declaration of emergency under IEEPA); *Htet v. Trump*, No. 24-1446, 2025 WL 522033, at *3-8 (D.D.C. Feb. 18, 2025) (concluding that President Biden's declaration of an emergency under IEEPA "represent[ed] a quintessential political question that this Court lacks jurisdiction to address"); *In re 650 Fifth Ave. & Related Props.*, 777 F. Supp. 2d 529, 575 n.16 (S.D.N.Y. 2011) (concluding that whether Iran's actions and policies constituted an "unusual and extraordinary threat to the national security, foreign

33

policy, and economy of the United States" was an unreviewable judgment "reserved to the executive branch"); *Beacon Prods. Corp. v. Reagan*, 633 F. Supp. 1191, 1194-95 (D. Mass. 1986) (concluding that whether Nicaragua posed sufficient threat to trigger the President's IEEPA power to impose an embargo on the country was a nonjusticiable political question).

Reviewing the fact of the underlying emergency—a foreign-affairs and national-security matter constitutionally and statutorily committed to the President—would require "the court to assess the wisdom of the President's judgment concerning the nature and extent of that threat, a matter not susceptible to judicially manageable standards." *Beacon Prods.*, 63 F. Supp. at 1195. Thus, the President's "motives, his reasoning, his finding of facts requiring the action, and his judgment, are immune from judicial scrutiny." *Florsheim*, 744 F.2d at 796; *see United States v. Bush & Co.*, 310 U.S. 371, 380 (1940) ("For the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains.").

The President's emergency declarations do not go unreviewed. Congress designated *itself*—not the judiciary—as the body to supervise emergency declarations and the adequacy of the President's response. *See* 50 U.S.C. § 1622(c) (creating fast-tracked procedures for review and disapproval of emergency declarations); *Amirnazmi*, 645 F.3d at 577 (in IEEPA, "Congress reaffirmed its essential legislative function, and struck a careful balance between affording the President a degree of authority to address the exigencies of national emergencies and restraining his ability to perpetuate emergency situations indefinitely by creating more opportunities for congressional input." (cleaned up)). Therefore, any challenge to the fact of the emergency itself—particularly the claim that the emergency is not "unusual" or "extraordinary" enough, in plaintiffs' view—is a nonjusticiable political question that this Court lacks jurisdiction to consider.

Plaintiffs' personal opinions on economic theory, Mot. 19, merely reinforce why that must be the case. Citing one Washington think-tank paper from six years ago and invoking the "mainstream economic consensus," plaintiffs claim that persistent trade deficits are not "necessarily a problem." But whether that is so is precisely the sort of judgment committed to the political branches of government. "How, for example, is the court to determine whether" the effects of persistent trade deficits on the United States' national security posture "pose[] more than an ordinary or usual threat?" *Beacon Prods.*, 63 F. Supp. at 1195. The question is not fit for judicial resolution. It is for the political branches to resolve. Indeed, the tariffs at issue are presently being debated in Congress, as designed under IEEPA's legislative-review component. *See* Joint Resolution, S.J. Res. 49, 119th Cong. (2025).

The same is true of the means the President has chosen to deal with the declared national emergency. Mot. 16. IEEPA, by using "may," 50 U.S.C. § 1701, and authorizing a variety of actions, *id.* § 1702(a)(1)(B), gives the President discretion over how to deal with the relevant threat. How the President uses that discretion is, again, not subject to judicial review and is instead a matter for the political branches to work out. *See, e.g.*, *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1342-44 (Fed. Cir. 2010) (use of "may" in statutory authorization to the President meant that "the President's exercise of his discretion is not subject to judicial review"); *Corus*, 352 F.3d at 1358 ("The Supreme Court has established that where the President has complete discretion whether to take an action in the first place, courts are without authority to review the validity of an agency recommendation to the President regarding such action."); *Florsheim*, 744 F.2d at 793; *Dalton v. Specter*, 511 U.S. 462, 477 (1994) ("Where a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's

decision is not available."); *Biden v. Texas*, 597 U.S. 785, 802 (2022) ("This Court has repeatedly observed that the word 'may' clearly connotes discretion.") (cleaned up).

If the Court were to break with uniform precedent and review the merits of the President's declaration of a national emergency and the appropriate response, it still must reject plaintiffs' arguments. A national emergency exists for the reasons explained in the President's Executive Orders. Both plaintiffs and amici, Mot. 18-19, Amicus Br. 16-18, ignore that the basis for the declared emergency is not just "persistent annual U.S. goods trade deficits" but also the currently acute *effects* of such persistent trade deficits. As noted, the President found that these deficits have "atroph[ied]" our nation's "domestic production capacity" such that now, the United States' "military readiness" and "national security posture" are "compromise[d]." 90 Fed. Reg. at 15,044-45. That finding of an abnormal state of affairs, *cf.* H.R. Rep. No. 95-459, at 10, besides being unreviewable, is unchallenged by plaintiffs. Plaintiffs' attack on the declared emergency thus fails.

Similarly, the President's chosen means are reasonably related to addressing the national emergency. The imposed tariffs have a "direct effect" on the United States' trade deficit, *Yoshida*, 526 F.2d at 580, and on improving this nation's "domestic production capacity," "military readiness," and "national security posture," 90 Fed. Reg. at 15,044-45. The President's action thus bears "an eminently reasonable relationship to the emergency confronted." *Yoshida*, 526 F.2d at 580.

For their part, amici offer two variations on plaintiffs' theme. Their underdeveloped arguments that the President's true goal is to generate revenue and that tariffs are a "permanent policy" (rather than the sort of "temporary" fix they believe IEEPA should be limited to) are

foreclosed for the same reasons as plaintiffs' arguments.  Amicus Br. 16-18; *see, e.g.*, *Hawaii*, 585 U.S. at 708; *Corus*, 352 F.3d at 1358; *Chang*, 859 F.2d at 896 n.3; *Yoshida*, 526 F.2d at 579.

Amici's arguments fail on their own terms.  IEEPA does not say that actions taken to deal with a national emergency must not generate revenue.  Quite the opposite: "licenses," for example, typically cost money.  50 U.S.C. § 1702(a)(1).  That the tariffs at issue have been touted as revenue-generating, Amicus Br. 17, is thus no revelation.  Moreover, Congress designated itself the arbiter of the President's emergency declarations and his responses to those emergencies.  50 U.S.C. § 1622(c); *Amirnazmi*, 645 F.3d at 577.  Unless Congress terminates the emergency declaration, the President may employ his authority under IEEPA to address an unusual and extraordinary threat for as long as that threat exists.  *See, e.g.*, Notice of Mar. 7, 2025, *Continuation of the National Emergency With Respect to Iran*, 90 Fed. Reg. 11,887 (Mar. 12, 2025) (continuing a national emergency dating back to 1995 with respect to Iran); Cong. Research Serv., *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, R45618 at 17 (Jan. 30, 2024) ("The average length of an emergency invoking IEEPA . . . [is] 15 years for emergencies declared in the 2000s.").  That is precisely why Congress rejected a proposal "that it place a definite time limit on the duration of any state of national emergency" in IEEPA.  H.R. Rep. No. 95-459, at 10.

Even if the Court determines it can review the fact of the underlying emergency—and it should not—plaintiffs' and amici's arguments must nonetheless fail.

## III.    Plaintiffs Are Not Entitled To A Preliminary Injunction

### A.    Plaintiffs Cannot Establish The Likelihood Of Immediate, Irreparable Harm

Plaintiffs fail to show entitlement to a preliminary injunction because they cannot show they "will be immediately and irreparably injured" before the Court can decide the case on the merits.  *Asociacion Colombiana de Exportadores de Flores v. United States*, 717 F. Supp. 847,

851 (Ct. Int'l Trade 1989).  "Critically, irreparable harm may not be speculative, or determined by surmise."  *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*, 393 F. Supp. 3d 1271, 1276 (Ct. Int'l Trade 2019) (cleaned up).  As the Federal Circuit has explained, an injunction "will not issue simply to prevent a mere possibility of injury . . . .  A presently existing, actual threat must be shown."  *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983) (quotation omitted).  Put another way, "[a] movant must show that the harm is certain to occur and that it is a direct result of the action it is challenging."  *Retractable Techs., Inc. v. United States*, 739 F. Supp. 3d 1330, 1340 (Ct. Int'l Trade 2024) (citing *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  The court "should be wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted by plaintiff."  *Atari Games Corp. v. Nintendo of Am.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990).

The Court already held that plaintiffs "have not clearly shown a likelihood that immediate and irreparable harm would occur before consideration of their Motion for Preliminary Injunction."  Order, ECF No. 13.  In the same vein, plaintiffs cannot show that they will experience irreparable harm while the Court considers their simultaneous motion for summary judgment, especially in view of the highly expedited briefing of that motion.  Plaintiffs have still failed to present any actual evidence that they will experience immediate, irreparable harm.

First, it appears that no plaintiff has actually *paid* additional duties pursuant to the Executive Orders.[3]  *See generally* McCann Decl., Exh. A.  Nor have plaintiffs established that they will imminently be required to do so.  Genova Pipe asserts it has goods scheduled to arrive

---

[3]  Both V.O.S. and Terry Cycling have recently made entries that appear to be subject to the tariffs at issue, but neither has yet deposited estimated duties.  *See* McCann Decl. ¶¶ 5, 8.

in May and June, Mot. Exh. B ¶¶ 10-11, and V.O.S. claims to expect shipments to arrive during the 90-day pause period, *id.* Exh. A ¶ 28.  MicroKits and FishUSA do not even claim that they intend to import goods subject to the tariffs within any particular period.[4]  Plaintiffs' failure to establish immediacy defeats their claim of irreparable harm.  And even if plaintiffs risked immediate liability for duties, any such payments could be recovered if plaintiffs prevail in this litigation.  *See* Joint Proposed Stipulation, *Auxin Solar, Inc. v. United States*, Ct. Int'l Trade No. 23-274, ECF No. 19; Notice of Stipulation, *Retractable Technologies, Inc. v. United States*, Ct. Int'l Trade No. 24-185, ECF No. 68.

Second, even if plaintiffs would soon be liable for duties pursuant to the Executive Orders, the speculative statements in their declarations show only the possibility of future economic loss, which this Court has held is insufficient to show irreparable harm—far short of a real risk of immediate extinction required to justify a preliminary injunction.  *See*, *e.g.*, *Corus Grp. PLC v. Bush*, 217 F. Supp. 2d 1347, 1355 (Ct. Int'l Trade 2002) (concluding that the plaintiff had failed to establish irreparable harm because there was no evidence the plant was "in danger of imminent closure" despite testimony that "sound business principles would require [the company] to close the plant rather than operate at a loss"); *Shandong Huarong General Grp. v. United States*, 122 F. Supp. 2d 143, 147 (Ct. Int'l Trade 2000) (rejecting allegations of irreparable harm on the basis that "affidavits submitted by interested parties are weak evidence, unlikely to justify a preliminary injunction" and noting that no independent evidence "indicat[ed] exactly how and when these lost sales would force it out of business.") (cleaned up).

---

[4]  Indeed, MicroKits does not appear to have made an entry since 2022 and FishUSA since early 2024.  *See* McCann Decl. ¶¶ 6-7.

The Court also found no irreparable harm in a case where a plaintiff claimed "significant and permanent monetary injury as a consequence of posting large cash deposits." *Shree Rama Enter. v. United States*, 983 F. Supp. 192, 195 (Ct. Int'l Trade 1997) (quotation omitted). There, even though the plaintiffs had submitted customer letters and descriptions of conversations stating that the customers had or would switch suppliers rather than pay the higher deposit rates, the Court found the plaintiffs' showing "insufficient." *Id.* Finding no threat of immediate extinction, the Court held that the *Shree Rama* plaintiffs did not meet the standard for showing irreparable harm. *Id.* The Court further explained that even allegations of bankruptcy would be "weak evidence" if based on affidavits from interested parties—absent "evidence from independent sources" or "hard evidence" of the serious permanent harm that would result. *Id.*

The theme is clear: as explained in *Corus,* "[e]very increase in duty rate will necessarily have an adverse effect on foreign producers and importers," but if "the court were to find irreparable harm under these facts, the court would likely be required to do so in any challenge to a duty increase because every plaintiff could argue that increased tariffs would cause revenue shortfalls possibly resulting in either operating at a loss or plant closure at some future date." 217 F. Supp. 2d at 1355. Thus, the mere threat of an "adverse economic impact" cannot establish irreparable harm because it would "effectively create a *per se* irreparable harm rule in similar challenges—a result likely contrary to the extraordinary nature of the remedy." *Id.*

Like in *Corus*, *Shandong Huarong*, and *Shree Rama*, plaintiffs in this case cannot establish irreparable harm. Plaintiffs fail to provide any "hard evidence" that they face immediate extinction absent a preliminary injunction. Instead, their declarations reflect no more than speculative concerns as to the effects the tariffs may eventually have on aspects of their businesses. *See, e.g.*, Mot. Exh. A ¶¶ 23, 28, 38; Exh. B. ¶¶ 9-11, 13; Exh. C ¶¶ 9, 12; Exh. D ¶¶

40

19, 21, 23; Exh. E ¶¶ 19, 26.  Plaintiffs' generalized and speculative allegations come nowhere close to establishing that plaintiffs are at real and immediate risk of extinction, and do not constitute "hard" or "independent" evidence of serious, imminent harm.

Beyond potential economic loss, plaintiffs claim they will experience loss of goodwill and reputational harm, but they provide no concrete evidence or additional detail beyond conclusory, unsupported statements.  *See, e.g.*, Mot. Exh. B ¶ 13 ("Genova Pipe's Canadian customers may opt for local suppliers . . . potentially resulting in . . . harm to Genova Pipe's reputation and goodwill"), Exh. C ¶ 17 ("MicroKits will suffer . . . harm to its reputation and loss of goodwill"), Exh. D ¶ 24 ("FishUSA will suffer damages to its reputation and loss of goodwill . . . if FishUSA is forced to continue pausing orders"), Exh. E ¶ 34 ("These tariffs . . . will cause . . . loss of goodwill, and damage to its reputation").  These vague allegations do not include evidence as to *how* the tariffs pose an immediate threat to plaintiffs' reputation and goodwill, and do not establish enduring, irreparable reputational harm.  *See Ninestar Corp. v. United States*, 687 F. Supp. 3d 1308, 1340-41 (Ct. Int'l Trade 2024) (finding no irreparable harm because the plaintiff "has not offered the [requisite] quantum of evidence here to show that the loss of its reputation is irreparable absent a preliminary injunction," even though the plaintiff provided multiple pieces of evidence showing that business intended to distance themselves due to allegations of forced labor).  Plaintiffs also fail to explain how they would sustain any of these harms absent their own business decisions made as a result of lost earnings—which are not sufficient to show irreparable harm, given that "temporary loss of income" does not generally constitute irreparable harm.  *See Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Finally, plaintiffs fail to explain how monetary compensation would be inadequate.  For plaintiffs that will actually pay tariffs, were they to ultimately prevail, they could receive back

any duties or tariffs they paid on any unliquidated entries.  28 U.S.C. §§ 2643-44.  And, even if

future entries are liquidated, defendants do not intend to oppose the Court's authority to order

reliquidation of entries of merchandise subject to the challenged tariffs if the tariffs are found in

a final and unappealable decision to have been unlawfully collected.  Such reliquidation would

result in a refund of all duties determined to be unlawfully assessed, with interest.  *Id.*; *see* Joint

Proposed Stipulation, *Auxin Solar, Inc. v. United States*, Ct. Int'l Trade No. 23-274, ECF No. 19.

## B.    The Remaining Preliminary Injunction Factors Do Not Favor Plaintiffs

Even if plaintiffs could establish that they would suffer irreparable harm absent a

preliminary injunction, that showing would still be "outweighed" by the remaining injunctive

factors.  Because plaintiffs are not entitled to summary judgment, they cannot demonstrate a

likelihood of success on the merits.  The remaining factors—the balance of hardships and the

public interest, which "merge when the Government is the opposing party," *Nken v. Holder*, 556

U.S. 418, 435 (2009)—likewise favor the government.  It is not in the public's interest for the

President's response to a national emergency and exercise of foreign-affairs powers to be

enjoined; nor does the balance of hardships favor plaintiffs.

Courts must "pay particular regard for the public consequences" when "employing the

extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (cleaned up).  Indeed, in *Winter*, the

Supreme Court vacated the lower court's injunction, concluding that, even if the petitioners had

shown irreparable harm, the public interest and balance of equities weighed decisively against

injunctive relief.  *Id*. at 23-32 (an injunction "does not follow from success on the merits as a

matter of course").

Plaintiffs' purported irreparable harm is far outweighed by the public interest in

maintaining the challenged executive actions.  The President has declared a national emergency

in light of threats to the United States' economy, military preparedness, and national security.  In

these circumstances, NEA and IEEPA all authorize the President to take all appropriate and feasible action to address this emergency.  The equities and public interest lie there, not with plaintiffs.

Moreover, where, as here, the President is acting with Congress's authorization, adding its constitutional authority to regulate trade to the President's constitutional authority over foreign affairs, the "public interest" is the policy underlying the specific legislation.  *Yakus*, 321 U.S. at 442.  Injunctive relief interfering with action authorized by Congress and taken by the President, after following all the applicable procedures, would contravene the public interest.

As for the balance of hardships, Plaintiffs' proposed injunction would be an enormous intrusion on the President's conduct of foreign affairs and efforts to protect national security under IEEPA and the Constitution.  *See* U.S. Const. art. II, §2.  This is particularly so given that the United States is currently in sensitive trade negotiations with a multitude of countries— discussions that would grind to a halt should a preliminary injunction issue.  *See* Executive Order 14266 (since the issuance of Executive Order 14257, "more than 75 other foreign trading partners, including countries enumerated in Annex I to Executive Order 14257, have approached the United States to address the lack of trade reciprocity in our economic relationships and our resulting national and economic security concerns.  This is a significant step by these countries toward remedying non-reciprocal trade arrangements and aligning sufficiently with the United States on economic and national security matters.").  Plaintiffs' request to import merchandise without paying the applicable tariffs would undermine the President's goals, and the requested injunction would weaken the effectiveness of the President's chosen action.  By contrast, plaintiffs have not shown any hardship beyond compensable economic harm.  Moreover, plaintiffs' concerns about cost and competitiveness are far from unique.  In considering the

public interest, the Court should also consider the broader implications if the thousands of other companies subject to similar tariffs requested the same relief. The balance of hardships favors the Government.

**C.    Any Preliminary Injunction Should Be Limited Only To Plaintiffs And Would Require Them To Post A Bond**

If this Court were to issue a preliminary injunction, its order must be limited in scope to the plaintiffs. Injunctive relief must be narrowly tailored and limited to the harm shown. *See Gemveto Jewelry Co. v. Jeff Cooper Inc.*, 800 F.2d 256, 259 (Fed. Cir. 1986). Moreover, nationwide injunctions are only available in "exceptional cases." *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018); *see Florida*, 19 F.4th at 1282 (appropriate circumstances for issuing a nationwide injunction "are rare"); *City of Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020) ("[s]uch injunctions present real dangers, and will be appropriate only in rare circumstances."). Here, plaintiffs cannot show why a preliminary injunction is necessary at all, let alone a nationwide one. Certainly, they cannot show that they will be deprived of complete relief without a nationwide injunction. *Cf. Florida*, 19 F.4th at 1281.

The Court should also order plaintiffs to quantify their harm—for instance, specify what tariffs that they would otherwise have paid, which must not be speculative—and post a bond in that amount. USCIT Rule 65(c) (requiring "the movant [to] give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").

Here, should the Court enter a preliminary injunction, (i) any order should be limited to the plaintiffs to this litigation; (ii) as a condition of relief, plaintiffs should identify the entries, by entry number, importer name, and importer number, that would be covered by any such order;

44

and (iii) the Court should order plaintiffs to post Single Transaction Bonds for all such identified entries during the pendency of any injunctive order in an amount equal to the total entered value, plus all applicable duties, taxes, and fees, including the duties that would otherwise have been deposited pursuant to the Executive Orders.  *See PrimeSource Bldg. Prods., Inc. v. United States*, 535 F. Supp. 3d 1327, 1330, 1334 (Ct. Int'l Trade 2021).  Such an order would ensure that the Court follow the directive that it "must narrowly tailor an injunction to fit the specific adjudged violations," *Gemveto*, 800 F.2d at 259, while ensuring at least minimal protection of the United States' interests.

## CONCLUSION

For these reasons, the Court should deny plaintiffs' motion for a preliminary injunction and summary judgment and enter judgment in favor of defendants.

DATED: April 29, 2025

OF COUNSEL:

ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Sosun Bae
SOSUN BAE

Senior Trial Counsel
LUKE MATHERS
CATHERINE M. YANG
BLAKE W. COWMAN
COLLIN T. MATHIAS
Trial Attorneys
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 305-7568
sosun.bae@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court and this Court's April 22, 2025 order, that this brief contains 13,755 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Sosun Bae
SOSUN BAE

# EXHIBIT A

**UNITED STATES COURT OF INTERNATIONAL TRADE**

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
            THE HONORABLE TIMOTHY M. REIF, JUDGE
            THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., PLASTIC ) <br> SERVICES AND PRODUCTS, LLC d/b/a ) <br> GENOVA PIPE, MICROKITS, LLC, ) <br> FISHUSA INC., TERRY PRECISION ) <br> CYCLING LLC, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> DONALD J. TRUMP in his official capacity, ) <br> EXECUTIVE OFFICE OF THE PRESIDENT, ) <br> THE UNITED STATES, U.S. CUSTOMS AND ) <br> BORDER PROTECTION, PETE R. FLORES ) <br> in his official capacity, JAMIESON GREER ) <br> in his official capacity, OFFICE OF THE ) <br> UNITED STATES TRADE ) <br> REPRESENTATIVE, and HOWARD ) <br> LUTNICK in his official capacity, ) <br> ) <br> Defendants. ) | Court No. 25-00066 |

**DECLARATION OF SHAROLYN McCANN**

I, Sharolyn McCann, based upon my personal knowledge and information made known to me in the course of my employment, hereby make the following declaration with respect to the above-captioned matter:

1.      I am the Director, Commercial Operations, Revenue and Entry Division, Office of Trade, U.S. Customs and Border Protection. I have worked in this position for four years. Prior to my work in the Commercial Operations, Revenue and Entry Division, I worked in the Office

of Trade's Trade Transformation Office.  I started my career in 1988 as an Import Specialist in the New York Seaport.

2.      As a Director, among my other responsibilities, I am trained and authorized to perform agency functions related to CBP's processing of entries of imported merchandise in the Automated Commercial Environment (ACE).  I am also trained and authorized to query and run reports to pull import data from ACE.

3.      I queried import data in ACE with respect to the plaintiffs in this action: V.O.S. Selections, Inc. (V.O.S.), MicroKits, LLC (MicroKits), FishUSA Inc. (FishUSA), Terry Precision Cycling LLC (Terry Cycling), and Plastic Services and Products, LLC, d/b/a Genova Pipe (Genova Pipe).

4.      The relevant data in ACE indicate that each plaintiff has an associated Importer of Record (IOR) number.  An IOR number is a unique number generated for a specific entity importing goods into the United States.  I searched by the IOR number associated with each plaintiff's name.

5.      The relevant data in ACE indicate that, from April 5, 2025, to 12:00 p.m. eastern daylight time on April 28, 2025, the IOR Number associated with V.O.S. made no entries for which tariffs imposed pursuant to Executive Order 14257 (April 2, 2025) (as amended and modified by EO 14259 (April 8, 2025) and EO 14266 (April 9, 2025), respectively) (EO 14257 tariffs) were both declared and deposited.

      a.   The IOR Number associated with V.O.S. made an entry on April 5, 2025, the date on which the EO 14257 tariffs went into effect.  The IOR for this entry claimed an exemption from EO 14257 tariffs under subheading 9903.01.28 of the Harmonized Tariff Schedule of the United States (HTSUS) for "Articles the

product of any country that (1) were loaded onto a vessel at the port of loading

and in transit on the final mode of transit prior to entry into the United States,

before 12:01 a.m. eastern daylight time on April 5, 2025 and (2) are entered for

consumption, or withdrawn from warehouse for consumption after 12:01 a.m.

eastern daylight time on April 5, 2025." Accordingly, the IOR did not deposit EO

14257 tariffs on this entry.

b. The IOR Number associated with V.O.S. also made an entry on April 11, 2025,

which was after the EO 14257 tariffs went into effect on April 5, 2025. The IOR

for this entry neither declared nor deposited EO 14257 tariffs for the entry. Nor

did the IOR declare an exemption from EO 14257 tariffs under subheading

9903.01.28, HTSUS. Based on the information available in ACE, this entry may

have been eligible for the exemption from EO 14257 tariffs under subheading

9903.01.28, HTSUS.

c. The IOR Number associated with V.O.S. also made an entry on April 21, 2025,

which was after the date that this action was filed. The IOR for this entry

declared that it is subject to EO 14257 tariffs of 10% *ad valorem* under

subheading 9903.01.25, HTSUS, but has not yet deposited these tariffs.

6. The relevant data in ACE indicate that, from April 5, 2025, to 12:00 p.m. eastern

daylight time on April 28, 2025, the IOR Number associated with MicroKits made no entries of

merchandise for which EO 14257 tariffs were declared or deposited. The most recent entry

listed for the IOR Number associated with MicroKits was made on December 20, 2022.

7. The relevant data in ACE indicate that, from April 5, 2025, to 12:00 p.m. eastern

daylight time on April 28, 2025, the IOR Number associated with FishUSA made no entries of

merchandise for which EO 14257 tariffs were declared or deposited.  The most recent entry listed for the IOR number associated with FishUSA was made on March 30, 2024.

8.    The relevant data in ACE indicate that, from April 5, 2025, to 12:00 p.m. eastern daylight time on April 28, 2025, the IOR Number associated with Terry Cycling made no entries of merchandise for which EO 14257 tariffs were declared or deposited.

   a.    The IOR Number associated with Terry Cycling made an entry on April 8, 2025, which was after the EO 14257 tariffs went into effect.  The IOR for this entry neither declared nor deposited EO 14257 tariffs for the entry, nor did it claim an exemption from EO 14257 tariffs under subheading 9903.01.28, HTSUS.  Based on the information available in ACE, it appears that the entry is subject to EO 14257 tariffs.

   b.    The IOR Number associated with Terry Cycling also made an entry on April 25, 2025, which was after the date that this action was filed.  The IOR for this entry claimed an exemption from EO 14257 tariffs under subheading 9903.01.28, HTSUS.

9.    The relevant data in ACE indicate that, from April 5, 2025, to 12:00 p.m. eastern daylight time on April 28, 2025, the IOR Number associated with Genova Pipe made no entries for which EO 14257 tariffs were declared or deposited.  The most recent entry listed for the IOR number associated with Genova Pipe was made on March 4, 2025.

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28

U.S.C. § 1746.

SHAROLYN J MCCANN    Digitally signed by
                     SHAROLYN J MCCANN
                     Date: 2025.04.29 10:12:02
                     -04'00'

Sharolyn McCann
Director, Commercial Operations, Revenue
and Entry Division
U.S. Customs and Border Protection