IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

Before Honorable Gary S. Katzmann, Judge, Honorable
Timothy M. Reif, Judge, Honorable Jane A. Restani, Judge

| | |
|---|---|
| V.O.S. SELECTIONS, INC., *et al.*<br><br>        Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>        Defendants. | Case No. 25-00066-GSK-TMR-JAR |

**Plaintiffs' Reply Brief in Support of Their Motion for
Preliminary Injunction and Motion for Summary
Judgment for Permanent Injunction**

# Table of Contents

Table of Authorities ................................................................................... iii

Summary of the Argument ......................................................................... 1

Argument ................................................................................................... 2

I.    IEEPA does not authorize the President to impose tariffs. ......................... 2

    A.  The plain meaning of IEEPA does not support the claim that the statue authorizes the President to impose tariffs. ........................... 3

    B.  Precedent does not support the claim that IEEPA authorizes the President to impose tariffs. ............................................................ 5

II.   There is no national emergency or "unusual and extraordinary threat" sufficient to invoke IEEPA. ............................................... 9

    A.  There is no valid national emergency and the President's invocation of IEEPA is not a political question. .................................... 10

    B.  There is no "unusual and extraordinary threat." ................................ 14

III.  Defendants' interpretation of IEEPA runs afoul of the major questions doctrine and Constitutional nondelegation. ........................... 16

    A.  The major questions doctrine requires Congress to 'speak clearly' when delegating such significant power. ................................. 16

    B.  Granting the President unilateral authority to impose tariffs would make IEEPA unconstitutional under the nondelegation doctrine. .................................................................................... 21

    C.  Constitutional avoidance requires a ruling against Defendants' interpretation of IEEPA. ................................................................ 25

IV.   Plaintiffs are entitled to a preliminary injunction. ................................. 26

    A.  Plaintiffs will suffer irreparable harm. ............................................. 26

    B.  The remaining preliminary injunction factors favor Plaintiffs. ........... 31

    C.  This Court should grant a broad preliminary injunction against the Liberation Day Order's enforcement. ............................... 34

Conclusion ............................................................................................... 38

Certificate of Compliance ......................................................................... 39

# Table of Authorities

**Cases**

*A. L. A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) ............................................................................ 23, 25

*Alabama Association of Realtors v. HHS,*
594 U.S. 758 (2021) ................................................................................. 20

*Algonquin SNG, Inc. v. Federal Energy Administration,*
518 F.2d 1051 (D.C. Cir. 1975)............................................................... 12

*Am. Power & Light Co. v. SEC,*
329 U.S. 90 (1946) ................................................................................... 23

*Am. Signature, Inc. v. United States,*
598 F.3d 816 (Fed. Cir. 2010) ................................................................ 32

*American Institute for Intern. Steel, Inc. v. United States,*
376 F.Supp.3d 1335 (Ct. Int'l Trade 2019) ........................................... 22

*Atchison, T. & S. F. R. Co. v. United States,*
284 U.S. 248 (1932) ................................................................................. 33

*Baker v. Carr,*
369 U.S. 186 (1962) ........................................................................... 10, 13

*Beacon Prods. Corp. v. Reagan,*
633 F. Supp. 1191 (D. Mass. 1986) ................................................... 15, 16

*Biden v. Nebraska,*
600 U.S. 477 (2023) ........................................................................... 19, 20

*Bostock v. Clayton Cty.,*
590 U.S. 644 (2020) ................................................................................... 3

*Boys Mkts., Inc. v. Retail Clerk's Union,*
398 U.S. 235 (1970) ................................................................................... 7

*Celsis in Vitro, Inc. v. CellzDirect, Inc.,*
664 F.3d 922 (Fed. Cir. 2012)..................................................... 28, 29, 31

*Ceramica Regiomontana, S.A. v. United States,*
7 Ct. Int'l Trade 390 (1984) .................................................................... 35

*Chastleton Corp. v. Sinclair,*
264 U.S. 543 (1924) ................................................................................. 10

*CIC Servs., LLC v. IRS,*
  593 U.S. 209 (2021) ............................................................................... 5

*City and County of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ............................................................... 35

*City of Chicago v. Barr,*
  961 F.3d 882 (7th Cir. 2020) ................................................................. 35

*Colautti v. Franklin,*
  439 U.S. 379 (1979) ............................................................................. 14

*Crowell v. Benson,*
  285 U.S. 22 (1932) ............................................................................... 25

*Direct Mktg. Ass'n v. Brohl,*
  575 U.S. 1 (2015) ................................................................................... 5

*Erlenbaugh v. United States,*
  409 U.S. 239 (1972) ............................................................................... 6

*Ex parte Milligan,*
  71 U.S. 2 (1866) ................................................................................... 10

*FDA v. Brown & Williamson,*
  520 U.S. 120 (2000) ............................................................................. 16

*Georgia v. President of the U.S.,*
  46 F.4th 1283 (11th Cir. 2022) ............................................................. 17

*Gibbons v. Ogden,*
  22 U.S. 1 (1824) ..................................................................................... 5

*Girouard v. United States,*
  328 U.S. 61 (1946) ................................................................................. 7

*Gundy v. United States,*
  588 U.S. 128 (2019) ............................................................................. 22

*Hamdi v. Rumsfeld,*
  542 U.S. 507 (2004) ............................................................................. 33

*Harjo v. Kleppe,*
  420 F. Supp. 1110 (D.D.C. 1976) ......................................................... 13

*Home Bldg. & Loan Asso. v. Blaisdell,*
  290 U.S. 398 (1934) ............................................................................. 33

*In re 650 Fifth Ave. & Related Props.,*
  777 F. Supp. 2d 529 (S.D.N.Y. 2011) ............................................. 15, 16

*In re Section 301 Cases,*
    524 F. Supp. 3d 1355 (Ct. Int'l Trade 2021) ............................................................ 34

*Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.,*
    448 U.S. 607 (1980) ................................................................................................. 18

*Johnson v. Couturier,*
    572 F.3d 1067 (9th Cir. 2009) ................................................................................ 38

*Johnson v. Eisentrager,*
    339 U.S. 763 (1950) ................................................................................................. 10

*Kentucky v. Biden,*
    23 F.4th 585 (6th Cir. 2022) .................................................................................... 17

*Kwo Lee, Inc. v. United States,*
    24 F. Supp. 3d 1322 (Ct. Int'l Trade 2014) ...................................................... 30, 34

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ................................................................................................. 12

*Louisiana v. Biden,*
    55 F.4th 1017 (5th Cir. 2022) .................................................................................. 17

*Ludecke v. Watkins,*
    335 U.S. 160 (1948) ................................................................................................. 10

*Maple Leaf Fish Co. v. United States,*
    762 F.2d 86 (Fed. Cir. 1985) ................................................................................... 21

*Mayes v. Biden,*
    67 F.4th 921 (9th Cir. 2023) .................................................................................... 17

*McAfee v. U.S.,*
    531 F. Supp. 177 (Ct. Int'l Trade 1982) ................................................................. 31

*Mistretta v. United States,*
    488 U.S. 361 (1989) ................................................................................................. 22

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ................................................................................................... 5

*Nat'l Treasury Emps. Union v. Trump,* No. 25-0935,
    2025 U.S. Dist. LEXIS 80268 (D. D. C. Dist. April 28, 2025) ............................... 37

*Nebraska v. Su,*
    121 F. 4th 1 (9th Cir. 2024) ........................................................................ 17, 18, 19

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................................. 31

*Retractable Techs., Inc. v. United States*,
    739 F. Supp. 3d 1330 (Ct. Int'l Trade 2024) ............................................ 29

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020) ...................................................................... 18

*United States v. Arch Trading Co.*,
    987 F.2d 1087 (4th Cir. 1993) .......................................................... 24

*United States v. Dhafir*,
    461 F.3d 211 (2nd Cir. 2006)............................................................ 24

*United States v. Shih*,
    73 F.4th 1077 (9th Cir. 2023) .......................................................... 24

*United States v. U.S. Coin & Currency*,
    401 U.S. 715 (1971) ...................................................................... 32

*United States v. Yoshida International, Inc.*,
    526 F.2d 560 (C.C.P.A. 1975) ................................................... passim

*Util. Air Reg. Group v. EPA*,
    573 U.S. 302 (2014) ...................................................................... 16

*W. Coast Hotel Co. v. Parrish*,
    300 U.S. 379 (1937) ...................................................................... 33

**Constitutional Provisions**

U.S. Const. art. I, § 8 ................................................................... 6, 19

U.S. Const. art. II, § 1 .................................................................. 18

**Statutes**

20 U.S.C. § 1098bb.......................................................................... 20

42 U.S.C. § 264............................................................................. 20

50 U.S.C. § 1701...................................................................... 10, 14

50 U.S.C. § 1702............................................................................. 2

**Other Authorities**

Amanda Frost, *In Defense of Nationwide Injunctions*, 93 NYU L. Rev. 1065 (2018) 36

*American Heritage Dictionary* (1976) ...................................................... 3

*Black's Law Dictionary* (12th ed. 2024) .................................................... 4

*Black's Law Dictionary* 1156 (5th ed. 1979) ............................................... 3

Congressional Research Service, *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, R45618, January 30, 2024 ................................. 9

Counsel on Foreign Relations, The U.S. Trade Deficit: How Much Does It Matter? 11

Dir. of National Intelligence, National Intelligence Estimate: Economic and National Security Implications of the COVID-19 Pandemic Through 2026, Apr. 2022 ................................................................................................................... 21

Donald Trump, Truth Social, May 4, 2025, 7:18 PM ................................................. 13

Erica York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, Tax Foundation, Apr. 11, 2025 ............................................................. 32

International Emergency Economic Powers Act (IEEPA) Frequently Asked Questions, U.S. Customs and Border Protection .................................................... 28

Jack Goldsmith & Curtis Bradley, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 U. Penn. L. Rev. 1743 (2024) ........................................... 22

Jack Goldsmith, *Maximum Executive Power and the Fate of the Unitary Executive,* Executive Functions, Jan. 28, 2025 ...................................................................... 18

Lenny P. Feldman, *Two Minutes in Trade–In Transit, Out of the Tariff?*, ST&R, April 13, 2025 ......................................................................................................... 28

Mary Cunningham, *IMF Forecasts Slower U.S. Economic Growth in 2025, Pointing to Escalating Trade War,* CBS News (April 22, 2025) ............................................ 32

Megan Cassella and Kevin Breuninger, *U.S. Chamber of Commerce asks Trump for tariff exclusions to 'stave off a recession,'* CNBC, May 1, 2025 .............................. 29

Miller & Chevalier, *What You Need to Know About Reciprocal Tariffs*, April 4, 2025 ............................................................................................................................. 27

Olesya Dmitracova, *The Economic Damage From Trump's Tariffs is Piling Up*, CNN, Apr. 23, 2025 .............................................................................................. 32

Paul Davidson, et al., *Is America's Economic Slip Temporary? Trump, Biden Allies Divided Over GDP Report,* USA Today (April 30, 2025)......................................... 32

*Random House College Dictionary* 1112 (rev. ed. 1975) .............................................. 3

Ronald Reagan, Message to the Congress on Economic Sanctions Against Nicaragua (May 1, 1985) ..................................................................................................... 16

*Trading with the Enemy Act Reform Legislation*, Report of the Committee on International Relations on H.R. 7738, H.R. Rep. No. 95-459 (1977)................. 9, 11

Washington International Trade Association, The U.S. Trade Deficit ..................... 11

*Webster's Third New International Dictionary* (1976) ................................................. 4

# Summary of the Argument

Defendants' position amounts to an unlimited, unreviewable executive power to impose any tariffs, in any amount, on any country, at any time. So long as the President declares a national emergency—a determination Defendants claim is itself unreviewable—his authority to impose taxes in the form of tariffs on the American people is, under the Defendants' logic, essentially unlimited.

This breathtaking power grab is illegal for multiple reasons: (1) the International Emergency Economic Powers Act (IEEPA) does not grant authority to impose tariffs; (2) the law can only be invoked in the event of an emergency, which does not exist here; (3) IEEPA requires an "unusual and extraordinary threat," which also does not exist in this case; (4) if IEEPA were ambiguous on tariffs, the major questions doctrine requires a ruling that Congress did not delegate the tariff power to the executive; (5) if IEEPA does grant the vast, unconstrained power claimed by Defendants, it would violate the nondelegation doctrine; and (6) constitutional avoidance requires a ruling against the government where the text is ambiguous. This Court need only agree with Plaintiffs on one of these points for them to prevail.

Plaintiffs are therefore likely to prevail on the merits and will suffer irreparable harm if the tariffs imposed by Executive Order 14257 (the "Liberation Day tariffs") remain in effect. And the balance of parties' interests and the public interest favor of granting a preliminary injunction. That injunction should be nationwide in scope because an injunction limited to Plaintiffs would be inequitable, lead to uneven

1

imposition of tariffs, and fail to fully prevent the harm inflicted on Plaintiffs and others. Further, because there are no genuine issues of material fact and because Plaintiffs have proved their claim that the Liberation Day tariffs exceed the scope of executive power, this Court should grant summary judgment to Plaintiffs and enter a permanent injunction prohibiting the enforcement of those tariffs.

## Argument

## I.  IEEPA does not authorize the President to impose tariffs.

Defendants fail to identify any actual grant of tariff authority in IEEPA—because there is none. Instead, they fall back on inference and supposition based on expansive interpretations of general language—exactly the sort of approach to executive authority the Supreme Court has repeatedly rejected. Defendants claim the text of IEEPA authorizes the President to impose tariffs because it says, in relevant part: "[T]he President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise . . . regulate . . . any . . . importation or exportation of . . . any property in which any foreign country or national thereof has any interest . . . ." Defs.' Resp. 11 (quoting 50 U.S.C. § 1702(a)(1)(B)). Defendants use IEEPA's reference to "regulation" as a get-out-of jail-free card. But if that were the case, then there is truly no limit on the President's tariff authority. Any government policy, at such a level of abstraction, can be declared a "regulation." Both the plain meaning of words and existing precedent support Plaintiffs' contention that Executive Order 14257 (the "Liberation Day Order") goes beyond the bounds of anything Congress ever authorized.

2

**A.    The plain meaning of IEEPA does not support the claim that the statute authorizes the President to impose tariffs.**

Courts must "normally interpret . . . a statute in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cty.*, 590 U.S. 644, 654 (2020). Defendants cite the most recent edition of *Black's Law Dictionary* for the definition of "regulate": "To *control* (an activity or process) esp. through the implementation of *rules*." Defs.' Resp. 12 (emphasis added). But imposing a tax or tariff is not the same as regulation. A tariff does not "control" imported property—even if in the abstract it exerts control over the behavior of market participants. It is simply the government taking a percentage of the value of the imported property for itself.

Nor does it fit any of the other definitions of "regulate" that Defendants cite. *See* Defs.' Resp. 12. All the dictionary definitions of the term "regulate" cited by Defendants refer to "control[ing]" by way of "rules"—none refer to the collection of *funds*. *See id.* The 1979 *Black's Law Dictionary* version—closer in time to IEEPA— is even worse for their argument: to regulate is to "fix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws." *Regulate*, *Black's Law Dictionary* 1156 (5th ed. 1979). All Defendants' citations carry the sense of *modifying behavior* by establishing standards, by imposing direction or limitation. Indeed, most of them include the word "direct" as a corollary of "control." *See Regulate*, *Random House College Dictionary* 1112 (rev. ed. 1975) ("[T]o control or direct by a rule, principle, method, etc."); *Regulate*, *American Heritage Dictionary* (1976) ("To control or direct according

3

to a rule"); *Regulate, Webster's Third New International Dictionary* (1976) ("[T]o govern or direct according to rule; to bring under the control of law or constituted authority"). A tariff does not fix, establish, adjust, or direct imported property. And very few, if any, fluent English speakers have ever referred to their tax liabilities as a form of "direction."

Defendants claim that IEEPA's grant of authority to regulate any importation of property must include the power to impose tariffs because the term "regulate" would mean little more than to "prevent or prohibit"—terms already in the statute—and would therefore be superfluous. Defs.' Resp. 14. But "regulate" is not extensive with the power to prevent or prohibit. Indeed, Defendants' dictionary definitions contradict their argument that if the term "regulate" does not include "tax or tariff" it only can mean "prevent or prohibit." *See* Defs.' Resp. 12 (citing, e.g., *Black's Law Dictionary* (12th ed. 2024): "To control (an activity or process)"). There are many ways to "control" other than to "prevent or prohibit." If Congress enacted a statute authorizing the President to "regulate, prevent, or prohibit pollution," "regulate" wouldn't be superfluous; it would simply provide a lesser power than categorical prohibition: the President might prohibit particularly harmful pollution but only enact regulations limiting the damage from less extreme forms. The same is true here: the President might prohibit importation of some particularly dangerous items, but could impose less extreme regulatory constraints, such as safety inspections, on other imports.

4

**B.    Precedent does not support the claim that IEEPA authorizes the President to impose tariffs.**

Supreme Court precedent explicitly distinguishes between taxes and regulations. *See CIC Servs., LLC v. IRS*, 593 U.S. 209, 216 (2021) (challenge to IRS reporting requirements not barred by the Anti-Injunction Act because a "reporting requirement is not a tax; and a suit brought to set aside such a rule is not one to enjoin a tax's assessment or collection"). This important distinction exists even though regulations may facilitate the collection of taxes, and even though taxes may further a regulatory objective. *Id.* ("That is so even if the reporting rule will help the [government] bring in future tax revenue."); *see also Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 8 (2015) ("'assessment, levy or collection' . . . do not encompass enforcement of the notice and reporting requirements"). Even as applied to the government *collecting money*, the Supreme Court distinguishes tax collection meant to raise revenue from financial penalties designed to punish illicit behavior. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012).

Defendants assert that precedent supports their claim that tariffs are a form of regulation of commerce. Defs.' Resp. 12–13. But, in fact, the cases Defendants cite support the conclusion that the power to impose tariffs and taxes is distinct from regulation. In *Gibbons v. Ogden*, 22 U.S. 1, 202 (1824), the Court explained that "a duty of tonnage being part of the power of imposing taxes, its prohibition may certainly be made to depend on Congress, without affording any implication respecting a power to regulate commerce." *Id.* And the Court held in *Board of Trustees of University of Illinois. v. United States*, 289 U.S. 48, 58 (1933), that "[i]t is

5

true that the taxing power is a distinct power; that it is distinct from the power to regulate commerce."

Indeed, the Constitution refers to import duties as part of the taxing power, separate from the power to regulate commerce, which is in a different clause. U.S. Const. art. I, § 8, cl. 3. If the power to "regulate" international commerce included the power to impose tariffs, it would have rendered superfluous Congress's power to "lay and collect taxes, duties, imposts and excises."  U.S. Const. art. I, § 8 cl. 1.

Neither the text of IEEPA nor Supreme Court precedent support Defendants' assertion that the power to regulate the importation of property from another country includes the power to impose tariffs on such property.

*United States v. Yoshida International, Inc.*, 526 F.2d 560, 577 (C.C.P.A. 1975), is not to the contrary. In that case, the predecessor of the Federal Circuit interpreted the Trading With The Enemy Act (TWEA) to allow the President to impose an import duty surcharge. The canon of construction *in pari materia* reflects practical considerations of interpretation but is not binding precedent. *Erlenbaugh v. United States*, 409 U.S. 239, 243–44 (1972) ("The rule of *in pari materia*—like any canon of statutory construction—is a reflection of practical experience in the interpretation of statutes."). The canon is most usefully applied where Congress passes two statutes around the same time—as opposed to the 60 years between the TWEA and IEEPA). *Id.* The Supreme Court has repeatedly warned against overreading Congress's failure to affirmatively reject a particular judicial interpretation of a text. *Boys Mkts., Inc. v. Retail Clerk's Union*, 398 U.S. 235, 241–

6

42 (1970) ("'[I]t is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law.'") (quoting *Girouard v. United States*, 328 U.S. 61, 69 (1946)). *Yoshida* alone, therefore, does not resolve whether IEEPA authorizes the President to impose tariffs; it is incumbent upon this Court to perform the textual analysis in the first instance.

Further, *Yoshida* did not contemplate anything like the awesome scope of authority the President now claims. Key to the reasoning in *Yoshida* was that President Nixon *had not* overturned Congress's established system of import duties. There is an entire section of the opinion titled "[the] Limited Nature of Proclamation 4074." *Yoshida*, 526 F.2 at 577–78. The court upheld President Nixon's import surcharge precisely because it adhered to previously established congressional tariff limits. *Id.* at 577 ("[F]ar from fixing rates in disregard of congressional will, [the proclamation] specifically provided, as noted above, that if the imposition of an additional duty of 10 percent ad valorem would cause the total duty or charge payable to exceed the total duty or charge payable at the rate [set by Congress], then [Congress's rates] shall apply.").

The *Yoshida* court *rejected* the argument that "if Proclamation 4074 were upheld, the President, by merely declaring a national emergency, could determine and fix rates of duty at will, without regard to statutory rates prescribed by Congress." 526 F.2d at 577. The court warned that "a finding that the President has the power under [the TWEA] to impose whatever tariff rates he deems desirable simply by declaring a national emergency would not only render our trade

agreements program nugatory, it would subvert the manifest Congressional intent to maintain control over its Constitutional power to levy tariffs." *Id.* That is *exactly* what the Liberation Day order amounts to.

Even if *Yoshida* required this Court to hold that IEEPA grants the President some power to impose tariffs—which it does not—*Yoshida* would require this Court still hold that the Liberation Day tariffs are not authorized by IEEPA because *Yoshida* rejected the broad assertion of unilateral presidential authority to impose tariffs, holding that it would *subvert congressional intent*. President Nixon's imposition of tariffs was much more limited than the Liberation Day tariffs at issue here. Indeed, the tariffs in *Yoshida* did not "attempt[] . . . to tear down or supplant the entire tariff scheme of Congress, [rather] the President imposed a limited surcharge, as a temporary measure calculated to help meet a particular national emergency, which is quite different from imposing whatever tariff rates he deems desirable." *Id.* at 577–78 (cleaned up). "[P]residential actions must be judged in the light of what the President actually did, not in the light of what he could have done." *Id.* at 577. *Yoshida* does not support Defendants' assertion of the power to impose the "Liberation Day" tariffs under IEEPA.

*Yoshida* does not help Defendants for the additional reason that IEEPA is a more limited statute than TWEA. "Congress enacted IEEPA in 1977 to *limit* the emergency economic powers that it had delegated to the President under the Trading with the Enemy Act." Congressional Research Service, *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, R45618, January 30,

2024 at 2 (emphasis added).[1] This was part of the broader congressional response to the excesses of the Nixon administration, establishing a commission to assess concerns about presidential powers; and "[a]mong the more controversial statutes highlighted by the committee was TWEA," such that the chair of one of the House committees "described TWEA as conferring 'on the President what could have been dictatorial powers that he could have used without any restraint by Congress.'"*Id.* at 7. Because of this, "Congress wrote the International Emergency Economic Powers Act (IEEPA) to confer 'upon the President a new set of authorities for use in time of national emergency which are both more limited in scope than those of section 5(b) and subject to procedural limitations.'" *Id.* at 9 (quoting *Trading with the Enemy Act Reform Legislation*, Report of the Committee on International Relations on H.R. 7738, H.R. Rep. No. 95-459, at 2 (1977)). Congress therefore intended IEEPA to be a much more limited grant of authority than the TWEA. It strains credulity to assert, as Defendants do, Defs.' Resp. 20, that IEEPA supports much *broader* presidential power to impose tariffs than TWEA.

## II.    There is no national emergency or "unusual and extraordinary threat" sufficient to invoke IEEPA.

Even if IEEPA authorizes tariffs in some circumstances—which it does not—the Liberation Day tariffs are still not supported by IEEPA because there is no national emergency or "unusual and extraordinary threat," as required by statute. 50 U.S.C.

---

[1] https://www.congress.gov/crs-product/R45618

§ 1701(a). These are independent requirements that must both be satisfied to authorize invocation of IEEPA.

**A.    There is no valid national emergency and the President's invocation of IEEPA is not a political question.**

While courts are understandably loath to nitpick the President's response to acute circumstances, it is settled law that "resort to the courts may be had . . . to challenge the construction and validity of the statute and to question the existence of [a] 'declared war'" or other statutory requirements, even in the field of foreign affairs. *Ludecke v. Watkins*, 335 U.S. 160, 171 (1948); *Johnson v. Eisentrager*, 339 U.S. 763, 775 (1950) (reaffirming courts' ability to review whether the [statutory] predicates have been met, including "to ascertain the existence of a state of war").

All the foundational political question cases are consistent in holding that a case or controversy does not "lie beyond judicial cognizance" simply because it "touches foreign relations." *Baker v. Carr*, 369 U.S. 186, 211 (1962). Throughout our history, the courts have reviewed abuses of emergency powers. *See, e.g.*, *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547 (1924) (scrutinizing Congress's assessment that emergencies growing out of World War I still existed after 1922); *Ex parte Milligan*, 71 U.S. 2, 121 (1866) (disallowing the use of military commissions during the Civil War). If courts can consider whether we are in a state of war, they can certainly consider the lesser exigency of a claimed economic emergency.

Treating IEEPA as an unreviewable grant of presidential discretion is at complete odds with congressional intent—which was to *cabin* emergency powers to

their proper scope. As the House committee explained, its goal in enacting IEEPA was to limit presidential power:

> [G]iven the breadth of the authorities, and their availability at the President's discretion upon a declaration of a national emergency, their exercise should be subject to various substantive restrictions. The main one stems from a recognition that emergencies are by their nature rare and brief, and are not to be equated with normal ongoing problems. A national emergency should be declared and emergency authorities employed only with respect to a specific set of circumstances which constitute a real emergency, and for no other purpose. The emergency should be terminated in a timely manner when the factual state of emergency is over and not continued in effect for use in other circumstances. A state of national emergency should not be a normal state of affairs.

*Trading with the Enemy Act Reform Legislation* H.R. Rep. No. 95-459, at 11 (1977). And yet the claimed emergency here is literally "a normal state of affairs." Indeed, it is *the* normal state of affairs: As Plaintiffs pointed out in their memorandum, trade deficits have been normal for this country since World War II—we seem to have survived that 80 year "emergency" pretty well. *See* Pls.' Memo 18–19.

Defendants' unsupported claim that deficits can cumulatively create an emergency over time is unavailing. Defs.' Resp. 35. Any normal ongoing problem can be transformed into an emergency by such unsupported speculative reasoning, thereby eviscerating IEEPA's limitations on executive discretion. Indeed, trade deficits have *declined* as a percentage of GDP since 2006.[2]

---

[2] "The U.S. current account deficit relative to GDP reached a historic high of 5.8% of GDP in 2006." In 2024, it was 3.1%. Washington International Trade Association, The U.S. Trade Deficit, https://www.wita.org/ustrade/us-trade-trends/the-us-trade-deficit/; Counsel on Foreign Relations, The U.S. Trade Deficit: How Much Does It Matter?, https://www.cfr.org/backgrounder/us-trade-deficit-how-much-does-it-matter

IEEPA was passed with the express purpose of limiting the President's emergency powers—*see* § I.B, *supra*—yet now the executive claims Congress's intent was to simply grant him a blank check. If courts are to grant absolute deference to the President's judgment, then the standards laid out in IEEPA become superfluous. There would be no need for Congress to require an "unusual or extraordinary threat"—any President declaring an emergency will simply declare that too. The *only* purpose could be for *courts* to judge the President's assertions against the standards imposed upon him by Congress. Without that, the entire statute becomes a simple grant of unlimited executive discretion.

Defendants counter that Congress granted that review authority to itself, citing 50 U.S. Code § 1622, the National Emergencies statute—not IEEPA. Defs.' Resp. 34. But the fact that Congress created a procedure by which it might express its opinion hardly divests courts of their inherent judicial power to interpret the law—a power which it is incumbent upon courts to exercise, rather than deferring to the other branches. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024). As the primary precedent upon which Defendants rely explains: "The mere incantation of 'national emergency' cannot, of course, sound the death-knell of the Constitution . . . . The declaration of a national emergency is not a talisman enabling the President to rewrite the tariff schedules, as it was not in this case . . . . 'Our laws were not established merely to be followed only when times are tranquil.'" *Yoshida*, 526 F.2d at 583 (quoting *Algonquin SNG, Inc. v. Federal Energy Administration*, 518 F.2d 1051, 1062 (D.C. Cir. 1975)). The judiciary is "not at

liberty to shut its eyes to an obvious mistake," *Baker,* 369 U.S. at 214; *accord Harjo v. Kleppe*, 420 F. Supp. 1110, 1117 (D.D.C. 1976) (reaffirming the courts' power to review issues "usually considered a matter for political departments" when a political branch "acts arbitrarily").

If the President can declare an entirely normal state of affairs an emergency, then anything can be an emergency, and absurdities flow without end. The President could tomorrow declare the precarious incomes of country club golf professionals a national emergency and tariff the importation of teaching aids that provide alternative golf instruction on the theory that inferior foreign instructional resources constitute an unusual and extraordinary threat to his handicap. He could tariff lederhosen and beer to confront the national emergency of too many raucous Oktoberfest celebrations. In fact, the President has announced plans to impose 100% tariffs on foreign-produced movies, claiming they pose a "National Security threat."[3]

The political question doctrine has never countenanced such absurdities. Rather, it is a recognition of the role of courts relative to the President, and that role is to interpret and impose those requirements and limitations that Congress saw fit to demand of the executive. To demand that courts rubber-stamp any emergency a President declares, and any policies derived from such, is to license tyranny.

---

[3] Donald Trump, Truth Social, May 4, 2025, 7:18 PM, available at https://truthsocial.com/@realDonaldTrump/posts/114452117143235155.

**B.    There is no "unusual and extraordinary threat."**

In addition to requiring a declaration of a national emergency, invocation of IEEPA also requires the presence of an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). IEEPA authority "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

Mere declaration of a national emergency, even a valid one, does not by itself satisfy the requirement that an "unusual and extraordinary threat" be present. Otherwise, that requirement would become superfluous. Such redundancy violates the "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative." *Colautti v. Franklin*, 439 U.S. 379, 392 (1979).

Even if the validity of the emergency declaration were a political question— which it is not—that does not mean the further statutory predicates imposed by IEEPA to prevent abuse of emergency powers disappear. "Though courts will not normally review the essentially political questions surrounding the declaration or continuance of a national emergency, they will not hesitate to review the actions taken in response thereto or in reliance thereon." *Yoshida*, 526 F.2d at 583. "It is one thing for courts to review the judgment of a President that a national emergency exists. It is another for courts to review his acts arising from that judgment." *Id.* It is therefore incumbent on Defendants, even granting the existence

14

of an emergency, to meet the remaining statutory standards—including "unusual and extraordinary threat." And they make no effort to do so. None of their citations support the idea that, once an emergency is declared, the subsidiary statutory requirements disappear.

The existence of trade deficits is entirely normal, and not an "unusual and extraordinary threat," or even any threat at all. Pls.' Memo at 18–19. Defendants have no real answer to this point and, conflate the requirement of an "unusual and extraordinary threat" with that of declaring a national emergency, even though the two are separate. *See* Defs.' Resp. 32. This Court should not defer to the President's mere assertion that an unusual and extraordinary threat exists. To do so would essentially eviscerate this important part of the statute.

None of the cases cited by Defendants mandate the conclusion that the President's assertion of an unusual and extraordinary threat is unreviewable by this Court. *See* Defs.' Resp. 33–34 (citing *In re 650 Fifth Ave. & Related Props.*, 777 F. Supp. 2d 529, 575 n.16 (S.D.N.Y. 2011); *Beacon Prods. Corp. v. Reagan*, 633 F. Supp. 1191, 1194–95 (D. Mass. 1986)). District court decisions are not binding precedents, and both cases are easily distinguishable because they addressed uses of IEEPA in response to actual "unusual and extraordinary threats" to U.S. security. One involved sanctions imposed against Iran in response to the Iranian government's 1979 seizure of the US embassy in that country, and support of terrorism. *See In re 650 Fifth Ave.*, 777 F. Supp. 2d at 535–45. Even so, the court ultimately concluded that the plaintiffs' claim that their property was illegally

15

seized under IEEPA did *not* present an unreviewable political question. *Id.* at 543–46. The other involved President Reagan's imposition of an embargo against Nicaragua in response to the communist government's alliance with the Soviet Union and support of insurgencies in its region. *Beacon Prods. Corp.*, 633 F. Supp. At 1192–95; *cf.* Ronald Reagan, Message to the Congress on Economic Sanctions Against Nicaragua (May 1, 1985)[4] (describing "Nicaragua's continuing efforts to subvert its neighbors, its rapid and destabilizing military buildup, its close military and security ties to Cuba and the Soviet Union and its imposition of Communist totalitarian internal rule" as the reasons for the embargo). These classic national security threats arising from sudden crises are a far cry from the situation in the present case.

## III. Defendants' interpretation of IEEPA runs afoul of the major questions doctrine and Constitutional nondelegation.

### A. The major questions doctrine requires Congress to 'speak clearly' when delegating such significant power.

The major questions doctrine (MQD) requires Congress to "speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Reg. Group v. EPA*, 573 U.S. 302, 324 (2014) (citations omitted); *see also FDA v. Brown & Williamson*, 520 U.S. 120, 159–60 (2000) (holding that Congress cannot be assumed to have implicitly delegated the power to regulate "a significant portion of the American economy" because "Congress could not have intended to delegate a decision of such economic and political significance" without explicitly

---

[4] available at https://www.reaganlibrary.gov/archives/speech/message-congress-economic-sanctions-against-nicaragua

saying so). The use of IEEPA to impose massive tariffs on goods imported from almost every nation in the world is unquestionably a decision of "vast economic and political significance," more so than any of the other actions ruled to be "major questions" by the Supreme Court. *See* Pls.' Memo. 13–14.

Defendants nonetheless claim that MQD applies only to executive agencies, not to the President, and therefore this enormous assertion of power is exempt from scrutiny. This distinction is indefensible. It has already been rejected by at least three federal courts of appeals: the Fifth, Sixth, and Eleventh Circuits. *See Louisiana v. Biden*, 55 F.4th 1017, 1031 n.40 (5th Cir. 2022) ("delegations to the President and delegations to an agency should be treated the same under the major questions doctrine"); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295–96 (11th Cir. 2022) (holding that an assertion of power by the President under the Procurement Act is "no exception" to application of MQD); *Kentucky v. Biden*, 23 F.4th 585, 606–08 (6th Cir. 2022) (applying MQD to a presidential directive). The Ninth Circuit previously held otherwise in a decision that was later vacated. *Mayes v. Biden*, 67 F.4th 921, 932–34 (9th Cir. 2023), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023). The Ninth Circuit has since applied MQD to a presidential action but held that policy did not run afoul of the doctrine because it wasn't a "transformative expansion" of executive authority. *Nebraska v. Su*, 121 F. 4th 1, 14 (9th Cir. 2024). The unprecedented use of IEEPA—a statute never before used to impose tariffs of any kind—to impose tariffs on imports from almost every nation in the world surely qualifies as a "transformative expansion," if anything does.

17

For MQD purposes, "[i]t makes no difference which Executive Branch officer has received an unlawful delegation." *Id*. at 15 (Nelson, J., concurring). The doctrine "is fundamentally a separation of powers doctrine" that "keeps Congress in its constitutional lane, preventing it from delegating 'fundamental policy decisions' to the Executive Branch." *Id.* (quoting *Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.*, 448 U.S. 607, 687 (1980) (Rehnquist, J., concurring in the judgment)). That logic applies regardless of whether the power in question is claimed by the President or by an agency. *Id*. Indeed, under the "unitary executive" theory otherwise embraced by Defendants, "the "entire 'executive Power' belongs to the President alone." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 213 (2020) (quoting U.S. Const. art. II, § 1).[5] Agencies are, in this view, just adjuncts to presidential authority. If MQD does not apply to the President, then he could evade judicial review under MQD simply by issuing an executive order requiring the agency in question to do his bidding. "Distinguishing between presidential and agency delegations also ignores the realities of administrative decision-making. The President is likely to be closely involved in major policies, even if they are ultimately promulgated by an agency." *Su*, 121 F.4th at 19 (Nelson, J., concurring).

Defendants' argument that the President is different because he is subject to "political accountability" also makes no sense. Defs.' Resp. 22. Given extensive

---

[5] On the Defendants' embrace of unitary executive theory, *see, e.g.*, Jack Goldsmith, *Maximum Executive Power and the Fate of the Unitary Executive,* Executive Functions, Jan. 28, 2025 (noting this administration has advanced a maximalist version of the theory), available at https://executivefunctions.substack.com/p/maximum-executive-power-and-the-fate.

presidential control over agencies, the latter also face accountability through him. In addition, agencies face accountability through congressional action. Congress can legislate to curb the power of agencies that anger majority public opinion. Indeed, agencies face greater congressional constraint than the President, because Congress can adopt legislation abolishing an agency entirely, whereas it cannot do the same to the President.

Exempting the President from MQD scrutiny also makes no sense if the doctrine is understood as a linguistic canon, that "situates text in context," and therefore requires clearer and less ambiguous statements to justify broad delegations of power, as opposed to narrow ones. *See Biden v. Nebraska*, 600 U.S. 477, 508–14 (2023) (Barrett, J., concurring, adopting this approach). "Here, it would be even stranger to treat the President differently . . . . Why would our normal interpretive process turn on the identity of the Executive Branch officer to whom Congress delegated power? An implausible reading of a statute is no less implausible when that statute confers authority on the President versus an agency." *Su*, 121 F.4th at 19–20 (Nelson, J., concurring).

Defendants' claim that MQD does not apply to issues involving foreign affairs and national security is also unavailing. Defs.' Resp. 22. There is no such exception to the doctrine. And an exception is particularly inappropriate when it comes to delegation of a core congressional authority: the powers to "lay and collect taxes, duties, imposts and excises," and "[t]o regulate commerce with foreign nations." U.S. Const. art. I, § 8 cl. 1, 3.

19

The Supreme Court has applied MQD to assertions of executive authority
stemming from national emergencies, such as the COVID-19 pandemic. *See, e.g.*,
*Biden v. Nebraska*, 600 U.S. 477 (2023) (claim of power to forgive student loans
based on a national emergency declaration). It did so even though the claimed
authority in question was based on the 2003 HEROES Act, legislation meant in
large part to address war and foreign policy emergencies. *See id.* at 494 (noting that
"[t]he HEROES Act authorizes the Secretary to 'waive or modify any statutory or
regulatory provision applicable to the student financial assistance programs under
title IV of the [Education Act] as the Secretary deems necessary in connection with
a war or other military operation or national emergency.' 20 U.S.C. § 1098bb(a)(1)").
In *Alabama Association of Realtors v. HHS*, the Court applied MQD to invalidate a
nationwide eviction moratorium intended to curb the spread of COVID-19, even
though the statute authorized measures to curb the "spread of communicable
diseases from foreign countries into the States or possessions, or from one State or
possession into any other State or possession." 594 U.S. 758, 761 (2021) (quoting 42
U.S.C. § 264(a)). The possibility that the eviction moratorium might inhibit the
spread of COVID-19 "from foreign countries" did not prevent application of MQD.
Moreover, the widespread death and economic disruption inflicted by the COVID-19
emergency quite obviously impacted U.S. foreign policy and national security. *See*
Dir. of National Intelligence, National Intelligence Estimate: Economic and
National Security Implications of the COVID-19 Pandemic Through 2026, Apr.

20

2022,[6] (outlining major implications in detail). That did not prevent the Supreme Court from applying MQD to policies intended to mitigate the pandemic, and such considerations should not prevent its application here.

*Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985), cited by the Defendants, is not to the contrary. That ruling emphasizes that judicial intervention is appropriate when there is "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Id*. at 89. In this case, for reasons already discussed, we have both multiple "clear misconstruction[s]" of IEEPA and "action outside delegated authority." *See* §§ I–II, *supra*. In addition, *Maple Leaf* predates the Supreme Court's modern MQD decisions and thus did not consider whether that doctrine applies.

Defendants' reliance on *Yoshida* is equally unavailing. *Yoshida* was decided before the development of modern Supreme Court MQD precedent and cannot override or circumscribe those decisions. Nor did *Yoshida* endorse anything like the boundless executive discretion to impose tariffs claimed by Defendants. *See* § I.B, *supra*; § III.B, *infra*.

## B. Granting the President unilateral authority to impose tariffs would make IEEPA unconstitutional under the nondelegation doctrine.

"The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488

---

[6] available at https://www.dni.gov/files/ODNI/documents/assessments/NIE-Economic_and_National_Securtiy_Implications_of_the_COVID-19_Pandemic_Through_2026.pdf

U.S. 361, 371 (1989). Despite Defendants' suggestions to the contrary, there is no doubt that nondelegation principles apply to tariff and trade legislation. "Supreme Court jurisprudence, from the early days of the Republic, evinces affirmation of the principle that the separation of powers must be respected and that the legislative power over trade cannot be abdicated or transferred to the Executive." *American Institute for Intern. Steel, Inc. v. United States,* 376 F. Supp. 3d 1335, 1347 (Ct. Int'l Trade 2019) (Katzmann, J., dubitante); *cf.* Jack Goldsmith & Curtis Bradley, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 U. Penn. L. Rev. 1743, 1788–89 (2024) (explaining that "the President has no independent constitutional authority over international commerce" and therefore "a simple categorical determination that an area involves foreign affairs or national security cannot by itself suffice to address delegation concerns" when it comes to IEEPA and other statutes related to foreign trade). Congress must at least provide an "intelligible principle" to control the discretion of the executive. *Gundy v. United States*, 588 U.S. 128, 132, 135 (2019).

Under the government's interpretation of IEEPA, the President has virtually unlimited authority to impose tariffs, so long as he proclaims a national emergency, which he can do anytime he wants for any reason he wants, with no judicial review. This would be the most "sweeping delegation of legislative power" since the Supreme Court invalidated the National Recovery Act, which gave "virtually unfettered" discretion to the President "in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country."

*A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 539, 542 (1935). Here we have a similar claim to "virtually unfettered discretion" to impose tariffs on international trade, with dramatic effects on the economy. It is true that "[t]he legislative process would frequently bog down if Congress were constitutionally required to appraise before-hand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). But that doesn't mean Congress can take the opposite extreme, granting unfettered, unreviewable discretion to exercise an enumerated congressional power anytime the executive wants.

Defendants cite cases, such as *Yoshida*, holding that IEEPA and its predecessor statute, TWEA, do not violate nondelegation. But these cases did not uphold the kind of limitless authority claimed by Defendants here. *Yoshida* emphasized that "the delegation could not constitutionally have been of the full and all-inclusive power to regulate foreign commerce." 526 F.2d at 574 (quotation omitted). *Yoshida* upheld a limited imposition of a "surcharge" under TWEA because "the surcharge was limited to articles which had been the subject of prior tariff concessions and, thus, to less than all United States imports," and because "[w]ith respect to those articles on which no concession had been granted, the congressionally established rates remained untouched." *Id.* at 577. Thus, presidential discretion was constrained by tariff rates previously set by Congress. By contrast, the Defendants' *do* claim an "all-inclusive power" to impose tariffs at will.

23

The cases Defendants rely on all emphasize the limited nature of presidential authority under IEEPA. *See United States v. Dhafir*, 461 F.3d 211, 216–17 (2nd Cir. 2006) ("The powers granted to the President are explicitly defined and circumscribed"); *United States v. Arch Trading Co.*, 987 F.2d 1087, 1093 (4th Cir. 1993) ("[T]he authorities delegated are defined and limited."); *United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) (IEEPA "limits the President's authority to prohibit certain types of transactions."). None of these decisions hold that IEEPA grants tariff authority to the President at all; they could not, since no previous President has used it in that way. Instead, they interpret the real IEEPA, which "meaningfully constrains the [President's] discretion . . . by requiring that "[t]he authorities granted to the President . . . may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared," rather than the mythical statute of the Defendants' imagination, under which these terms mean whatever the executive says they mean. *Dhafir*, 461 F.3d at 216–17. If the President can declare a "national emergency" anytime he wants and there is no enforceable limit to what he can consider to be an "unusual and extraordinary threat," then these terms impose no "meaningful constraint" on his discretion.

Defendants are wrong to claim that nondelegation problems are somehow averted by Congress's ability to investigate or terminate (by means of new legislation) the President's national emergency declaration after the fact. Such congressional action is *always* possible for any kind of delegated power. By this

standard, a statute giving the President the power to "impose any taxes or tariffs he deems necessary" would be an acceptable delegation, since Congress could always investigate the President's justifications for using that power and overturn any tariffs with new laws. The whole point of limiting delegations is to prevent a "sweeping delegation of legislative power" in ways that create "unfettered discretion" in the first place. *Schechter Poultry*, 295 U.S. at 539, 542. If after-the-fact congressional review were sufficient, no delegation would ever be too broad.

## C.    Constitutional avoidance requires a ruling against Defendants' interpretation of IEEPA.

At the very least, the nondelegation issues raised by Defendants' interpretation of IEEPA are serious enough to trigger the canon of constitutional avoidance. "When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson*, 285 U.S. 22, 62 (1932).

Here, for reasons already noted, there are several different "fairly possible" ways to avoid the nondelegation issue. These include (1) holding that IEEPA does not authorize tariffs, (2) holding that there is no valid national emergency, (3) holding there is no "unusual and extraordinary threat," and (4) holding that MQD bars the Defendant's interpretation of IEEPA on any of the previous three points. Any of these four perfectly plausible options would avoid the need to consider the constitutional question raised by the Defendants' approach.

25

**IV.    Plaintiffs are entitled to a preliminary injunction.**

**A.    Plaintiffs will suffer irreparable harm.**

Plaintiffs have established likelihood of immediate, irreparable harm in the form of lost business opportunities, reputational damage, and loss of goodwill. It is irrelevant whether Plaintiffs have already paid the Liberation Day tariffs because they have established that they will, in their regular course of business, import goods for which they will be responsible for paying challenged tariffs.

As Defendants note, Plaintiffs V.O.S. and Terry Precision Cycling have both "made entries that appear to be subject to the tariffs at issue[.]" Defs.' Resp. 38, n.3. Because tariffs must be paid immediately upon arrival at the port, V.O.S. will "imminently be required to [pay additional duties pursuant to the Executive Orders]" for the entry referenced by the government. Pls.' Mot., Decl. Schwartz Ex. A, ¶ 25; *see* Defs.' Resp. 38–39, n.3. As of this moment. V.O.S. has two containers with a total value of $122,234 scheduled to arrive in the next few weeks which will incur tariffs of $12,223, which V.O.S. will pay upon arrival of the shipments at the port. Decl. of Victor Schwartz, Exhibit A, ¶¶ 4–6.

Terry Cycling has paid $26,094.35 in duties authorized by the Liberation Day Order between April 18, 2025, and May 2, 2025. Decl. of Nikolaus Holm, Exhibit B, ¶¶ 6–7. Terry Cycling will also imminently be required to pay additional duties for the entry referenced by Defendants. *See* Defs.' Resp. 38–39, n.3. Terry Cycling will continue to import goods, in the regular course of its business, that are subject to the Liberation Day tariffs. Pls.' Mot., Decl. Holm, Ex. E, ¶¶ 24–27.

Genova Pipe does not have an alternative domestic supplier for the raw materials it requires to operate its business; to continue operations Genova Pipe must continue importing raw materials from abroad. Pls.' Mot., Decl. Reese, Ex. B, ¶¶ 5–7. Therefore, Genova Pipe will imminently be required to pay the additional duties.

FishUSA relies on foreign imports because there is no alternative source for its products in the United States, and there is insufficient time to create such an alternative. Pls.' Mot., Decl. Pastore, Ex. D, ¶¶ 12, 13, 25. Therefore, FishUSA will continue to import goods from abroad, necessary to the operation of the business, which will incur the additional duties.

MicroKits has delayed ordering the necessary component parts as a direct result of the tariffs; therefore, it has not paid the tariffs. "At the current rates MicroKits cannot order parts" and the business only "has enough parts to continue manufacturing operations for 7 weeks before it will have to shut down." Pls.' Mot., Decl. Levi, Ex. C, ¶¶ 7, 10.

The Liberation Day tariffs have only been in place for a short time due to exclusions for items already in transit.[7] By using the word *"and"* instead of *"or,"* the

---

[7] "The Reciprocal Tariffs will not apply to goods loaded onto a vessel at the port of loading and in transit on the final mode of transit before 12:01 a.m. EDT on the effective date and entered for consumption or withdrawn from the warehouse for consumption after 12:01 a.m. EDT on the effective date and before 12:01 a.m. EDT on May 27 2025." Miller & Chevalier, *What You Need to Know About Reciprocal Tariffs*, April 4, 2025, https://www.millerchevalier.com/publication/what-you-need-know-about-reciprocal-tariffs-updated#:~:text=the%20Reciprocal%20Tariffs.-,What%20if%20my%20products%20are%20already%20in%20transit%20to%20the,EDT%20on%20May%2027%202025; *see also* International Emergency Economic

Liberation Day Order has created ambiguity for businesses, such as Plaintiffs, about whether goods shipped before April 5th will still be subject to the new duty.[8]

"[T]he mere possibility of future monetary damages does not defeat a motion for preliminary injunction" because "[a]s its name implies, the irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address." *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). Plaintiffs' losses are precisely the kind that go beyond measurable monetary damages and therefore cannot be addressed by money alone. The point of a preliminary injunction is to prevent the irreparable harm that would occur from being subjected to the tariffs; requiring Plaintiffs to have their businesses permanently damaged as a precondition for a preliminary injunction defeats the purpose of a preliminary injunction remedy.

Monetary compensation is inadequate because Plaintiffs will suffer irreparable harm from the cumulative effect of the tariffs on the Plaintiffs' business operations, including harm to goodwill, reputational damage, and lost business opportunities, as detailed in Plaintiffs' declarations, respectively. *See* Pls.' Mot., Exs. A–E. As this Court has stated, "bankruptcy or a substantial loss of business may constitute

---

Powers Act (IEEPA) Frequently Asked Questions, U.S. Customs and Border Protection, https://www.cbp.gov/trade/programs-administration/trade-remedies/IEEPA-FAQ (last modified May 1, 2025).

[8] *See* Lenny P. Feldman, *Two Minutes in Trade–In Transit, Out of the Tariff?*, ST&R, April 13, 2025, https://www.strtrade.com/trade-news-resources/str-trade-report/podcast/two-minutes-in-trade-in-transit-out-of-the-tariff?mkt_tok=NzIzLVdPWi00NDYAAAGZ5GamqSRRk1XYyatXq6bLu0pLLRRgn vHcHYHbhbppHZRdKxkKsNnNPx8WWiydIeWFAjy3VtWkeSuf-kIocaa7F66kCRRRbPM7liE_vSR3sV0

irreparable harm because those events render a final judgment ineffective and deprive movant of 'meaningful judicial review.'" *Retractable Techs., Inc. v. United States*, 739 F. Supp. 3d 1330, 1340 (Ct. Int'l Trade 2024) (citations omitted). "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis in Vitro,* 664 F.3d at 930. Just as "[t]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who do not knock on the door or to identify the specific persons who do not reorder because of the existence of the infringer" there is no way to measure and compensate by monetary damages the knock-on effects from damage to supplier and customer relationships, goodwill, reputation and lost business opportunities for our Plaintiffs. *Id.* It is for good reason that the U.S. Chamber of Commerce sent a letter to the administration on April 30 asking for tariff relief at least for small business like Plaintiffs to "save America's small businesses and stave off a recession," explaining that "the Chamber is hearing from small business every day who are seeing their ability to survive endangered by the recent increase in tariff rates."[9]

Genova Pipe will suffer loss of goodwill and damage to reputation absent an injunction because its Canadian customers will be deterred from buying Genova Pipe's USA-made products and will enter into relationships with other suppliers;

---

[9] Megan Cassella and Kevin Breuninger, *U.S. Chamber of Commerce asks Trump for tariff exclusions to 'stave off a recession,'* CNBC, May 1, 2025, available at https://www.cnbc.com/2025/05/01/trump-tariffs-recession-chamber-of-commerce.html

there is no amount of monetary compensation that can repair these damaged relationships at the resolution of this case. Pls.' Mot., Decl. Reese, Ex. B, ¶ 13.

This Court has previously recognized irreparable harm due to "loss of goodwill and damage to his reputation from his domestic customers due to his failure to deliver because of his inability to pay the fully collateralized bond amount." *Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322, 1328 (Ct. Int'l Trade 2014). V.O.S. finds itself in a similar situation; the tariffs will create an immediate cash flow problem. As a small business, V.O.S. does not have access to capital like a large corporation might; the only way to increase working capital is to sell off existing inventory quickly, at a steep discount or loss, reducing overall inventory level, limiting the ability of V.O.S. to service its customers. Pls.' Mot., Decl. Schwartz, Ex. A, ¶¶ 25–30. If V.O.S. cannot sell inventory fast enough, V.O.S. will not be able to pay its suppliers.

FishUSA has no alternative source for its products in the United States and insufficient time to create such an alternative before the business will be irreparably harmed. Pls.' Mot., Decl. Pastore, Ex. D, ¶¶ 12, 13, 25. FishUSA has already lost business opportunities due to the tariffs, in the form of stopping work on a project that was slotted to go into production imminently. *Id*. ¶¶ 27–28. FishUSA has already paused production of some products and paused orders which will damage the business' reputation with suppliers. *Id*. ¶¶ 18, 23, 24.

The tariffs are an existential threat to Terry Cycling. Pls.' Mot., Decl. Holm, Ex. E, ¶ 5. "It is difficult for this court to envision any irreparable damage to a plaintiff

and his business more deserving of equitable relief than the [very] loss of the business itself." *McAfee v. U.S.*, 531 F. Supp. 177, 179 (Ct. Int'l Trade 1982). Terry Cycling's product category is "highly sensitive" to price increases, particularly in an inflationary environment. Pls.' Mot., Decl. Holm, Ex. E, ¶ 32. The Federal Circuit Court of Appeals has previously recognized testimony about the sensitivity of the market as a permissible basis for irreparable harm. *See Celsis in Vitro*, 664 F.3d at 930.

MicroKits will suffer irreparable harm in the form of lost business opportunities because it "will not be able to compete with copycat versions of its product" and MicroKits has already been forced to delay hiring an operations assistant. Pls.' Mot., Decl. Levi, Ex. C, ¶¶ 15, 16. MicroKits also "will not be able to produce enough inventory to stay in stock during the crucial Q4 holiday sales season" if it cannot immediately order more parts to continue manufacturing. *Id*. ¶ 12. This mirrors *Celsis in Vitro,* where testimony about the inability to market to potential and existing customers during the growth stage of a product leading to price erosion, reputational damage, and loss of business opportunities was permissible evidence of irreparable harm. 664 F.3d at 930.

**B.    The remaining preliminary injunction factors favor Plaintiffs.**

Defendants blend the two remaining preliminary injunction factors together — the balance of hardship and the public interest—because those factors "merge when the Government is the opposing party." *Nken v. Holder,* 556 U.S. 418, 435 (2009).

Defendants argue that there is a "public interest in maintaining the challenged executive actions." Defs.' Resp. 42. But "[o]f course the government has no

31

legitimate interest in upholding an unconstitutional system" or requirement. *United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971) (Brennan J., concurring). By contrast, "[t]he public interest is served by ensuring that governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly." *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010).

Further, an injunction is in the public interest because the economic impact from the tariffs themselves has been disastrous, not just to Plaintiffs. *See, e.g.,* Paul Davidson, et al., *Is America's Economic Slip Temporary? Trump, Biden Allies Divided Over GDP Report,* USA Today (April 30, 2025) [10] (noting economic damage); Mary Cunningham, *IMF Forecasts Slower U.S. Economic Growth in 2025, Pointing to Escalating Trade War,* CBS News (April 22, 2025) [11] (tariffs are slowing economic growth); Olesya Dmitracova, *The Economic Damage From Trump's Tariffs is Piling Up*, CNN, Apr. 23, 2025[12] (noting growing damage); Erica York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, Tax Foundation, Apr. 11, 2025[13] (estimating extensive economic damage likely to be caused by the tariffs). This Court need not turn a blind eye to the obvious consequences the Liberation Day tariffs have had and will continue to have on American businesses

---

[10] https://www.usatoday.com/story/money/2025/04/30/gdp-report-economy-tariffs-impact-q1-2025/83333454007/
[11] https://www.cbsnews.com/news/imf-us-economy-2025-trade-war-tariffs-economic-outlook/
[12] available at https://www.cnn.com/2025/04/23/economy/uk-germany-economy-tariffs-intl/index.html
[13] https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/. Plaintiffs' Complaint contained a typo, incorrectly stating this number as "$1.4 to 2.2 billion." *See* ECF 2 at ¶ 71. The correct number is the one listed here: "$1.4 to 2.2 trillion."

and consumers. Indeed, the Supreme Court has repeatedly held that courts can take judicial notice of prevailing economic conditions that are obvious to all. *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 399 (1937) (taking judicial notice of economic depression); *Atchison, T. & S. F. R. Co. v. United States*, 284 U.S. 248, 260 (1932) (same); *Home Bldg. & Loan Asso. v. Blaisdell*, 290 U.S. 398, 444 (1934) (taking judicial notice of collapsing land values and mortgage lending).

Additionally, the public interest is not served by the erosion of separation of powers implicit in the maximalist view of executive authority espoused by Defendants. Far from "acting within Congress's authorization," as Defendants claim, Defs.' Resp. 43, the Administration asserts unreviewable authority to declare a national emergency whenever the President wants, and that even bilateral trade deficits that have existed for decades constitute an unusual and extraordinary threat. Defendants' argument that the "injunction would be an enormous intrusion on the President's conduct of foreign affairs," Defs.' Resp. 43, ignores the fact that even in the context of foreign policy, the Executive's actions are subject to judicial review. *See, e.g., Hamdi v. Rumsfeld,* 542 U.S. 507, 531, 533 (2004) (even "weighty and sensitive governmental interests" including "the Constitution[al] recogni[tion] that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them" "may not erode[]" "essential constitutional promises").

As to any interest the public may have in the policy underlying the Executive Order, "[t]he issuance of an injunction does not undermine that interest, it merely

33

maintains the status quo." *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1372 (Ct. Int'l Trade 2021). Here, that means the conditions that existed before the enactment of these unlawful tariffs. "The public interest is served by the accurate and effective, uniform and fair enforcement of trade laws." *Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322, 1332 (Ct. Int'l Trade 2014).

"While 'maintaining a maximum level of security for the unliquidated entries might serve the public interest of revenue collection,' this cannot be done 'at the cost of continuing to subject [a plaintiff] to an unlawful, and discriminatory bonding requirement.' Preserving Plaintiff's access to meaningful judicial review, a public interest in itself, protects against unchecked and unchallenged enforcement by preserving Plaintiff's opportunity to litigate a potentially meritorious claim. Accordingly, the public interest will be served by granting the Plaintiff a preliminary injunction." *Id.* (citations omitted).

## C. This Court should grant a broad preliminary injunction against the Liberation Day Order's enforcement.

This Court should enter a preliminary injunction enjoining the Liberation Day Order's enforcement entirely. Doing otherwise would be inequitable and result in uneven application of tariffs.

Defendants assert that a preliminary injunction issued by this Court should be limited to the parties to this litigation. Defs.' Resp. 44. They also assert that nationwide injunctions are only available in "exceptional cases" and "rare circumstances." Defs.' Resp. 44 (citing *City and County of San Francisco v. Trump*,

897 F.3d 1225, 1244 (9th Cir. 2018) and *City of Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020)).

But a nationwide injunction is appropriate where it is "necessary to give prevailing parties the relief to which they are entitled." *City and County of San Francisco*, 897 F.3d at 1244. And this is an exceptional case. Here, the President asserts broad, unilateral authority to impose tariffs on imports from every country in the world, which is already having an enormous impact not only the United States' economy, but the world economy. If there ever was an exceptional case requiring a nationwide injunction, it is this case.

And a nationwide injunction is in the public interest. "As for the public interest, there can be no doubt that it is best served by ensuring that the [government] complies with the law, and interprets and applies our international trade statutes uniformly and fairly." *Ceramica Regiomontana, S.A. v. United States*, 7 Ct. Int'l Trade 390, 397 (1984). A nationwide injunction is necessary to ensure uniformity and fairness and therefore is in the public interest. Otherwise, only Plaintiffs (and possible future litigants) will be exempt from the tariffs.

Further, the harm to Plaintiffs is not simply the cost of paying the Liberation Day tariffs. The application of those tariffs across the economy harms them. *See* § III.A, *supra*. The tariffs applied to Plaintiffs' suppliers or customers will affect their businesses, even if they are not required to directly pay the tariffs themselves. Thus, a nationwide injunction is necessary to give Plaintiffs the relief to which they are entitled.

Additionally, limiting the scope of the preliminary injunction would impair judicial efficiency. There are other similar challenges to the President's Liberation Day tariffs. Limiting the injunction to Plaintiffs would mean this Court would have to review every motion for preliminary injunction in those cases separately. And every business affected by the tariffs would need to file their own case for this court to resolve.

Finally, because the Court has exclusive jurisdiction under 28 U.S.C. § 1581(i)(1)(B) and because this case will be heard by a three-judge panel, the traditional concerns about nationwide injunctions—that they promote forum shopping, allow a single district court to control policy for the nation, prevent percolation of federal law, and can lead to conflicting injunctions—do not apply. *See* Amanda Frost, *In Defense of Nationwide Injunctions*, 93 NYU L. Rev. 1065, 1104 (2018).[14]

In issuing a nationwide preliminary injunction, this Court should not require Plaintiffs to post a bond. Defendants suggest this Court require Plaintiffs to "identify the entries, by entry number, importer name, and importer number, that would be covered" by the preliminary injunction and order Plaintiffs to "post Single Transaction Bonds for all such identified entries during the pendency of any injunctive order." Defs.' Resp. 44–45. But because of the nature of the Liberation Day tariffs and the nature of this claim, doing so does not make sense.

---

[14] Available at SSRN: https://ssrn.com/abstract=3112776

36

The across-the-board tariffs imposed by the President have significantly affected the entire world economy—not just certain imports of Plaintiffs. Plaintiffs and other U.S. companies have changed their behavior by holding off on imports that they might otherwise have made, holding off or cancelling expansion of imports, and exploring alternative suppliers and supply chains to avoid or lower the effect of the tariffs on their businesses. So it is impossible for Plaintiffs to identify all the entries that would be covered by the tariffs.

Further, courts have held there is broad discretion for a court to determine the appropriate amount of an injunction bond, including the discretion to require no bond at all. *See e.g., Nat'l Treasury Emps. Union v. Trump*, No. 25-0935, 2025 U.S. Dist. LEXIS 80268, *59 (D. D. C. Dist. April 28, 2025) (finding no bond required where plaintiff has made a showing that an Executive Order is of unprecedented scope, where the injunction would protect the public interest, and where the Executive Order poses an existential threat to plaintiff). *National Treasury Employees Union* dealt with the President's Executive Order removing collective bargaining rights for approximately two-thirds of the federal workforce. The reasons stated for not requiring a bond in that case apply even more strongly here. The scope of the Liberation Day tariffs is unprecedented, the effect on the public is vast, and the tariffs are an existential threat to at least some Plaintiffs, as well as many other businesses in the United States.

Finally, when unconstitutional conduct by the government is involved, as it is here, courts generally do not require plaintiffs to secure a bond in order to obtain

preliminary injunctive relief. Requiring a bond "to issue before enjoining potentially unconstitutional conduct by a governmental entity simply seems inappropriate because . . . protection of those rights should not be contingent upon an ability to pay." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).

This Court should therefore issue a nationwide injunction without requiring Plaintiffs to secure a bond.

## Conclusion

For the reasons set forth herein, and in their motion for preliminary injunction and permanent injunction, Plaintiffs respectfully request that this Court enjoin the imposition of tariffs set forth in Executive Order 14257 and grant other just relief as this Court may deem just or proper.

Dated: May 6, 2025

Respectfully submitted,

/s/ Jeffrey M. Schwab

Jeffrey M. Schwab
Reilly Stephens
James McQuaid
Bridget F. Conlan
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org
rstephens@ljc.org
jmcquaid@ljc.org
bconlan@ljc.org

Ilya Somin
Antonin Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, Virginia 22201
703-993-8069
isomin@gmu.edu

## Certificate of Compliance

I, Jeffrey M. Schwab, hereby certify that this brief complies with the 10,000-word limitation set forth in the Court's April 22, 2025, Order, Dkt. 13, because this brief contains 9,920 words. In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

Respectfully submitted

Dated: May 6, 2025                                /s/ Jeffrey M. Schwab

# Exhibit A

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. SELECTIONS, INC., *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> Defendants. | Case No. 25-00066 |

## DECLARATION OF VICTOR SCHWARTZ

I, Victor Schwartz, state as follows:

1. I am a US citizen at least 18 years of age. If called to testify, I would testify as follows:

2. I am the CEO of V.O.S. Selections, Inc. ("V.O.S.").

3. V.O.S. imports wines, spirits, and sakes from 14 different countries, including Austria, Italy, Greece, Lebanon, Morocco, Spain, France, Portugal, Mexico, Argentina, Germany, Croatia, Hungary and South Africa.

4. V.O.S. has two containers scheduled to arrive in the next few weeks; Container #1 valued at $49,814 (EUR 43,317.27) and Container #2 valued at $72,420 (EUR 62, 974.48), for a total value of $122,234 (EUR 106, 291.75).

5. The total expected tariffs for these two containers at a 10% rate is $12,223.

6. V.O.S. will pay these tariffs upon the shipment's arrival at the Port of New York.

1

Under penalty of perjury, I affirm that the foregoing is true and correct.

Dated: _5/5/25_

_____
Victor Schwartz

# Exhibit B

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| V.O.S. Selections, Inc., *et al.* <br><br>             Plaintiffs, <br><br> v. <br><br> Donald J. Trump, *et al.*, <br><br>             Defendants. | Case No. 25-00066 |

**DECLARATION OF NIKOLAUS HOLM**

I, Nikolaus Holm, state as follows:

1. I am a US citizen at least 18 years of age. If called to testify, I would testify as follows:

2. I am the [position] of Terry Precision Cycling, LLC ("Terry Cycling").

3. Terry Cycling is a brand of women's cycling apparel, registered in Delaware with its principal place of business in Burlington, Vermont.

4. Today, Terry Cycling imports finished goods directly from China, Taiwan, Vietnam, Italy and the Philippines.

5. Terry Cycling's US-based manufacturing partner imports fabrics and trims from several other countries including Guatemala, El Salvador, China, and the European Union to produce products domestically for Terry Cycling.

6. The following table reflects tariff payments made between April 18 and May 2, 2025 by Terry Cycling.

1

| Date | FedEx - Invoice number | Amount | IEEPA Amt. | Paid Date | Payment Reference | ACE Entry |
|---|---|---|---|---|---|---|
| 4/17/2025 | 2-377-41378 | $17,645.71 | $14,953.85 | 5/2/2025 | 36425126 | 799-7564802-4 |
| 4/15/2025 | 2-375-74035 | $1,887.16 | $738.80 | 4/21/2025 | 46869162 | 799-7511957-0 |
| 4/15/2025 | 2-376-24653 | $10,413.15 | $5,049.60 | 5/2/2025 | 36425126 | 799-7439836-5 |
| 4/11/2025 | 2-375-22389 | $11,079.83 | $5,352.10 | 4/18/2025 | 35959337 | 799-7463738-2 |

7.  The attached payment references reflect tariffs paid by Terry Cycling for the invoices in the prior table.

Under penalty of perjury, I affirm that the foregoing is true and correct.

Dated: __5/6/25__

Nikolaus Holm

2

**PAYMENT REFERENCE**

35959337

**PAYMENT DETAILS**

Payment Method   EFT
Payment Date     2025-04-18T16:48:45Z

## Payments

| ACCOUNT NUMBER | INVOICE NUMBER | INVOICE DATE | DUE DATE | TRACKING/TRANSACTION ID | TRANSACTION AMOUNT | STATUS |
|---|---|---|---|---|---|---|
| 2574-9372-5 | 2-375-22389 | 04/11/2025 | 04/26/2025 | 237522389 | $11,079.83 | Paid |
| 2574-9372-5 | 8-821-24958 | 04/07/2025 | 04/22/2025 | 882124958 | $32.53 | Paid |
| 2574-9372-5 | 2-373-73033 | 04/08/2025 | 04/23/2025 | 237373033 | $7,330.85 | Paid |

**SUBTOTAL**

Payment Cart Total  $18,443.21

**PAYMENT REFERENCE**

36425126

## Payments

| ACCOUNT NUMBER | INVOICE NUMBER | INVOICE DATE | DUE DATE | TRACKING/TRANSACTION ID | TRANSACTION AMOUNT | STATUS |
|---|---|---|---|---|---|---|
| 2574-9372-5 | 2-377-41378 | 04/18/2025 | 05/03/2025 | 237741378 | $17,645.71 | Paid |
| 2574-9372-5 | 2-378-05408 | 04/22/2025 | 05/07/2025 | 237805408 | $80.43 | Paid |
| 2574-9372-5 | 2-376-24653 | 04/15/2025 | 04/30/2025 | 237624653 | $10,413.15 | Paid |

**SUBTOTAL**

Payment Cart Total  $28,139.29

**PAYMENT REFERENCE**

46869162

**PAYMENT DETAILS**

Payment Method   EFT

Payment Date      2025-04-21T14:34:07Z

## Payments

| ACCOUNT NUMBER | INVOICE NUMBER | INVOICE DATE | DUE DATE | TRACKING/TRANSACTION ID | TRANSACTION AMOUNT | STATUS |
|---|---|---|---|---|---|---|
| 2574-9372-5 | 2-375-99007 | 04/15/2025 | 04/30/2025 | 237599007 | $3,422.53 | Paid |
| 2574-9372-5 | 2-375-74035 | 04/14/2025 | 04/29/2025 | 237574035 | $1,887.16 | Paid |
| 2574-9372-5 | 8-828-45766 | 04/14/2025 | 04/29/2025 | 882845766 | $241.55 | Paid |

**SUBTOTAL**

Payment Cart Total  $5,551.24

4