# United States Court of Appeals for the Federal Circuit

_____

**V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, DBA GENOVA PIPE, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,**
*Plaintiffs-Appellees*

**v.**

**DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, RODNEY S. SCOTT, COMMISSIONER FOR UNITED STATES CUSTOMS AND BORDER PROTECTION, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE UNITED STATES CUSTOMS AND BORDER PROTECTION, JAMIESON GREER, IN HIS OFFICIAL CAPACITY AS UNITED STATES TRADE REPRESENTATIVE, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, IN HIS OFFICIAL CAPACITY AS SECRETARY OF COMMERCE, UNITED STATES CUSTOMS AND BORDER PROTECTION,**
*Defendants -Appellants*

-------------------------------------

**STATE OF OREGON, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MINNESOTA, STATE**

V.O.S. SELECTIONS, INC. v. TRUMP

**OF NEVADA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF VERMONT,**
*Plaintiffs-Appellees*

**v.**

**PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, COMMISSIONER FOR UNITED STATES CUSTOMS AND BORDER PROTECTION, IN HIS OFFICIAL CAPACITY AS COMMISSIONER FOR U.S. CUSTOMS AND BORDER PROTECTION, UNITED STATES,**
*Defendants-Appellants*

————————————

2025-1812, 2025-1813

————————————

Appeals from the United States Court of International Trade in Nos. 1:25-cv-00066-GSK-TMR-JAR, 1:25-cv-00077-GSK-TMR-JAR, Senior Judge Jane A. Restani, Judge Gary S. Katzmann, Judge Timothy M. Reif.

————————————

Decided: August 29, 2025

————————————

NEAL KUMAR KATYAL, Milbank LLP, Washington, DC, argued for plaintiffs-appellees V.O.S. Selections, Inc., Plastic Services and Products, LLC, MicroKits, LLC, FishUSA Inc., Terry Precision Cycling LLC. Also represented by SAMANTHA KINSELLA ILAGAN, COLLEEN ROH SINZDAK; PAUL

HAROLD, STEFFEN NATHANAEL JOHNSON, Wilson, Sonsini, Goodrich & Rosati, PC, Washington, DC; MICHAEL W. MCCONNELL, Palo Alto, CA; JAMES J. MCQUAID, Liberty Justice Center, Arlington Heights, IL; JEFFREY MICHAEL SCHWAB, REILLY STEPHENS, Austin, TX.

BENJAMIN N. GUTMAN, Oregon Department of Justice, Salem, OR, argued for plaintiff-appellee State of Oregon. Also represented by CHRISTOPHER PERDUE, LEIGH SALMON; DUSTIN BUEHLER, Portland, OR.

BRETT SHUMATE, Civil Division, United States Department of Justice, Washington, DC, argued for defendants-appellants. Also represented by BRADLEY HINSHELWOOD, MICHAEL S. RAAB, SOPHIA SHAMS, DANIEL WINIK.

ILYA SOMIN, Law School, George Mason University, Arlington, VA, for plaintiff-appellee V.O.S. Selections, Inc.

JOSHUA BENDOR, Office of Arizona Attorney General, Phoenix, AZ, for plaintiff-appellee State of Arizona. Also represented by SYREETA TYRELL.

SARAH HUNTER WEISS, Colorado Department of Law, Denver, CO, for plaintiff-appellee State of Colorado.

MICHAEL SKOLD, Office of the Attorney General, Hartford, CT, for plaintiff-appellee State of Connecticut.

IAN LISTON, Delaware Department of Justice, Wilmington, DE, for plaintiff-appellee State of Delaware. Also represented by VANESSA L. KASSAB.

SARAH A. HUNGER, Office of Illinois Attorney General, Chicago, IL, for plaintiff-appellee State of Illinois.

VIVIAN MIKHAIL, Office of the Maine Attorney General, Augusta, ME, for plaintiff-appellee State of Maine.

PETER FARRELL, Office of the Minnesota Attorney General, St. Paul, MN, for plaintiff-appellee State of Minnesota.

HEIDI PARRY STERN, Office of the Nevada Attorney General, Las Vegas, NV, for plaintiff-appellee State of Nevada.

AMY SENIER, New Mexico Department of Justice, Santa Fe, NM, for plaintiff-appellee State of New Mexico.

ESTER MURDUKHAYEVA, Office of the New York State Attorney General, New York, NY, for plaintiff-appellee State of New York.  Also represented by RABIA MUQADDAM.

RYAN P. KANE, Vermont Office of the Attorney General, Montpelier, VT, for plaintiff-appellee State of Vermont.

————————————

Before MOORE, *Chief Judge*, LOURIE, DYK, PROST, REYNA, TARANTO, CHEN, HUGHES, STOLL, CUNNINGHAM, and STARK, *Circuit Judges*.[1]

Opinion for the court joined by *Circuit Judges* LOURIE, DYK, REYNA, HUGHES, STOLL, CUNNINGHAM, and STARK.

Additional views filed by *Circuit Judge* CUNNINGHAM, joined by *Circuit Judges* LOURIE, REYNA, and STARK.

Dissenting Opinion filed by *Circuit Judge* TARANTO, in which *Chief Judge* MOORE, and *Circuit Judges* PROST and CHEN, join.

PER CURIAM.

————————————

[1]    Circuit Judge Newman did not participate.

The Government appeals a decision of the Court of International Trade setting aside five Executive Orders that imposed tariffs of unlimited duration on nearly all goods from nearly every country in the world, holding that the tariffs were not authorized by the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq*. Because we agree that IEEPA's grant of presidential authority to "regulate" imports does not authorize the tariffs imposed by the Executive Orders, we affirm.

## I

## A

This case involves the extent of the President's authority under IEEPA to "regulate" importation in response to a national emergency declared by the President. For many years, Congress has carefully constructed tariff schedules which provide for, in great detail, the tariffs to be imposed on particular goods. Since taking office, President Donald J. Trump has declared several national emergencies. In response to these declared emergencies, the President has departed from the established tariff schedules and imposed varying tariffs of unlimited duration on imports of nearly all goods from nearly every country with which the United States conducts trade. This appeal concerns Five Executive Orders imposing duties on foreign trading partners to address these emergencies: Executive Orders Nos. 14193, 14194, 14195, 14257, and 14266 (hereinafter collectively referred to as the Challenged Executive Orders). We summarize the history of the Challenged Executive Orders by first discussing the national emergencies in response to which they were issued and then addressing the nature of

the measures directed by the Challenged Executive Orders.[2]

On January 20, 2025, the President declared the existence of a national emergency at the United States' southern border with Mexico under sections 201 and 301 of the National Emergencies Act (NEA), Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601–1651). *See* Proclamation No. 10886, Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8,327, 8,327 (Jan. 20, 2025). In the Proclamation, he identified the presence of "cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm Americans" at and around the southern border as threats to the country's territorial sovereignty. *Id.* Shortly thereafter, the President faulted Mexico for "afford[ing] safe havens for the cartels to engage in the manufacturing and transportation of illicit drugs" to the United States. Executive Order No. 14194, Imposing Duties to Address the Situation at Our Southern Border, 90 Fed. Reg. 9,117, 9,117 (Feb. 1. 2025).

The President also expanded the scope of the national emergency declared in Proclamation 10886 to include threats originating from Canada and the People's Republic of China. On February 1, 2025, he declared that "the sustained influx of illicit opioids and other drugs has profound consequences on our Nation" and stated that "Canada has played a central role in these challenges, including by failing to devote sufficient attention and resources . . . to

---

[2]    The President has continued to impose various tariffs targeting imports from dozens of U.S. trading partners during the pendency of this appeal. Because this appeal pertains only to the Challenged Executive Orders, we do not delve into the details of these later Executive Orders here.

effectively stem the tide of illicit drugs." Executive Order No. 14193, Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 9,113, 9,113 (Feb. 1, 2025). He similarly stated that this emergency had been exacerbated by China's failure "to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." Executive Order No. 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9,121, 9,122 (Feb. 1, 2025).

In response to the declared national emergency of the trafficking of opioids into the country and the ostensible failure of Mexico, Canada, and China to meaningfully address this threat, the President imposed what this opinion refers to as the "Trafficking Tariffs": 25 percent ad valorem duties on "[a]ll articles that are products of Canada," Executive Order No. 14193, 90 Fed. Reg. at 9,114,[3] 25 percent ad valorem duties on "[a]ll articles that are products of Mexico," Executive Order No. 14194, 90 Fed. Reg. at 9,118 (Feb. 1, 2025),[4] and 10 percent ad valorem duties on "[a]ll articles that are products of China," Executive Order No. 14195, 90 Fed. Reg. at 9,122. In each of these

---

[3]     Canadian energy and energy resources were subjected to a lower ad valorem rate of 10 percent. 90 Fed. Reg. at 9,114. Enforcement of the tariffs on Canadian products was subsequently delayed from the planned start date of February 4, 2025, to March 4, 2025. Executive Order No. 14197, Progress on the Situation at Our Northern Border, 90 Fed. Reg. 9,183, 9,183 (Feb. 3, 2025).

[4]     Enforcement of the tariffs on Mexican products was subsequently delayed from the planned start date of February 4, 2025, to March 4, 2025. Executive Order No. 14198, Progress on the Situation at Our Southern Border, 90 Fed. Reg. 9,185, 9,185 (Feb. 3, 2025).

Executive Orders, the President stated that the circumstances "constitute[d] an unusual and extraordinary threat, which ha[d] its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States." 90 Fed. Reg. at 9,114, 9,118, 9,122. In imposing these tariffs, he claimed to be acting under the authority of section 1702(a)(1)(B) of IEEPA and "specifically [found] that action under other authority to impose tariffs [was] inadequate to address this unusual and extraordinary threat." 90 Fed. Reg. at 9,114, 9,118, 9,122. Each of the Executive Orders providing for the Trafficking Tariffs directed the Secretary of Homeland Security to alter the Harmonized Tariff Schedule of the United States (HTSUS) to effectuate the new, higher Trafficking Tariffs. 90 Fed. Reg. at 9,115, 9,118, 9,123.

The President subsequently modified the Trafficking Tariffs. First, after determining that China "ha[d] not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions, and that the crisis described in Executive Order 14195 ha[d] not abated," he increased ad valorem duties on Chinese products from 10 percent to 20 percent. Executive Order No. 14228, Further Amendment to Duties Addressing the Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 11,463, 11,463 (Mar. 3, 2025). The President further implemented duty-free de minimis treatment[5] for otherwise covered articles from Canada and Mexico. *See* Executive Order No. 14231, Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 11,785, 11,785 (Mar. 6, 2025); Executive Order No. 14232, Amendment to Duties To Address the Flow of Illicit Drugs

---

[5]   Under Section 321(a)(2)(c) of the Tariff Act of 1930, duty-free de minimis treatment allows goods valued at $800 or less to enter the country without customs duties. 19 U.S.C. § 1321(a)(2)(C).

Across Our Southern Border, 90 Fed. Reg. 11,787, 11,787 (Mar. 6, 2025).[6]

On April 2, 2025, the President imposed what this opinion refers to as the "Reciprocal Tariffs": baseline 10 percent ad valorem duties on imports from nearly every country with which the United States has any significant trade relationship with additional ad valorem duties ranging from 11 percent to as high as 50 percent to be imposed "shortly thereafter" on a per-country basis. Executive Order No. 14257, Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits, 90 Fed. Reg. 15,041, 15,045, 15,049–50 (Apr. 2, 2025). Like the Trafficking Tariffs, these Reciprocal Tariffs were to be implemented by modifying the HTSUS. *Id.* at 15,047.

In imposing the Reciprocal Tariffs, the President again invoked his claimed authority under IEEPA; the NEA; section 604 of the Trade Act of 1974 (codified as amended at 19 U.S.C. § 2483); and 3 U.S.C. § 301.[7] *Id.* at 15,041. He

---

[6]    The President also originally implemented such duty-free de minimis treatment for otherwise eligible articles from China, Executive Order No. 14200, Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9,277, 9,277 (Feb. 5, 2025), but he later rescinded this de minimis treatment for Chinese products, Executive Order No. 14256, Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports, 90 Fed. Reg. 14,899, 14,899 (Apr. 2, 2025).

[7]    The Government does not contend that any of the statutes besides IEEPA grant the President the substantive authority to impose these tariffs. The NEA governs procedures for declaring and ending national emergencies;

explained that the Reciprocal Tariffs addressed "an unusual and extraordinary threat to the national security and economy of the United States" posed by "underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption." *Id.* On April 9, 2025, the President suspended the imposition of the additional country-specific ad valorem duties for all countries except China until July 9, 2025. Executive Order No. 14266, Modifying Reciprocal Tariff Rates To Reflect Trading Partner Retaliation and Alignment, 90 Fed. Reg 15,625, 15,626 (Apr. 9, 2025).

The President repeatedly amended the China-specific Reciprocal Tariff rate in response to China's adjustments of its own tariff rates on U.S. goods: he first increased the China-specific rate from 34 to 84 percent effective April 8, 2025, Executive Order No. 14259, Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China, 90 Fed. Reg. 15,509, 15,509 (Apr. 8, 2025), and then from 84 to 125 percent effective April 10, 2025, Executive Order No. 14266, 90 Fed. Reg. at 15,626. These new rates were to be effectuated by modifying the HTSUS to reflect the higher rates. Executive Order No. 14259, 90 Fed. Reg. at 15,509; Executive Order No. 14266, 90 Fed. Reg. at 15,626. Following discussions with Chinese officials, the President lowered the China-specific Reciprocal Tariff rate to 10 percent, effective until August 12, 2025, observing that these discussions were "a significant step by [China] toward remedying

---

section 604 of the Trade Act of 1974 requires the President to update the HTSUS to reflect import duties but does not provide the substantive authority to impose such duties; and 3 U.S.C. § 301 simply allows the President to delegate powers within the Executive Branch.

non-reciprocal trade arrangements and addressing the concerns of the United States relating to economic and national security matters." Executive Order No. 14298, Modifying Reciprocal Tariff Rates To Reflect Discussions With the People's Republic of China, 90 Fed. Reg. 21,831, 21,831–32 (May 12, 2025).

On July 7, 2025, the President paused enforcement of all Reciprocal Tariffs until August 1, 2025. Executive Order No. 14316, Extending the Modification of the Reciprocal Tariff Rates, 90 Fed. Reg. 30,823, 30,823 (July 7, 2025). On July 31, 2025, the President again paused enforcement of the Reciprocal Tariffs for seven days. Executive Order No. 14326, Further Modifying the Reciprocal Tariff Rates, 90 Fed. Reg. 37,963, 37,963–64 (July 31, 2025). The Reciprocal Tariffs (other than for China[8]) took effect on August 7, 2025.

## B

On April 14, 2025, five small businesses—V.O.S. Selections, Inc.; Plastic Services and Products, LLC, dba Genova Pipe; MicroKits, LLC; FishUSA, Inc.; and Terry Precision Cycling, LLC (collectively, the "Private Plaintiffs")—brought suit before the Court of International Trade (CIT) against the United States and various Government officials in their official capacities, challenging the President's imposition of the Reciprocal Tariffs. On April 23, 2025, Oregon and eleven other states (collectively, the "State Plaintiffs") brought suit before the CIT against the United

---

[8]    On August 11, 2025, the President issued a new Executive Order extending the suspension of the Reciprocal Tariffs against China from the prior deadline of August 12, 2025 to November 10, 2025. Executive Order No. 14334, Further Modifying the Reciprocal Tariff Rates To Reflect Ongoing Discussions With the People's Republic of China, 90 Fed. Reg. 39,305, 39,305–06 (Aug. 11, 2025).

States and various Government officials in their official capacities, challenging the President's imposition of both the Reciprocal Tariffs and the Trafficking Tariffs.

On May 28, 2025, a three-judge panel of the CIT granted summary judgment to the Private Plaintiffs and State Plaintiffs in a consolidated order, holding that both the Reciprocal Tariffs and the Trafficking Tariffs exceeded the President's authority under IEEPA and permanently enjoining the Government from imposing these tariffs. *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1383 (Ct. Int'l Trade 2025). The Government appealed both cases the same day and moved to stay the injunction pending appeal. We consolidated the appeals, granted the Government's motion to stay pending their resolution, and expedited briefing and oral argument. *V.O.S. Selections, Inc. v. Trump*, No. 2025-1812, 2025 WL 1527040, at *1 (Fed. Cir. May 29, 2025). We also sua sponte decided to assign the case to the court en banc. ECF No. 51 at 3 ("[T]he court also concludes that these cases present issues of exceptional importance warranting expedited en banc consideration of the merits in the first instance.").

## C

Before we reach the merits of this case, we briefly discuss the history and legal authority concerning the imposition of tariffs as relevant to this appeal.

The Constitution grants Congress the power to "lay and collect Taxes, Duties, Imposts and Excises" and to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 1, 3. Tariffs are a tax, and the Framers of the Constitution expressly contemplated the exclusive grant of taxing power to the legislative branch; when Patrick Henry expressed concern that the President "may easily become king," 3 *Debates in the Several State Conventions* 58 (Jonathan Elliot ed., 1836), James Madison replied that this

would not occur because "[t]he purse is in the hands of the representatives of the people," *id.* at 393.

At the time of the Founding, and for most of the early history of the United States, tariffs were the primary source of revenue for the federal government. *See* Goldwater Inst. Br. 12 n.5 (citing *Federalist* No. 12 at 75 (J. Cooke, ed., 1961) (Alexander Hamilton) ("[W]e must a long time depend for the means of revenue, chiefly on such duties.")). Setting tariff policy was thus considered a core Congressional function. *See* Michael W. McConnell, *The President Who Would Not Be King: Executive Power Under the Constitution* 101 (2020); *cf.* U.S. Const. art. I, § 9, cl. 4 (limiting direct taxation by tying it to a census for proper apportioning). In 1913, the Sixteenth Amendment was ratified, granting Congress the "power to lay and collect taxes on incomes, from whatever source derived." U.S. Const. amend. XVI. This ability of Congress to impose a domestic income tax reduced the importance of tariffs as a source of revenue for the federal government.

For much of this early history, Congress set tariffs without authorizing the President to adjust tariff rates by entering into international agreements. In the late nineteenth and early twentieth centuries, Congress began to delegate to the Executive limited authority to "activate or suspend" tariff rates through international agreements. Cato Inst. Amicus Br. 6–7 (citing Tariff Act of 1883, 22 Stat. 488; Tariff Act of 1890, 26 Stat. 567). Nonetheless, Congress continued to enact legislation establishing the basic tariff schedules. For example, in the Tariff Act of 1930, Congress set forth tariff rates in "ninety-five pages of schedules." *ClearCorrect Operating, LLC v. Int'l Trade Comm'n*, 810 F.3d 1283, 1297 (Fed. Cir. 2015).

Through the Tariff Classification Act of 1962, Congress adopted the Tariff Schedules of the United States. Pub. L. 87-456, 76 Stat. 72, 72–75 (1962). In 1988, the HTSUS was enacted by Congress. Omnibus Trade and Competitiveness

Act of 1988, Pub. L. 100-418, 102 Stat. 1107, 1148–50. The HTSUS sets the United States' current tariff schedules. During this entire period, Congress authorized the President to enter into agreements reducing tariff rates, or, in some cases, increasing tariff rates. That presidential authority to increase rates was cabined in various respects, including limitations on the President's authority to increase rates by more than a certain percentage of the established statutory rate. *See, e.g.*, Reciprocal Trade Agreements Act of 1934, Pub. L. No. 73-316, ch. 474, § 1, 48 Stat. 943, 943–45 (codified as amended at 19 U.S.C. §§ 1351–54 (2018)); Trade Act of 1974, Pub. L. No. 93-618, §§ 101–02, 151, 88 Stat. 1978, 1982–84 (1975) (codified at 19 U.S.C. §§ 2111–12). The HTSUS rates reflect applicable governing tariffs that have been set over time in part through international negotiations and multilateral and bilateral trade agreements like the United States-Mexico-Canada Agreement. Harmonized Tariff Schedule of the United States Revision 20 (Aug. 27, 2025), General Notes at 28; *see generally* 19 U.S.C. § 3004(b)(2) (directing the President to "take such action as the President considers necessary to bring trade agreements to which the United States is a party into conformity with the Harmonized Tariff Schedule").

In 1916, Congress passed legislation that created the United States Tariff Commission, which was later renamed the United States International Trade Commission (ITC). Revenue Act of 1916, Pub. L. No. 64-271, §§ 700–09, 39 Stat. 756, 795–98; 19 U.S.C. § 2231(a). Later legislation provided that one of the ITC's responsibilities is to provide recommendations to the President in making adjustments to the tariff schedule. 19 U.S.C. § 3005. The framework for tariff schedules is set forth in the HTSUS. "The [HTSUS] is the United States' implementation of the 1983 International Convention on the Harmonized Commodity Description and Coding ('the Convention'), which created a single international system of nomenclature to classify goods for

customs purposes." *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1336 (Fed. Cir. 2010). "As periodic changes are made to the international harmonized tariff system, the HTSUS is correspondingly modified pursuant to a statutory scheme established by the Omnibus Trade and Competitiveness Act of 1988." *Id.* The HTSUS itself "is indeed a statute but is not published physically in the United States Code." *Libas, Ltd. v. United States*, 193 F.3d 1361, 1364 (Fed. Cir. 1999). Congress's enactment of the HTSUS provided that its terms, including "[e]ach modification or change made to the [HTSUS] by the President under authority of law," "shall be considered to be statutory provisions of law for all purposes." 19 U.S.C. § 3004(c)(1).

## D

In 1917, Congress enacted the Trading with the Enemy Act (TWEA), Pub. L. No. 65-91, §§ 1–19, 40 Stat. 411, 411–26 (1917) (codified as amended at 12 U.S.C. § 95a; 50 U.S.C. §§ 4305–41), to address threats to the U.S. economy resulting from our entry into World War I. Section 5(b) of TWEA empowered the President to "investigate, regulate, or prohibit[] any transactions in foreign exchange" during wartime. 50 U.S.C. § 4305(b)(1)(A). In 1933, Congress expanded TWEA by authorizing the President to deploy the power to "investigate, regulate, or prohibit" foreign transactions during other national emergencies besides war. Emergency Banking Relief Act, Pub. L. No. 73-1, § 2, 48 Stat. 1, 1 (1933). In 1941, just one week after the Pearl Harbor attack, Congress further broadened presidential authority under TWEA by adding the phrase "importation or exportation" to the list of transactions involving foreign property that the President may "investigate, regulate, or . . . prohibit." First War Powers Act of 1941, Pub. L. No. 77-354, § 301, 55 Stat. 838, 839.

After World War II, presidents used TWEA to impose economic sanctions on foreign adversaries, regulate foreign exchange, and control exports based on several

declarations of national emergencies. *See, e.g.*, Proclamation 2914, Proclaiming the Existence of a National Emergency, 15 Fed. Reg. 9,029, 9,029 (Dec. 16, 1950) (President Truman invoking TWEA to declare a national emergency because of the outbreak of the Korean war and the threat of "communist imperialism"); Foreign Assets Control Regulations, 31 C.F.R. Pt. 500, 15 Fed. Reg. 9,040, *reserved by* Foreign Assets Control Regulations; Transaction Control Regulations (Regulations Prohibiting Transactions Involving the Shipment of Certain Merchandise Between Foreign Countries), 76 Fed. Reg. 35,739, 35,739 (Department of the Treasury forbidding any financial transactions involving, or on behalf of, North Korea in response to Proclamation 2914); Executive Order No. 11387, Governing Certain Capital Transfers Abroad, 33 Fed. Reg. 47, 47 (Jan. 1, 1968) (President Johnson placing controls on capital exports). In 1971, to address a balance of payments deficit,[9] President Nixon asserted the authority to temporarily suspend existing tariff agreements that reduced the statutory rates so as to impose a temporary additional ten percent ad valorem duty, which was not to exceed the amounts set in the Congressionally-approved existing Tariff Schedules of the United States, on all dutiable articles imported into the United States. Proclamation 4074, Imposition of Supplemental Duty for Balance of Payments Purposes, 85 Stat. 926, 926 (Aug. 15, 1971). This surcharge lasted less than five months. Proclamation 4098,

--------

[9]    A country's balance of payments is the difference between all money flowing into the country and the amount of money flowing out of the country to the rest of the world during a particular time period. A severe and sudden disruption in a country's ability to finance its international transactions, often due to an inability to cover essential imports or external debt repayments, is known as a balance-of-payments crisis. *See V.O.S. Selections*, 772 F. Supp. 3d at 1375.

Termination of Additional Duty for Balance of Payments Purposes, 86 Stat. 1,591, 1,592 (Dec. 20, 1971). Yoshida International, a zipper importer subject to the surcharge, filed a lawsuit challenging the legality of the temporary tariff surcharge imposed by President Nixon's Proclamation and sought a refund of taxes paid. The United States Customs Court ruled in favor of Yoshida, holding that the President had exceeded his statutory authority as delegated by the Tariff Act of 1930, the Trade Expansion Act of 1962, and section 5(b) of TWEA in assessing the surcharge; it accordingly concluded that President Nixon's imposition of a temporary surcharge was not authorized. *Yoshida Int'l v. United States*, 378 F. Supp. 1155, 1175–76 (Cust. Ct. 1974) (*Yoshida I*), *rev'd*, 526 F.2d 560 (CCPA 1975) (*Yoshida II*).

While *Yoshida I* was pending appeal, Congress enacted the Trade Act of 1974 (codified as amended at 19 U.S.C. §§ 2101–2497b). Section 122 of the Trade Act gave the President the authority to impose, for up to 150 days, import quotas and/or a temporary import surcharge of up to 15 percent "to deal with large and serious United States balance-of-payments deficits," "to prevent an imminent and significant depreciation of the dollar in foreign exchange markets," or "to cooperate with other countries in correcting an international balance-of-payments disequilibrium." 19 U.S.C. § 2132(a).

The next year, our predecessor court, the Court of Customs and Patent Appeals (CCPA), reversed the Customs Court's decision and upheld President Nixon's ten percent surcharge, determining that its imposition fell within the authority delegated to the President by section 5(b) of TWEA. *Yoshida II*, at 566. The court also noted that a "surcharge imposed after Jan. 3, 1975[,] must, of course, comply with [section 122 of the Trade Act]." *Id.* at 582 n.33. As described in greater detail below, the decision does not hold that TWEA created unlimited authority in the President to revise the tariff schedule, but only the limited temporary

authority to impose tariffs that would not exceed the Congressionally-approved tariff rates.

In 1976, Congress pared back the scope of TWEA and enacted the National Emergencies Act (NEA). Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601, 1621–22, 1631, 1641, 1651). The NEA limited presidential power and placed restrictions on the use of authorities granted by TWEA. As relevant to this appeal, the NEA ended within two years "[a]ll powers and authorities possessed by the President . . . as a result of the existence of any declaration of national emergency in effect on September 14, 1976," 50 U.S.C. § 1601(a), and placed new restrictions on the declaration and termination of future national emergencies. *Id*. §§ 1621–22.

The NEA did not explicitly address section 5(b) of TWEA; however, the NEA's legislative history indicates Congress's intent "to study section 5(b) [of TWEA] and propose such revisions as might be found necessary" to limit the President's exercise of authority granted in section 5(b) during peacetime. S. Rep. No. 95-466, at 2 (1977). IEEPA is the result of this legislative effort and is consistent with Congress's stated goal "to revise and delimit the President's authority to regulate international economic transactions during wars or national emergencies." *Id*. In drafting IEEPA, Congress adopted the same list of authorities as in TWEA—including the power to "regulate . . . importation"—but Congress explicitly limited the President's authority under IEEPA by substituting authorities "which [we]re both more limited in scope than those of [TWEA] section 5(b) and subject to various procedural limitations." H.R. Rep. No. 95-459, at 2, 19 (1977). The House Report also mentioned the *Yoshida II* decision in its background section, stating:

> [S]ection 5(b) came into play when, on August 15, 1971, President Nixon declared a national emergency with respect to the balance-

of-payments crisis and under that emergency imposed a surcharge on imports. In that case, section 5(b) was not among the statutes cited in the President's proclamation as authority for the surcharge[] but was so cited later by the Government in response to a suit brought in Customs Court by Yoshida International challenging the surcharge. The court's decision then rested on whether section 5(b) authorized imposition of duties. Although the lower court held that it did not, the Appeals Court reversed on the grounds that the existence of the national emergency made section 5(b) available for purposes which would not be contemplated in normal times.

*Id.* at 5 (footnotes omitted).

IEEPA provides that, after declaring a national emergency pursuant to the NEA, the President may "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any . . . importation or exportation of . . . any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B). Notably, IEEPA does not use the words "tariffs" or "duties," nor any similar terms like "customs," "taxes," or "imposts." IEEPA also does not have a residual clause granting the President powers beyond those which are explicitly listed.

E

In addition to the President's authority to adjust tariffs by international agreement and the limited authority conferred by Section 122 of the Trade Act of 1974 (codified at 19 U.S.C. § 2132), Congress has passed numerous other statutes that authorize the President and the executive branch to impose or modify tariffs on imports in certain circumstances. *See, e.g.*, Tariff Act of 1930, Pub. L. No. 71-361, § 338, 46 Stat. 590, 704 (codified at 19 U.S.C. § 1338);

Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872 (codified at 19 U.S.C. §§ 1801–1991); Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (1975) (codified as amended at 19 U.S.C. §§ 2101–2497b). Notably, every Congressional delegation to the President of the core legislative power to impose tariffs includes well-defined procedural and substantive limitations. For example, Section 232 of the Trade Expansion Act of 1962 authorizes the President to adjust the importation of certain articles if the Secretary of Commerce finds that they pose a threat to national security. 19 U.S.C. § 1862(c)(1)(A). The statute provides the President must, within ninety days, determine whether he concurs with the Secretary's report, and if he does concur, "determine the nature and duration of the action that . . . must be taken . . . so that such imports will not threaten to impair the national security." *Id.* § 1862(c)(1)(A)(ii). The President must take any such action within fifteen days of his determination. *Id.* § 1862(c)(1)(B). In all instances, section 232 requires the President to "submit to the Congress a written statement of the reasons why the President has decided to take action, or refused to take action." *Id.* § 1862(c)(2).

Provisions of the Trade Act similarly authorize the executive branch to impose tariffs on imports, but only once certain conditions set forth by statute have been met. Section 201 allows the President to "take all appropriate and feasible action within his power," including imposing tariffs (often called "safeguard" tariffs) if the ITC finds that imports are causing or threatening "serious injury" to a domestic industry. 19 U.S.C. § 2251(a). Under Section 301 of the Trade Act, the President may specifically direct the United States Trade Representative (USTR) to respond to unfair trade practices which violate trade agreements, or burden or restrict United States commerce, including by "impos[ing] duties or other import restrictions" on foreign countries responsible for the harmful conduct. 19 U.S.C. § 2411(a), (c)(1)(B). While the USTR may take any action

"within the power of the President with respect to trade in any goods or services, or with respect to any other area of pertinent relations with the foreign country," *id.* § 2411(a), the USTR must complete various steps before taking such action. For example, before imposing duties pursuant to section 301, the USTR must initiate an investigation, *id.* § 2412; consult with the foreign country regarding the practices being investigated, *id.* § 2413; determine whether the requisite conditions for action are met, and if so, publish its proposed action and the factual findings on which it is based, *id.* § 2414; and allow for public comment regarding both the proposed investigation and the final action, *id.* § 2412(a)(4). As interpreted by the Government, IEEPA, unlike these other statutes, would impose no such limitations on the President's authority.

## II

"We review a grant of summary judgment by the [CIT] de novo." *Aspects Furniture Int'l, Inc. v. United States*, 42 F.4th 1366, 1369 (Fed. Cir. 2022). "We review the [CIT]'s grant of an injunction for abuse of discretion," which "may be established by showing that the [CIT] 'made a clear error of judgment in weighing the relevant factors or exercised its discretion based on an error of law or clearly erroneous fact findings.'" *Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1084 (Fed. Cir. 2025) (internal citation omitted) (quoting *Wind Tower Trade Coal. v. United States*, 741 F.3d 89, 95 (Fed. Cir. 2014)) "To the extent the [CIT]'s decision to grant or deny an injunction 'hinges on questions of law,' this court reviews those determinations without deference." *Id.*

## III

We first consider whether this case falls within our court's subject matter jurisdiction. "The objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of

V.O.S. SELECTIONS, INC. v. TRUMP

judgment." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (internal citation omitted). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Although no party here questions our jurisdiction, we are obligated to confirm whether we have it.

We have jurisdiction over this appeal under 28 U.S.C. § 1295(a)(5). We review de novo whether the CIT had subject-matter jurisdiction. *Int'l Custom Prods., Inc. v. United States*, 467 F.3d 1324, 1326 (Fed. Cir. 2006). If the CIT lacked jurisdiction, we similarly lack jurisdiction to reach the merits of this appeal. *Glasstech, Inc. v. AB Kyro OY*, 769 F.2d 1574, 1577 (Fed. Cir. 1985) ("[A]n appellate court has no jurisdiction to decide the merits of the case if the court from which the appeal was taken was without jurisdiction.").

Article III of the Constitution provides that "[t]he judicial Power of the United States, shall be vested . . . in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. Accordingly, the "[j]urisdiction of the lower federal courts is . . . limited to those subjects encompassed within a statutory grant of jurisdiction." *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982).

The statute conferring jurisdiction on the CIT provides, in relevant part, that "the [CIT] shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." 28 U.S.C.

§ 1581(i)(1)(B).[10] By granting exclusive jurisdiction to the CIT, "[s]ection 1581(i) removes specific actions from the general federal-question jurisdiction of the district courts (under 28 U.S.C. § 1331) and places them in the jurisdiction of the [CIT]." *Orleans Int'l, Inc. v. United States*, 334 F.3d 1375, 1378 (Fed. Cir. 2003). The question here is whether the action before us arose from a law providing for tariffs such that the CIT had exclusive jurisdiction in the first instance, and we may properly maintain appellate jurisdiction.

A claim "arises out of" a tariff law "for reasons other than the raising of revenue," 28 U.S.C. § 1581(i)(1)(B), if the law in question is invoked as the authority to impose a tariff for such a non-revenue raising purpose. To determine jurisdiction pursuant to an "arising out of" provision, we do not have to decide whether the statute does in fact confer such authority. That question goes to the merits of the claim. "Jurisdiction is [the court's] authority to decide the case either way." *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913). It does not depend on the claim's success. *See id.*; *see also Bell v. Hood*, 327 U.S. 678, 682–83 (1946).

---

[10] While the President is a named party in this appeal, the CIT noted that section 1581(i), which permits actions "against the United States, its agencies, or its officers," does not cover an action naming the President. *V.O.S. Selections*, 772 F. Supp. 3d at 1366–67. The CIT therefore held that while the President "must be dismissed from the two cases before the court," it "retain[ed] 'jurisdiction to consider challenges to the President's actions in suits against subordinate officials who are charged with implementing the presidential directives." *Id.* at 1367 (quoting *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1366 (Fed. Cir. 2022)). The parties before us have not challenged those rulings.

The CIT found it had exclusive jurisdiction to hear the present case in part because the Challenged Executive Orders purport to "effect changes to the [HTSUS]" to reflect the Trafficking and Reciprocal Tariff rates. J.A. 64. The statute establishing the HTSUS specifies that "[t]he provisions of the [HTSUS] . . . enacted by" Congress, as well as "[e]ach modification or change made to the [HTSUS] by the President under authority of law," "shall be considered to be statutory provisions of law for all purposes." 19 U.S.C. § 3004(c)(1)(A), (C). The Challenged Executive Orders purport to modify the HTSUS—for example, by "inserting . . . new headings" providing for specific tariff rates applicable to goods from each country, 90 Fed. Reg. at 15,088, 15,090, by allegedly "modifying the HTSUS to temporarily suspend" certain tariffs, *id.* at 15,626, or by directing the Secretary of Homeland Security to alter the HTSUS to effectuate the orders, *id.* at 9,115, 9,118, 9,123. While executive orders are not ordinarily "law within the meaning of the Constitution," *Sierra Club v. U.S. Dep't of Energy*, 134 F.4th 568, 573 (D.C. Cir. 2025) (internal citation and quotation marks omitted), the Challenged Executive Orders, if authorized, would modify the HTSUS. These modifications to HTSUS are thus purported laws of the United States, and a lawsuit challenging tariffs effectuated by such a modification "arises out of [a] law of the United States providing for . . . tariffs." *See California v. Trump*, No. 25-cv-03372-JSC, 2025 WL 1569334, at *6 (N.D. Cal. June 2, 2025) (quoting 28 U.S.C. § 1581(i)).

Finding that the CIT has exclusive jurisdiction over the present cases is consistent with the reason why Congress established this exclusive jurisdiction in the first place, as noted by three district court courts considering challenges to the same tariffs now before us. *K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 188 (1988) ("Congress intended, first and foremost, to remedy the confusion over the division of jurisdiction between the Customs Court (now the Court of International Trade) and the district courts and to ensure

uniformity in the judicial decisionmaking process." (internal citation and quotation marks omitted)); *Webber v. U.S. Dep't of Homeland Sec.*, No. CV-25-26-GF-DLC, 2025 WL 1207587, at *7 (D. Mont. Apr. 25, 2025) ("Consolidating tariff matters with the [CIT] ensures a necessary 'degree of uniformity and consistency' throughout the United States." (quoting *Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*, 18 F.3d 1581, 1586 (Fed. Cir. 1994))); *California v. Trump*, 2025 WL 1569334, at *5–6.[11] The CIT had subject matter jurisdiction over this case in the first instance, and we accordingly have subject matter jurisdiction over this appeal.

---

[11] One decision from the District Court for the District of the District of Columbia has held otherwise. *See Learning Resources, Inc. v. Trump*, No. 25-1248 (RC), 2025 WL 1525376 (D.D.C. May 29, 2025), *appeal pending*, No. 25-5202 (D.C. Cir.), *cert. before judgment denied*, No. 24-1287, 2025 WL 1717468 (June 20, 2025). The district court in that case held that its jurisdiction was not precluded by § 1581's grant of exclusive jurisdiction to the CIT because IEEPA does not delegate to the President any authority to impose tariffs. *See id.* at *8 (holding that IEEPA's authorization of the President to "regulate . . . importation or exportation" does not encompass the power to tariff, because "[t]o regulate is to establish rules governing conduct; to tariff is to raise revenue through taxes on imports or exports."). This decision appears to erroneously conflate the merits question of whether IEEPA authorizes tariffs with the jurisdictional issue. Regardless, we do not agree with the jurisdictional analysis in *Learning Resources* because, whether or not IEEPA itself is a "law providing for tariffs," the Challenged Executive Orders, which direct modifications to the HTSUS, are such laws, for the reasons explained above.

## IV

We are not addressing whether the President's actions should have been taken as a matter of policy. Nor are we deciding whether IEEPA authorizes any tariffs at all. Rather, the only issue we resolve on appeal is whether the Trafficking Tariffs and Reciprocal Tariffs imposed by the Challenged Executive Orders are authorized by IEEPA. We conclude they are not.

## A

We first consider the statutory text, including any relevant canons of interpretation. *See U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023) ("We start, as always, with the text."). IEEPA authorizes the President to take certain actions in response to a declared national emergency arising from an "unusual and extraordinary threat[] . . . to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Upon the declaration of such an emergency, IEEPA authorizes the President to:

> investigate, block during the pendency of an investigation, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702(a)(1)(B) (emphases added).

The statute bestows significant authority on the President to undertake a number of actions in response to a declared national emergency, but none of these actions explicitly include the power to impose tariffs, duties, or the

like, or the power to tax. The Government locates that authority within the term "regulate . . . importation," but it is far from plain that "regulate . . . importation," in this context, includes the power to impose the tariffs at issue in this case.

Notably, when drafting IEEPA, Congress did not use the term "tariff" or any of its synonyms, like "duty" or "tax." There are numerous statutes that do delegate to the President the power to impose tariffs; in each of these statutes that we have identified, Congress has used clear and precise terms to delegate tariff power, reciting the term "duties" or one of its synonyms. In contrast, none of these statutes uses the broad term "regulate" without also separately and explicitly granting the President the authority to impose tariffs. The absence of any such tariff language in IEEPA contrasts with statutes where Congress has affirmatively granted such power and included clear limits on that power.

For example, section 338 of the Tariff Act of 1930 permits the President to "specify and declare new or additional *duties*." 19 U.S.C. § 1338(a) (emphasis added). Section 122 of the Trade Act of 1974 authorizes the President to proclaim "a temporary import surcharge . . . in the form of *duties*." 19 U.S.C. § 2132(a)(A) (emphasis added). Section 201 of the Trade Act authorizes the President to "proclaim an increase in, or the imposition of, any *duty* on the imported article" or to "proclaim a *tariff-rate* quota." 19 U.S.C. § 2253(a)(3)(A)–(B) (emphases added). And section 301 of the Trade Act allows the President to "impose *duties* or other import restrictions." 19 U.S.C. § 2411(c)(1)(B) (emphasis added).[12]

_____

[12]  *See also* 19 U.S.C. § 1671(a) ("[T]here shall be imposed upon such merchandise a countervailing duty, in

The only statute the Government identifies that might reasonably be viewed as inconsistent with this analysis is section 232 of the Trade Expansion Act of 1962. Section 232 provides that:

> [I]f the Secretary of the Treasury finds that an "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," the President is authorized to "take such action, and for such time, as he deems necessary to *adjust* the imports of (the) article and its derivatives so that . . . imports (of the article) will not threaten to impair the national security."

*Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 550 (1976) (quoting 19 U.S.C. § 1862(b) (1970 ed., Supp. IV) (emphasis added)).

In *Algonquin*, the Supreme Court interpreted the phrase "adjust the imports" in section 232 to permit the President to "control such imports of petroleum and petroleum products . . . by imposing on them a system of monetary exactions in the form of license fees." *Id.* at 551–52, 571. The Supreme Court rejected the argument that the

---

addition to any other duty imposed, equal to the amount of the net countervailable subsidy."); *id.* § 1673 ("[T]here shall be imposed upon such merchandise an antidumping duty, in addition to any other duty imposed."); *id.* § 2465 ("No duty-free treatment provided under this subchapter shall remain in effect after December 31, 2020."); *id.* § 2252(d)(2)(D) ("Such relief shall take the form of an increase in, or the imposition of, a duty on imports."); *id.* § 2411(c)(1)(B) ("[T]he Trade Representative is authorized to . . . impose duties or other import restrictions on the goods of . . . foreign countr[ies] for such time as the Trade Representative determines appropriate.").

authorization to "'adjust' imports should be read to encompass only quantitative methods [i.e.], quotas as opposed to monetary methods [i.e.]., license fees of effecting such adjustments," based on the statute's explicit statement that the circumstances that threaten to impair national security are not related to quantity of imports but rather "their use, their availability, [and] their character." *Id.* at 561 (quoting 104 Cong. Rec. 10542-10543 (1958) (remarks of Rep. Mills)).

Even section 232 does not undermine our conclusion regarding IEEPA's use of "regulate . . . importation." This is first because the use of the term "adjust," which the Government argues is synonymous with "regulate," in section 232 is in the context of a provision dealing with the imports and duties, making it far more plausible that the adjustment referenced in subsection (b) includes an adjustment to tariff rates. *See* 19 U.S.C. § 1862(a) (explicitly referring to "the duty . . . on any article"). Also, in construing the meaning of "adjust" in *Algonquin*, the Supreme Court also relied heavily on the statutory history of the Trade Expansion Act. Multiple members of the House and Senate had explicitly referenced the President's authority to "increase . . . duties" or "impose . . . fees" as contemplated by proposed amendments that were "strikingly similar" to the enacted law. *Algonquin*, 426 U.S. at 563–66. In contrast, here, neither the term "duties" nor any of its synonyms appear anywhere in the text of IEEPA, and the history of the enactment of IEEPA lacks any similar legislative lodestar. Moreover, section 232 is within title 19 of the U.S. Code, which is entitled "Customs Duties." *See INS v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 189 (1991) ("[W]e have stated that the title of a statute or section can aid in resolving an ambiguity in the legislation's text."). In contrast, IEEPA's provisions are located within title 50, which is entitled "War and National Defense." And in enacting IEEPA, Congress explicitly set out to cabin the President's authority, providing for authorities "which [we]re both

more limited in scope than those of [TWEA] and subject to various procedural limitations." H.R. Rep. No. 95-459, at 2.[13] Thus, even if *Algonquin* is viewed as supporting the proposition that "adjust the imports" includes the power to impose tariffs (as opposed to standing for the narrower proposition that, in section 232, which appears in title 19, "adjust" simply is not limited to non-monetary actions), it does not follow that IEEPA's use of "regulate . . . importation" also includes tariffs.

Further, as we previously discussed, *see supra* Section I.E., in each statute delegating tariff power to the President, Congress has provided specific substantive limitations and procedural guidelines to be followed in imposing any such tariffs. It seems unlikely that Congress intended, in enacting IEEPA, to depart from its past practice and grant the President unlimited authority to impose tariffs. The statute neither mentions tariffs (or any of its synonyms) nor has procedural safeguards that contain clear limits on the President's power to impose tariffs.

Taken together, these other statutes indicate that whenever Congress intends to delegate to the President the authority to impose tariffs, it does so explicitly, either by using unequivocal terms like tariff and duty, or via an overall structure which makes clear that Congress is referring to tariffs. This is no surprise, as the core Congressional power to impose taxes such as tariffs is vested exclusively in the legislative branch by the Constitution; when Congress delegates this power in the first instance, it does so clearly and unambiguously. *See Nat'l Cable Television Ass'n, v. United States*, 415 U.S. 336, 340–41 (1974) ("Taxation is a legislative function, and Congress . . . is the sole

---

[13]   To be clear, we cite legislative history as additional support for the conclusion we reach based on the statutory text alone. Even without this legislative history, we would reach the same conclusion.

organ for levying taxes . . . . It would be . . . a sharp break with our traditions to conclude that Congress had bestowed on [the executive branch] the taxing power.").

Contrary to the Government's assertion, the mere authorization to "regulate" does not in and of itself imply the authority to impose tariffs. The power to "regulate" has long been understood to be distinct from the power to "tax." In fact, the Constitution vests these authorities in Congress separately. U.S. Const. art. I, § 8 cl. 1, 3; *see also Gibbons v. Ogden*, 22 U.S. 1, 201 (1824) ("It is, that all duties, imposts, and excises, shall be uniform. In a separate clause of the enumeration, the power to regulate commerce is given, as being entirely distinct from the right to levy taxes and imposts, and as being a new power, not before conferred. The constitution, then, considers these powers as substantive, and distinct from each other."); *Nat'l Fed'n. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 552, 567 (2012) (holding that the individual mandate provision of the Patient Protection and Affordable Care Act was a permissible exercise of Congress's taxing power but exceeded Congress's power to regulate commerce). While Congress may use its taxing power in a manner that has a regulatory effect, *see Nat'l Fed'n. of Indep. Bus.*, 567 U.S. at 537, the power to tax is not *always* incident to the power to regulate.

Indeed, there are important examples where Congress has granted the power to regulate to the executive branch without delegating the power to impose tariffs. *See, e.g.*, Securities Exchange Act of 1934 Pub. L. No. 73-291, 48 Stat. 881 (codified as amended by Pub. L. No. 97-303, 96 Stat. 1409, 1409 at 15 U.S.C. § 78i(h)(1)) (directing the Securities and Exchange Commission "to regulate the trading of [tradeable assets]"); Communications Act of 1934, § 303, Pub. L. No. 73-416, 48 Stat. 1082, 1082 (codified as 47 U.S.C. § 303(e)) (directing the Federal Communications Commission to "[r]egulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each [radio] station and

from the apparatus therein"). The Government's suggestion would mean, for example, that Congress delegated to the SEC power to tax substantial swaths of the American economy by granting the SEC the authority to regulate various activities. *See* 15 U.S.C. § 78i(h)(1) ("[T]he Commission shall have the authority to regulate the trading of any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities."); *id.* § 78i(h)(2) ("[T]he Commission shall have the authority to regulate the trading of any security futures product to the extent provided in the securities laws.").

Even in the context of international trade, apart from the decision in *Yoshida II*, the Government has not pointed to any statute or judicial decision that has construed the power to regulate as including the authority to impose tariffs without the statute also including a specific provision in the statute authorizing tariffs. That was notably the case in *J. W. Hampton, Jr., & Co. v. United States*, where the statute authorized the President to act "to regulate the foreign commerce of the United States" and then specifically authorized tariffs. 276 U.S. 394, 401 (1928) (quoting Tariff Act, ch. 356 § 315, 42 Stat. 858, 941–42 (1922) (granting President authority to proclaim certain "increases or decreases in any rate of duty provided in th[e] act.")).

Upon declaring an emergency under IEEPA, a President may, in relevant part, "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit" the "importation or exportation of . . . any property in which any foreign country or a national thereof has any interest.". 50 U.S.C. § 1702(a)(1)(B). "Regulate" must be read in the context of

these other verbs,[14] none of which involve monetary actions or suggest the power to tax or impose tariffs.[15]

The Government's interpretation of IEEPA as providing the President power to impose unlimited tariffs also runs afoul of the major questions doctrine. *See, e.g.*, Oral

---

[14]   Instead, the other verbs implicate the common law doctrine that trade with enemy nations or hostile actors is illegal. *See, e.g.*, *The Julia*, 12 U.S. 181, 193 (1814) ("[I]n war all intercourse between the subjects and citizens of the belligerent countries is illegal, unless sanctioned by the authority of the government."); *Hanger v. Abbott*, 73 U.S. 532, 535–36 (1867) ("All foreign writers on international law concur in the opinion that the immediate and necessary consequence of a declaration of war is to interdict all intercourse or dealings between the subjects of the belligerent states."); *Coppell v. Hall*, 74 U.S. 542, 554 (1868) ("When international wars exist all commerce between the countries of the belligerents, unless permitted, is contrary to public policy, and all contracts growing out of such commerce are illegal. Such wars are regarded not as wars of the governments only, but of all the inhabitants of their respective countries."). Congress has long enacted statutes on this backdrop. *See, e.g.*, Section 5 of the Act of July 13, 1861, 12 Stat. 255, 257.

[15]   An import of goods may trigger a host of other customs-related procedures, such as acquisition of a Certificate of Origin under the North American Free Trade Agreement (NAFTA) rules of origin, *see Xerox Corp. v. United States*, 423 F.3d 1356, 1361 (Fed. Cir. 2005), licenses, *see Algonquin*, 426 U.S. at 571 (1976), and creation and management of foreign trade zones, *see Nissan Motor Mfg. Corp., U.S.A. v. United States*, 884 F.2d 1375, 1375 (Fed. Cir. 1989). These measures are more readily understood to fall under the authorization to "regulate . . . importation" granted to the President by IEEPA.

V.O.S. SELECTIONS, INC. v. TRUMP

Arg.[16] at 19:28–19:39 (the Government stating "there is no limit on the cap of the tariff in IEEPA itself"). The Supreme Court has explained that the doctrine applies in "cases in which the 'history and the breadth of the authority . . . asserted'" by the Government entails vast "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quoting *FDA v. Brown & Williamson*, 529 U.S. 120, 159 (2000)). In such cases, there may be a "'reason to hesitate before concluding that Congress' meant to confer such authority." *Id.* (quoting *Brown & Williamson*, 529 U.S. at 159–60). When the major questions doctrine is implicated, the Government must point to "clear congressional authorization" for that asserted power. *Id.* at 732 (quoting *Util. Air. Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

The tariffs at issue in this case implicate the concerns animating the major questions doctrine as they are both "unheralded" and "transformative." *Id.* at 722, 724; *see also id.* at 725 ("[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." (quoting *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941)).[17] The Supreme Court has explained that

---

[16]    *Available at* https://oralarguments.cafc.uscourts.gov/default.aspx?fl=25-1812_07312025.mp3.

[17]    The Government argues as a threshold matter that the major questions doctrine does not apply to the President because of the President's democratic and political accountability. *See* Government's Opening Br. 43–44. The Government fails to articulate why it makes any difference whether the challenged action is the result of presidential or agency action, since agency heads themselves are

where the Government has "never previously claimed powers of this magnitude," the major questions doctrine may be implicated. *Biden v. Nebraska*, 600 U.S. 477, 501–03 (2023).

Since IEEPA was promulgated almost fifty years ago, past presidents have invoked IEEPA frequently. But not once before has a President asserted his authority under IEEPA to impose tariffs on imports or adjust the rates thereof. Rather, presidents have typically invoked IEEPA to restrict financial transactions with specific countries or entities that the President has determined pose an acute threat to the country's interests. For example, in the aftermath of the September 11, 2001 terror attacks, President George W. Bush invoked IEEPA to establish a process for designating terrorist organizations and affiliated individuals to prevent the deployment of American resources for their advantage. Executive Order No. 13224, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed. Reg. 49,079, 49,079 (Sept. 23, 2001). In almost all

---

accountable to the President. *See Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). We accordingly join our sister circuits in concluding that delegations to the President are treated the same as delegations to executive agencies under the major questions doctrine. *See, e.g.*, *Louisiana v. Biden*, 55 F.4th 1017, 1031 n.40 (5th Cir. 2022); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295–96 (11th Cir. 2022); *Kentucky v. Biden*, 23 F.4th 585, 606–08 (6th Cir. 2022). The only circuit court decision to hold otherwise was vacated as moot, *see Mayes v. Biden*, 67 F.4th 921, 933 (9th Cir. 2023), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023); *see also Nebraska v. Su*, 121 F.4th 1, 9 n.2 (9th Cir. 2024) (acknowledging that "*Mayes* is no longer binding law"); *id.* at 20 (Nelson, J., concurring) (explaining why the major questions doctrine applies to presidential actions).

other instances where IEEPA has been invoked, presidents did so to freeze assets, block financial transfers, place embargoes, or impose targeted sanctions on hostile regimes and individuals. Even under IEEPA's predecessor, TWEA, a President has invoked his authority to impose tariffs on only one occasion, and on that occasion, the tariffs were of limited scope and duration. *See Yoshida II*, 526 F.2d at 572. The invocation of IEEPA to impose tariffs on nearly every country in the world is undoubtedly a significant departure from these previous invocations. "'This 'lack of historical precedent,' coupled with the breadth of authority that the [Government] now claims[] [may be] a 'telling indication'" that the Government's reading of a statute is incorrect. *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119–20 (2022) (per curiam) (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010)); *Dames & Moore v. Regan*, 453 U.S. 654, 669–74 (1981) (interpreting IEEPA in light of past presidential action).

Additionally, as already discussed, tariffs are a core Congressional power. The "basic and consequential tradeoffs" that are inherent in the President's decision to impose the Trafficking and Reciprocal Tariffs "are ones that Congress would likely have intended for itself." *Nebraska*, 600 U.S. at 506 (quoting *West Virginia*, 597 U.S. at 730). Moreover, the United States imports more than $4 trillion of goods annually; these imports account for 14 percent of the nation's economy. J.A. 215. The Government itself has claimed that the Reciprocal Tariffs will "generate between $2.3 trillion and $3.3 trillion over the budget window." The White House, *Statement from the Off. of Commc'ns, FACT: One, Big, Beautiful Bill Cuts Spending, Fuels Growth*, https://www.whitehouse.gov/articles/2025/05/fact-one-big-beautiful-bill-cuts-spending-

fuels-growth/ (May 28, 2025).[18] The Executive's use of tariffs qualifies as a decision of vast economic and political significance, so the Government must "point to clear congressional authorization" for its interpretation of IEEPA. *West Virginia*, 597 U.S. at 723 (quoting *Util. Air*, 573 U.S. at 324).

For the reasons discussed above, we discern no clear congressional authorization by IEEPA for tariffs of the magnitude of the Reciprocal Tariffs and Trafficking Tariffs. Reading the phrase "regulate . . . importation" to include imposing these tariffs is "a wafer-thin reed on which to rest such sweeping power." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021)

---

[18]    Indeed, the economic impact of the tariffs is predicted to be many magnitudes greater than the two programs that the Supreme Court has previously held to implicate major questions. In *Alabama Association of Realtors v. Department of Health & Human Services*, the Court held that the power to impose "$50 billion in . . . economic impact" was "exactly the kind of power" "of vast economic and political significance" for which it "expect[s] Congress to speak clearly." 594 U.S. 758, 764 (2021) (per curiam) (internal quotation marks omitted). In *Nebraska*, the Supreme Court pointed to the "staggering" scope of impact of a program "between $469 billion and $519 billion," which was "ten times the 'economic impact'" in *Alabama Association* that it previously concluded "triggered analysis under the major questions doctrine." 600 U.S. at 502–03. As noted, the Government's estimates of the Reciprocal and Trafficking Tariffs impact are at least five times larger. And given the President's continued invocation of IEEPA to impose additional expansive tariffs during the pendency of this appeal, the overall economic impact of the tariffs imposed under the Government's reading of IEEPA is even larger still.

(per curiam). In this respect, the Government's argument resembles the argument expressly rejected by the Supreme Court in *Nebraska*, where the Court concluded that Congress's authorization to the Secretary of Education to "waive or modify" laws and regulations governing student debt did not encompass student debt relief. 600 U.S. at 494–96. The Court explained that "[h]owever broad the meaning of 'waive or modify,' that language cannot authorize the kind of exhaustive rewriting of the statute that has taken place here." *Id.* at 500. The same is true of the statutory language ("regulate . . . importation") at issue in this case.

We are unpersuaded by the Government's argument that it is "particularly inappropriate to construe narrowly a delegation of power in the arena of foreign affairs and national security." Government's Opening Br. 45. While the President of course has independent constitutional authority in these spheres, the power of the purse (including the power to tax) belongs to Congress. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015) ("[I]t is essential the congressional role in foreign affairs be understood and respected. . . . The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue."); *Fuld v. Pal. Liberation Org.*, 606 U.S. 1, 19 (2025) ("The Federal Government's inherent foreign affairs power, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution." (internal quotation marks omitted)). Absent a valid delegation by Congress, the President has no authority to impose taxes.

Given these considerations, we conclude Congress, in enacting IEEPA, did not give the President wide-ranging authority to impose tariffs of the nature of the Trafficking and Reciprocal Tariffs simply by the use of the term "regulate . . . importation."

B

In urging us to reach a contrary conclusion, the Government relies heavily on *Yoshida II*, a decision of our predecessor court, the CCPA. In the Government's view, we should discern that Congress intended to include in IEEPA the power to impose tariffs because it enacted IEEPA with knowledge of existing judicial precedent set by *Yoshida II*, which recognized the delegation of tariff authority to the President under TWEA, IEEPA's predecessor statute, and contained the identical "regulate . . . importation" language. Thus, we consider whether, even if Congress ratified *Yoshida II*'s understanding of the term "regulate," to what extent that ratification authorizes the Trafficking and Reciprocal Tariffs imposed by the Challenged Executive Orders under IEEPA.

*Yoshida II* concerned President Nixon's issuance of Proclamation 4074 to address a balance-of-payments deficit. 526 F.2d at 567. The CCPA reversed the Customs Court's determination that TWEA section 5(b) did not authorize President Nixon's 10 percent import surcharge. 526 F.2d at 566. Section 5(b) of TWEA also authorized the President to "regulate . . . importation." *Id.* at 573; 50 U.S.C. § 4305(b)(1)(B). The CCPA held that TWEA "does in fact delegate to the President, for use during war or during national emergency only, the power to 'regulate importation,'" and that power also included the authority to "impos[e] an import duty surcharge." *Yoshida II*, 526 F.2d at 573, 577.[19] Without foreclosing the possibility

---

[19] We note that *Yoshida II* is not binding on the en banc court. *See Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1316 (Fed. Cir. 2013) ("Indeed, '[t]he province and obligation of the en banc court is to review the current validity of challenged prior decisions.'" (alteration in original) (quoting *United States v. Aguon*, 851 F.2d

V.O.S. SELECTIONS, INC. v. TRUMP

that TWEA delegated authority to the President to impose
some tariffs, the CCPA also "agree[d] with the Customs
Court that the delegation could not constitutionally have
been of the full and all-inclusive power to regulate foreign
commerce." *Id.* at 574. Thus, it determined that "[a] ques-
tion remain[ed] . . . as to how the President may regulate
importation in a national emergency, i.e., what means of
execution of the delegated powers are permissible." *Id.*
at 574.

The CCPA ultimately concluded that President Nixon's
tariff was authorized given its "[l]imited [n]ature" in time,
scope, and amount, since it was a temporary measure, "lim-
ited to articles which had been the subject of prior tariff
concessions, and, thus, to less than all United States im-
ports," and subject to a maximum rate that had been pre-
scribed by Congress. *Id.* at 577–78. Thus, the CCPA held
that "[f]ar from attempting . . . to tear down or supplant the
entire tariff scheme of Congress, the President imposed a
limited surcharge, as a temporary measure . . . calculated
to help meet a particular national emergency, which is
quite different from imposing whatever tariff rates he
deems desirable." *Id.* at 577–78 (internal quotation marks
omitted).

The Government argues that because *Yoshida II* was
existing precedent at the time IEEPA was enacted, Con-
gress intended to ratify *Yoshida II*'s understanding of the
term "regulate . . . importation" as used in TWEA by using
the same language in IEEPA. Even if we assume, as the

---

1158, 1167 n. 5 (9th Cir. 1988) (*en banc*), *rev'd on other
grounds*, *Evans v. United States*, 504 U.S. 255 (1992))). But
because *Yoshida II* approved narrowly circumscribed tar-
iffs that did not exceed Congressional caps, and the CCPA
expressly declined to approve unbounded tariffs, today's
case does not require us to decide whether to overrule *Yo-
shida II*.

Government urges, that Congress intended to ratify *Yoshida II* when it enacted IEEPA, we still must consider what it is that Congress ratified. *Yoshida II* does not broadly conclude that "regulate . . . importation" must be read to include any type of tariff imposition. In fact, it held the opposite. The CCPA's reasoning in *Yoshida II* was expressly premised on the *limits* of President Nixon's Proclamation. The court noted that "[t]he Executive does not here seek, nor would it receive, judicial approval of a wholesale delegation of legislative power." *Id.* at 583. And the CCPA agreed with the Customs Court that to sanction "the exercise of an unlimited power . . . would be to strike a blow to our Constitution." *Id.* Thus, the CCPA explicitly contrasted presidential conduct it found permissible within the power granted by TWEA—"'a temporary measure' . . . calculated to help meet a particular national emergency" that is limited in scope and amount—with conduct it found impermissible under TWEA—"imposing whatever tariff rates [the President] deems desirable." *Id.* at 578.

The Government would have us define "regulate . . . importation" to include only the portion of *Yoshida II* authorizing tariffs and ignore the rest of its holding. But if the ratification doctrine is to apply, and we are to presume that Congress intended for the holding of *Yoshida II* to apply to the newly enacted IEEPA, then we must presume that it intended for the court's entire holding to apply, not just the portion favorable to the Government. And because *Yoshida II* was explicit in its view that an unbounded tariff authority would *not* be permitted, that understanding must be attributed to Congress as well.

Accepting the Government's argument as correct—that Congress ratified *Yoshida II*'s conclusion that "regulate . . . importation" could include the power to impose tariffs—we still must conclude that the Challenged Executive Orders in this case exceed the authority provided by that interpretation of IEEPA. Both the Trafficking Tariffs and the Reciprocal Tariffs are unbounded in scope, amount, and

V.O.S. SELECTIONS, INC. v. TRUMP

duration. These tariffs apply to nearly all articles imported into the United States (and, in the case of the Reciprocal Tariffs, apply to almost all countries), impose high rates which are ever-changing and exceed those set out in the HTSUS, and are not limited in duration. The Trafficking and Reciprocal Tariffs assert an expansive authority that is beyond the express limitations of *Yoshida II*'s holding and, thus, beyond the authority delegated to the President by IEEPA.

\* \* \*

## V

The final issue raised by this appeal is whether the CIT abused its discretion in vacating and permanently enjoining the operation of the Challenged Executive Orders. For the reasons explained below, we vacate the CIT's injunction and remand.

An injunction "does not follow from success on the merits as a matter of course." *Winter v. NRDC*, 555 U.S. 7, 32 (2008). Under "well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The four factors a plaintiff must establish to secure a permanent injunction are: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the [trial] court, reviewable on appeal for abuse of discretion." *Id.*

After invalidating both the Trafficking Tariffs and the Reciprocal Tariffs imposed by the Challenged Executive

Orders as contrary to law, the CIT ordered the Government to issue the "necessary administrative orders to effectuate the permanent injunction" "within 10 calendar days." *V.O.S. Selections*, 772 F. Supp. 3d. at 1384. The CIT did not address the *eBay* factors in its original opinion. The following week, in an order responding to the Government's motions to stay the CIT's enforcement of its judgment pending the Government's appeal to this Court, the CIT explained that "[t]he injunction issued on account of Plaintiffs' success on the merits and the unavailability under the Uniformity Clause of a complete legal remedy in the form of piecemeal duty refunds to specific plaintiffs," and that "[i]ntrinsic to this exercise of equitable discretion was the compelling public interest in 'ensuring that governmental bodies comply with the law' . . . and the lack of any cognizable hardship borne by the United States in the form of its non-enforcement of orders issued *ultra vires*." J.A. 63 (quoting *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010)).

We need not decide whether the CIT abused its discretion by only articulating its analysis of the *eBay* factors some days after it issued its original opinion on the merits, nor whether the Government has shown any prejudice from the delay. Nor need we evaluate the sufficiency of the CIT's explanation. This is because vacatur of the universal injunction is warranted based on the Supreme Court's intervening decision in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025).

In *CASA*, the Supreme Court considered the Government's challenge to three universal injunctions issued by different district courts prohibiting enforcement of the President's policy with respect to birthright citizenship. *Id.* at 2549. While the Court held that the universal injunctions at issue "likely exceed the equitable authority Congress has granted to federal courts," *id.* at 2548, it "decline[d] to take up . . . in the first instance" arguments as to the permissible scope of injunctive relief, *id.* at 2558.

Instead, it instructed "[t]he lower courts [to] move expeditiously to ensure that, with respect to each plaintiff, the injunctions comport with this rule and otherwise comply with principles of equity" as outlined in the opinion. *Id.* at 2563; *see also Doe v. Trump*, 142 F.4th 109, 112 (1st Cir. 2025) (remanding "for the limited purpose of enabling the District Court to consider the bearing, if any, of that guidance in *CASA* on the scope of the preliminary injunction . . . and to act accordingly"); *United States v. Texas*, No. 24-50149, 2025 WL 1836640, at *38 (5th Cir. July 3, 2025) ("Like the Supreme Court in *Trump v. CASA*, we 'decline to take up . . . in the first instance' arguments as to the permissible scope of injunctive relief in the present case. '[W]e therefore leave it' to the district court to consider any arguments the parties may present in this regard." (alterations in original)).

We will follow this same practice.[20] On remand, the CIT should consider in the first instance whether its grant of a universal injunction comports with the standards outlined by the Supreme Court in *CASA*.

## VI

We affirm the CIT's holding that the Trafficking and Reciprocal Tariffs imposed by the Challenged Executive Orders exceed the authority delegated to the President by IEEPA's text. We also affirm the CIT's grant of declaratory relief that the orders are "invalid as contrary to law." *V.O.S. Selections*, 772 F. Supp. 3d at 1383–84. We vacate the CIT's grant of a permanent injunction universally

---

[20]    We are neither affirming nor reversing the CIT's holding that any relief short of a universal injunction would be unconstitutional as violative of the Uniformity Clause. On remand, the CIT will need to reconsider this holding in light of the guidance provided by the Supreme Court in *CASA*.

enjoining the enforcement of the Trafficking and Reciprocal Tariffs and remand for the CIT to reevaluate the propriety of granting injunctive relief and the proper scope of such relief, after considering all four *eBay* factors and the Supreme Court's holding in *CASA*.

## AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED-IN-PART

### Costs

No costs.

# United States Court of Appeals
# for the Federal Circuit

---

**V.O.S. SELECTIONS, INC., PLASTIC SERVICES
AND PRODUCTS, LLC, DBA GENOVA PIPE,
MICROKITS, LLC, FISHUSA INC., TERRY
PRECISION CYCLING LLC,**
*Plaintiffs-Appellees*

**v.**

**DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY
AS PRESIDENT OF THE UNITED STATES,
EXECUTIVE OFFICE OF THE PRESIDENT,
UNITED STATES, RODNEY S. SCOTT,
COMMISSIONER FOR UNITED STATES CUSTOMS
AND BORDER PROTECTION, IN HIS OFFICIAL
CAPACITY AS COMMISSIONER OF THE UNITED
STATES CUSTOMS AND BORDER PROTECTION,
JAMIESON GREER, IN HISOFFICIAL CAPACITY
AS UNITED STATES TRADE REPRESENTATIVE,
OFFICE OF THE UNITED STATES TRADE
REPRESENTATIVE, HOWARD LUTNICK, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF
COMMERCE, UNITED STATES CUSTOMS AND
BORDER PROTECTION,**
*Defendants -Appellants*

------------------------------------

**STATE OF OREGON, STATE OF ARIZONA, STATE
OF COLORADO, STATE OF CONNECTICUT,
STATE OF DELAWARE, STATE OF ILLINOIS,
STATE OF MAINE, STATE OF MINNESOTA, STATE**

**OF NEVADA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF VERMONT,**
*Plaintiffs-Appellees*

**v.**

**PRESIDENT DONALD J. TRUMP, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, COMMISSIONER FOR UNITED STATES CUSTOMS AND BORDER PROTECTION, IN HIS OFFICIAL CAPACITY AS COMMISSIONER FOR U.S. CUSTOMS AND BORDER PROTECTION, UNITED STATES,**
*Defendants-Appellants*

————————————

2025-1812, 2025-1813

————————————

Appeals from the United States Court of International Trade in Nos. 1:25-cv-00066-GSK-TMR-JAR, 1:25-cv-00077-GSK-TMR-JAR, Senior Judge Jane A. Restani, Judge Gary S. Katzmann, Judge Timothy M. Reif.

————————————

CUNNINGHAM, *Circuit Judge*, joined by *Circuit Judges* LOURIE, REYNA, and STARK, additional views.

We join the majority opinion in full. While we agree with the majority that the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, does not grant the President authority to impose the type of tariffs imposed by the Executive Orders, Maj. Op. at 26–42, we write separately to state our view that IEEPA does not

authorize the President to impose any tariffs. In particular, we conclude that (1) the Government's expansive interpretation of "regulate" is not supported by the plain text of IEEPA; (2) the Government's reliance on the ratification of our predecessor court's opinion in *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (CCPA 1975) ("*Yoshida II*") does not overcome this plain meaning; and (3) the Government's understanding of the scope of authority granted by IEEPA would render it an unconstitutional delegation.

### A.

We start by addressing the statutory text of IEEPA. IEEPA allows the President to declare a national emergency to deal with "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Once the President declares such an emergency, IEEPA grants the President the power to:

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States[.]

50 U.S.C. § 1702(a)(1)(B). The Government locates the President's purported tariff authority in the statute's grant of power to "regulate . . . importation." Appellants' Br. 32.

The plain meaning of "regulate" does not support the Government's argument. "Regulate" means "[t]o fix, establish or control; to adjust by rule, method, or established

mode; to direct by rule or restriction; to subject to governing principles or laws." *Regulate*, *Black's Law Dictionary* (5th ed. 1979). "Regulate" also means "to govern or direct according to rule," "to bring under the control of law or constituted authority," or "make regulations for or concerning." *Regulate*, *Webster's Third New International Dictionary* (1961). As the plain meaning of "regulate" does not include measures for raising revenue, the Government is forced to rely on a syllogism: it contends to "regulate" importation means to "adjust" or "control" the quantity of imports, and tariffs are ways to "adjust" or "control" the quantity of imports. Appellants' Br. 32–33; Am. First Leg. Found. Br. 3–5; *see* Dissent at 29–33. The Government's broad interpretation of "regulate" as encompassing every possible method and mode of adjustment of the quantity of importation, including taxation, faces three textual problems in the specific context[1] of 50 U.S.C. § 1702: (1) it is inconsistent with how "regulate" would be applied beyond its application to "importation;" (2) it renders the other listed powers in IEEPA surplusage; and (3) it violates the proposition that Congress must speak clearly when authorizing taxation.

First, the Government's interpretation of "regulate" would require "regulate" to have multiple meanings in the

---

[1]     As the dissent notes, taxes can sometimes be a form of regulation. Dissent at 29–33. However, "[s]tatutory language has meaning only in context." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 415 (2005). The examples the dissent marshals all contain explicit grants of taxation authority and thus stand for the uncontroversial principle that taxation can sometimes have a regulatory purpose; they do not support the broader proposition that "regulate," in all contexts and most especially in the context of IEEPA, is interpreted to include the taxation power.

very provision on which the Government relies. The Supreme Court has "never engaged in such interpretive contortion" to conclude that Congress intended to "giv[e] the same word, in the same statutory provision, different meanings in different factual contexts." *United States v. Santos*, 553 U.S. 507, 522 (2008) (emphasis omitted). IEEPA's grant of the power to "regulate" applies not just to "importation," but to

> any acquisition, *holding*, withholding, use, transfer, *withdrawal*, *transportation*, importation or *exportation* of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest.

50 U.S.C. § 1702(a)(1)(B) (emphases added). If the Government's reading of "regulate" to include adjusting quantity through taxation is adopted, then the President would have the power to unilaterally tax bank *withdrawals* or to implement a wealth tax on any foreign property *holdings*. Similarly, under the Government's interpretation, the President could "regulate . . . *transportation*" by taxing transportation to reduce it. Further, reading IEEPA's grant of authority to "regulate . . . *exportation*" to include the ability to reduce exportation by taxing it would render the provision unconstitutional. U.S. Const. art. I, § 9, cl. 5. The Government's suggestion that "it is natural to read the President's power to 'regulate . . . importation' as encompassing the power to impose tariffs, while reading the power to 'regulate . . . exportation' as excluding that power," Appellants' Reply Br. 9, effectively concedes that its argument requires reading "regulate" to have different meanings in different factual contexts of the same statutory provision. We reject the Government's proposal that we adopt such a fluctuating construction of "regulate."

Second, the Government's interpretation of "regulate" would make the President's other authorities in IEEPA superfluous. It is a "'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). If the Government's expansive reading of "regulate" were correct, there would have been little need for Congress to separately list, for example, the powers to "direct and compel," or "prevent or prohibit" in IEEPA. *See* 50 U.S.C. § 1702(a)(1)(B). Notably, the power to "prevent or prohibit" any particular act of importation (or acquisition, holding, or withdrawal) is subsumed in a definition of "regulate" that includes no limits on the scope of authorized restrictions. Thus, we also reject the Government's interpretation for allowing the term "regulate" to render many of the remaining listed powers superfluous.

Third, even if the Government's reading were plausible, any delegation is far from clear. "Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to" impose "'fees' or 'taxes.'" *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989) (quoting *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 559 n.10 (1976)); *see National Cable Television Ass'n v. United States*, 415 U.S. 336, 341 (1974) ("It would be such a sharp break with our traditions to conclude that Congress had bestowed on a federal agency the taxing power."). We reject the dissent's suggestion that because IEEPA involves foreign affairs, it must be interpreted so broadly as to include tariff authority. Dissent at 36.[2] We

---

[2]    Indeed, the dissent's key case for this proposition held that a statute should be read to incorporate "the

are aware of no Supreme Court case applying that proposition to read a broad delegation of taxing authority into ambiguous text.  For a similar reason, we reject the dissent's suggestion that "[t]axing through tariffs is just a less extreme, more flexible tool for pursuing the same objective of controlling the amount or price of imports that, after all, could be barred altogether."  Dissent at 32.  The power of the purse[3] is "the most comple[te] and effectual weapon

---

historical authority of the President in the fields of foreign commerce and of importation into the country," which would not include taxation authority.  *B-West Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996) (quoting *S.P.R. Sugar Co. Trading Corp. v. United States*, 334 F.2d 622, 634 (Ct. Cl. 1964)); *compare id.* ("Presidents acting under broad statutory grants of authority have 'imposed and lifted embargoes, prohibited and allowed exports, suspended and resumed commercial intercourse with foreign countries.'" (quoting *S.P.R. Sugar*, 334 F.2d at 633)), *with* Maj. Op. at 33 n.14 (explaining the difference between the President's historical authority to ban commerce with enemies and the tariff authority); *cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 643–44 (1952) (Jackson, J., concurring) ("Congress alone controls the raising of revenues and their appropriation . . . . [T]he Constitution did not contemplate that the title Commander-in-Chief of the Army and Navy will constitute him also Commander-in-Chief of the country, its industries and its inhabitants.").

[3]    At the founding, the power to tariff and the power to tax were synonymous.  "[N]early all" government revenue came from tariffs until 1862. Andrew Reamer, *Chapter 2: Before the U.S. Tariff Commission: Congressional Efforts to Obtain Statistics and Analysis for Tariff-setting, 1789–1916, in A Centennial History of the United States International Trade Commission* 33, 35–37 (2017); *see* Adv. Am. Freedom Br. 18 (noting that at the founding,

with which any constitution can arm the immediate representatives of the people," The Federalist No. 58, at 394 (James Madison) (J. Cooke ed., 1961), not a mere lesser authority to the traditional executive power that enables it to cut off trade with wartime enemies. *See* Maj. Op. at 33 n.14.

Instead, we read "regulate" in its statutory context. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (referring to statutory context and recognizing that Congress does not "hide elephants in mouseholes"). It is natural to read "regulate . . . importation" to include measures like supply chain validation, quarantines, and known importer rules. *See, e.g.*, Exec. Order No. 13194, 66 Fed. Reg. 7389, 7389–90 (Jan. 18, 2001) (authorizing "promulgation of rules and regulations" under IEEPA to stop "indirect importation" of rough diamonds from Sierra Leone); *see also* Maj. Op. at 33 n.15 (collecting examples). Thus, a proper construction of "regulate" would encompass measures enabling the President "to direct by rule or restriction," but would not strain the term to cover every possible method or mode of restriction, such as taxation.

### B.

In urging a contrary result, the Government relies heavily on the supposed ratification of *Yoshida II*. *See* Appellants' Reply Br. 4–6. The ratification doctrine applies only when (1) Congress "simply reenact[s]" a statute "without change" and (2) there is a "judicial consensus so broad and unquestioned that we must presume Congress knew of

---

"taxations levied on imports were not a special category of power that Congress shared with, or could share with, the President").

and endorsed it." *JAMA v. ICE*, 543 U.S. 335, 349 (2005).[4] Neither requirement is met here.

Congress did not reenact the Trading with the Enemy Act ("TWEA") without change; rather, it withdrew some of the authority previously granted to the President, including the "authority to regulate purely domestic transactions." H.R. Rep. No. 95-459, at 11 (1977). Tariffs may be less anomalous when domestic economic regulation is also contemplated. Moreover, key portions of *Yoshida II*'s reasoning are no longer applicable. First, *Yoshida II* relied on the absence of "acts providing procedures prescribed by the Congress for the accomplishment of the very purpose sought to be obtained." 526 F.2d at 578. Here, there are numerous other authorities that the President could have invoked. *See* J.A. 475 ("Peter Navarro: . . . There's 122, there's 301, there's 232, there's 338. There's all sorts of things we can do well within the law."). Second, as concerns the tariffs considered in *Yoshida II*, at least as a practical matter, Congress had retroactively passed a measure providing President Nixon the authority to enact balance-of-payment tariffs. *See* S. Rep. No. 93-1298, at 88 (1974) (providing "explicit statutory authority" for Nixon's actions, without commenting on whether TWEA was misconstrued). No such implicit or explicit approval exists here: instead, when the President in 2019 asked Congress

---

[4]  The substantive weakness of the Government's position also supports finding that *Yoshida II* was not ratified. It is inappropriate to rely on "language in a Committee Report" or "a few isolated statements" when the invocation of ratification "would result in a construction of the statute which not only is at odds with the language of the section in question and the pattern of the statute taken as a whole, but also is extremely far reaching in terms of the virtually untrammeled and unreviewable power it would vest." *SEC v. Sloan*, 436 U.S. 103, 121 (1978).

to give him authority to impose reciprocal tariffs, Congress demurred. President Donald J. Trump, State of the Union (Feb. 5, 2019), https://trumpwhitehouse.archives.gov/briefings-statements/president-donald-j-trumps-state-union-address-2/ ("Tonight, I am also asking you to pass the United States Reciprocal Trade Act, so that if another country places an unfair tariff on an American product, we can charge them the exact same tariff on the same product that they sell to us."); *see* United States Reciprocal Trade Act, H.R. 764, 116th Cong. (2019) (proposing granting the President a narrow power to impose reciprocal tariffs); *see also* United States Reciprocal Trade Act, H.R. 735, 119th Cong. (2025). Thus, the relevant portion of IEEPA was not effectively reenacted without change.

Nor was there a broad and unquestioned judicial consensus from which we can presume that Congress endorsed *Yoshida II*. Congress heard testimony explicitly questioning *Yoshida II* as a "thin" opinion that should not "define the scope of congressional delegation." *Emergency Controls on International Economic Transactions: Hearing on H.R. 1560 and H.R. 2382 Before the Subcomm. on Int'l Econ. Pol'y & Trade of the H. Comm. on Int'l Rels.*, 95th Cong. 8–9, 18 (1977) (statement of Prof. Andreas F. Lowenfeld, New York University Law School).[5] Indeed, *Yoshida II*

---

[5]    The dissent cites this testimony for the proposition that Congress knew of *Yoshida II*, without analyzing whether Congress endorsed it. Dissent at 37. Congress recognized the importance of Professor Lowenfeld's opinions and adopted numerous of his proposals, including modifying the statute to require "express renewal," to require "a new declaration of emergency" for new actions, and to raise the standard for what counts as an "emergency." *Emergency Controls on International Economic Transactions: Hearing on H.R. 1560 and H.R. 2382 Before the*

explicitly indicated that future tariffs "must, of course, comply with the statute now governing such action." 526 F.2d at 582 n.33. Moreover, by its terms, *Yoshida II* did not "approve in advance any future surcharge of a different nature, or any surcharge differently applied or any surcharge not reasonably related to the emergency declared." *Id.* at 577. Thus, *Yoshida II* hardly set out an unquestioned definition of the word "regulate." At most, it left the door slightly open as to whether its holding would apply prospectively. The legislative history suggests that, while Congress knew about *Yoshida II*, it did not endorse it or convert its retroactive holding into a prospective one: the only mention of *Yoshida II* in the key committee report is in a summary of past uses, H.R. Rep. No. 95-459, at 5, which the same report also states were "something quite different from what was envisioned in 1917." *Id.* at 8–9. Thus, there was no broad and unquestioned judicial consensus surrounding *Yoshida II*, and *Yoshida II*'s interpretation of "regulate" as encompassing tariffs was not ratified.

## C.

The Government's interpretation of IEEPA would render it an unconstitutional delegation. Because taxation authority constitutionally rests with Congress, any delegation of that authority to the President must at least set out an intelligible principle that includes "both 'the general policy'" that the President "must pursue and 'the boundaries of [its] delegated authority.'" *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2497 (2025) (alteration in original) (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). Similarly, Congress must "provide[ ] sufficient

---

*Subcomm. on Int'l Econ. Pol'y & Trade of the H. Comm. on Int'l Rels.*, 95th Cong. 10–11 (statement of Prof. Andreas F. Lowenfeld, New York University Law School); *see* 50 U.S.C. § 1701; 50 U.S.C. § 1622(d).

standards to enable both 'the courts and the public [to] ascertain'" whether the President "has followed the law." *Id.* (second alteration in original) (quoting *OPP Cotton Mills, Inc. v. Adm'r of Wage & Hour Div., Dep't of Lab.*, 312 U.S. 126, 144 (1941)). Because this is undoubtedly a case that "affect[s] the entire national economy," the "'guidance' needed is greater . . . than when [Congress] addresses a narrow, technical issue." *Id.* (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001)). For taxes,[6] both "quantitative" and "qualitative limits on how much money" the President can raise are permissible, but it would "pose a constitutional problem" if the "statute gives the [executive branch] power, all on its own, to raise [a] hypothetical $5 trillion" with no "ceiling." *Id.* at 2501–02.

The Government's interpretation of IEEPA would be a functionally limitless delegation of Congressional taxation authority.[7] Even if we assume that "to deal with any

---

[6]    Justice Gorsuch has stated that tariffs "arguably raise[ ] distinct nondelegation questions from domestic taxes," but did so in arguing that domestic taxes should be subject to an even stricter non-delegation standard; he did not suggest that tariffs are not subject to the intelligible principle standard. *Consumers' Rsch.*, 145 S. Ct. at 2533 n.15 (Gorsuch, J., dissenting).

[7]    Notably, the CCPA in *Yoshida II* relied on examining the "actions . . . judged in the light of what the President actually did, not in the light of what he could have done." 526 F.2d at 577. Subsequently, however, the Supreme Court has made clear that in assessing whether a Congressional grant of authority violates the non-delegation doctrine, courts cannot limit their analysis only to how that authority has actually been exercised. In *Whitman*, the Supreme Court explained that "[t]he very choice of which portion of the power to exercise—that is to say, the

unusual and extraordinary threat" satisfies the requirement to set out the "general policy," the "boundaries" the Government identifies, Appellants' Br. 37–41, are no boundaries at all. The Government and the dissent contend that IEEPA has constitutionally satisfactory limits because of a requirement that the threat be "unusual and extraordinary," and that it "has its source in whole or substantial part outside the United States." Appellants' Br. 37 (quoting 50 U.S.C. § 1701(a)); *see* Dissent at 59–63 (rejecting solely procedural or judicially unenforceable limits). Whether or not this limit provides an intelligible principle for the other authorities in IEEPA, it provides no limit on the supposed power to tax. As soon as the President sees an unusual and extraordinary threat, the Government's interpretation of IEEPA would enable the President to set whatever tariff rates he wishes.[8]   The Government's

---

prescription of the standard that Congress had omitted— would *itself* be an exercise of the forbidden legislative authority." 531 U.S. at 473. Thus, *Yoshida II's* analysis does not fully address how non-delegation issues are litigated today. Accordingly, to the extent the Government relies on ratification of *Yoshida II* without the limits in *Yoshida II*, its interpretation runs into substantial non-delegation problems.

[8]   Indeed, at oral argument, the Government suggested that the only limit preventing it from using tariffs to address a *budget* deficit emergency is that the President must find that the emergency has its source in "substantial part outside the United States." Oral Arg. 39:20–39:51, https://oralarguments.cafc.uscourts.gov/default.aspx?fl=25 -1812_07312025.mp3; 50 U.S.C. § 1701(a). Consider, however, that under the Government's view, the President could make such a factual finding by merely pointing to a lack of taxes paid on imports from outside the country. But

interpretation would leave neither quantitative nor qualitative restrictions on how much money the executive branch could raise without Congressional authorization.

The historical distinction between the quantitative limits implicated by the other listed powers in IEEPA and taxes, *see* Maj. Op. at 33 n.14, distinguishes the present circumstances from the cases cited by the dissent for the proposition that the non-delegation doctrine is weakened in the area of foreign affairs. *See* Dissent at 60–61 (citing Curtis Bradley & Jack Goldsmith, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 U. Pa. L. Rev. 1743 (2024)). The cases cited by the dissent either involved the traditionally executive embargo power or involved the sort of executive calculation and fact-finding that do not implicate the non-delegation doctrine. *See Gundy v. United States*, 588 U.S. 128, 158–163 (2019) (Gorsuch, J., dissenting) (discussing *Cargo of the Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382 (1813) and *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928), and explaining how, in those cases, "Congress had made all the relevant policy decisions," leaving fact-finding for the executive). Indeed, "IEEPA [is] not [an] authorization[] that obviously connect[s] to independent presidential power." Bradley & Goldsmith at 1796; *see id.* at 1788–89 (noting that the narrower Section 232 is "close to the line of constitutionality" under a more modern non-delegation doctrine, and that the proposition that national security assessments can be "interlinked with Congress's authority over trade" is "highly debatable and would entail a very relaxed approach to the independent powers idea."). Moreover, the idea that tariff delegations are subject to a lower non-delegation standard is incompatible with *J.W. Hampton*, which addressed a

---

if the President can declare an emergency to cut the deficit by raising taxes in whatever way he wishes, not much remains of Congressional authority over taxation.

tariff statute while creating the intelligible principle standard.  276 U.S. at 409, 413.

Even the broadest tariff-related statute upheld by the Supreme Court imposed more meaningful limits than those imposed by IEEPA.  The Supreme Court upheld the limits in Section 232 of the Trade Expansion Act of 1962, noting that there needed to be a factual finding "that an 'article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security,'" that the President's delegated taxation authority had a ceiling because he could "act only to the extent 'he deems necessary to adjust the imports . . . so that such imports will not threaten to impair the national security,'" and that there were "specific factors to be considered by the President in exercising his authority under s 232(b)." *Algonquin*, 426 U.S. at 559.  Thus, the Supreme Court understood Section 232 to contain a qualitative limit similar to the limits at issue in *Consumers' Research*.  The Government identifies no such quantitative or qualitative limits here.  Accordingly, even if we thought the Government's reading of IEEPA were plausible, we would "shun an interpretation that raises serious constitutional doubts." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018).

### D.

Congress "alone has access to the pockets of the people."  The Federalist No. 48, at 334 (James Madison) (J. Cooke ed., 1961).  Accordingly, we would also affirm because Congress did not unambiguously delegate its taxing power to the President in IEEPA.

# United States Court of Appeals
# for the Federal Circuit

———————————

**V.O.S. SELECTIONS, INC., PLASTIC SERVICES AND PRODUCTS, LLC, DBA GENOVA PIPE, MICROKITS, LLC, FISHUSA INC., TERRY PRECISION CYCLING LLC,**
*Plaintiffs-Appellees*

**v.**

**DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, RODNEY S. SCOTT, COMMISSIONER FOR UNITED STATES CUSTOMS AND BORDER PROTECTION, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE UNITED STATES CUSTOMS AND BORDER PROTECTION, JAMIESON GREER, IN HISOFFICIAL CAPACITY AS UNITED STATES TRADE REPRESENTATIVE, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, HOWARD LUTNICK, IN HIS OFFICIAL CAPACITY AS SECRETARY OF COMMERCE, UNITED STATES CUSTOMS AND BORDER PROTECTION,**
*Defendants -Appellants*

————————————————————

**STATE OF OREGON, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF**

**NEW YORK, STATE OF VERMONT,**
*Plaintiffs-Appellees*

**v.**

**PRESIDENT DONALD J. TRUMP, UNITED STATES
DEPARTMENT OF HOMELAND SECURITY,
KRISTI NOEM, SECRETARY OF HOMELAND
SECURITY, IN HER OFFICIAL CAPACITY AS
SECRETARY OF THE DEPARTMENT OF
HOMELAND SECURITY, UNITED STATES
CUSTOMS AND BORDER PROTECTION, RODNEY
S. SCOTT, COMMISSIONER FOR UNITED STATES
CUSTOMS AND BORDER PROTECTION, IN HIS
OFFICIAL CAPACITY AS COMMISSIONER FOR
U.S. CUSTOMS AND BORDER PROTECTION,
UNITED STATES,**
*Defendants-Appellants*

————————————

2025-1812, 2025-1813

————————————

Appeals from the United States Court of International
Trade in Nos. 1:25-cv-00066-GSK-TMR-JAR, 1:25-cv-
00077-GSK-TMR-JAR, Senior Judge Jane A. Restani,
Judge Gary S. Katzmann, Judge Timothy M. Reif.

————————————

TARANTO, *Circuit Judge*, dissenting, with whom *Chief
Judge* MOORE and *Circuit Judges* PROST and CHEN join.

Before us on appeal is the decision of the Court of In-
ternational Trade (CIT) in *V.O.S. Selections, Inc. v. United
States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) (*CIT
Op.*) in a pair of cases—one brought by five private busi-
nesses and the other brought by twelve States—in which
all plaintiffs assert harm to their interests in imported
goods.  *Id.* at 1367, 1369.  The CIT ruled that it had

jurisdiction over the case and that at least one plaintiff in each group had constitutional standing. *Id.* at 1365–69. The CIT then granted summary judgment to the plaintiffs, holding unlawful the asserted cause of the harm—namely, tariffs on imports of goods imposed by two groups of executive orders issued by the President. *Id.* at 1383. For authority to impose the tariffs in both the first group, which concerns what have been called the reciprocal tariffs, and the second group, which concerns what have been called the (drug-)trafficking tariffs, the President relied on the International Emergency Economic Powers Act (IEEPA), Pub. L. No. 95-223, §§ 201–207, 91 Stat. 1625, 1626–28 (1977) (codified as slightly amended at 50 U.S.C. §§ 1701–1706). The CIT set aside the tariffs on the ground that they were not authorized by IEEPA, and it issued an injunction as a remedy. *CIT Op.* at 1370–84.

This court today affirms the holdings on jurisdiction, standing, and unlawfulness, while vacating the CIT's injunction and remanding for reconsideration of the remedy. Maj. Op. at 24–25, 42–44. We agree with the majority's decision on jurisdiction and standing and on the need for reconsideration of the remedy if the tariffs are unlawful. But we disagree with the majority's conclusion on the issue of the tariffs' legality. We conclude that plaintiffs have not justified summary judgment in their favor on either statutory or constitutional grounds.

Regarding *statutory authority*: Plaintiffs have not shown on summary judgment that either group of tariffs fails to meet the preconditions IEEPA sets for the exercise of the presidential authorities that IEEPA grants—requiring that measures adopted be imposed to deal with an unusual and extraordinary threat, having foreign sources, to the national security or foreign policy or economy of the United States, the threat declared as a national emergency (lasting one year unless renewed). The majority does not disagree. Rather, the majority concludes that the particular tariffs at issue are not among the tools IEEPA makes

available through the authorization to "regulate . . . importation" of goods, IEEPA § 203(a)(1)(B) [50 U.S.C. § 1702(a)(1)(B)], even when all the required preconditions are met. Maj. Op. at 37–38. We think otherwise. IEEPA's language, as confirmed by its history, authorizes tariffs to regulate importation—a conclusion that the majority does not squarely reject, but Judge Cunningham and those who join her opinion do. And IEEPA's language does not contain the additional limits on which the majority opinion today relies as the sole basis for its illegality holding. Maj. Op. at 37–42. IEEPA embodies an eyes-open congressional grant of broad emergency authority in this foreign-affairs realm, which unsurprisingly extends beyond authorities available under non-emergency laws, and Congress confirmed the understood breadth by tying IEEPA's authority to particularly demanding procedural requirements for keeping Congress informed. And, contrary to the CIT's reason for invalidating the reciprocal tariffs, such emergency authority is not displaced by another statute (section 122 of the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978, 1987–88, (1974) (codified at 19 U.S.C. § 2132)); nor does IEEPA contain the exclusion of using IEEPA authorities as leverage that the CIT articulated as the sole basis for holding the trafficking tariffs unlawful. Finally, the major questions doctrine does not call for a different statutory conclusion. Regarding *constitutionality*: We conclude that IEEPA's authorization of presidential action in this realm is not an unconstitutional delegation of legislative authority under the Supreme Court's decisions, which have upheld broad grants of authority, including tariffing authority, in this foreign-affairs-related area.

For those reasons, on the present state of governing law, we would reverse the CIT's summary judgment and remand for further proceedings on any issues concerning unlawfulness that plaintiffs have preserved. We therefore respectfully dissent.

## I. BACKGROUND

### A. Executive Orders

One group of executive orders at issue began with Executive Order 14257, 90 Fed. Reg. 15041 (April 2, 2025) (EO '257), titled *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*. That order announced a 10% tariff on imports from all trading partners (subject to certain exceptions) effective April 5, 2025, and country-specific higher tariffs for 57 named countries effective a few days later.[1]  EO '257, 90 Fed. Reg. at 15045 (§§ 2–3), 15049 (Annex I).  That order was followed by several orders that largely paused the country-specific portions of the tariffs announced in EO '257, while for a time increasing tariffs for the People's Republic of China.  *See CIT Op.* at 1363–64.  EO '257 calls the tariffs in this first group "reciprocal tariffs."  Both the private plaintiffs and State plaintiffs challenge these reciprocal tariffs.

The second group of executive orders at issue began on February 1, 2025, with the issuance of executive orders that raised tariffs on Canada, Mexico, and China based on the roles (such as deficient interdiction and cooperation with U.S. law enforcement) those countries assertedly play

---

[1] The private plaintiffs state how the "additional reciprocal tariffs on specific countries" were calculated: They are "based on a simple ratio of the trade deficit in goods (excluding services) as a percentage of total U.S. import from the given country."  Private Appellees' Brief at 48.  That is, for country X, the amount is based on the difference between the value of U.S. goods entering X and the value of X goods entering the U.S., divided by the value of X goods entering the U.S.  The government has not disputed that assertion about the basis for the country-specific tariffs.

in exacerbating opioid and related crime problems in the United States.  Exec. Order No. 14193, 90 Fed. Reg. 9113 (Feb. 1, 2025) (EO '193) (Canada); Exec. Order No. 14194, 90 Fed. Reg. 9117 (Feb. 1, 2025) (EO '194) (Mexico); Exec. Order No. 14195, 90 Fed. Reg. 9121 (Feb. 1, 2025) (EO '195) (China).  Several follow-on executive orders included pauses based on seemingly positive responses from the governments of Canada and Mexico, increases to the rates based on assertedly inadequate or negative responses from the government of China, and some alterations of the rates and definitions of the class of subject goods.  *See CIT Op.* at 1362–63 (summarizing executive orders); Maj. Op. at 6–11.  Following the CIT, we refer to this second group as involving *trafficking tariffs*.  Only the State plaintiffs challenge these tariffs.

Both groups of executive orders rely on IEEPA for authority to impose the tariffs.  The executive orders declare or cite declarations of national emergencies (a requirement for action under IEEPA), in accordance with the National Emergencies Act of 1976, Pub. L. No. 94-412, 90 Stat. 1255, 1255–57, §§ 101, 201–202, 301, 401 (1976) (codified as amended at 50 U.S.C. §§ 1601, 1621–22, 1631, 1641) (NEA).  EO '257, 90 Fed. Reg. at 15041, 15044; EO '193, 90 Fed. Reg. at 9113–14; EO '194, 90 Fed. Reg. at 9117; EO '195, 90 Fed. Reg. at 9121.  The orders provide that the imposed tariffs will be embodied in the Harmonized Tariff Schedule of the United States (HTSUS), citing § 604 of the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978, 2073 (1974) (codified as amended at 19 U.S.C. § 2483), which directs the President to "embody in the [HTSUS] . . . Acts affecting import treatment, and actions thereunder, including . . . *modification* . . . or *imposition* of any rate of duty or other import restriction." (Emphases added.)  Congress has declared that the HTSUS, including "[e]ach modification or change made . . . by the President under authority of law (including section 604 of the Trade Act of 1974 [19 U.S.C. § 2483])," "shall be considered to be

statutory provisions of law for all purposes." 19 U.S.C.
§ 3004(c)(1). Finally, the executive orders cite 3 U.S.C.
§ 301, which provides for presidential delegation of authorities granted to the President.

The CIT in this case did not hold, and the parties have
not argued to us, that different conclusions regarding lawfulness may apply to some executive orders but not others
within each of the two groups of tariffs. In particular, all
of the challenges to the tariffs presented to us by the plaintiffs in support of the summary judgment granted in their
favor, including the challenges deemed meritorious by the
CIT, are put forth as invalidating the initial EO '257 reciprocal tariffs and the initial trafficking tariffs (EOs '193,
'194, and '195). Like the CIT, we therefore may and do
evaluate the challenges now before us as they apply to
those initial tariffs (though what occurred in the follow-on
orders may have a bearing on that evaluation). If there are
grounds for separately challenging any of the follow-on orders, such grounds are not currently presented to us.

## B. IEEPA

Emergency declarations and powers, having a long lineage, drew particular congressional attention in the early
1970s. In 1972, the Senate created a Special Committee on
the Termination of the National Emergency to study such
national emergencies, associated legislative authorities,
and the impact of their termination. S. Res. 9, 93d Cong.
(1973); S. Res. 224, 93d Cong. (1973); S. Res., 94th Cong.
(1975); *see* S. Rep. No. 94-922, at 1–4 (1976). In November
1973, the Senate committee published a report cataloguing
emergency powers statutes, S. Rep. No. 93-549 (1973), and
in July 1974, the same Senate committee (with the same
makeup but slightly renamed as the Special Committee on
National Emergencies and Delegated Emergency Powers
to reflect an expanded mandate) published a 140-page report after a year-and-a-half-long study of national emergencies and delegated emergency powers since the

Founders' era, Senate Special Committee on National Emergencies and Delegated Emergency Powers, A Brief History of Emergency Powers in the United States, 93d Cong., 2d Sess. (Comm. Print 1974) (1974 Emergency Powers Report). *See* S. Rep. No. 94-922, at 4–5. In the Foreword to the 1974 Emergency Powers Report, at v, Co-Chairs Senators Frank Church and Charles McC. Mathias, Jr. observed that "[t]he United States has been in a state of national emergency since March 9, 1933," and that "especially since the days of the 1933 economic emergency, it has been Congress' habit to delegate extensive emergency authority—which continues even when the emergency has passed—and not to set a terminating date." They added: "The United States thus has on the books at least 470 significant emergency powers statutes without time limitations delegating to the Executive extensive discretionary powers, ordinarily exercised by the Legislature, which affect the lives of American citizens in a host of all-encompassing ways." *Id.*; *see United States v. Yoshida International, Inc.*, 526 F.2d 560, 581 n.32 (C.C.P.A. 1975) (*Yoshida CCPA*) (reciting 470 figure and citing 1973 report, S. Rep. No. 93-549).

Among the emergency-power statutes then in place was the Trading with the Enemy Act (TWEA), Pub. L. No. 65-91, 40 Stat. 411 (1917) (current version at 50 U.S.C. §§ 4301–41), which initially applied only in times of war but was "expanded to deal with peacetime national emergencies in 1933." *Regan v. Wald*, 468 U.S. 222, 225–26 & n.2 (1984); *see* Emergency Banking Relief Act of 1933, Pub. L. No. 73-1, § 2, 48 Stat. 1, 1–2 (1933); War Powers Act of 1941, Pub. L. No. 77-354, § 301, 55 Stat. 838, 839–40 (1941) (providing TWEA authorities "[d]uring the time of war or during any other period of national emergency declared by the President"). Beginning in 1941, TWEA section 5(b)(1) acquired its present language and paragraph structure (as relevant here), authorizing the President, "by means of instructions, licenses, or otherwise," to take a variety of

related actions in two categories—one focused on money or its financial substitutes (subsection A) and the other on property (subsection B). War Powers Act of 1941, § 301, 55 Stat. at 839–40 (amending section 5(b) of TWEA). Under TWEA, the President may

> (A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, and

> (B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . .

TWEA § 5(b) [50 U.S.C. § 4305(b)(1)]. That language has been part of TWEA ever since. *See Regan v. Wald*, 468 U.S. at 226 n.2, 227 n.7; 50 U.S.C. App. § 5(b) (1976 ed.); 50 U.S.C. § 4305(b)(1) (current version).

In 1976, Congress enacted the NEA. §§ 101, 201–202, 301, 401, 501–02, 90 Stat. at 1255–59, now codified as amended at 50 U.S.C. §§ 1601, 1621–22, 1631, 1641, 1651. The NEA, where applicable, generally terminated preexisting declarations of emergency, NEA § 101, 50 U.S.C. § 1601, and established new constraints on new declarations, NEA §§ 201–202, 301, 401, 50 U.S.C. §§ 1621–22, 1631, 1641. One provision governing national emergencies declared under the NEA requires automatic termination of the declared emergency after one year unless renewed by the President. NEA § 202(d), 50 U.S.C. § 1622(d). Another provision, as enacted, allowed both for presidential termination by proclamation and for congressional termination

by concurrent resolution without presidential action or approval, NEA § 202(a), 50 U.S.C. § 1622(a); *see also* NEA § 202(b)–(c), 50 U.S.C. § 1622(b)–(c); but in 1985, after the Supreme Court held legislative vetoes to be unconstitutional in *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919 (1983), Congress changed the provision to refer instead to a joint resolution, which is subject to a presidential veto, Foreign Relations Authorization Act, Pub. L. No. 99-93, § 801, 99 Stat. 405, 448 (1985) (amending 50 U.S.C. § 1622(a)–(c)). Significantly, the NEA expressly exempted TWEA from its provisions, leaving congressional reconsideration of TWEA for another day. NEA § 502(a)(1), 90 Stat. at 1258 (current version at 50 U.S.C. § 1651); *see* S. Rep. No. 94-1168, at 7 (1976) (explaining that TWEA and a few other emergency laws, on which the government was relying, were exempted from the NEA to allow for "further investigation" and "careful consideration" and future "enactment of permanent law where appropriate").

At the end of 1977, Congress addressed TWEA, enacting Public Law No. 95-223, 91 Stat. 1625, 1626–29 (1977). In Title I, Congress deleted TWEA's general phrase covering any "period of national emergency declared by the President," thus returning TWEA to its original more limited application—only to wartime situations. § 101, 91 Stat. at 1625. In Title II, Congress enacted IEEPA to give the President what the Supreme Court has since recognized to be "essentially the same" set of authorities for peacetime that remained in TWEA for wartime, *Regan v. Wald*, 468 U.S. at 227–28, using language "directly drawn" from TWEA, *Dames & Moore v. Regan*, 453 U.S. 654, 671 (1981). 91 Stat. at 1626–29. We describe the current version of IEEPA, *see* 50 U.S.C. §§ 1701–04, which is identical in all material respects to the version of IEEPA enacted in 1977.

Congress in IEEPA first defined the "situations in which authorities may be exercised," 91 Stat. at 1626 (capitalization corrected), providing standards not found in

TWEA. Section 202 states as follows (emphases added to the words chiefly at issue on appeal here):

> (a) **Any authority granted to the President by section 203 [§ 1702] may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.**
>
> (b) **The authorities granted** to the President by section 203 [§ 1702] **may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared** for purposes of this chapter **and may not be exercised for any other purpose.** Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

IEEPA § 202, 91 Stat. at 1626 [50 U.S.C. § 1701] (emphases added).

Those provisions may be summarized as imposing four requirements. For the President to exercise the authorities set forth in the next section of IEEPA (§ 203, 50 U.S.C. § 1702), (i) there must be an unusual and extraordinary threat to the national security, foreign policy, or economy of the United States, § 202(a); (ii) the threat must wholly or substantially have a source outside the United States, § 202(a); (iii) the President must declare a national emergency with respect to that threat (an emergency that, under the NEA, expires after one year unless renewed and that also may be terminated by presidential proclamation or a congressional joint resolution), § 202(a)–(b); and

V.O.S. SELECTIONS, INC. v. TRUMP

(iv) the authorities must be exercised to deal with that threat and not for any other purpose, § 202(b).

Section 203, codified as slightly amended in 50 U.S.C. § 1702, contains the "grant of authorities," 91 Stat. at 1626, referred to in section 202.  Using TWEA's bifurcation between (A) finance and (B) property and materially identical language, section 203(a)(1) states as follows (emphases added to the words chiefly at issue on appeal here):

(a)(1) At the times and to the extent specified in section 202 [§ 1701], **the President may**, under such regulations as he may prescribe, **by means of instructions, licenses, or otherwise**—

(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities, . . . ;

**(B)** investigate, block during the pendency of an investigation,[2] **regulate**, direct and compel, nullify, void, prevent or prohibit, **any** acquisition, holding, withholding, use, transfer, withdrawal, transportation, **importation** or exportation **of**, or dealing in, or exercising any right, power, or privilege with

_____

[2]  The "block during the pendency of an investigation" phrase was added by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA Patriot Act), Pub. L. No. 107-56, § 106, 115 Stat. 272, 277–78 (2001).

respect to, or transactions involving, **any property in which any foreign country or a national thereof has any interest . . . .**

IEEPA § 203, 91 Stat. at 1626 [50 U.S.C. § 1702] (emphases added).[3] Thus, of most pertinence here, the President, by means of instructions, license, or otherwise, not only may prevent or prohibit but also may regulate any importation of property of a foreign country or national. § 203(a)(1)(B) [§ 1702(a)(1)(B)].

Finally, Congress wrote into IEEPA demanding requirements for keeping Congress well informed about the President's exercise of IEEPA authority. § 204 [§ 1703]. "[I]n every possible instance," the President must consult with Congress before and during the exercise of granted authority. § 204(a) [§ 1703(a)]. Upon exercising an IEEPA authority, the President must "immediately" transmit a report to Congress "specifying":

(1) the circumstances which necessitate such exercise of authority;

(2) why the President believes those circumstances constitute an unusual and extraordinary threat, which has its source in whole or substantial part

---

[3] Section 203 contains other provisions not specifically at issue here: *e.g.*, granting authority to require record-keeping, § 203(a)(2) [§ 1702(a)(2)], and stating exceptions, including for personal communications and humanitarian donations, § 203(b) [§ 1702(b)]. Section 203 also contains a provision (subparagraph (a)(1)(C)) added by the USA Patriot Act in 2001 to provide confiscation authority when the United States is engaged in armed hostilities or has been attacked. Pub. L. No. 107-56, § 106, 115 Stat. 272, 277–78 (2001).

outside the United States, to the national security, foreign policy, or economy of the United States;

(3) the authorities to be exercised and the actions to be taken in the exercise of those authorities to deal with those circumstances;

(4) why the President believes such actions are necessary to deal with those circumstances; and

(5) any foreign countries with respect to which such actions are to be taken and why such actions are to be taken with respect to those countries.

IEEPA § 204(b) [50 U.S.C. § 1703(b)]. And the President must update such reports, detailing changes, every six months. § 204(c) [§ 1703(c)]. Those requirements are "supplemental to," not a substitution for, the NEA's congressional-information requirements found in section 401 of the NEA, 50 U.S.C. § 1641. IEEPA § 204(d) [§ 1703(d)].

The majority today (at pp. 18–19, 30) quotes the key congressional committee report explaining the bill enacted as Pub. L. No. 95-223 The pertinent passage of the report states: "Title II of the bill, the [IEEPA], confers upon the President a new set of authorities for use in time of national emergency which are both more limited in scope than those of section 5(b) [of TWEA] and subject to various procedural limitations, including those of the [NEA]." H. R. Rep. No. 95-459, at 2 (1977); *see also id.* at 11 (referring to excluding purely domestic problems). That statement does not refer to narrowing of the set of actions the President may take under IEEPA. Thus, the new limitation "in scope" (including the foreign-source requirement) refers at most to the set of substantive preconditions stated in IEEPA section 202, which had no counterpart in TWEA, and to the requirement of declaring a national emergency subject to NEA requirements, including the one-year expiration in the absence of renewal, which were not contained in TWEA. *See* IEEPA § 202 [50 U.S.C. § 1701]; NEA

§§ 201–202, 301, 401 [50 U.S.C. §§ 1621–22, 1631, 1641]. The "procedural limitations" include the demanding new requirements for close involvement of Congress, IEEPA § 204 [50 U.S.C. § 1703], not matched by any requirement or limitation found in TWEA. But the specified types of action that the President may take, set forth in section 203 of IEEPA, as relevant here, are *not* more limited than those specified in TWEA: They are drawn from and essentially the same as those in TWEA, as the Supreme Court has twice noted. *See Regan v. Wald*, 468 U.S. at 228 ("The authorities granted to the President by § 203 of IEEPA are essentially the same as those in § 5(b) of TWEA, but the conditions and procedures for their exercise are different." (footnote noting a few differences immaterial to the present case)); *Dames & Moore*, 453 U.S. at 671. In particular, they contain the identical authorization of the President to "regulate . . . importation." Importantly, it is only the scope of section 203's grant of authorities that the majority relies on today. The House Report language quoted by the majority thus has no significance for the only basis of the majority's ruling.

## C. CIT Decision

In the pair of cases now on appeal, the CIT had before it the private plaintiffs' motion for summary judgment of unlawfulness of the reciprocal tariffs along with what it construed as the State plaintiffs' motion for summary judgment of unlawfulness of the reciprocal and trafficking tariffs. *CIT Op.* at 1364–65. The government did not itself file a motion for summary judgment; in opposing the grant of summary judgment for the plaintiffs, the government merely asserted without elaboration in the conclusion of its response (and requested in its proposed court order) that judgment should be entered for it. Defs.' Resp. in Opp'n to Mot. for Prelim. Inj. and Summ. J. at 45, *V.O.S. Selections, Inc. v. United States* (CIT No. 25-66), Dkt. No. 32 (Apr. 29, 2025); Defs.' Resp. in Opp'n to Mot. for Summ. J. and

Prelim. Inj. at 45 (CIT No. 25-77), Dkt. No. 41 (May 16, 2025). The CIT granted summary judgment to the plaintiffs.

Before reaching the merits, the CIT held that it had jurisdiction under 28 U.S.C. § 1581(i), which provides for exclusive CIT jurisdiction over "any civil action commenced against the United States, its agencies or its officers, that arise out of any law of the United States providing for—(A) revenue from imports or tonnage; (B) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue . . . ." *CIT Op.* at 1365–66. The CIT explained that the executive orders "made amendments to the HTSUS," which (as noted above) has the status of a statute. *CIT Op.* at 1366.[4] The CIT also held that at least one private plaintiff and at least one State plaintiff had constitutional standing, because, through declarations, they had sufficiently stated that they would be harmed by the challenged tariffs, whether by paying the increased amounts as importers or, as purchasers of imported goods covered by the tariffs, by paying higher prices on or encountering difficulties in obtaining such goods. *Id.* at 1367–69.

On the merits, the CIT first held that the reciprocal tariffs are unauthorized by IEEPA, ultimately concluding that the IEEPA authority relevant to this case had been displaced by another statute (section 122 of the Trade Act of 1974). *Id.* at 1370–76. The court began with an explanation that the constitutional nondelegation doctrine would not permit a congressional delegation of "unlimited" tariff authority to the President and that IEEPA's

---

[4] As the majority opinion notes (at 23 n.10), the CIT, in a ruling not challenged on appeal, concluded that the President "must be dismissed from the two cases before the court," but the executive orders are properly reviewed in this suit. *CIT Op.* at 1366–67 (citations omitted).

language authorizing the President to "regulate . . . importation," § 203(a)(1)(B) [§ 1702(a)(1)(B)], does not authorize "unlimited tariffs." *CIT Op.* at 1371–73. But the CIT did not deny, and could not have denied, that IEEPA by its terms, quoted and summarized above, contains limits—including not only a declaration of national emergency (expiring after a year, unless renewed, and subject to legislative override) and the procedural limitations of section 204 of IEEPA, but the substantive preconditions of section 202 of IEEPA, requiring that any authority is being exercised to deal with an unusual and extraordinary threat, from a foreign source, to the national security, foreign policy, or economy of the United States. *See supra* at pp. 11–12. And the CIT did not hold that such limits were insufficient to pass muster under the nondelegation doctrine and did not ultimately hold that reciprocal tariffs run afoul of these statutory limits.

Thus, the CIT did not hold that the reciprocal tariffs fail to meet the conditions set in section 202 of IEEPA, including the requirements of a national-emergency declaration and the requirement that IEEPA authority be "exercised to deal with any unusual and extraordinary threat" to national security, foreign policy, or the economy emanating in whole or substantial part from abroad, and for no other purpose. § 202(a) [§ 1701(a)]. The CIT likewise did not hold, as plaintiffs contended, that tariff-imposition authority is simply outside the power to "regulate . . . importation" granted by section 203 [§ 1702]. The CIT recognized that this court's predecessor, in *Yoshida CCPA* at 573, reached the opposite conclusion in holding that TWEA's "regulate . . . importation" language includes the power to impose tariffs and upholding under that language the specific tariffs at issue in *Yoshida CCPA*—the tariff surcharge imposed, on August 14, 1971, by Presidential Proclamation No. 4074, Imposition of Supplemental Duty for Balance of Payments, 85 Stat. 926 (1971 Presidential

Proclamation).  *CIT Op.* at 1372 (citing *Yoshida CCPA* at 573, 576–78).

Instead, the CIT looked outside IEEPA to identify a limit that the CIT concluded precluded the President's imposition of the reciprocal tariffs under IEEPA.  Specifically, the CIT held that section 122 of the Trade Act of 1974 [19 U.S.C. § 2132] concerning expressly specified balance-of-payments problems, is the exclusive presidential tariff authority for addressing the category of problems to which the reciprocal tariffs are directed, displacing any authority that would otherwise be found in IEEPA.  *CIT Op.* at 1374–76; *see also id.* at 1375 ("Section 122 removes the President's power to impose remedies in response to balance-of-payments deficits, and specifically trade deficits, from the broader powers granted to a president during a national emergency under IEEPA by establishing an explicit non-emergency statute with greater limitations." (footnote and citations omitted)).  The CIT seems to have categorically concluded that IEEPA could not be used to impose any tariffs responding to "balance-of-payments deficits."  *Id.* at 1374 ("Congress cabined the President's authority to impose tariffs in response to balance-of-payments deficits to non-emergency legislation[.]" (section heading; capitalization generally deleted)).  Although the CIT noted that section 122 sets caps of 15% and 150 days on certain surcharges, *id.,* caps that EO '257 exceeds, the CIT held the reciprocal tariffs invalid in full, not just insofar as they exceed 15% in amount or 150 days in duration, *id.* at 1376.

The CIT next held that IEEPA does not authorize the trafficking tariffs.  In contrast to what it concluded regarding the reciprocal tariffs, the CIT did not conclude that authority under IEEPA's section 203 for the trafficking tariffs had been displaced by another statute, and it did not otherwise hold that the trafficking tariffs were outside section 203's grant of authority to "regulate . . . importation." § 203 [§ 1702].  Rather, the CIT reasoned that the trafficking tariffs fall outside section 202's requirement for

presidential action (identified *supra* at p. 12 as requirement (iv))—that the authority be "exercised to deal with" the stated unusual and extraordinary threat and not "for any other purpose," § 202(b) [§ 1701(b)]. *Id.* at 1376–83. As an initial matter, the CIT held that the political question doctrine does not preclude judicial review for compliance with that condition, but the court recognized the principle requiring "'considerable deference'" in trade policy, as it is an aspect of foreign affairs. *CIT Op.* at 1377–80 (quoting *Federal Mogul Corp. v. United States*, 63 F.3d 1572, 1581 (Fed. Cir. 1995)). Here, the CIT then held, the trafficking tariffs fail to meet section 202's "exercised to deal with" condition—not because the President failed to issue an on-point declaration of a national emergency (not in dispute here) or because the opioid and related crime problems are not properly deemed to be an unusual and extraordinary threat within IEEPA's terms (also not in dispute or questioned by the majority), but because the tariffs do not "deal with" that threat. *Id.* at 1380–82. In the CIT's view, the "deal with" language "connotes a direct link between an act and the problem it purports to address." *Id.* at 1381. The tariffs lack such a direct link, the CIT ruled, because (1) the tariffs are imposed on "all articles," including many imported articles far removed from the opioid and crime problems that constitute the threat, and (2) actions that simply exercise leverage over the foreign government to solve those problems cannot meet the CIT's articulated direct-link requirement. *Id.* at 1381–82. The CIT therefore held the trafficking tariffs to be unlawful.

The government timely appealed to bring the CIT's judgment within our jurisdiction under 28 U.S.C. § 1295(a)(5).

## II. DISCUSSION

Like the majority today, we take no issue with the CIT's holdings that it had jurisdiction and that enough plaintiffs had constitutional standing in order for the

lawfulness of the reciprocal and trafficking tariffs to be adjudicated. We also agree with the majority that, if the tariffs are unlawful, a remand is needed regarding remedy. But we disagree with the CIT's holding, and the majority's conclusion today, that plaintiffs are entitled to summary judgment that the tariffs are unlawful.

The CIT reasoned that IEEPA does not and constitutionally could not grant "unlimited" tariff authority. *CIT Op.* at 1370–74; *see also* Maj. Op. at 6, 18, 30, 33, 41 ("unlimited"); *id.* at 40–41 ("unbounded"). But that reasoning, by its terms, does not identify why *these particular tariffs* constitute an exercise of "unlimited" tariff authority or are otherwise unauthorized by IEEPA given its statutory limits. It bears repeating that IEEPA's section 202 [§ 1701] requires that (i) there is an unusual and extraordinary threat to the national security, foreign policy, or economy of the United States; (ii) the threat wholly or substantially has a source outside the United States; (iii) the President declares a national emergency with respect to that threat (a declaration that expires after one year unless renewed and is subject to legislative override); and (iv) the authorities granted in section 203 [§ 1702] are exercised to deal with that threat and not for any other purpose. *See supra* at pp. 11–12. The section 203 authority invoked here is the authority to regulate importation, by means of instructions, licenses, or otherwise, authority that *Yoshida CCPA* held, when considering the identical language in TWEA, authorizes the imposition of tariffs. *See supra* at pp. 17–18. We are thus presented with statutory and constitutional questions: (1) whether the reciprocal and trafficking tariffs are unauthorized by sections 202 or 203, either because they exceed limits set by those provisions or because those provisions have been displaced by another statute in a respect that governs the present tariffs, and (2) if the tariffs are authorized by IEEPA, whether sections 202 and 203 are unconstitutional under the nondelegation doctrine.

We follow the CIT in addressing the reciprocal tariffs first and then the trafficking tariffs. We discuss all the legal issues common to the groups of tariffs in discussing the reciprocal tariffs. Only one issue remains for separate discussion—the "exercised to deal with" limitation of section 202 [§ 1701]—when we turn to the trafficking tariffs.

## A. Reciprocal Tariffs

For the invalidity of the reciprocal tariffs, the private and State plaintiffs mostly present statutory arguments. Regarding non-compliance with IEEPA's section 202, they make only one argument: that the problem identified by EO '257 is not unusual or extraordinary. They do not dispute that the reciprocal tariffs otherwise satisfy the other three requirements of section 202. Regarding section 203, plaintiffs argue that the "regulate . . . importation" authority does not encompass tariffs at all, an argument adopted by Judge Cunningham's separate opinion but not adopted by today's majority opinion. Plaintiffs may be suggesting—and in any event, today's court majority concludes—that the "regulate" authority contains certain (undefined temporal and/or duty amount and/or scope) limits that preclude the tariffs here at issue. Turning away from IEEPA itself, plaintiffs argue, as the CIT ruled, that any IEEPA authority for the reciprocal tariffs is displaced by section 122 of the Trade Act of 1974 [19 U.S.C. § 2132]. They also suggest that, even if ordinary statutory analysis does not render the reciprocal tariffs unlawful, the major questions doctrine supports such a holding. Finally, plaintiffs argue that, if IEEPA authorizes the reciprocal tariffs and is not displaced here by section 122, then IEEPA is unconstitutional under the nondelegation doctrine.

## 1. IEEPA § 202: Unusual and Extraordinary Threat

We begin with IEEPA's section 202 [§ 1701], about which plaintiffs make just one argument concerning the reciprocal tariffs—that there is no "unusual and extraordinary threat" to the national security, foreign policy, or

V.O.S. SELECTIONS, INC. v. TRUMP

economy of the United States (and hence cannot be an "emergency," which adds nothing to this argument). Private Appellees Brief at 39–42; State Appellees Brief at 25–29. They do not assert a failure to meet section 202's other requirements: They do not deny that there is a qualifying foreign source of the threat or a qualifying declaration of national emergency or that the authorities are being exercised "to deal with" the threat without an extraneous purpose. The CIT did not adopt plaintiffs' argument that the reciprocal tariffs were unauthorized because there is no "unusual and extraordinary threat"; nor does this court's majority. We readily conclude that plaintiffs have not shown on summary judgment that the reciprocal tariffs are contrary to the "unusual and extraordinary threat" statutory limit.

### a. Judicial Review

As an initial matter, we note that the unusual-and-extraordinary-threat requirement on its face involves factual and policy judgments to which the courts are obliged to give considerable deference. The President is not subject to the Administrative Procedure Act, including its various process and explanation requirements for agency decision-making. *See Dalton v. Spector*, 511 U.S. 462, 469 (1994); *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992); 5 U.S.C. §§ 701(b)(1), 704. And when presidential determinations are reviewable, the Supreme Court and our court have repeatedly stressed that judicial review of the President's decisions, at least in spheres of national security and foreign affairs, is very tightly limited. *See, e.g., Trump v. Hawaii*, 585 U.S. 667, 686 (2018); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010); *Regan v. Wald*, 468 U.S. at 242; *Haig v. Agee*, 453 U.S. 280, 292 (1981); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1950); *United States v. George S. Bush & Co.*, 310 U.S. 371, 379–80 (1940); *see also, e.g., USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1365–66, 1366 n.3 (Fed. Cir. 2022); *Motions Systems Corp. v. Bush*, 437 F.3d 1356, 1359–62 (Fed. Cir.

2006) (en banc); *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985); *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 796 (Fed. Cir. 1984).[5]

Like the CIT, we are not prepared to say that compliance with the unusual-and-extraordinary-threat requirement is wholly unreviewable, as a political question or otherwise. *See CIT Op.* at 1377–80. The well-established deference standard just noted provides very strong protection of presidential discretion. The principle that "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [judicial] review," *Dalton*, 511 U.S. at 476, however, does not mean that there is no such thing as action identifiable as outside the statutory or other bounds on presidential discretion. Thus, we are not prepared to say that the strong protection of presidential discretion wholly precludes a court from finding an abuse of discretion regarding the IEEPA substantive boundary. In this context, such judicial review would mean

---

[5] The court in *Maple Leaf* said that a court may "interpose" when there has been "a significant procedural violation, or action outside delegated authority" and, also, when there has been "a clear misconstruction of the governing statute." 762 F.2d at 89. The "clear misconstruction" formulation, to the extent it requires that any actionable misconstruction of the governing statute be "clear," raises an issue of incompatibility with *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). No such incompatibility exists if the *Maple Leaf* formulation is understood as simply stating an interpretive principle, favoring broad readings of statutes in the area, *see infra* at pp. 36–37, for the courts to apply in making their own determinations of the proper statutory interpretation. We do not rely on any deference-in-interpretation requirement, so need not explore the *Loper Bright* question about the *Maple Leaf* formulation.

judicial identification of an action as crossing the statutory boundary, after scrupulous and humble recognition of all the predictive, evaluative, and other judgment-call-based elements that, though people may passionately hold contrary views, are not subject to objective proof of error. *See*, *e.g.*, *Federal Communications Commission v. Consumers' Research*, 606 U.S. ___, 145 S. Ct. 2482, 2515–16 (2025) (Kavanaugh, J., concurring) ("To elaborate: Although the nondelegation doctrine's intelligible principle test has historically not packed much punch in constricting Congress's authority to delegate, the President generally must act within the confines set by Congress when he implements legislation. So the President's actions when implementing legislation *are* constrained—namely, by the scope of Congress's authorization and by any restrictions set forth in that statutory text. See *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394–96, 404 (2024).").

But we need not and should not undertake to elaborate on how to identify such situations unless tackling that task is necessary, and it is not necessary in this case.

### b. Executive Order 14257

Plaintiffs argue that the reciprocal tariffs violate the unusual-and-extraordinary-threat requirement because the goods trade deficit is not "unusual" or "extraordinary." In so arguing they necessarily presuppose that the requirement embodies a principle that is intelligible, at least to the extent that a violation of that principle is ascertainable, and they do not ask that we depart from the undeniably strong respect for presidential discretion embodied in the case law. In the present matter, plaintiffs' challenge to the President's unusual-and-extraordinary-threat determination can and should be rejected without further exploration of the scope of review. Plaintiffs' argument suffers from a decisive defect that is independent of the deference issue: Their challenge is misfocused as it does not address the actual bases provided in EO '257 for the unusual-and-

extraordinary threat determination and, thus, the presidential action at issue.

Plaintiffs assert only that trade deficits cannot be an "unusual and extraordinary threat" because they are old rather than unusual. Private Appellees Brief at 39–42; State Appellees Brief at 25–29. But that argument disregards the President's finding in EO '257 of a recent notable increase in aggregate goods trade deficits generally and for agricultural trade deficits in particular. *See* 90 Fed. Reg. at 15042 (stating that "the trading relationship between the United States and its trading partners has become highly unbalanced, particularly in recent years"); *id.* at 15044 (stating that agricultural surplus as of January 2021 "has vanished" and "been replaced by a projected $49 billion annual agricultural trade deficit" and that the annual U.S. goods trade deficits "have grown by over 40 percent in the past 5 years alone"). And that is not the only mismatch between plaintiffs' challenge and the actual premise of EO '257.

A group of economists, appearing as amici in support of plaintiffs, attempts to bolster the argument that large and persistent trade deficits are not unusual or extraordinary by making a fundamental point: "Both aggregate and bilateral trade deficits are generally harmless." Amended Brief *Amici Curiae* of Economists in Support of Affirmance at 7; *see also id.* at 4 (noting global prevalence of persistent national trade deficits). It is critical, therefore, to identify the particular kinds of harmful effects when asserting that a goods trade deficit is in fact harmful. EO '257 does so. And plaintiffs' argument does not address those effects.

EO '257 does not rest on a premise that such goods trade deficits (*i.e.*, more imports than exports of goods, suitably measured), whether in the aggregate with all U.S. trading partners or bilaterally with specific countries, even when large and persistent, are inherently (*i.e.*, always, per se, or necessarily) threatening to national security or the

economy.  Instead, it targets the "unusual and extraordinary threat" of particular goods trade deficits (and foreign government's policies that lead to goods trade deficits) that cause a number of specified negative effects (consequences), such as domestic manufacturing deficiencies, that EO '257 asserts follow from the recent and current goods trade deficits, even if they would not follow from all goods trade deficits (or even all prolonged ones).  EO '257 relies on *those* problems as making the "underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies"—"as indicated by large and persistent annual U.S. goods trade deficits"—into "an unusual and extraordinary threat to the national security and economy of the United States."  90 Fed. Reg. at 15041.  About that group of negative effects, the ones actually detailed in and relied on by EO '257, plaintiffs make no case at all: They say nothing to indicate that those effects are usual or ordinary, much less to allow such a determination on their motions for summary judgment.

The particular problems recited in EO '257 to establish the statutorily required unusual-and-extraordinary threat are not focused on a "monetary crisis," *CIT Op.* at 1374, of the sort that lay behind the 1971 Presidential Proclamation at issue in *Yoshida CCPA* and that gave rise to Congress's enactment of section 122 of the Trade Act of 1974 [19 U.S.C. § 2132], *see* S. Rep. No. 93-1298, at 87–89 (1974); H. R. Rep. No. 93-571, at 27–31 (1973).  Rather, the problems identified in EO '257 that the present-day goods trade deficits "have led to" are focused on deficiencies in "domestic production" (including deficiencies in "the U.S. manufacturing and defense-industrial base" and to the nation's making of agricultural products) wholly or partly caused by the purchase of imported goods made abroad in place of domestically made goods, 90 Fed. Reg. at 15043.  EO '257 early on states:

> Large and persistent annual U.S. goods trade deficits have led to the hollowing out of our manufacturing base; inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains; and rendered our defense-industrial base dependent on foreign adversaries.

*Id.* at 15041. EO '257 adds: "A nation's ability to produce domestically is the bedrock of its national and economic security." *Id.* at 15043. And it elaborates further:

> Permitting [structural] asymmetries [between the United States and its trading partners] to continue is not sustainable in today's economic and geopolitical environment because of the effect they have on U.S. domestic production. . . .

> Both my first Administration in 2017, and the Biden Administration in 2022, recognized that increasing domestic manufacturing is critical to U.S. national security. . . .

> U.S. production [particularly in certain advanced industrial sectors] could be permanently weakened. . . .

> [B]ecause the United States has supplied so much military equipment to other countries, U.S. stockpiles of military goods are too low to be compatible with U.S. national defense interests. . . .

> In recent years, the vulnerability of the U.S. economy in this respect was exposed both during the COVID–19 pandemic, when Americans had difficulty accessing essential products, as well as when the Houthi rebels later began attacking cargo ships in the Middle East. . . .

> The decline of U.S. manufacturing capacity threatens the U.S. economy in other ways, including through the loss of manufacturing jobs. . . .

> Just as a nation that does not produce manufac-
> tured products cannot maintain the industrial base
> it needs for national security, neither can a nation
> long survive if it cannot produce its own food. . . .
>
> Such impact upon military readiness and our na-
> tional security posture is especially acute with the
> recent rise in armed conflicts abroad.

*Id.* at 15043–44 (Preamble); *id.* at 15045 (§ 1).

Plaintiffs do not assert that they are entitled to sum-
mary judgment because EO '257 is wrong in its findings
about significant increases in the goods trade deficit in re-
cent years, generally and, in particular, *e.g.*, for agricul-
tural products. Nor do they deny that long-standing trade-
related conditions might, like conditions that lead to bank-
ruptcy, build gradually, but then suddenly reach a crisis
level. And they simply say nothing to show, much less to
support summary judgment in their favor, that the litany
of negative effects of present-day trade deficits enumerated
in EO '257 are usual or ordinary. Thus, they have made no
case for entitlement to summary judgment that there is no
unusual and extraordinary threat addressed by the recip-
rocal tariffs or, accordingly, that the reciprocal tariffs are
unauthorized by section 202.

### 2. IEEPA § 203

Regarding IEEPA's section 203 [50 U.S.C. § 1702],
plaintiffs argue that all the tariffs at issue (reciprocal and
trafficking) fall outside the set of authorities granted to the
President in that section. Private Appellees Brief at 19–
26; *see*, *e.g.*, State Appellees Brief at 11–17, 20, 32–51. We
reject the several arguments they present for limiting the
broad scope of section 203's authorization to "regulate . . .
importation." The CIT did not rely on such arguments or
so hold. Instead, the CIT held, for the reciprocal tariffs,
that IEEPA is displaced by another statute (section 122 of
the Trade Act of 1974 [19 U.S.C. § 2132]), as discussed

further *infra* in Section II.A.3.  Today's majority, however, holds that "regulate . . . importation" does not authorize the tariffs at issue here.  The majority opinion does not deny that some tariffs might be authorized, while Judge Cunningham's opinion does; the majority holds that section 203 of IEEPA includes some temporal and/or duty amount and/or scope limits that, in turn, the present tariffs violate.  We disagree with the no-tariffs and not-these-tariffs positions concerning the scope of section 203 of IEEPA.

a. Coverage of Tariffs by "Regulate . . . Importation"

Plaintiffs argue that "regulat[ing] . . . importation" does not include imposing tariffs.  Private Appellees Brief at 20–25; State Appellees Brief at 32–51.  We disagree.

Definitions of the term "regulate" provide broad understandings of the term's ordinary meaning: to "fix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws."  Black's Law Dictionary 1156 (5th ed. 1979); *see also* Webster's Third New International Dictionary 1913 (1976) (defining "regulate" as "to govern or direct according to rule" and "to bring under the control of law or constituted authority").  As the government states in its opening brief, "[i]mposing tariffs on imports is clearly a way of 'control[ling]' imports (*Black's*); 'govern[ing] or direct[ing]' them 'according to rule' (*Webster's*); 'adjust[ing]' them 'by rule, method, or established mode' (*Black's*); or, more generally 'subject[ing]' them 'to governing principles or laws' (*Black's*)."  Government's Opening Brief at 32 (first alteration added).

This straightforward result is supported by the longstanding judicial recognition that taxes are often a species of regulation—specifically aimed at altering conduct.  *See*, *e.g.*, *CIC Services, LLC v. Internal Revenue Service*, 593 U.S. 209, 224 (2021) (a "regulatory tax" is a "tax designed mainly to influence private conduct"); *National Federation of Independent Business v. Sebelius*, 567 U.S. 519,

567 (2012) (*NFIB*) (explaining that "taxes that seek to in-fluence conduct are nothing new" and that "[s]ome of our earliest federal taxes sought to deter the purchase of im-ported manufactured goods in order to foster the growth of domestic industry"); *Sunshine Anthracite Coal Co. v. Ad-kins*, 310 U.S. 381, 393 (1940) (explaining that a tax can in "purpose and effect" be "primarily a sanction to enforce . . . regulatory provisions" of a statute and that "[t]he power of taxation, granted to Congress by the Constitution, may be utilized as a sanction for the exercise of another power which is granted it"); *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937) (explaining that "[e]very tax is in some measure regulatory").  With respect to imports particu-larly, the Supreme Court in *Gibbons v. Ogden* explained long ago that "duties may often be, and in fact often are, imposed on tonnage, with a view to the regulation of com-merce" and that, indeed, "[t]he right to regulate commerce, even by the imposition of duties, was not controverted" by the Framers.  22 U.S. (9 Wheat.) 1, 202 (1824).[6]  And our

---

[6]  The Court made this observation in rejecting re-spondent Ogden's argument that New York could ban com-peting interstate-waterway boat services even when offered by persons given a federal license under a federal statute.  Ogden argued that the commerce power of Art. I, § 8, cl. 1, cl. 3, is not preemptive (to use modern language) because the separately stated power to impose duties, Art. I, § 8, cl. 1, was not generally preemptive.  *Gibbons*, 22 U.S. (9 Wheat.) at 201–02.  The premise as to import duties, the Court agreed, was supported by the fact that the Framers saw fit to include a separate provision barring States from imposing import duties.  *See id.*; Art. I, § 10, cl. 2.  But Og-den's proposed conclusion did not follow, the Court held, because duties could be *both* regulatory *and* aimed to rais-ing revenue, and the Framers banned all such duties, as "a prudent precaution," to avoid the need for sifting.  *Gibbons*,

predecessor court, in *Yoshida CCPA*, observed: "Though the power to tax and to lay duties upon imports and the power to regulate commerce are distinct, it is well established that the first power can be employed in the exercise of the second." *Yoshida CCPA*, 526 F.2d at 575 n.20 (citing not only the above-quoted page of *Gibbons*, but also *McGoldrick v. Gulf Oil Corp.*, 309 U.S. 414, 428 (1940); *Board of Trustees v. United States*, 289 U.S. 48, 58 (1933); and *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 411 (1928)).

Context is always relevant to interpretation, and in the context of IEEPA's section 203, the natural reading of "regulate" in the phrase "regulate . . . importation" is one that

---

22 U.S. (9 Wheat.) at 202. The § 10, cl. 2 ban therefore did not imply that, for all regulatory measures, action by Congress under the Commerce Clause was not preemptive.

It is the Court's recognition of the common understanding that duties are often a form of "regulation" that is key for present purposes, not that Article I states both a taxing power and the commerce power. The Court held in *NFIB* that the imposition at issue, though plainly regulatory, was a valid exercise of the taxing power, 567 U.S. at 567, but was not a valid exercise of the commerce power only because its subject was not commercial activity but inactivity, *id.* at 549–58. Relatedly, that one object of "regulation" is "exportation" in IEEPA § 203(a)(1)(B) [§ 1702(a)(1)(B)], and one type of regulation may be independently unconstitutional for exported articles, Art. I, § 9, cl. 5, does not in our view undermine the strong reasons that "regulate" includes tariffs in IEEPA § 203(a)(1)(B) at least where no independent constitutional bar exists. *Cf. Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42, 61 (2024) (declining to "disregard the statute's clear terms" just because there may be "a valid constitutional defense" to some applications).

embraces tariffs.  The provision includes authorization for the extreme tools of "prohibit[ing]" and "prevent[ing]" importation (and a host of related tools).  § 203(a)(1)(B) [50 U.S.C. § 1702(a)(1)(B)].  Taxing through tariffs is just a less extreme, more flexible tool for pursuing the same objective of controlling the amount or price of imports that, after all, could be barred altogether.  The context also includes IEEPA's positive emphasis on breadth when it gives the President authority to act by "means of instructions, licenses, *or otherwise*."  § 203(a)(1) [§ 1702(a)(1)] (emphasis added); *see also Yoshida CCPA*, 526 F.2d at 576 ("The words 'or otherwise,' if they mean anything, must mean that Congress authorized the use of means which, though not identified, were different from, and additional to, 'instructions' and 'licenses.'").

We know of no persuasive basis for thinking that Congress wanted to deny the President use of the tariffing tool, a common regulatory tool, to address the threats covered by IEEPA.  Indeed, a contrary conclusion about the IEEPA language, "regulate . . . importation," would seem to deny the President tariffing authority even in a time of war, because the language of TWEA is identical.  The Supreme Court has recognized "the broad authority of the Executive when acting under th[e] congressional grant of power" provided in section 203.  *Dames & Moore*, 453 U.S. at 672.  Given the surrounding terms and the evident goal, *i.e.*, given this linguistic and substantive context, there is every reason to understand "regulate" to include, not exclude, such an ordinary tool of import regulation as tariffing.[7]  Although a similar conclusion presumably would not be justified for some or many other uses of the word "regulate"

---

[7]  IEEPA enumerates exceptions to the President's authority under section 203.  IEEPA § 203(b) [§ 1702(b)].  Tariff authority is not included in the enumerated exceptions.

in the United States Code, *see* Maj. Op. at 29–30, that fact does not weaken the conclusion that "regulate" as used in the IEEPA statute includes tariffs.

Congressional usage elsewhere is consistent with this conclusion. For example, ever since 1934, when it added section 350 to the Tariff Act of 1930, Congress has expressly recognized that import duties are a form of "regulation" of imports. Reciprocal Trade Agreements Act of 1934, Pub. L. No. 73-316, § 1, 48 Stat. 943, 943–44 (1934) (defining "duties and other import restrictions" as including "(1) rate and form of import duties and classification of articles, and (2) limitations, prohibitions, charges, and exactions other than duties, imposed on importation or imposed for regulation of imports") (current version at 19 U.S.C. § 1351(c)(1)(A)–(B)). Similarly, in section 122(a) of the Trade Act of 1974, Congress expressly used the phrase "*restrict* imports" to cover duties. 88 Stat. at 1978 (codified at 19 U.S.C. § 2132(a)) (emphasis added); *see also*, *e.g.*, S. Rep. No. 93-1298, at 24 (referring to an "import surcharge" as a type of "[i]mport restriction[]" and discussing "a temporary reduction in the rate of duty . . . or a temporary suspension of other import restrictions"); *id.* at 69 (discussing "existing duties or other import restrictions"). These usages confirm the natural meaning of "regulate" as including tariffs when the object is to control imports.

The majority notes that a variety of statutes use "tariff" or "duty" or the like when conveying presidential authority, whereas IEEPA does not. Maj. Op. at 27. But as the Supreme Court recently reiterated, "Congress need not state its intent in any particular way, or use magic words," even to waive sovereign immunity, explaining that (on the particular issue presented) "even if Congress typically confers the authority to settle claims by use of the term 'settle,' that standard practice does not bind legislators to specific words or formulations." *Soto v. United States*, 605 U.S. 360, 371 (2025) (internal quotations and citation omitted). Context can establish the authorization without a particular word.

*Id.* at 368. Here, the usage in the other cited statutes is hardly surprising, because Congress in those statutes was overwhelmingly focused on tariff issues. In contrast, Congress in IEEPA (as in TWEA) was focused on the subject of emergencies and giving plainly broad emergency authority regarding foreign property. In this context, breadth is the proper lesson, without need for a listing of specific common tools for achieving the evident legislative objective.

The Supreme Court's decision in *Federal Energy Administration v. Algonquin SNG, Inc.* supports this interpretation. 426 U.S. 548 (1976). The Court there held that the language "adjust imports" in section 232(b) of the Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872, 877 (codified as amended at 19 U.S.C. § 1862(b)–(c)), is not confined to "imposition of quotas" but includes "imposition of monetary exactions—*i.e.*, license fees and duties." *Algonquin*, 426 U.S. at 561–62. The Court readily deemed such exactions to be within the natural scope of the language as a means of "adjust[ing] imports," *id.* at 561, though section 232(b) makes no reference to "duties." And it did so without any reliance on or even mention of the fact that section 232(a) [§ 1862(a)] refers to duties in preserving the effects of certain earlier laws.[8] The Court also

———————————

[8] Nor did the Court rely on any heading or title. Section 232 as enacted and amended contains no heading except the section title "Safeguarding National Security." *See* Trade Expansion Act of 1962, 76 Stat. at 877; Trade Act of 1974, tit. 2, § 127, 88 Stat. at 1993; Crude Oil Windfall Profit Tax Act of 1980, Pub. L. No. 96-223, § 402, 94 Stat. 229, 301 (1980); Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1501, 102 Stat. 1107, 1257–60 (1988). Congress, while recognizing that the codifiers placed section 232 in Title 19 of the United States Code,

explained that "limiting the President to the use of quotas would effectively and artificially prohibit him from directly dealing with some of the very problems against which § 232(b) is directed." 426 U.S. at 561–62. So too here: An exclusion of tariffs, a common tool of import regulation, would be an "artificial" prohibition not grounded in the natural scope of the language of IEEPA's section 203.

Such a limitation would be especially out of place in an emergency statute like IEEPA, for which restricting "flexibility required to meet problems" is particularly unlikely. *Yoshida CCPA*, 526 F.2d at 573; *id.* at 578 & n.28 (stating that "Congress necessarily intended a grant of power adequate to deal with national emergencies" and referring to "the flexibility imperative inherent in the delegation of emergency powers"). And it would be out of keeping with "the principle that statutes granting the President

_____

see, *e.g.*, Trade Act of 1974, tit. 2, § 127, 88 Stat. at 1993, has not enacted Title 19 into positive law.

The majority suggests that the Court in *Algonquin* found duties to be within "adjust imports" because it found that the statute's concern with national security is related only to imports' "use," "availability," and "character" and is "not related to quantity of imports." Maj. Op. at 29 (citing 526 U.S. at 561 (quoting 104 Cong. Rec. 10542–43 (1958) (remarks of Rep. Mills))). The cited passage notes "Congress' judgment that '*not only* the quantity of imports . . . but *also* the circumstances under which they are coming in: their use, their availability, their character' could endanger the national security." *Algonquin*, 426 U.S. at 561 (quoting 104 Cong. Rec. 10542–43 (remarks of Rep. Mills)) (emphases added). This statement of the breadth of congressional concern only reinforced the natural meaning of "adjust imports" and confirmed that denying duty coverage would "artificially prohibit" the President from dealing with the congressionally identified problem. *Id.* at 562.

authority to act in matters touching on foreign affairs are to be broadly construed," *B-West Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996), consistent with the history of, and recognized reasons for, broad delegations to the President involving such matters, *see, e.g.*, *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 109–10 (1948) (citing *Norwegian Nitrogen Co. v. United States*, 288 U.S. 294 (1933), and *George S. Bush & Co.*, 310 U.S. 371); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319–20 (1936); *Hamilton v. Dillin*, 88 U.S. (21 Wall.) 73, 93 (1874).

The background of IEEPA powerfully supports this straightforward conclusion from the text. The Supreme Court has explained that the "pertinent language of [section] 1702[, IEEPA's section 203,]" was "directly drawn" from section 5(b) of TWEA. *Dames & Moore*, 453 U.S. at 671; *see Regan v. Wald*, 468 U.S. at 228 (explaining that IEEPA granted the President authorities that "are essentially the same as those in [section] 5(b) of TWEA"). This is self-evident from a comparison of the language of IEEPA and TWEA, set forth *supra* at p. 9 (TWEA section 5(b)) and pp. 12–13 (IEEPA section 203). Importantly, in late 1975, our predecessor court, with generally exclusive appeals-court-level jurisdiction in the area, *see North American Cement Corp. v. Anderson*, 284 F.2d 591, 592 (D.C. Cir. 1960), held in *Yoshida CCPA* that the TWEA "regulate" language does embrace the authority to impose tariffs as a tool of regulation, 526 F.2d at 576 (concluding that "regulation importation" encompasses "imposing an import surcharge").

The *Yoshida CCPA* decision was known to those in Congress who were working on the emergency-law issue and what to do about TWEA particularly. *See, e.g.*, Emergency Controls on International Economic Transactions, Hearings on H. R. 1560 and H. R. 2382 and Markup of the Trading with the Enemy Reform Legislation before the Subcommittee on International Economic Policy and Trade

of the House Committee on International Relations, 95th Cong., 1st Sess., at 9, 18, 223 n.6 (1977) (commenting on the *Yoshida CCPA* decision, and its holding that TWEA includes the imposition of duties, in hearings covering the markup of TWEA reform legislation). In late 1977, Congress enacted IEEPA by borrowing the very language from TWEA that *Yoshida CCPA* had construed to include tariffs. Such an enactment after our predecessor court had so ruled is itself significant confirmation of the tariff-including interpretation of "regulate . . . importation," which is the most natural meaning. *Cf. Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.*, 586 U.S. 123, 131 (2019) (noting congressional reenactment of pertinent statutory language after Federal Circuit confirmed the meaning of the language suggested by Supreme Court authorities). Even more pointed confirmation comes from the fact that the key committee report explaining the legislation that enacted IEEPA discusses *Yoshida CCPA* and indicates no disagreement or disapproval, H. R. Rep. No. 95-459, at 5 (acknowledging that *Yoshida CCPA* concluded that TWEA "authorized imposition of duties"), and the Senate thereafter neither made any relevant change in the language to preclude continued interpretation of "regulate . . . importation" to include import duties nor registered any disagreement with that decision, S. Rep. No. 95-466, at 2, 5 (1977).

In light of all the foregoing, we would hold, as our predecessor court did in *Yoshida CCPA*, that tariffing is within the language of "regulate . . . importation" in this broad grant of emergency authorities.

### b. Majority's Narrowing Constraints

The majority today holds that, even if imposing tariffs can be a form of "regulat[ing] . . . importation" under section 203 of IEEPA, the President must act within some set of limits that the majority sketches but does not define. The majority suggests that the President must announce any such tariffs as temporary, limit them to some subset of

imported articles, and/or constrain them by some maximum rate prescribed elsewhere by Congress. Maj. Op. at 17, 37–41. The majority mentions three features of the 1971 Presidential Proclamation at issue in *Yoshida CCPA* as a source for its suggestion: a statement in the proclamation that the surcharge imposed there was "temporary"; a provision capping the proclamation-imposed tariff surcharge for all imports at rates elsewhere set by Congress for imports from just a small number of countries (so-called "column 2" rates); and the imposition of the surcharge only on non-duty-free imports and imports that were the subject of concessions in trade agreements. Maj. Op. at 39–40 (citing *Yoshida CCPA*, 526 F.2d at 577–78).[9] The majority relies on such constraints in the 1971 Presidential Proclamation as invalidating the reciprocal tariffs—and the trafficking tariffs as well. But there is no textual support in section 203 of IEEPA for these constraints or other sound basis for adopting such constraints. Nor do we read *Yoshida CCPA*'s interpretation of "regulate . . . importation"—as authorizing the imposition of duties—to be confined to the facts of the 1971 proclamation.

---

[9] For almost all countries, the 10% surcharge imposed by the 1971 proclamation was not capped by the rate (even the non-concession rate) Congress had otherwise prescribed for imports from the particular country, which for almost all countries was the rate specified in column 1. Rather, the 10% surcharge was capped, for goods from all countries, only by the rate Congress had set for specifically identified "Communist Countries" for the same goods (in column 2), *see* U.S. Tariff Commission, Tariff Schedules of the United States Annotated at 3–4 (1971). 85 Stat. at 927–28. Today, HTSUS General Note 3(b) states that the column 2 rates apply to Belarus, Cuba, North Korea, and the Russian Federation. General Note 3(b), HTSUS (2025).

i

Regarding the temporal constraint, we first note that the majority does not say that the presidential announcement must set a specified end point. The 1971 Presidential Proclamation did not set an end point. All it did was use the word "temporary" in the heading ("Temporary Modifications for Balance of Payments Purposes"), 85 Stat. at 927—while also stating in the actual prescribing language that the surcharges "*shall continue in effect until modified or terminated* by the President or by the Secretary of the Treasury," *id.* (subpart C, paragraph 2) (emphasis added), and declaring that the Secretary may, among other things, "*reimpose the rate of additional duty* herein . . . if he determines that such action is consistent with safeguarding the balance of payments position of the United States," *id.* at 928 (subpart C, paragraph 4) (emphasis added).

But if mirroring the 1971 Presidential Proclamation is what the majority means to require, what must count is substance, not the mere use or non-use of the word "temporary." And in substance, there is no material difference between the 1971 Presidential Proclamation and the tariffs at issue here. For one thing, the executive orders here have a presumptive expiration date on the tariffs: Under the NEA, the underlying emergency expires after a year unless renewed. They could be renewed, of course, but the 1971 Presidential Proclamation itself, which contains no presumptive expiration date, is express that the surcharge imposed there might be reimposed, and the President could in any event have issued a new proclamation. Likewise, the executive orders here indicate that the measures imposed will last until changed or removed, and they contemplate downward change if the problem being addressed is sufficiently resolved. *See* EO '257, 90 Fed. Reg. at 15047 (§ 4) (reciprocal tariffs); EO '193, 90 Fed. Reg. at 9115 (§ 3) (Canada trafficking tariff); EO '194, 90 Fed. Reg. at 9119 (§ 3) (Mexico trafficking tariff); EO '195, 90 Fed. Reg. at

V.O.S. SELECTIONS, INC. v. TRUMP

9123 (§ 3) (China trafficking tariff).[10]  So, too, the 1971 proclamation states that the surcharge lasts until changed. The majority thus cannot find in a comparison to the 1971 proclamation upheld in *Yoshida CCPA*, as recognized in the lead-up to the enactment of IEEPA, a basis for finding a crucial temporal limitation that is missing from the tariffs at issue here.

IEEPA itself supplies no basis for whatever affirmative requirement of temporariness the majority has in mind as a ground for invalidating the tariffs at issue.  Section 203 of IEEPA [50 U.S.C. § 1702], in reciting the litany of presidential authorities, does not impose a requirement that they be "temporary."  Nor does section 202 of IEEPA [§ 1701].  Section 202 does contain two kinds of time limits. First, it ties the exercise of authority to a declaration of emergency, and that emergency, under the NEA, expires in a year unless renewed.  IEEPA § 202(a) [§ 1701(a)].  Second, it says that the President is limited to exercising the section 203 authorities to deal with an unusual and extraordinary threat (to specified U.S. interests, from foreign sources, and upon a declared national emergency).  IEEPA § 202(b) [§ 1701(b)].  But IEEPA does not prescribe a temporal limit on how long the threat (or underlying national emergency) lasts—which Congress cannot be understood to have assumed was predictable at the time of presidential action.  In fact, IEEPA has been used frequently by Presidents since 1977, and "[o]n average, emergencies invoking IEEPA last more than nine years," with "the length of emergencies invoking IEEPA . . . increas[ing] each decade." Congressional Research Service, C. Casey, D. Rennack, &

_____

[10]  For Canada and Mexico, the President quickly paused the imposition of tariffs when it looked like those countries were taking helpful steps.  Exec. Order No. 14197, 90 Fed. Reg. 9183 (Feb. 3, 2025); Exec. Order No. 14198, 90 Fed. Reg. 9185 (Feb. 3, 2025).

J. Elsea, The International Emergency Economic Power Act: Origins, Evolution, and Use at 17 (Jan. 30, 2024) (CRS IEEPA Study); *id.* at 58–63 tbl. A-1 (listing emergencies); *id.* at 66–86 tbl. A-3 (listing IEEPA-related executive orders); *see id.* at 25 ("IEEPA has served as an integral part of the postwar international sanctions regime"); *id.* at 55 ("IEEPA sits at the center of the modern U.S. sanction regime."). Thus, textually and as implemented for almost 50 years, the statute imposes no "temporariness" constraint that supplements what is inherent in section 202 of IEEPA and in the present tariffs—the status of the emergency declaration and the continuation of the unusual and extraordinary threat. Here, the CIT did not hold, the majority does not conclude, and plaintiffs have not argued that the actual identified threat has come to an end or that the courts can so determine and order termination of the tariffs. *Cf. Ludecke v. Watkins*, 335 U.S. 160, 166–73 (1948) (explaining that the termination of war is a political act left to treaty, legislation, or presidential proclamation).

The suggested constraints of some kind of cap in duty amount and some limitation of what products may be covered fare no better. As to the former: The executive orders do state specific duty amounts. They indicate that an increase might turn out to be warranted because of the threat, but such an increase would itself be embodied in a specification of duty amounts. And the duty amounts must reflect the requirement that section 203's authorities be exercised only to deal with the threat and for no other purpose. But nothing in IEEPA's text further restricts the rates of imposed tariffs.

Similarly, nothing in IEEPA's text requires mirroring the 1971 proclamation's limitation of the surcharge to imports that previously had been the subject of duties and concessions on trade agreements. That limitation was a choice the President made in 1971 to suit the overall mix of circumstances then faced, requiring judgment calls about the best way to proceed. Whatever constraints

affected the President's choice in 1971, nothing in IEEPA suggests the necessity of such a scope-of-imports limitation. And if there were such a limitation, there is no apparent reason it would not equally apply to all the non-tariff measures authorized by section 203, such as "prohibit[ion]." Since IEEPA's enactment in 1977, Presidents have regularly prohibited importation of *any* articles from specified countries, and the majority has not explained how its proposed scope-limiting approach could be squared with that historical practice. *See* CRS IEEPA Study at 66–86 tbl. A-3 (listing IEEPA-related executive orders that, *e.g.*, order that the "import" or "importation" of "any goods or services" or "any products" of Iraqi, Iranian, Sudanese, or Nicaraguan origin is "prohibited" (Exec. Order No. 12722, 55 Fed. Reg. 31803 (1990) (Iraq); Exec. Order No. 13059, 62 Fed. Reg. 44531 (1997) (Iran); Exec. Order No. 13067, 62 Fed. Reg. 65989 (1997) (Sudan) Exec. Order No. 14088, 87 Fed. Reg. 64685 (2022) (Nicaragua))).

In short, the majority's efforts at narrowing the section 203 tariff authorization (beyond the limits prescribed by section 202), besides being insufficiently defined, have no proper foundation in the statute.

ii

We see no sound rationale for adopting the non-text-based limitations suggested by the majority. In particular, the suggested limitations do not follow from the fact that Congress adopted the "regulate . . . importation" language soon after, and with expressed awareness of, the decision in *Yoshida CCPA*. That adoption does not play the role of a ratification that overrides an otherwise-clear contrary meaning. It merely confirms that Congress must have understood the meaning of the text that is already clear from ordinary textual analysis. Moreover, the three features of the 1971 Presidential Proclamation on which the majority focuses were merely among the *sufficient* conditions the CCPA cited for holding the 1971 tariffs to be authorized by

TWEA. Our predecessor court in *Yoshida CCPA* did not say that those facts were *necessary* or otherwise set an outer boundary of TWEA's authorization. Indeed, the CCPA stressed that TWEA provided a "broad and express" delegation to the President and that "presidential actions must be judged in the light of what the President actually *did*, not in light of what he could have done" or "what he *might do*." 526 F.2d at 573, 577, 583–84 (emphases added) (citation omitted). There was, in short, no ruling in *Yoshida CCPA* about conditions necessary under TWEA that Congress could have ratified.

Nor can the majority's suggestions be supported on a rationale that section 203 of IEEPA must be given a narrow enough scope—even in a non-textual way—to avoid finding presidential authorization to impose tariffs beyond the authorization provided by tariff laws generally. The CIT rightly refrained from any such conclusion.

It is the obvious role of emergency laws to confer authority that Congress has not conferred in non-emergency laws. Otherwise, the President would hardly need to rely on emergency laws, yet the President has repeatedly done so during our history. Congress understood this practical reality in the lead-up to its passage in 1977 of IEEPA. *See*, *e.g.*, 1974 Emergency Powers Report, at 1 (explaining in the second sentence of the report that John Locke "argued that occasions may arise when the Executive must exert a broad discretion in meeting special exigencies or 'emergencies' for which the legislative power has no relief and/or existing law will not grant necessary remedy"); *see generally id*. And Congress has long enacted broad emergency laws to play that role. *See* C. BRADLEY, HISTORICAL GLOSS AND FOREIGN AFFAIRS 174–78 (2024) (BRADLEY); *Dames & Moore*, 453 U.S. at 677–78 (noting, in an IEEPA case, that Congress has elsewhere shown its "acceptance of a broad scope for executive action in circumstances such as those presented" there and that IEEPA "delegates broad

authority to the President to act in times of national emergency with respect to property of a foreign country").

Logically, we see no sound basis for insisting that limits in non-emergency tariff authorizations be read into emergency authorizations. Such an insistence would run counter to the governing approach to interpreting "statutes touching on the same topic." *Kirtz*, 601 U.S. at 63. Courts are to apply a "strong presumption" that such statutes "coexist harmoniously" so as to preserve both. *Id.* at 63–64 (internal quotation marks and citation omitted). That presumption is overcome only if there is an "actual inconsistency*," see id.* at 64, or a party otherwise carries the "heavy burden" of showing a "clear and manifest" expression of congressional intent that one statute displaces the other, *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (internal quotation marks, alterations, and citations omitted); *see Kirtz*, 601 U.S. at 63–64. *See also J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred International, Inc.*, 534 U.S. 124, 144 (2001) (explaining that "this Court has not hesitated to give effect to two statutes that overlap, so long as each reaches some distinct cases" (citing *Connecticut National Bank v. Germain*, 503 U.S. 249, 253 (1992))).

To diminish the scope that IEEPA would otherwise have, the inquiry required would be a focused consideration of a particular non-IEEPA statute and a showing that the identified statute clearly contradicts IEEPA or otherwise expresses a clear intent to limit IEEPA. The CIT recognized as much by choosing to rely only on section 122 of the Trade Act of 1974 [19 U.S.C. § 2132] instead of tariff laws collectively. *See CIT Op.* at 1374–76. We address the specific section 122 issue next, and we disagree with the CIT's conclusion. But methodologically, the CIT was right not to narrow IEEPA based on a more general view that Congress has not conferred in its tariff laws collectively a general authority as broad as the "emergency economic powers" conferred by IEEPA.

Precedent confirms the correctness of the CIT's avoidance of such a rationale. That rationale would be much the same as the analysis rejected by the Supreme Court in *Algonquin*. The Supreme Court in that case was reviewing a holding of the D.C. Circuit that gave a limited reading to section 232(b) of the Trade Expansion Act of 1962, which grants (and then granted) the President special authority to "adjust the imports" of goods whose importation "threaten[s] to impair the national security." Trade Expansion Act of 1962 § 232(b) [50 U.S.C. § 1862(b)–(c)]; *see Algonquin*, 426 U.S. at 550, 557–58 (citations omitted). The D.C. Circuit held that the statute did not authorize the imposition of monetary duties on oil imports in the form of per-barrel license fees. *See Algonquin*, 426 U.S. at 557 (citations omitted). The D.C. Circuit reasoned that "reading the statute to authorize" such duties "'would be an anomalous departure' from 'the consistently explicit, well-defined manner in which Congress has delegated control over foreign trade and tariffs.'" *Id.* (quoting *Algonquin SNG, Inc. v. Federal Energy Administration*, 518 F.2d 1051, 1055 (D.C. Cir. 1975)). The Supreme Court reversed. It insisted on resolving the question simply by analyzing the terms of section 232(b), which it readily found broad enough to embrace the duties, 426 U.S. at 561–62, and confirming that the legislative history was not to the contrary, *id.* at 562–71. There was no specific statute contradicting the fair interpretation of section 232(b), and the Court gave no weight to the more general idea of anomaly on which the D.C. Circuit had relied.

Our predecessor court, in *Yoshida CCPA*, similarly rejected a gestalt-anomaly approach. It said that the Customs Court, in the decision under review, had treated an assortment of tariff statutes—"[t]he Tariff Act of 1930[,] and its amendments, the Trade Agreements Act of 1934, and its amendments, and the Trade Expansion Act of 1962[,] all providing tariff-making authority to the President, albeit with various limitations"—"as indicating a

congressional intent that such limitations should apply to any delegation of its tariff making authority." 526 F.2d at 578. The CCPA rejected that approach, stressing that "[t]he existence of limited authority under certain trade acts does not preclude the execution of other, broader authority under a national emergency powers act." *Id.*

In short, we find in IEEPA what must be considered an eyes-open choice of a broad standard. Such breadth is evident in the language and history of IEEPA. And it is confirmed by the fact that Congress took pains to impose exacting requirements for the President to involve Congress in the exercise of IEEPA authorities, from consultation at the outset to regular reporting afterward. IEEPA § 204 [50 U.S.C. § 1703]; *see supra* at pp. 13–14. Those demands are a strong indication that Congress knew it was giving broad powers to the President.

### 3. Displacement by 1974 Trade Act § 122

The CIT, not finding a limit within IEEPA that the reciprocal tariffs violated, ultimately held the tariffs unlawful on the ground that, even if IEEPA itself would support the reciprocal tariffs, section 122 of the Trade Act of 1974 [19 U.S.C. § 2132] "removes" any presidential authority under IEEPA for these tariffs. *CIT Op.* at 1375 ("Section 122 removes the President's power to impose remedies in response to balance-of-payments deficits, and specifically trade deficits, from the broader powers granted to a president during a national emergency under IEEPA by establishing an explicit non-emergency statute with greater limitations." (footnote omitted)). The CIT seems to have categorically concluded that section 122 displaces all "emergency"-action authority responding to a particular problem. *Id.* at 1374 (reasoning that Congress "cabined" the President's tariff authority to respond to the specified problem to the exercise of authority under "to non-emergency legislation"). The majority does not adopt this conclusion. And we conclude that this is not the proper

understanding of the relationship between IEEPA and section 122, at least as applied to the reciprocal tariffs here.

We have already recited the very demanding standard that must be met before a court, faced with two statutes that overlap in subject matter, may declare one to displace the other rather than give full effect to both as complementary. A contradiction or expressions of Congress's clear, manifest intent to displace that statute is required. *See supra* at p. 44. The plaintiffs do not present arguments consistent with this demanding standard. *See, e.g.*, Private Appellees Brief at 25–37; State Appellees Brief at 11–23. Applying that standard, we conclude that section 122 does not displace IEEPA authority as relevant here.

As already noted, section 122 was part of the Trade Act of 1974 and grew out of the 1971 Presidential Proclamation that responded to a "monetary crisis." *CIT Op.* at 1374. Section 122(a) states:

> Whenever fundamental international payments problems require special import measures to restrict imports—
>
>> (1) to deal with large and serious United States balance-of-payments deficits,
>>
>> (2) to prevent an imminent and significant depreciation of the dollar in foreign exchange markets, or
>>
>> (3) to cooperate with other countries in correcting an international balance-of-payments disequilibrium,
>
> the President shall proclaim, for a period not exceeding 150 days (unless such period is extended by Act of Congress)—
>
>> (A) a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already

> imposed, if any) on articles imported into the United States;
>
> (B) temporary limitations through the use of quotas on the importation of articles into the United States; or
>
> (C) both a temporary import surcharge described in subparagraph (A) and temporary limitations described in subparagraph (B).

Trade Act of 1974 § 122, 88 Stat. at 1987–88 [19 U.S.C. § 2132(a)]. Under this language, the necessary threshold condition for application of this provision is the existence of "fundamental international *payments* problems." *Id.* (emphasis added). When there are such payments problems, *and* those problems in turn require special measures "to restrict imports" for any of the three enumerated purposes (*e.g.*, to reduce the need for foreign currency by reducing imports), the President must take certain actions (presumptively, as the President may decline to impose "import restrictions" if such impositions are contrary "to the national interest," Trade Act of 1974 § 122(b), 88 Stat. at 1988 [§ 2132(b)]. Among the presumptively mandatory actions are tariff surcharges of up to 15% for up to 150 days.

Neither section 122 of the Trade Act of 1974 nor IEEPA completely overlaps the other: For example, IEEPA applies to national security and foreign policy threats well outside section 122, and section 122 applies even where the relevant circumstances do not rise to the level of a national emergency. In any event, (1) the two statutes are not contradictory for the problem addressed by the reciprocal tariffs and (2) there is no clear and manifest intent that this problem is to be addressed by, and only by, the measures specified in section 122.

First, section 122 and IEEPA do not contradict each other regarding the circumstances presented by the

reciprocal tariffs.  Of course, for certain goods trade defi-cits, both statutes might apply—but a goods trade deficit *alone* is not enough for application of either IEEPA or sec-tion 122.  As already discussed, *see supra* at pp. 25–28, problems may or may not arise from goods trade deficits at all, and different kinds of problems may arise separately and at different times.  Here, the problems addressed by the reciprocal tariffs (imposed under IEEPA) are not the problems addressed by the terms of section 122, and that is reason enough to conclude that section 122 does not dis-place IEEPA's coverage to the reciprocal tariffs.

More specifically, the reciprocal tariffs rest on the find-ing that a goods trade deficit has given rise to a variety of domestic problems centered on manufacturing deficiencies. *See supra* at pp. 26–28.  It is those problems which underlie the national emergency declared with respect to the unu-sual and extraordinary threat, thus triggering application of IEEPA.  EO '257 contains no finding that there even is an overall balance-of-payments deficit, which considers not just transactions in goods but also services, capital invest-ments, and other international transactions.[11]  Moreover,

---

[11]   A textbook from the time explains balance-of-pay-ments accounting.  P. KENEN & R. LUBITZ, INTERNATIONAL ECONOMICS at 52–78 (3d ed. 1971).  It breaks down the ledger of this "double-entry bookkeeping" system into a "current" account showing "flows of goods and services" and a "capital" account showing "lending and investment" on one side and a "cash" account showing "how cash balances and short-term claims have changed in response to current and capital transactions" on the other, the two sides having to balance because "[a]ll current and capital account trans-actions must have cash or credit counterparts."  *Id.* at 53–55; *see also CIT Op.* at 1375.  Trade in goods is therefore just one part of the set of transactions covered by the

and sufficient for our conclusion that the statutes do not contradict each other as relevant here, the reciprocal tariffs do not in any way focus on "fundamental international *payments* problems." Trade Act of 1974 § 122(a) [§ 2132] (emphasis added); *see generally* EO '257. Such problems concern the payments (financial, cash) side of the accounting statement, which involves the reserves of currencies (or their substitutes like gold) and the operation of foreign-exchange markets that determine the ability of persons from one country to acquire another country's currency needed to make the foreign purchases or investments reflected in the current and capital accounts.[12] That is the nature of

--------------------

overall balance of payments, which also includes services and capital investments (on the transactions side of the ledger) and payments (on the payments side). *Compare* § 122(a) (referring to "balance-of-payments") *with* § 122(c) (referring to "balance-of-trade"); *see* S. Rep. No. 93-1298, at 87–89 (explaining change of terminology); H. R. Rep. No. 93-1644, at 27 (1974) (acknowledging and receding to Senate's change of terminology).

[12] *See* KENEN & LUBITZ at 57–58 (noting that a "gap between gross payments *from* the United States and gross payments *to* the United States" (the "*gross payments deficit*") "is not necessarily a 'bad thing,'" but can become "dangerous" by "cut[ting] so deeply into *cash* holdings that a country can no longer cope with unplanned deficits arising from cyclical and other disturbances"); *id.* at 58 (noting variety of "chain[s] of events" needed to "decrease the American demand for foreign currencies and increase the foreign demand for U.S. dollars" so as to "reduce the gross payments deficit and restore equilibrium in the foreign-exchange market by forestalling further changes in the banks' working balances," depending on "the extent to which exchange rates are free to fluctuate" and "the way each country's money supply is connected to its gold and

the problem underlying the 1971 Presidential Proclamation on which section 122 was based, *see CIT Op.* at 1374; *Yoshida CCPA*, 526 F.2d at 567 & n.3, 580, and section 122 is limited to some subset of such "fundamental international *payments* problems," Trade Act of 1974 § 122(a) [§ 2132] (emphasis added).[13]

Thus, section 122 does not apply to the problems underlying the reciprocal tariffs, which are not the payments problems that are the precondition to section 122's application. Even if section 122 is the exclusive authority for presidential action to address some problems, it is not exclusive for the problem at issue here—and certainly not clearly so.[14]  For this reason alone, applying IEEPA here does not

---

foreign-exchange holdings"); *id.* (identifying "*excess demand* for foreign currency (an *excess supply* of dollars) in the foreign-exchange market," which is the "*net payments deficit*," as "the best available measure of payments disequilibrium because . . . it corresponds to the actual excess supply of dollars in the foreign exchange market" that "must be either eliminated or financed").

[13]  The original Administration proposal for what became section 122 did not contain that language.  *See* H. R. 6767, 93d Cong., 1st Sess. (Apr. 10, 1973) (§ 401).  The House Committee on Ways and Means added the language, after hearings, when it introduced and soon reported out the bill that became law, H. R. 10710, 93d Cong., 1st Sess. (Oct. 3, 1973).  *See* H. R. Rep. No. 93-571, at 27–28, 97–98, 199–200.

[14]  The *Yoshida CCPA* court stated, in dictum, that future presidential actions "must . . . comply" with section 122.  526 F.2d at 582 n.33.  That point must be understood as limited to the particular "balance of payments problems" actually covered by section 122, namely, a subset of "fundamental international payments

contradict section 122, and section 122, which is readily read as not prescribing anything for the problem addressed in the reciprocal tariffs, does not express a clear, manifest intent to displace the emergency authority of IEEPA.

Second, even aside from the foregoing, there is no clear, manifest intent to displace emergency authority, which resided in TWEA at the time of section 122's enactment and would come to reside in IEEPA in 1977. Section 122 does not contain any "notwithstanding any other provision of law," displacement-of-other-authority, or exclusivity language at all. The statutory language provides no indication that Congress intended section 122 to be the exclusive authority for the President to impose tariffs to address all balance-of-payments problems, let alone all possible effects of trade deficits. All it says is that whenever there is the identified precondition, there is a presumptive mandate for presidential action, and all the language does is set a percent and time limit on that presumptively mandatory measure. It says nothing to negate otherwise-available presidential authority.

Third, and independently sufficient, the CIT recognized that section 122 addresses "*non*-emergency" situations. *CIT Op.* at 1374 (emphasis added). It is implausible to suggest that Congress, in acting to supply special presidential authority (indeed, presumptive duties) for certain surcharges even when the given problem was not an emergency, was implicitly denying the President otherwise-available authority to address the given problem when it rose to the level of an emergency. It is far more plausible that Congress was leaving any emergency authority unimpaired but adding non-emergency authority.

_____

problems"—which do not include the problems identified in the reciprocal tariffs.

Legislative history indicates that this is just what the key Senate committee understood.  That committee recognized that other statutes, including TWEA, might well provide overlapping authority in the balance-of-payments context.  In its November 1974 report, the committee mentioned the Customs Court's July 8, 1974 decision in *Yoshida International, Inc. v. United States,* 378 F. Supp. 1155, 1168–76 (Cust. Ct. 1974), which held that TWEA did *not* authorize import-duty surcharges (such as the surcharge imposed by the 1971 Presidential Proclamation, based on a payments crisis).  S. Rep. No. 93-1298, at 88. The Committee referred to the decision and recognized that it might be reversed on appeal:

> The importance of providing such authority [under section 122] is manifest in the light of the recent decision by the United States Customs Court which held that the 10 percent import surcharge imposed temporarily in August of 1971 was without advance authority.  If that position is upheld on appeal it could involve a substantial loss of revenue to the U.S. Treasury and windfall gains to those importers who passed on the import surcharge to consumers.  While the Committee does not wish to take a position one way or the other on the validity of the 1971 surcharge, it does feel the Executive ought to have explicit statutory authority to impose certain restrictions on imports for balance of payments reasons.

*Id.*  Despite recognizing that TWEA might authorize import-duty surcharges to address balance-of-payments problems, and despite making other changes in the House bill that had come to it, the Senate committee did not include any "notwithstanding any other authority," displacement-of-other-authority, or exclusivity language.  The committee, instead, simply added an express authority applicable even when there was no emergency, indeed made the

President's exercise of that authority presumptively mandatory, and set limits on *that* authority.

Finally, when Congress enacted IEEPA in 1977—after section 122 was enacted—it did not adopt any language narrowing presidential authority wherever it would touch on topics addressed in section 122. And the key committee report does not indicate any (unenacted) intent to do so. *See generally* S. Rep. No. 95-466. The relationship between IEEPA and section 122 is therefore subject to the general principle governing judicial handling of overlapping statutes. Under that principle, section 122 does not displace IEEPA, at least for purposes of the reciprocal tariffs.

### 4. Major Questions Doctrine

Moving past ordinary statutory analysis, plaintiffs (and the majority) invoke the "major questions doctrine" (or canon) to argue that we should reach a statutory result contrary to the conclusions we have drawn about IEEPA (including that it is not displaced by section 122 of the Trade Act of 1974). Private Appellees Brief at 46–54; State Appellees Brief at 12–18. Under that doctrine (or canon), in "certain extraordinary cases," circumstances give "reason to hesitate before concluding that Congress meant to confer" the authority needed to uphold a challenged government action. *West Virginia v. Environmental Protection Agency*, 597 U.S. 697, 723, 721 (2022) (internal quotation marks and citation omitted). The doctrine has supported rejection of the statutory claim when, in light of several contextual features such as narrowness of the statutory words at issue, "common sense as to the manner in which Congress would have been likely to delegate such power . . . made it very unlikely that Congress had actually done so." *Id.* at 722–23 (cleaned up) (internal quotation mark and citation omitted); *see id.* at 724 (determination is whether authority claimed is "beyond what Congress could reasonably be understood to have granted"); *see Biden v. Nebraska*, 600 U.S. 477, 518–19 (2023) (Barrett, J.,

concurring) (explaining that it is relevant whether the asserted power is within the delegatee's "wheelhouse"). We see no convincing basis in that doctrine for altering the statutory conclusion we have reached.

The language of IEEPA is undeniably broad on its face. It lists a host of powers—some (such as prohibition and prevention) even more restrictive than tariffing. There is no suggestion that the IEEPA-specified authority must be exercised only for specified types of products or only for a narrow set of countries. *See supra* at pp. 41–42. The facially evident intent is to provide flexibility in the tools available to the President to address the unusual and extraordinary threats specified in a declared national emergency. This is not an "ancillary," "little used backwater" provision, *West Virginia*, 597 U.S. at 710, 730, or a delegation outside the recipient's wheelhouse.

The breadth is anything but surprising in the context here. As Justice Kavanaugh recently reiterated in explaining why the canon has not been applied "in the national security or foreign policy contexts," "the canon does not reflect ordinary congressional intent" in these contexts because "the usual understanding is that Congress intends to give the President substantial authority and flexibility to protect America and the American people." *Consumers' Research*, 145 S Ct. at 2516 (Kavanaugh, J., concurring); *see id.* (describing major questions doctrine as having been applied "in the domestic sphere," and citing authorities, none of which involve foreign affairs). There is simply no "common sense" expectation in the present context, involving emergencies touching foreign affairs, that Congress was unlikely to be granting the authority at issue. The facial breadth in an emergency context makes the straightforward application of the statute's words hardly "'unheralded,'" *West Virginia*, 597 U.S. at 722 (quoting *Utility Air Regulatory Group v. Environmental Protection Agency*, 573 U.S. 302, 324 (2014)), and if a more specific herald is needed, *see Biden*, 600 U.S. at 506 (requiring "clear

congressional authorization" for certain agency actions), it is present in the 1971 proclamation, *Yoshida CCPA*, and subsequent congressional adoption of the relevant language in 1977.

For those reasons, we conclude that the essential premise for using the major questions doctrine to reject the claimed authority for the challenged action is missing here. Congress very clearly made a broad delegation here, as in other emergency-authority delegations. Whether to provide such delegations is certainly open to policy debate, as it carries obvious risks, *see Yoshida CCPA*, 526 F.2d at 583–84, and such debate has occurred over the decades, but the policy debate is not for us to resolve. We do not see IEEPA as anything but an eyes-open congressional choice to confer on the President "broad authority" to choose tools to restrict importation when the IEEPA section 202 standards are met. *Dames & Moore*, 453 U.S. at 677. We therefore see no reason to pull back from the statutory conclusions we have reached above.

### 5. Constitutional Nondelegation Doctrine

Plaintiffs argue that IEEPA is an unconstitutional delegation of legislative authority to the President, *i.e.*, violates the nondelegation doctrine. Private Appellees Brief at 54–62; State Appellees Brief at 18–20. The Supreme Court has not ruled on the issue, though it has upheld action under the statute. *E.g.*, *Dames & Moore*, 453 U.S. at 672, 677–78. All the courts of appeals to have considered the question have rejected such challenges. *United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 820 (2024); *United States v. Amirnazmi*, 645 F.3d 564, 577 (3d Cir. 2011); *United States v. Dhafir*, 461 F.3d 211, 215–17 (2d Cir. 2006); *United States v. Arch Trading Co.*, 987 F.2d 1087, 1092–94 (4th Cir. 1993); *see also United States v. Mirza*, 454 F. App'x 249, 255–56 (5th Cir. 2011) (non-precedential). On the state of the

longstanding case law on the subject, we too reject the non-delegation-doctrine challenge.

The general standard for determining whether Congress had unconstitutionally delegated the legislative power assigned to it by Article I of the Constitution requires two elements to be supplied by Congress—an understandable statement of "the general policy that the agency must pursue" and understandable "boundaries," *i.e.*, "sufficient standards to enable both the courts and the public [to] ascertain whether the agency has followed the law." *Consumers' Research*, 145 S. Ct. at 2497 (cleaned up) (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946); *OPP Cotton Mills, Inc. v. Administrator of Wage and Hour Division, Department of Labor*, 312 U.S. 126, 144 (1941)); *id.* at 2501, 2504, 2507, 2511. That standard, not a different one, the Supreme Court held a few months ago, applies to statutes that authorize monetary impositions such as taxes. *Id.* at 2497–501. And, as applied to such impositions, the Court specifically rejected the argument that "Congress must set a 'definite' or 'objective limit' on how much money an agency can collect—a numeric cap, a fixed rate, or the equivalent." *Id.* at 2497. What applies, the Court held, is the "usual nondelegation standard," and that standard is "trained on intelligible principles, not on numeric caps and 'mathematical formula[s].'" *Id.* at 2498 (quoting *United States v. Rock Royal Co-operative, Inc.*, 307 U.S. 533, 577 (1939)); *see also id.* at 2498 n.3 (rejecting dissent's "rate-or-cap test").

The government suggests that the *Consumers' Research* standard is inapplicable when the delegation is to the President rather than to a non-elected executive official. Government's Reply Brief at 18–20. The government has not persuasively justified that suggestion. No question is presented here about whether a *tougher* standard than the one confirmed in *Consumers' Research* might apply to a delegation to a board protected against discretionary removal by the President (*i.e.*, "an independent agency").

*Consumers' Research*, 145 S. Ct. at 2517 (Kavanaugh, J., concurring). The government's suggestion is that a *laxer* standard than the *Consumers' Research* standard should apply *whenever* the delegatee is the President. That contention presents two difficulties.

First, the nondelegation doctrine polices *what* Congress has delegated to another branch, not to *whom* it has delegated the authority. *See Gundy v. United* States, 588 U.S. 128, 132 (2019) (plurality opinion) ("The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government."). Indeed, "[t]o distinguish between the permissible and the impermissible in this sphere," the Supreme Court has "long asked whether Congress has set out an 'intelligible principle' to guide what it has given the agency to do." *Consumers Research*, 145 S. Ct. at 2497 (quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928)). Whether Congress has provided an intelligible principle depends on the text of the statute Congress created, not on the character of the receiving party.

Second, the Supreme Court has observed that, whenever an executive officer is exercising executive power, the officer is exercising power that belongs to the President. *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 203 (2020) ("Under our Constitution, the 'executive power'—all of it—is 'vested in a President' . . . ."). Although we need not draw a definitive conclusion on the matter, it is not apparent to us why the *Consumers' Research* standard should be categorically lowered for delegations to the President. *See Consumers' Research*, 145 S. Ct. at 2512 n.1 (Kavanaugh, J., concurring) (citation omitted) (stating his view that delegations to "executive officers or agencies . . . are not analytically distinct for present purposes from delegations to the President because the President controls, supervises, and directs those executive officers and agencies").

Relatedly, we are not prepared to rely on the merely procedural requirements, such as declaring a national emergency and complying with the requirements of keeping Congress informed, as themselves sufficient to meet the understandable-boundaries element of that standard even if the substantive requirements were not sufficient. The Supreme Court suggested that procedural requirements could not suffice in that way when it stated in *Rock Royal* that "procedural safeguards cannot validate an unconstitutional delegation" while noting that such safeguards "do furnish protection against an arbitrary use of properly delegated authority." 307 U.S. at 576 (citing with "cf." signal and *A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 533 (1935)). Application of the nondelegation doctrine must at least focus on, perhaps even be limited to, substantive constraints on the exercise of the delegated power. Regarding the national emergency, the NEA provides no substantive standards for what may be declared a national emergency, *see* 50 U.S.C. §§ 1621–1641, and consistent with that absence of standards, such a declaration itself is likely unreviewable, *see Haig*, 453 U.S. at 292; *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988); *Yoshida CCPA*, 526 F.2d at 581 n.32; *cf. Shih*, 73 F.4th at 1092. The focus therefore must be on the substantive requirement that the presidential action be exercised, upon declaration of a national emergency, to deal with an unusual and extraordinary threat to the national security, foreign policy, or economy of the United States, emanating in relevant part from abroad, and for no other reason. *See*, *e.g.*, *supra* at pp. 11–12.

One feature of the present case that clearly is relevant to how demanding the nondelegation doctrine is here is the fact, not meaningfully disputed by plaintiffs, that the tariffs involve the President's role and responsibilities in foreign affairs (including national security), which has constitutional foundations (in Article II) and which Congress may help the President more effectively perform by

furnishing the President with tools, such as criminal pro-
hibitions or tariff impositions, that can be created only by
Congress exercising its Article I powers. *See Trump
v. United States*, 144 S. Ct. 2312, 2327 (2024) (explaining
that the President "has important foreign relations respon-
sibilities: making treaties, appointing ambassadors, recog-
nizing foreign governments, meeting foreign leaders,
overseeing international diplomacy and intelligence gath-
ering, and managing matters related to terrorism, trade,
and immigration"); C. Bradley & J. Goldsmith, Foreign Af-
fairs, Nondelegation, and the Major Questions Doctrine,
172 U. Pa. L. Rev. 1743 (2024); BRADLEY at 168–90. The
tariffs involve goods crossing into the United States from
foreign countries, foreign governments' policies respecting
both those goods and U.S. exports for entry into those gov-
ernments' countries, and the possibility of presidential ne-
gotiation of agreements with foreign governments. The
Supreme Court has recognized that the congressional
grant to the President of tariffing and other import-control
authority dates back to the founding era and has treated
such actions as involving foreign affairs. *See*, *e.g.*, *J.W.
Hampton*, 276 U.S. at 413; *Buttfield v. Stranahan*, 192 U.S.
470, 496 (1904); *Marshall Field & Co. v. Clark*, 143 U.S.
649, 695–97 (1892); *Cargo of the Brig Aurora v. United
States*, 11 U.S. (7 Cranch) 382, 387–89 (1813); *see* Bradley
& Goldsmith at 1757 (explaining that "Congress in the
early post-Founding period authorized the President to
make broad discretionary policy determinations" and
"many of the broadest delegations came in contexts related
to foreign affairs," noting specifically a 1794 authorization
to the President, while Congress was in session, to "impose
a shipping embargo 'whenever, in his opinion, the public
safety shall so require'"); BRADLEY at 168–73. Opinions by
and from within the Court suggest that Congress has espe-
cially great leeway to delegate authority to the President
in foreign-affairs matters, based on the view that realities
in that area frequently support "paint[ing] with a brush
broader than that it customarily wields in domestic areas,"

*Zemel v. Rusk*, 381 U.S. 1, 17 (1965), and the notion that "the same limitations on delegation do not apply 'where the entity exercising the delegated authority itself possesses independent authority over the subject matter,'" *Loving v. United States*, 517 U.S. 748, 772–73 (1996) (quoting *United States v. Mazurie*, 419 U.S. 554, 556–57 (1975)). *See United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 540–41 (1950); *Curtiss-Wright Export Corp.*, 299 U.S. at 312–22; *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 n.2 (1952) (Jackson, J., concurring) (reading *Curtiss-Wright* to hold that "the strict limitation upon congressional delegations of power to the President over internal affairs does not apply with respect to delegations of power in external affairs"). Several Justices have in recent years noted the distinctive character of foreign-affairs matters under the nondelegation doctrine. *See Consumers' Research*, 145 S. Ct. at 2516 (Kavanaugh, J., concurring) (raising question); *id.* at 2539 n.20 (Gorsuch, J., dissenting) (same); *Department of Transportation v. Association of American Railroads*, 575 U.S. 43, 79–80 & n.5 (2015) (Thomas, J., concurring in the judgment).

The Court's formulation requiring the ability of courts to ascertain whether substantive boundaries have been crossed suggests at least a presumption of judicial enforceability of those boundaries—at least the boundaries without which the policy leeway would be too great. *Cf. Yakus v. United States*, 321 U.S. 414, 426 (1944) (asking if legislation makes it possible for courts to ascertain compliance); *Gundy*, 588 U.S. at 158 n.39 (Gorsuch, J., dissenting). In the present context, the strong principles of deference in the foreign-affairs area (including the emergency authority at issue here) and broad interpretation and permissible greater leeway of delegation all have constitutional foundations. Over statutory matters, Congress has abilities to adjust grants of authority (over the long term anyway) and to exercise powers over matters for which the President needs congressional action (in the shorter term). We do not

see how it would make sense to say that broad delegations, subject to particularly deferential review, both of which are permitted for constitutional reasons, together lead to a conclusion of unconstitutionality.

The IEEPA standard might well pass constitutional muster even under ordinary delegation standards, *i.e.*, outside the foreign-affairs and related contexts where especially great leeway is allowed, even recognizing that "[t]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457, 475 (2001); *see Consumers' Research*, 145 S. Ct. at 2497 (repeating *Whitman* point). The Court recently explained that it has found a violation in only two cases (the same year): *Panama Refining Co. v. Ryan*, 293 U.S. 388, 415 (1935), where Congress established "no cr[i]terion" and declared "no policy"; and *Schechter Poultry*, 295 U.S. at 521–22; 541–42, where Congress authorized creation of codes of "fair competition" nationwide with "no standards" except to "rehabilitat[e], correct[], and expan[d]" the economy. *Consumers' Research*, 145 S. Ct. at 2502–03. The Court explained:

> At the same time, we have found intelligible principles in a host of statutes giving agencies significant discretion. So, for example, we upheld a provision enabling an agency to set air quality standards at levels "requisite to protect the public health." We sustained a delegation to an agency to ensure that corporate structures did not "unfairly or inequitably distribute voting power" among security holders. And we affirmed authorizations to regulate in the "public interest" and to set "just and reasonable" rates, because we thought the discretion given was not unbridled.

*Id.* at 2503 (quoting *Whitman*, 531 U.S. at 472; then *American Power & Light*, 329 U.S. at 104; citing *National*

*Broadcasting Co. v. United States*, 319 U.S. 190, 225–226 (1943); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 600 (1944)); *see also New York Central Securities Corp. v. United States*, 287 U.S. 12, 24 (1932); *Federal Communications Commission v. Radio Corporation of America Communications*, 346 U.S. 86, 90 (1953); *Federal Radio Commission v. Nelson Brothers Bond & Mortgage Co.*, 289 U.S. 266, 285 (1933).

The leeway allowed by those precedents makes it challenging to distinguish the substantive requirements that we have focused on here—namely, that there is a qualifying "unusual and extraordinary threat," *see supra* at pp. 22–28, and that the President must be exercising the IEEPA-specified authorities "to deal with" that threat and for no other purpose, *see infra* at pp. 64–67. Those standards are on their face intelligible, as even plaintiffs have presupposed in arguing that they are violated. But we need not decide whether IEEPA would pass muster under standards other than those which apply in the context of this case, involving emergency authority addressing foreign-source conduct threatening the national security, foreign policy, or economy of the United States. Under the applicable standards, we see no basis for finding a constitutional violation under current doctrine.

The Court's decision in *Algonquin* is significant for the present case. There, the Court held that section 232(b) of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, "easily fulfills" the "intelligible principle" test articulated in the *J.W. Hampton* case. 426 U.S. at 559. The Court explained that the statute authorizes presidential action (which the Court held included imposition of duties) to the extent the President deems necessary where imports "threaten to impair the national security," based on consideration of, *e.g.*, what goods are needed, domestic industry's ability to supply them, and other obviously pertinent facts. § 232(b), (c) [§ 1862(b), (c)]; *see* 426 U.S. at 559. The Court held that the statute presented not even a "looming problem of

improper delegation" that would call for a narrowing stat-
utory construction to avoid the problem. 426 U.S. at 560.
We note that, while section 232 requires that the President
receive certain findings of threatened impairment of the
national security from the Secretary of the U.S. Depart-
ment of Commerce, we have held that those findings are no
more reviewable than if they were the President's own find-
ings, as they are part of a single process. *USP Holdings*,
36 F.4th at 1369–70 (relying on *George S. Bush & Co.*, 310
U.S. at 379–80). The Supreme Court readily upheld sec-
tion 232(b)—with what this court's majority today calls the
provision's "well-defined procedural and substantive limi-
tations," Maj. Op. at 20—against a nondelegation chal-
lenge. Although some features of IEEPA differ from the
features of section 232, we do not see a basis for a different
result in this case under current nondelegation law.

## B. Trafficking Tariffs

We finally turn to the trafficking tariffs (applicable to
Canada, Mexico, and China), which are challenged only by
the State plaintiffs (not the private plaintiffs), for which
only one issue not already discussed—a statutory issue—
remains for consideration. The essential characteristics
that frame the issue raised are simply described. The ma-
jority does not doubt, and the State plaintiffs do not dis-
pute, that the problem the trafficking tariffs target—
introduction of opioids or precursors and other criminal ac-
tivity—rises to the level of an "unusual and extraordinary
threat" to the national security, foreign policy, or economy
of the United States (and has been properly declared to be
a national emergency). IEEPA § 202(a) [§ 1701(a)]. Nor is
there any contention that the President's actions have an-
other purpose than addressing that threat. IEEPA
§ 202(b) [§ 1701(b)]. Instead, the challenge focuses on the
fact that the tariff measures adopted (then paused and
modified) apply to a large variety of imports that them-
selves are not the source of the problem, *i.e.*, are not illegal
drugs or precursors and do not involve criminal activity.

The CIT held that fact to place the trafficking tariffs outside the power of the President to exercise the section 203-specified authorities "to deal with" the threat, IEEPA § 202(a), (b) [§ 1701(a), (b)], even though, as the CIT did not dispute, the trafficking tariffs seek indirectly to induce the foreign governments' action in alleviating that threat. *CIT Op.* at 1381–82. That holding, we conclude, is contrary to the statute.

IEEPA does not say that the imports covered by section 203 authorities must be the source of the "threat" required by section 202. The section 203 authorities may be "exercised to deal with *any* unusual and extraordinary threat" meeting the specified conditions (the threat must be to our national security, foreign policy, or economy, it must be declared to be a national emergency, and, under section 202(b) [§ 1701(b)], the authorities must be exercised to deal with that threat and for no other reason). IEEPA § 202(a) [§ 1701(a)] (emphasis added). Nor does IEEPA use the language of "direct link" (or the word "direct") at all, much less in a sense that precludes a measure reasonably designed to work as leverage. *CIT Op.* at 1381–82.

IEEPA says only that the President's exercise of authority must be "*to* deal with" the identified threat, and not "for any other purpose." IEEPA § 202(b) [§ 1701(b)] (emphasis added). That language addresses the *intended effect* of the measures on the threat, not the *content* of the measure adopted. The measure must aim to achieve that effect and not be so overbroad that it can reliably be inferred to be really for a different purpose. IEEPA § 202(b) [§ 1701(b)]. But that does not require that the imports taxed themselves be responsible for the threat. A measure that reaches imports, property, or other interests of foreign actors can be an obvious and effective tool for dealing with the threat by inducing the foreign country to take action to redress the harm identified as a threat.

We see no persuasive basis for a contrary reading in light of the Supreme Court's decision in *Dames & Moore*. There, the Court held that IEEPA authorized the President to take action involving Iranian assets as leverage to solve a problem based on Iran's holding of American hostages, not to solve a problem with the specific assets frozen. The Supreme Court blessed the measure as a "'bargaining chip' to be used by the President when dealing with a hostile country." *Dames & Moore*, 453 U.S. at 673.

Similarly, here, the tariffs are to be a "bargaining chip" to get Canada, Mexico, and China to take more action regarding the criminal trafficking identified in the executive orders. The President found that Canada and Mexico had "played a central role" in the challenge posed by "[g]ang members, smugglers, human traffickers, and illicit drugs of all kinds" that "have poured across our borders and into our communities," including by "failing to devote sufficient attention and resources or meaningfully coordinate with the United States law enforcement partners to effectively stem the tide of," for Canada, "illicit drugs," and, for Mexico, "unlawful migration and illicit drugs." EO '193, 90 Fed. Reg. at 9113; EO '194, 90 Fed. Reg. at 9117. Similarly, he found that China had "subsidized and otherwise incentivized PRC chemical companies to export fentanyl and related precursor chemicals that are used to produce synthetic opioids sold illicitly in the United States," and "plays a central role" in the challenge posed by "[t]he influx of these drugs," "not merely by failing to stem the ultimate source of many illicit drugs distributed in the United States, but by actively sustaining and expanding the business of poisoning our citizens." EO '195, 90 Fed. Reg. at 9121.

The trafficking tariffs make clear that the President contemplated eliminating or lowering the tariffs if the country subject to the tariff took adequate steps concerning the specific identified threat. And the actions immediately following issuance of the tariffs confirm the proper focus of

the tariffs on the underlying drug/crime problem (thus, no "other purpose," IEEPA § 202 [§ 1701]) and the utility of tariffs as a bargaining chip.  Both Canada and Mexico's "immediate steps designed to alleviate the illegal migration and illicit drug crisis through cooperative action" (resulting in the President pausing the tariffs on goods from Canada and Mexico), and China's failure to take such steps (resulting in the President increasing tariffs), evince their utility as such a bargaining chip.  Exec. Order No. 14197, 90 Fed. Reg. 9183 (Feb. 3, 2025); Exec Order No. 14198, 90 Fed. Reg. 9185 (Feb. 3, 2025); Exec. Order No. 14228, 90 Fed. Reg. 11463 (Mar. 3, 2025).  The States make no real argument to the contrary.

* * *

For the foregoing reasons, we respectfully dissent from the majority's affirmance of the CIT's summary judgment that the reciprocal and trafficking tariffs are unlawful.