IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

Before Honorable Gary S. Katzmann, Judge, Honorable
Timothy M. Reif, Judge, Honorable Jane A. Restani, Judge

| | |
|---|---|
| V.O.S. SELECTIONS, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Case No. 25-00066 |

### JOINT BRIEF OF *AMICI CURIAE* THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND THE CONSUMER TECHNOLOGY ASSOCIATION

Daryl Joseffer
Kevin R. Palmer
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

*Counsel for the Chamber of
Commerce of the United States
of America*

Gregory G. Garre
Roman Martinez*
Soren J. Schmidt
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
(202) 637-2207
gregory.garre@lw.com

Jonathan T. Stoel
Katherine Wellington
Nicholas R. Sparks
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-6634
jonathan.stoel@hoganlovells.com

*Counsel for Amici Curiae*

---

* Application for admission to the U.S. Court of International Trade pending.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

    A.    The Government Routinely Refunds Tariffs ............................................ 2

    B.    Refunds Need Not Require Burdensome Litigation .............................. 4

    C.    The Typical Administrative Procedures Are Impractical ..................... 7

    D.    This Court Should Facilitate A Streamlined Refund Process ............... 8

    E.    The Government's Recent Statements On Refunds Underscore
        The Need For Guidance ...................................................................... 12

CONCLUSION.................................................................................................. 14

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*AGS Co. Auto. Sols. v. CBP,*
  --- F. Supp. 3d ---, 2025 WL 3634261 (Ct. Int'l Trade Dec. 15, 2025) .................... 4

*AGS Co. Auto. Sols. v. CBP,*
  No. 1:25-cv-255 (Ct. Int'l Trade) ............................................................. 5

*Baxter Healthcare Corp. v. United States,*
  925 F. Supp. 794 (Ct. Int'l Trade 1996) ................................................ 10

*Hitachi Home Elecs. (Am.), Inc. v. United States,*
  661 F.3d 1343 (Fed. Cir. 2011) ............................................................. 7

*Learning Res., Inc. v. Trump,*
  607 U.S. ---, 2026 WL 477534 (U.S. Feb. 20, 2026) ................................ 1

*M.G. Maher & Co. v. United States,*
  26 CIT 1040 (2002) ............................................................................ 9

*Princess Awesome, LLC v. U.S. Customs and Border Prot.,*
  No. 25-078 (Ct. Int'l Trade filed Apr. 24, 2025) .................................... 4

*Swisher Int'l v. United States,*
  205 F.3d 1358 (Fed. Cir. 2000) ............................................................ 9

*Trump v. CASA,*
  145 S. Ct. 2540 (2025) ........................................................................ 6

*U.S. Shoe Corp. v. United States,*
  22 C.I.T. 737 (1998) ............................................................................ 9

*United States Shoe Corp. v. United States,*
  No. 94-11-00668, slip op. 98-126 (C.I.T. Aug. 28, 1998) .................. 9, 10

*United States v. U.S. Shoe Corp.,*
  523 U.S. 360 (1998) ............................................................................ 8

*V.O.S. Selections, Inc. v. Trump,*
  No. 25-1812, Dkt. No. 171 (Fed. Cir. Feb. 27, 2026) .......................... 13

*V.O.S. Selections, Inc. v. Trump,*
  No. 25-1812, Dkt. No. 6 (Fed. Cir. May 29, 2025) ................................ 4

## STATUTES

19 U.S.C.

    § 1313(a)........................................................................................................ 2

    § 1313(*l*) ...................................................................................................... 2

    § 1514(c)(3).................................................................................................. 3

    § 1515(a)............................................................................................... 3, 7, 8

    § 1520(a)(1)................................................................................................. 3

26 U.S.C. § 4461.................................................................................................... 9

28 U.S.C. § 1581(a) and (i).................................................................................... 9

Pub. L. 99-662, Title XIV, § 1402(a), 100 Stat. 4266 (1986) ........................................ 8

## REGULATIONS

19 C.F.R.

    § 10.625(b).................................................................................................. 3

    § 24.36(a).................................................................................................... 3

    § 174.13(b).................................................................................................. 7

## OTHER AUTHORITIES

*'A matter of survival': Small Businesses Speak Out on Tariffs*, U.S.
Chamber of Com. (updated Oct. 1, 2025) ...................................................... 5

*Amended Procedure for Refunds of Harbor Maintenance Fees Paid on
Exports of Merchandise*, 66 Fed. Reg. 16,854, 16,854 (Mar. 28, 2001)............. 9, 11

An Act for laying a Duty on Goods, Wares, and Merchandises imported
into the United States, § 3, 1 Stat. 24 (1789) ........................................................ 2

Barry J. McMillion, Cong. Rsch. Serv., IN12586, *U.S. Court of
International Trade: Background, Judgeships, and Caseload
Statistics* (2025) (*CIT CRS Report*).................................................................. 8, 9

Heather M. Pichelman, Note, *It's Pay-Up Time for the Government on
the Harbor Maintenance Tax: Exporters Are Receiving Their Tax
Refunds, But What About Interest?*, 11 Fed. Cir. B.J. 427, 427 (2001) ............... 10

*Implementing the United States–Japan Agreement* § 2(d), Exec. Order
No. 14,345, 90 Fed. Reg. 43,535 (Sept. 9, 2025) .................................................... 11

Louise Radnofsky et al., *The $130 Billion Race for Companies to Get
Their Tariff Money Back*, Wall St. J. (Feb. 25, 2026) ........................................ 1, 5

*Modifying the Scope of Tariffs on the Government of Brazil* § 2, Exec.
Order 14,361, 90 Fed. Reg. 54,467 (Nov. 20, 2025) ................................ 11

Penn Wharton Budget Model, *Supreme Court Tariff Ruling: IEEPA
Revenue and Potential Refunds* (Feb. 20, 2026) .................................... 10

S. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131
Harv. L. Rev. 417, 474 (2017) ............................................................... 6

Tr. of Interview with U.S. Trade Representative Jamieson Greer, ABC
News (Feb. 22, 2026) ............................................................................ 12

Tr. of Interview with U.S. Treasury Secretary Scott Bessent, CNN,
(Feb. 22, 2026) ..................................................................................... 12

U.S. Customs and Border Protection, *Accelerated Liquidation Policy
and Post Summary Correction (PSC) Status Check* (November 17,
2020) ...................................................................................................... 7

U.S. Customs and Border Protection, *CSMS #45255051 - Guidance:
Generalized System of Preferences (GSP) Expires effective, December
31, 2020* (Dec. 21, 2020) ................................................................ 10, 11

U.S. Customs and Border Protection, *CSMS # 66242844 - Updated
Guidance - Implementation of the United States-Japan Agreement
and Modification of Duties on Imports from Japan* (Sept. 15, 2025) ................. 12

U.S. Customs and Border Protection, *CSMS # 66336270 - Guidance –
Implementation of Tariff-Related Elements of the United States-
European Union Framework Agreement* (Sept. 24, 2025) .................................... 11

U.S. Customs and Border Protection, *Post Summary Corrections* ......................... 3, 7

U.S. Gov't Accountability Off., *GAO-20-182, Customs and Border
Protection: Risk Management for Tariff Refunds Should Be
Improved* 1 (2019) ............................................................................... 3

## INTEREST OF AMICI CURIAE

The Chamber of Commerce of the United States of America is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the Chamber regularly files briefs as amicus curiae in cases, like this one, raising issues of concern to the Nation's business community.

The Consumer Technology Association (CTA) is North America's largest technology trade association. CTA's members are the world's leading innovators— from startups to global brands—helping support more than 18 million American jobs. International trade is vital to the consumer technology sector.  CTA's members rely on global supply chains that are intricate and often take decades to develop.  CTA therefore frequently advocates in court and before Congress to promote fair and sustainable trade practices, as well as other significant legal issues for the consumer technology industry.

The disposition of this case is of paramount importance to the business community.  The tariffs imposed under the International Emergency Economic Powers Act (IEEPA) caused substantial harm to *amici*'s members—increasing their costs, undermining their ability to plan for the future, affecting their relationships with customers and thus their goodwill, and in some cases, threatening their very existence.  Both the Chamber and CTA participated as *amici* in support of the

challengers both in the Federal Circuit and Supreme Court.  *See Amici Curiae* Brief of the Chamber of Commerce of the United States of America and the Consumer Technology Association, *V.O.S. Selections, Inc. v. Trump*, No. 25-1812, Dkt. No. 108 (Fed. Cir. July 8, 2025); Brief of the Chamber of Commerce of the United States of America and the Consumer Technology Association in Support of Respondents, *Trump v. V.O.S. Selections*, No. 25-250 (U.S. Oct. 24, 2025).   Now that the Supreme Court has struck down the IEEPA tariffs, it is vital to *amici*'s members that a process be swiftly established to provide refunds to relieve those harms.[*]

---

[*] *Amici* state that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amici*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

## INTRODUCTION

The Supreme Court has spoken:  The President exceeded his authority in imposing tariffs under IEEPA.  *Learning Res., Inc. v. Trump*, 607 U.S. ---, 2026 WL 477534 (U.S. Feb. 20, 2026).  There is no question that American businesses are now entitled to the return of the billions of dollars they were forced to pay under these unlawful tariffs.  The law is clear on that point, and the government has repeatedly stated that it would issue refunds if the tariffs were ultimately deemed invalid.  Instead, the question is *how* that relief will be provided.  For multiple reasons, this Court's guidance on that question is essential.

According to one source, over 300,000 importers have paid IEEPA tariffs, 34 million entries are at issue, and approximately $129 billion of businesses' money is at stake.  Louise Radnofsky et al., *The $130 Billion Race for Companies to Get Their Tariff Money Back*, Wall St. J. (Feb. 25, 2026), https://tinyurl.com/4tkm93sn.  At that magnitude, the traditional pathways for obtaining refunds are impractical.  Requiring every importer to file a lawsuit or pursue existing administrative procedures will result in unacceptable cost and delay for most importers, while also straining judicial and executive resources.  To relieve those unnecessary burdens, this Court should facilitate a streamlined procedure that capitalizes on the information the government already maintains and the efficiencies that today's technology provides.

This Court's prompt engagement will benefit both sides in this dispute.  Refund uncertainty creates real harm for importers across the country—distorting cash flow, pricing, and contractual expectations.  But in opposing preliminary injunctive relief,

the government assured courts that those importers would not suffer irreparable harm if tariffs were collected while the parties continued to litigate over their validity. Now, the Administration is awaiting further direction from this Court on how it should approach the very refunds that would enable it to fulfill that promise. *Amici* respectfully request that the Court take this opportunity to craft a clear, commonsense solution, as it has in the past.

## ARGUMENT

### A.    The Government Routinely Refunds Tariffs

Although the scope of the IEEPA tariffs is unprecedented, refunds are nothing new. The government has reimbursed unlawful or excessive duties since the First Congress. Today, U.S. Customs and Border Protection (CBP) returns billions of dollars through multiple refund mechanisms. And here, the government promised that refunds would be similarly available in the event IEEPA tariffs were determined to be invalid, as they now have been by the Supreme Court.

A few examples show that refunds are, and always have been, commonplace. Take "drawback" refunds, which return duties, taxes, and fees paid on imported goods that are later exported or destroyed. 19 U.S.C. § 1313(a). Congress has authorized drawbacks since the first Tariff Act in 1789. *See* An Act for laying a Duty on Goods, Wares, and Merchandises imported into the United States, § 3, 1 Stat. 24 (1789) (providing that "the duties paid" on imports "shall be returned" when the goods are "exported"). Then, as now, each drawback payment refunds up to 99 percent of the duty originally paid. *Id.*; *see* 19 U.S.C. § 1313(*l*). The Government Accountability Office has estimated that the drawback payment program refunds about $1 billion

each year.  U.S. Gov't Accountability Off., *GAO-20-182, Customs and Border Protection: Risk Management for Tariff Refunds Should Be Improved* 1 (2019).

CBP refunds tariff payments in other ways too.  As a general matter, the Secretary of the Treasury issues refunds "[w]henever it is ascertained on liquidation or reliquidation . . . that more money has been deposited or paid as duties than was required by law."  19 U.S.C. § 1520(a)(1).  In these circumstances, CBP automatically calculates and provides a "refund of excessive duties," including "interest on the excess moneys deposited with Customs."  19 C.F.R. § 24.36(a).  CBP has provided such refunds for entire categories of duties, such as those retroactively reduced by trade agreements.  *See, e.g.*, 19 C.F.R. § 10.625(b) (providing refunds for duties retroactively lowered by the Dominican Republic—Central America—United States Free Trade Agreement).  Importers may also request refunds both before and after liquidation.  Before liquidation, an importer may initiate the post summary corrections process to identify and correct errors in tariff duty calculations.  *See* U.S. Customs and Border Protection, *Post Summary Corrections*, https://tinyurl.com/m3bzffcy (accessed February 26, 2026).  And after liquidation, importers may file an administrative protest that challenges the amount of duties.  *See* 19 U.S.C. § 1514(c)(3).  If CBP allows the protest, "any duties . . . found to have been assessed or collected in excess shall be remitted or refunded."  *Id.* § 1515(a).

Given the well-worn avenues for providing refunds, it is no surprise that the government has repeatedly represented in connection with this litigation that refunds would be available if the IEEPA tariffs were invalidated.  The government

told this Court that a stay pending appeal would not irreparably harm plaintiffs because "[f]or any plaintiff who is an importer, . . . plaintiffs will assuredly receive payment on their refund with interest." Dkt. No. 59 at 8; *see also Princess Awesome, LLC v. U.S. Customs and Border Prot.*, No. 25-078 (Ct. Int'l Trade filed Apr. 24, 2025), Dkt. No. 17 (May 23, 2025). The government told the Federal Circuit the same thing. *V.O.S. Selections, Inc. v. Trump*, No. 25-1812, Dkt. No. 6 at 25 (Fed. Cir. May 29, 2025).[1] The courts have relied on those representations. *See, e.g.*, *AGS Co. Auto. Sols.*, 2025 WL 3634261, at *2. The question of *whether* importers may obtain refunds for IEEPA tariffs is therefore beyond dispute. The government must refund the duties unlawfully imposed, just as it has routinely refunded other tariff duties since 1789.

### B.    Refunds Need Not Require Burdensome Litigation

Going forward, the question is how refunds should be made available to importers. This Court should reject any approach that requires each of the hundreds of thousands of businesses that paid invalid tariffs to separately initiate legal proceedings to obtain refunds.

First, absent a well-defined and streamlined refund mechanism, thousands of individual refund claims could be filed in this Court, creating significant administrative burdens for both the judiciary and the government and delaying relief for affected businesses. Before the Supreme Court even issued its decision, importers

---

[1] *See also* Plaintiffs' Motion at 5; *AGS Co. Auto. Sols. v. CBP*, --- F. Supp. 3d ---, 2025 WL 3634261, at *2 (Ct. Int'l Trade Dec. 15, 2025) (collecting statements from the government).

filed over 900 cases to preserve their right to refunds. *See* Plaintiffs' Motion at 2; *see AGS Co. Auto. Sols. v. CBP*, No. 1:25-cv-255 (Ct. Int'l Trade) (lead docket for consolidated claims). Just a few days after the decision, the number of claimants had burgeoned to "at least 1,800 . . . , with more joining the rolls every day." Louise Radnofsky et al., *The $130 Billion Race for Companies to Get Their Tariff Money Back*, Wall St. J. (Feb. 25, 2026), https://tinyurl.com/4tkm93sn. That number will grow exponentially should this Court hold that affirmative litigation is the only viable path for obtaining a refund. This Court, and the litigants before it, would be disserved by that enormous wave of litigation—much of which could be efficiently and effectively resolved in streamlined administrative proceedings before CBP.

Second, requiring importers to file a lawsuit would pose an insurmountable obstacle to many of *amici*'s members. Most small businesses operate with tight profit margins and limited financial flexibility. The IEEPA tariffs have already stretched their resources to the breaking point. *See 'A matter of survival': Small Businesses Speak Out on Tariffs*, U.S. Chamber of Com. (updated Oct. 1, 2025), https://tinyurl.com/yj58vtty. They simply cannot afford protracted legal battles with the government. *See* Plaintiffs' Motion at 6 (collecting statements from the Administration that refund litigation could take "weeks," "months," or "years"). Moreover, for businesses of all sizes, these problems are compounded by the fact that many individual refunds amount to small sums. Where the costs of lawsuits exceed the actual refunds, businesses will be forced to abandon their claims and leave their money in the hands of the government—for all practical purposes, as if the tariffs had

5

never been struck down. To actually be made whole after the Supreme Court's decision, many importers need a more cost-effective option.

Third, nothing in the Supreme Court's decision in *Trump v. CASA* requires each business to file a separate lawsuit to obtain relief. 145 S. Ct. 2540 (2025). In *CASA*, the Court rejected the lower-court practice of granting "universal injunctions" that "prohibit enforcement of a law or policy against anyone," as opposed to "only against the plaintiffs in the lawsuit." *Id.* at 2548. The circumstances in this case are starkly different. Now that the Supreme Court has issued a final decision holding that the President lacked authority to issue *any* tariffs under IEEPA, there is no need to individually litigate whether particular IEEPA duties were valid—they are *all* invalid. See S. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 474 (2017) (explaining that "the way to resolve legal questions for nonparties is through precedent, not through injunctions").

*CASA* also does not prohibit this Court from facilitating a centralized and efficient process under which all importers—including the plaintiffs in this case—could receive individualized refunds from the government. This Court could craft an injunction facilitating a streamlined administrative process for plaintiffs in this case to use in obtaining their refunds. And once that process is established, it could also serve as a mechanism for the hundreds of thousands of other businesses that have not filed suit. *Cf. CASA*, 145 S. Ct. at 2557. Both equity and judicial economy counsel that course.

### C.     The Typical Administrative Procedures Are Impractical

Given the scope of refunds at issue, the administrative procedures that importers typically use to request refunds are also impractical to provide full relief to all of the parties adversely impacted by the government's collection of IEEPA tariffs.

As explained above, importers can currently seek refunds from the CBP in two ways: (1) Post Summary Corrections (before liquidation) and (2) protest actions (after liquidation).  *See supra* Section A.  Post Summary Corrections are filed on an entry-by-entry basis; protest actions can be grouped together, but only for entries that involve the "same category of merchandise."  U.S. Customs and Border Protection, *Post Summary Corrections*, *supra*; 19 C.F.R. § 174.13(b).  To process these filings, CBP can take up to 314 days (for corrections) and two years, if not more (for protests).[2] *See* U.S. Customs and Border Protection, *Accelerated Liquidation Policy and Post Summary Correction (PSC) Status Check* (November 17, 2020), https://tinyurl.com/yc5rmdkv; 19 U.S.C. § 1515(a).

With over 300,000 importers due refunds, and 34 million affected entries, private systems will quickly become overwhelmed.  Businesses with a significant volume of imports required to do entry-by-entry correction may need to hire additional employees and make system changes to prepare and monitor their requests.  That process would not only be burdensome—it could be operationally

---

[2] The governing statute, 19 U.S.C. § 1515(a), provides that a protest shall be decided within two years, unless the requesting party seeks accelerated disposition. The Federal Circuit has held that a failure by CBP to decide a protest within two years does not confer standing on the requesting party to seek relief in court.  *See Hitachi Home Elecs. (Am.), Inc. v. United States*, 661 F.3d 1343 (Fed. Cir. 2011).

infeasible.  Moreover, processing times for all businesses may multiply.  And importers will be tied up in years of administrative proceedings before collecting the refunds they are due in light of the Supreme Court's decision.  A simplified procedure is needed to ensure that businesses have a way to secure refunds that does not involve years of staffing, system changes, and monitoring to recover funds they are owed.

### D.    This Court Should Facilitate A Streamlined Refund Process

In addressing Plaintiffs' Motion, this Court should facilitate a streamlined process that resolves these parties' claims, and thereby provides a blueprint for other importers to secure refunds.  Doing so will provide meaningful relief to affected importers while sparing this Court from a flood of litigation, the government from an inordinate number of administrative filings, and other importers from complexity and uncertainty.  As this Court's own history teaches, an orderly and simple process will benefit all parties involved.

This Court's experience with the Harbor Maintenance Tax ("HMT") is particularly instructive.  In 1986, Congress imposed the HMT on shipments of commercial cargo passing through U.S. ports.  *See* Pub. L. 99-662, Title XIV, § 1402(a), 100 Stat. 4266 (1986), *codified at* 26 U.S.C. § 4461.  But in 1998, the Supreme Court held that the HMT was an unconstitutional tax on exports.  *United States v. U.S. Shoe Corp.*, 523 U.S. 360 (1998).  Following that decision, thousands of shippers sued for refunds of the HMT:  In fiscal year 1999, there were 6,433 cases filed in this Court—more than *13 times* the median annual filings between 1996 and 2024.  Barry J. McMillion, Cong. Rsch. Serv., IN12586, *U.S. Court of International*

*Trade: Background, Judgeships, and Caseload Statistics* (2025) (*CIT CRS Report*), https://tinyurl.com/jhh8skwb.

In response, this Court—accounting for party proposals and objections—designed a simple procedure for shippers to seek refunds directly from the government. *U.S. Shoe Corp. v. United States*, 22 C.I.T. 737, 737 (1998) (announcing the Court's intended claims resolution procedure after considering party proposals, allowing for objections, and scheduling a hearing); *see Amended Procedure for Refunds of Harbor Maintenance Fees Paid on Exports of Merchandise*, 66 Fed. Reg. 16,854, 16,854 (Mar. 28, 2001) (summarizing this Court's order in *United States Shoe Corp. v. United States*, No. 94-11-00668, slip op. 98-126 (C.I.T. Aug. 28, 1998)). Each affected shipper could file a claim with Customs, which would then search its database for all payments subject to refund, and—unless disputed by the shipper—stipulate to a court order requiring the refund and issue it. *Id.* Initially, the procedure was available only to shippers who had filed a complaint in court, but Customs later expanded it to those who had not. *Id.* at 16,854-55. And in time, the government further streamlined the procedure "to simplify the process and improve its effectiveness." *Id.* at 16,855; *see id.* at 16,855-56. Suits under 28 U.S.C. § 1581(a) and (i) remained available as a backstop to those procedures, but shippers were not required to come to this Court to seek a refund. *See Swisher Int'l v. United States*, 205 F.3d 1358, 1359-60 (Fed. Cir. 2000); *M.G. Maher & Co. v. United States*, 26 CIT 1040, 1040-41 (2002).

A simple, clear, and efficient refund process is even more important here. The HMT implicated as many as one hundred thousand claimants seeking over $730 million in refunds. *Baxter Healthcare Corp. v. United States*, 925 F. Supp. 794, 796 (Ct. Int'l Trade 1996); Heather M. Pichelman, Note, *It's Pay-Up Time for the Government on the Harbor Maintenance Tax: Exporters Are Receiving Their Tax Refunds, But What About Interest?*, 11 Fed. Cir. B.J. 427, 427 (2001). The IEEPA tariff refunds will dwarf even those enormous figures, implicating more than three times the potential claimants and two hundred times the amount to be refunded than the HMT did. *See* Penn Wharton Budget Model, *Supreme Court Tariff Ruling: IEEPA Revenue and Potential Refunds* (Feb. 20, 2026), https://tinyurl.com/3mj8y3vz (explaining that, accounting for interest, the refunds for IEEPA tariffs may reach $175 billion). As such, it is all the more urgent that this Court streamline the refund procedures to ensure that businesses across the country can obtain that relief in a timely and organized way.

Importantly, the government's capabilities to refund IEEPA tariff duties through simple—and even automatic—internal processes have only improved since the days of the HMT. In 2020, for example, the Generalized Systems of Preferences (GSP) program—which allowed for duty-free entry on certain imports—lapsed. *See* U.S. Customs and Border Protection, *CSMS #45255051 - Guidance: Generalized System of Preferences (GSP) Expires effective, December 31, 2020* (Dec. 21, 2020), https://tinyurl.com/ywuf5s2v. But CBP "encourage[d] importers to continue to flag GSP eligible importations," explaining that it "has programming in place that, in the

event that GSP is renewed with a retroactive refund clause, will allow CBP to automate the duty refund process." *Id.*

Here, the government can likewise easily identify entries where IEEPA duties were paid. CBP has required that the duty entries for IEEPA tariffs include a secondary harmonized tariff schedule code "appropriately associated" with those tariffs. *See* U.S. Customs and Border Protection, *CSMS # 66336270 - Guidance – Implementation of Tariff-Related Elements of the United States-European Union Framework Agreement* (Sept. 24, 2025), https://tinyurl.com/37jvn8hh. In fact, CBP has already issued refunds for some of those tariffs because they were retroactively reduced by a subsequent trade agreement. *See, e.g.*, *Implementing the United States–Japan Agreement* § 2(d), Exec. Order No. 14,345, 90 Fed. Reg. 43,535 (Sept. 9, 2025); U.S. Customs and Border Protection, *CSMS # 66242844 - Updated Guidance - Implementation of the United States-Japan Agreement and Modification of Duties on Imports from Japan* (Sept. 15, 2025), https://tinyurl.com/ykxjrs7c; *Modifying the Scope of Tariffs on the Government of Brazil* § 2, Exec. Order 14,361, 90 Fed. Reg. 54,467 (Nov. 20, 2025).

Because the government has tracked the payment of IEEPA tariff duties, it knows who paid them and in what amounts, even without refund-seeking submissions from the affected importers. *Cf.* 66 Fed. Reg. at 16,855 (establishing refund procedure "without submission of documentary proof of payment in most cases"). That is further reason to drastically simplify—or even automate—administrative procedures for refunding the IEEPA tariffs. Under that process, there

would still be a role for individualized evidence (including government or other records), but a centralized process would allow for the swift and efficient processing of most refund requests. Indeed, because CBP already possesses the data identifying every IEEPA-tariffed entry, a refund framework that depends on importer-initiated claims could create *more* administrative bottlenecks than it resolves. Relying on existing records and technology is a far more efficient path forward.

This efficiency is important not only to reduce strain on courts and the government, but to ensure that refunds issue on a defined and predictable timeline. Delay should not become a *de facto* denial of recovery for importers who paid unlawful tariffs and wish to seek appropriate relief.

### E. The Government's Recent Statements On Refunds Underscore The Need For Guidance

Finally, the government's response to the Supreme Court's decision highlights the need for this Court's intervention in facilitating an efficient refund process. In opposing the challengers' request for a preliminary injunction against collection of the tariffs, the government specifically represented that, if the tariffs were declared unlawful, the government would refund the tariffs with interest. *Supra* Section A & n.1. But since the release of the Supreme Court's decision, administration officials have made clear that they will not address the issue of refunds without further direction from this Court. *See* Tr. of Interview with U.S. Treasury Secretary Scott Bessent, CNN, (Feb. 22, 2026), https://tinyurl.com/5c9damsz; Tr. of Interview with U.S. Trade Representative Jamieson Greer, ABC News (Feb. 22, 2026), https://tinyurl.com/yvm97t59; *see also* Plaintiffs' Motion at 6 (collecting

Administration statements questioning whether refunds must be paid); Opp'n to Mot. for Immediate Issuance of the Mandate and Cross-Mot. to Stay the Mandate, *V.O.S. Selections, Inc. v. Trump*, No. 25-1812, Dkt. No. 171 at 2-3 (Fed. Cir. Feb. 27, 2026) (suggesting that IEEPA tariff refunds could take longer than the "seven years" over which the HMT was refunded).   In seeking the Court's guidance, the government is aligned with the hundreds of thousands of importers seeking clarity on how this process should unfold.

## CONCLUSION

The Court should grant Plaintiffs' Motion for Permanent Injunctive Relief, Dkt. No. 72.  In so doing, it should facilitate a streamlined administrative process through which the government can swiftly and systematically refund the IEEPA tariffs that it unlawfully charged American businesses.


Respectfully submitted,


Daryl Joseffer
Kevin R. Palmer
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

*Counsel for the Chamber of*
*Commerce of the United States*
*of America*

*/s/ Gregory G. Garre*
Gregory G. Garre
Roman Martinez*
Soren J. Schmidt
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
(202) 637-2207
gregory.garre@lw.com

Jonathan T. Stoel
Katherine Wellington
Nicholas R. Sparks
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-6634
jonathan.stoel@hoganlovells.com

*Counsel for Amici Curiae*

Dated: March 4, 2026

---

* Application for admission to the U.S. Court of International Trade pending.

14

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

Before Honorable Gary S. Katzmann, Judge, Honorable
Timothy M. Reif, Judge, Honorable Jane A. Restani, Judge

| | |
|---|---|
| V.O.S. Selections, Inc., *et al.*,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>　　　　　　　Defendants. | Case No. 25-00066 |

## <u>Certificate of Compliance</u>

Pursuant to U.S. Court of International Trade's Standard Chambers Procedures, undersigned counsel certifies this brief complies with the Court's type-volume limitation rules because it contains 3,692 words.  This brief also complies with all typeface and margin requirements.

Respectfully submitted,

　　　　　　　　　　　　　　　　*/s/ Gregory G. Garre*
　　　　　　　　　　　　　　　　Gregory G. Garre

　　　　　　　　　　　　　　　　*Counsel for Amici Curiae*