## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

|  |  |
|---|---|
| V.O.S. SELECTIONS, INC.; PLASTIC SERVICES AND PRODUCTS, LLC d/b/a GENOVA PIPE; MICROKITS, LLC; FISHUSA INC.; and TERRY PRECISION CYCLING LLC,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP in his official capacity, EXECUTIVE OFFICE OF THE PRESIDENT, THE UNITED STATES, U.S. CUSTOMS AND BORDER PROTECTION, PETE R. FLORES, in his official capacity, JAMIESON GREER, in his official capacity, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, and HOWARD LUTNICK, in his official capacity,<br><br>Defendants. | Court No. 25-00066 |

## DECLARATION OF EXECUTIVE ASSISTANT COMMISSIONER SUSAN S. THOMAS

I, Susan S. Thomas, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me in the course of my employment, hereby make the following declaration with respect to the above-captioned matter:

1. I am the Executive Assistant Commissioner (EAC), Office of Trade, U.S. Customs and Border Protection (CBP), a position I have held since March 2026. My work includes enforcing over 500 U.S. customs and trade laws, including the implementation of all tariff measures under the International Emergency Economic Powers Act (IEEPA),

1

overseeing 14 trade agreements, directing CBP's seven Priority Trade Issues in collaboration with 49 partner government agencies, and overseeing the regulatory framework for more than $3 trillion in legitimate trade each year. Previously, I served as the Acting Executive Assistant Commissioner, Office of Trade, from March 2025 until March 2026. Prior to my tenure as the Acting Executive Assistant Commissioner of the Office of Trade, I held various leadership positions within CBP focused on cargo security, trade enforcement, and operation management. I have been employed by CBP or its predecessor agencies since 1995.

2. As the EAC, I lead and oversee CBP's Office of Trade (OT). OT consolidates the trade policy, program development, and compliance measurement functions of CBP, leads development of CBP's national strategy to enforce trade laws, and manages the design and implementation of strategic initiatives for trade compliance and enforcement. OT directs national enforcement responses through coordination with international partners and other U.S. government agencies, and it directs the enforcement of intellectual property rights, the identification of risks to detect and prevent the importation of contaminated agricultural or food products, the enforcement of free trade agreement eligibility, the administration of CBP's efforts to enforce the statutory prohibition on the importation of goods made with forced labor, and the administration of the nation's antidumping and countervailing duty (AD/CVD) laws. Finally, OT oversees the issuance of all CBP regulations, legally binding rulings and decisions, informed compliance publications and structured programs for external CBP training and outreach on international trade laws and CBP regulations.

3. As the OT EAC, I report directly to Commissioner Rodney S. Scott. The Executive Director of the Trade Programs Directorate within the Office of Trade, Brandon Lord,

2

has filed numerous declarations in *Euro-Notions Florida, Inc. v. United States et al.* (Court No. 25-00595) and *Atmus Filtration, Inc. v. United States, et al.* (Court No. 26-01259), outlining CBP's progress in refunding IEEPA duties, copies of which are included as Exhibits A-I.  Executive Director Lord reports directly to me.

4. In the Court's Order of May 27, 2026, the Court ordered the parties to "show cause as to why the court should not remove the suspension of immediate compliance with its order that U.S. Customs and Border Protection ('Customs') liquidate or reliquidate, without regard to IEEPA duties, all entries entered subject to IEEPA duties," and it ordered that "each of the parties shall submit a brief, not longer than 10 pages, in response to this Order to Show Cause."  Immediate compliance with the Court's order is not possible.

**IEEPA Duties**

5. Over 330,000 importers have made over 53 million entries for which they deposited or paid IEEPA duties, and as of March 4, 2026, the total amount of IEEPA duties deposited or paid is approximately $166 billion.  Ex. B, Lord Decl. ¶ 12 (March 6, 2026).  CBP is facing an unprecedented volume of refunds, and for reasons previously explained, CBP's typical refund mechanisms were insufficient to address this volume.  Ex. B, Lord Decl. ¶¶ 16-17 (March 6, 2026).

**Development of CAPE**

6. CBP is committed to refunding IEEPA duties as quickly and efficiently as possible to comply with all legal requirements and final court orders.  In accordance with 19 U.S.C. § 1500(d), CBP liquidates each entry, including making revenue adjustments via bills or refunds, as appropriate, in accordance with 19 U.S.C. § 1505(b).  The entry legally serves as CBP's basis of accounting upon which revenue adjustments are made.  To address this unprecedented volume of refunds, and to respond to the Court's orders to effectuate

3

refunds as efficiently as possible, CBP developed and deployed, within a 45-day period of time, a new capability within CBP's system of record for imported merchandise — the Automated Commercial Environment (ACE) — to calculate and provide valid refunds of additional *ad valorem* duties imposed under IEEPA, referred to as the Consolidated Administration and Processing of Entries (CAPE) functionality. CAPE enables the update, liquidation, and calculation of interest for each impacted entry, along with the consolidation of refunds by importer of record or CBP Form 4811 Designee and liquidation date, providing for the required information as well as efficiency gains for both industry and government. The CAPE components and functionality are described with specificity in Executive Director Lord's March 12, 2026 Declaration. Ex. C, Lord Decl. ¶¶ 3, 5, 7, 9 (March 12, 2026).

7. CBP is developing and deploying CAPE in phases, in consultation with the Court and plaintiffs in *Euro-Notions* (and previously in *Atmus Filtration*) and associated conferences. It has been CBP's understanding that the Court has been satisfied with the development and deployment of CAPE and the refund process, and accordingly the Court's order of May 27, 2026 was puzzling. CBP's deployment of CAPE has been on track, and the agency has not changed course since the refund process began. Phased development allows CBP to begin refunding IEEPA duties paid on the largest groups of entries, by refund amount, faster. If CBP waited to deploy CAPE until it developed the programming necessary to address all entry and refund scenarios, deployment of CAPE and therefore, the initiation of the refund process, would have been significantly delayed.

8. The first phase of the CAPE functionality became available for use by importers and their brokers in ACE at 7:11am eastern time on Monday, April 20, 2026. CAPE Phase 1 covers unliquidated entries and entries that have been liquidated within 80 days of the

CAPE Declaration acceptance.  Ex. E, Lord Decl. ¶¶ 14-15 (March 30, 2026).  More than 60% of the IEEPA duties paid are eligible for refund in Phase 1 of CAPE.  As of 3pm eastern time on June 1, 2026, 16.123 million entries have been processed in CAPE Phase 1, and $89.57 billion in both potential and certified refunds of IEEPA duties have been accepted for processing in CAPE.  Of the $89.57 billion, approximately $22.80 billion in refunds, including principal and interest, have been completed and sent to the Department of the Treasury for disbursement.

9.  IEEPA refunds present an unprecedented volume of entries for CBP to update, and CAPE has provided the ability to process those entry changes at record levels, providing efficiency gains for both importers and government.  By way of comparison, in fiscal year 2025, CBP issued refunds for approximately 338,000 entries.  By contrast, in the first six weeks of deployment, CAPE has processed IEEPA refunds for 8.44 million entries.

10. CBP continues to expand CAPE's scope to incorporate additional categories of entries as quickly as possible.  As the Court is aware, CBP is currently developing additional CAPE functionality to include entries flagged for reconciliation, for which no Type 09 reconciliation entry has been filed, which remain unliquidated or are within 80 days of liquidation.  CBP anticipates deploying this enhanced capability for entries flagged for reconciliation on June 29, 2026.  Approximately 3.3 million entries with IEEPA duties have been flagged for reconciliation.  Of these 3.3 million entries, approximately 2.8 million entries have no reconciliation entry on file, and are unliquidated or within 80 days of liquidation.  Deployment of this enhanced CAPE functionality will thus cover approximately $28.7 billion in IEEPA duties paid.  Once this functionality is deployed, over 80% of IEEPA duties will be eligible for refund in CAPE.

11. Following the deployment of enhanced functionality to cover the entries flagged for reconciliation as described in the paragraph above, CBP intends to expand CAPE functionality to cover entries that liquidated more than 80 days prior to acceptance of the CAPE Declaration, for entries filed by plaintiffs in actions in the U.S. Court of International Trade for which the Court has ordered reliquidation. Once the enhancements for the entries flagged for reconciliation described in the paragraph above are successfully deployed, CBP anticipates that CAPE functionality will be expanded to cover plaintiffs' entries liquidated beyond 80 days, and that this expansion will be deployed approximately four weeks after successful deployment of the enhancements for the entries flagged for reconciliation. To adhere to this timeframe, CBP will need to receive each plaintiff's 11-digit importer of record number(s) approximately two weeks prior to deployment.

12. At this time, CBP does not intend to refund IEEPA duties on entries of non-plaintiffs that liquidated beyond the 80-day period because the Court's order to reliquidate all entries, including those of non-plaintiffs, without regard to IEEPA duties, is currently on appeal. At this time, CBP is limiting its planned enhanced CAPE functionality, as described in the preceding paragraph, to plaintiffs with pending court cases for which the Court has ordered reliquidation. CBP is required to liquidate/reliquidate entries in accordance with the law. Should the Court's order become final and require the reliquidation of entries of all importers, CBP intends to fully comply with the Court's final decision as expeditiously as possible.

13. CBP has identified, and discussed with this Court in closed settlement conferences, the remaining categories of entries for which IEEPA duty refunds still need to be addressed. Those categories include (a) entries covered by a drawback claim; (b) entries flagged for

6

reconciliation for which a Type 09 reconciliation entry has been filed; (c) entries included on an administrative protest; and (d) entries not filed in ACE. Each of these categories of entries presents unique circumstances requiring either specific CAPE functionality adjustments or an alternative approach. Entries flagged for reconciliation for which a Type 09 reconciliation entry has been filed pose an enhanced risk of over-refunding the duties and require additional evaluation and controls. Similarly, entries designated on drawback claims are at greater risk for over-refunding duties and require additional evaluation and controls. Once CBP has expanded CAPE to capture the categories set forth in paragraphs 10 and 11 above, CBP will address these remaining categories of entries as expeditiously and efficiently as it can, consistent with all applicable laws and final court orders.

14. The feedback that CBP has received from the trade community on CAPE and IEEPA refund processing has generally been positive. Although some issues remain to be worked out, overall, the trade community appears satisfied with the speed and efficiency of the refund process.

15. CAPE is designed to operate consistently for all importers, whether large or small. A CAPE Declaration may be filed by any importer, and it does not require the assistance of a broker or other trade professional. CBP designed CAPE as a web-based portal to ensure that all parties have equal access, and to ensure large businesses do not gain an unfair advantage, particularly as small businesses account for the overwhelming majority of importers.[1] CBP has engaged in extensive messaging to notify all parties of the availability of CAPE for seeking a refund on appropriate entries, including the

---

[1] Indeed, CBP analysis conducted in 2022 found that between 86.4% and 96.4% of all importers would be considered a small business based on Small Business Administration standards.

7

establishment of a public webpage on IEEPA refunds, with numerous Frequently Asked Questions (FAQs), public messages, trainings and guidance manuals and documents. CBP supported "Small Business Month" in May 2026 by offering four webinars specifically geared toward small businesses who may be new to ACE and international trade processes. These recorded webinars will be available shortly for playback on cbp.gov.

## Status of Refunds to Plaintiffs in this Action

16. Three of the five plaintiffs in this action have availed themselves of CAPE and have filed CAPE Declarations for IEEPA refunds of 98.5% of their IEEPA duties paid. Two of the five plaintiffs in this action did not pay IEEPA duties.

## Impossibility of Immediate Compliance

17. The Lord Declaration of March 6, 2026, attached hereto as Exhibit B, explained in detail why CBP's traditional liquidation/reliquidation mechanisms could not, and still cannot, effectuate the Court's order immediately. Although CBP has successfully deployed CAPE, CBP cannot program for all functionalities at once, and it is simply not technically possible to program CAPE to immediately refund all IEEPA duties for all categories of entries for all importers. ACE functionalities, including CAPE and its enhancements, must be programmed and tested individually/sequentially to avoid unintended consequences from integrating new untested components. Each CAPE enhancement involves time for programming (varying greatly depending on the complexity of the task), testing, messaging internally and to the trade community, and a period of continuous monitoring and support for any technical issues after deployment.

18. Phase 1 of CAPE was designed to capture the majority of unliquidated entries, and CBP is proceeding to further deploy capability for CAPE to process unliquidated entries

8

flagged for reconciliation for which a Type 09 reconciliation entry has not been filed. Nonetheless, should the Court remove the suspension of immediate compliance with its order, CBP will be faced with immediate noncompliance as unliquidated entries will continue to automatically liquidate with IEEPA duties unless they have been included on a CAPE declaration. As explained in the Lord Declaration of March 6, 2026, it is not currently possible for CBP to immediately prevent additional entries from liquidating. Ex. B, Lord Decl. ¶ 12 (March 6, 2026). Moreover, CBP does not have sufficient personnel to immediately comply with the Court's order to manually liquidate or reliquidate all entries without IEEPA duties. Ex. B, Lord Decl. ¶¶ 23-26 (March 6, 2026).

19. Entries of merchandise subject to AD/CVD may be processed in CAPE to remove the IEEPA duties, but they cannot be liquidated while the U.S. Department of Commerce (DOC) suspension of liquidation remains in place. CBP has explained the administrative burdens associated with issuing pre-liquidation refunds, which is a manual process. Ex. F, Lord Decl. ¶¶ 7-9 (April 14, 2026). Once CBP receives instructions from DOC, it will liquidate these entries without IEEPA duties and in accordance with all applicable laws and instructions.

20. CBP is attentive to the risks of fraud and other risks to the revenue, and the need to ensure that the valid party to whom the money is due receives the refund of IEEPA duties. With the unprecedented refund volume, CBP is addressing the heightened risk of fraud and additional preventative or remedial measures to ensure that refunds are issued to the validated party.

21. The refunds of IEEPA duties paid for shipments sent to the United States through the international postal network present unique issues and considerations because (a) entries

for such shipments are not made in ACE, and (b) the duties for such shipments were collected from the sender and remitted to CBP by third parties, such that CBP has no information or ability to refund the duties directly to the party who paid them, rather than merely enriching the third parties who collected and remitted the duties to CBP.

22. CBP has made the processing of IEEPA refunds a top priority. Any additional diversion of resources, which are already strained, would prevent personnel from fully carrying out the agency's critical trade enforcement mission. Personnel would be redirected from responsibilities that serve to mitigate imminent threats to national and economic security. Those activities include, but are not limited to, detecting and disrupting goods imported into the United States with a false declaration of country of origin to avoid payment of duties found by the courts to be lawful, including those imposed under Section 301 of the Trade Act of 1974 and Section 232 of the Trade Expansion Act of 1962, protecting against free trade agreement abuse, preventing goods made with forced labor from entry into the United States, detecting evasion of duties lawfully imposed under the nation's antidumping and countervailing duty laws, and other illicit actions that threaten U.S. domestic industry and the safety of individuals within the United States.

I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 4th day of June, 2026.

Susan S. Thomas
Executive Assistant Commissioner
Office of Trade
U.S. Customs and Border Protection

10